EUGENE SCALIA, SBN 151540
escalia@gibsondunn.com
KATHERINE MORAN MEEKS
(*pro hac vice*)
   DC Bar No. 1028302
   kmeeks@gibsondunn.com
BRIAN A. RICHMAN
(*pro hac vice*)
   DC Bar No. 230071
   brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

(*Additional counsel listed on next page*)

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA,

WESTERN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION, | CASE NO. 2:24-cv-00801-KS **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California. | |
| Defendants. | |

BRADLEY J. HAMBURGER,
    SBN 266916
    bhamburger@gibsondunn.com
SAMUEL ECKMAN, SBN 308923
    seckman@gibsondunn.com
ELIZABETH STRASSNER,
    SBN 342838
    estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

DARYL JOSEFFER
(*pro hac vice*)
    DC Bar No. 457185
    djoseffer@uschamber.com
TYLER BADGLEY
(*pro hac vice*)
    DC Bar No. 1047899
    tbadgley@uschamber.com
KEVIN PALMER
(*pro hac vice*)
    DC Bar No. 90014967
    kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C. 20062-2000
Telephone:  202.659.6000
Facsimile:   202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

Gibson, Dunn &
Crutcher LLP

**INTRODUCTION**

1.      This lawsuit challenges two novel California laws that unlawfully attempt to regulate speech related to climate change.  Senate Bills 253 and 261 impermissibly compel thousands of businesses to make costly, burdensome, and politically fraught statements about "their operations, not just in California, but around the world," Assembly Comm. on Nat'l Res., Analysis of SB 261 (2023–2024 Reg. Sess.) July 7, 2023 at 6, in order to stigmatize those companies and shape their behavior.  Both laws unconstitutionally compel speech in violation of the First Amendment and seek to regulate an area that is outside California's jurisdiction and subject to exclusive federal control by virtue of the Clean Air Act and the federalism principles embodied in our federal Constitution.  These laws stand in conflict with existing federal law and the Constitution's delegation to Congress of the power to regulate interstate commerce. This Court should enjoin the Defendants from carrying out the State's plan.

2.      Plaintiffs support policies that reduce greenhouse-gas emissions as much and as quickly as reasonably possible, consistent with the pace of innovation and the feasibility of implementing large-scale technical change.  Plaintiffs likewise support policies that provide for the disclosure of material information, including climate-related information, as necessary to protect investors.  At the same time, policies must be informed by the best science, a careful analysis of available alternatives, and attention to legal rights and requirements.  Further, neither businesses nor consumers benefit from a patchwork of inconsistent state-by-state regulatory regimes, under which multiple states attempt to regulate emissions nationally through conflicting means.  The laws at issue here run roughshod over those considerations, in violation of the Constitution.

3.      On October 7, 2023, Governor Gavin Newsom signed into law S.B. 253 and 261.

4.      The laws were designed to "create accountability" for those that are not, in the Legislature's opinion, "doing their part to tackle the climate crisis."  Statement

Gibson, Dunn &
Crutcher LLP

of Sen. Scott Wiener (Sept. 17, 2023), http://tinyurl.com/27up3ded (discussing S.B. 253).  They will force every covered "entity," as a consequence of merely entering the California market, to publicly state its opinions regarding the risks associated with climate change, post those opinions to its own website, and then disclose an inexact, misleading calculation of the "entity's" greenhouse-gas emissions.  *E.g.*, S.B. 253 § 2(c)(1)(A)(i)(I); S.B. 261 § 2(b)(1)(A).  The purpose of this compelled speech is to fuel pressure campaigns against businesses:  "For companies, the knowledge" that their compelled statements "will be publicly available might encourage them to take meaningful steps" to support the policy goals of the State.  Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 12.  By the Governor's own reckoning, the legislation will have a negative "financial impact" on the more than 10,000 businesses covered, will impose deadlines that are "likely infeasible," and will deluge the public with "inconsistent" information.  Signing Statement of Gov. Newsom, S.B. 253 (Oct. 7, 2023), http://tinyurl.com/4mz6by3p.

5.     The State's plan for compelling speech to combat climate change is unconstitutional—twice over.

6.     The plan violates the First Amendment.  It forces thousands of companies to engage in controversial speech that they do not wish to make, untethered to any commercial purpose or transaction.  And it does all this for the explicit purpose of placing political and economic pressure on companies to "encourage" them to conform their behavior to the political wishes of the State.

7.     To make matters worse, the State's stated objective in enacting S.B. 253 and 261 is to regulate conduct, "not just in California, but around the world."  Assembly Comm. on Nat'l Res., Analysis of SB 261 (2023–2024 Reg. Sess.) July 7, 2023 at 6.  For example, one legislator specifically noted that S.B. 253 had been described as "groundbreaking legislation with the potential to reach far beyond California's borders."  Remarks of Assemblymember Rick Chavez Zbur, Debate on S.B. 253 (Sept. 11, 2023), http://tinyurl.com/taajvam8 (at 5:17:52–5:18:16).  The State

does not have that authority.  While federal law may permit California to regulate greenhouse-gas emissions *within* the State's own borders, California has no right to regulate emissions in other states or in other parts of the world, let alone to do so through a novel program of speech regulation.

8.      S.B. 253 and 261 violate the First Amendment.  Both laws are also precluded by federal law and run headlong into the Dormant Commerce Clause and broader federalism principles.  This Court should bar the Defendants from enforcing the laws.

## PARTIES

9.      Plaintiff Chamber of Commerce of the United States of America ("the U.S. Chamber") is the world's largest business federation.  The U.S. Chamber represents 300,000 direct members and indirectly represents the interests of more than three million businesses and organizations.  Its members include many companies doing business in California that are subject to S.B. 253 and 261.  An important function of the U.S. Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the U.S. Chamber regularly participates in cases that raise issues of vital concern to America's business community.

10.      Plaintiff California Chamber of Commerce ("CalChamber") is the largest broad-based business advocate to government in California.  CalChamber represents more than 13,000 members that employ one quarter of the private sector workforce in California.  Many of CalChamber's members are subject to S.B. 253 and 261.  CalChamber works at both the state and federal levels to advocate for its members, and CalChamber actively tracks legislation in the California State Legislature.  Like the U.S. Chamber, CalChamber regularly participates in cases that raise issues of vital concern to California's business community.

11.      Plaintiff American Farm Bureau Federation ("AFBF") was formed in 1919 and is the largest non-profit general farm organization in the United States.

Gibson, Dunn &
Crutcher LLP

Representing about six million member families in all fifty States and Puerto Rico, AFBF's members grow and raise every type of agricultural crop and commodity produced in the United States.  Its mission is to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers.  To that end, AFBF regularly participates in litigation.  While AFBF's members will not be directly regulated by the challenged laws, its members will bear much of the burden.  Nearly every farmer touches the value chain of those that will be directly regulated by the laws and thus will be caught up in those companies' efforts to report Scope 3 emissions, incurring burdensome compliance costs, regardless of their contacts with California.  Moreover, some regulated companies may favor larger farms that can more easily supply the information, to the detriment of smaller operations, leading to increased consolidation and integration.

12.   Plaintiff Los Angeles County Business Federation ("BizFed") is a grassroots alliance of over 240 diverse business groups who represent 420,000 employers with over five million employees in the Los Angeles region.  As a united federation, BizFed advocates for policies and projects that strengthen the regional economy at the local, state and federal level.  A number of BizFed members are impacted by S.B. 253 and 261.

13.   Plaintiff Central Valley Business Federation ("BizFed CV") is a grassroots alliance of over 75 diverse business groups who represent 30,000 employers with over 400,000 employees in the Central Valley.  As a united federation, BizFed CV advocates for policies and projects that strengthen the regional economy at the local, state and federal level.  A number of BizFed CV members are impacted by S.B. 253 and 261.

14.   Plaintiff Western Growers Association ("WGA"), founded in 1926, represents local and regional family farmers growing fresh produce in California, Arizona, Colorado, and New Mexico.  Western Growers' members and their workers provide over half of the nation's fresh fruits, vegetables, and tree nuts, including half

of America's fresh organic produce.  S.B. 253 and 261 will impact many family farms that are members of WGA.

15.     Defendant Liane M. Randolph is sued in her official capacity as the Chair of the California Air Resources Board ("CARB").

16.     Defendant Steven S. Cliff is sued in his official capacity as the Executive Officer of CARB.

17.     Defendant Robert A. Bonta is sued in his official capacity as the Attorney General of California.  Under S.B. 253, CARB "shall consult with . . . [t]he Attorney General" "[i]n developing the regulations" under the statute.  S.B. 253 § 2(c)(4)(A). Additionally, "the Attorney General [is] the chief law officer of the State" of California and has "the duty . . . to see that the laws of [California] are uniformly and adequately enforced."  Cal. Const. art. 5, § 13.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.  This action arises under the United States Constitution.

19.     Because Plaintiffs seek an "injunction[] to protect rights safeguarded by the Constitution," they have presented a federal question that the federal courts have jurisdiction to resolve under 28 U.S.C. § 1331.  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

20.     Each of the Plaintiffs has standing to bring this lawsuit because at least one of its members would have standing to sue in its own right, the interests it seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires an individual member to participate in this suit.  *See California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1099–1100 (9th Cir. 2024).  For example, Plaintiffs' members that are affected and injured by the challenged laws include: Chevron Corp., a member of the U.S. Chamber, CalChamber, BizFed, and BizFed CV, whose annual

revenues exceed $1 billion and whose headquarters is located in San Ramon, California; Triple H Farm, a family-owned and operated farm that is a member of AFBF and in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253; U-Haul Holding Company, a member of the U.S. Chamber whose annual revenues exceed $1 billion and whose operations in California include "do-it-yourself" moving and storage; and White Farms and Cattle, a family-owned and operated farm that is a member of AFBF and in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253.

21.    Venue is proper in this District under 28 U.S.C. § 1391 because all Defendants maintain an office and conduct their official duties within this judicial district.

22.    Venue is further proper in this District under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to this action occurred within this judicial district; to wit, Plaintiff BizFed resides within this judicial district at 1150 South Olive Street, Los Angeles, California, 90015.

## BACKGROUND

**A.    California Seeks to Hold Corporations "Accountable" for Climate Change Through Senate Bills 253 and 261.**

23.    S.B. 253 and 261 were designed to "create accountability for those that aren't" "doing their part to tackle the climate crisis."  Statement of Sen. Scott Wiener (Sept. 17, 2023), http://tinyurl.com/27up3ded.  "Californians," one of the bill's authors wrote, "have a right to know who" is "destroying [their] planet" by "causing" climate change.  Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 7.

24.    These laws were supported by scores of "environmental organizations," Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 2, "including groups dedicated to minimizing the effects of climate change," Sen. Judiciary Comm., Analysis of S.B. 261 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 2.

25.    As one supporter explained, "[f]ighting the climate crisis requires bold, strategic regulations," and the bills offered "California regulators and communities just that." *California Passes First-in-the-Nation Bill to Expand Transparency in California Emissions*, SIERRA CLUB CALIFORNIA (Sept. 12, 2023), http://tinyurl.com/4v8z34fk.  Other supporters have claimed that the laws will help "check the climate crisis" by letting the public "hold [companies] accountable," *California Lawmakers Approve Groundbreaking Climate Disclosure Bill*, PUBLIC CITIZEN (Sept. 12, 2023), http://tinyurl.com/36svd2t3, and by "ensuring accountability for those emitting greenhouse gasses," *Sacramento Rally to Unite for Climate Transparency & Passage of SB 253 & SB 261*, CERES (Aug. 22, 2023), http://tinyurl.com/wz8tzcac.

26.    The laws seek this "accountability" through an unconstitutional mechanism: regulation of speech.  S.B. 261 requires each covered entity to prepare a detailed report opining on the risks of climate change and to post that report to its own website.  S.B. 253, in turn, requires each covered entity to estimate, and then publicly disclose, that "entity's" greenhouse-gas emissions, including the emissions of *others* that it does business with, such as customers, suppliers, and contractors.

27.    As supporters of the bills explained, the purpose of these speech compulsions is to "encourage" companies to conform their behavior to the policy preferences of the State.  Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 12.

28.    As one legislative report explained, "the knowledge that" companies' compelled statements "will be publicly available might encourage them to take meaningful steps to reduce [greenhouse-gas] emissions."  *Id.*  And the goal of S.B. 253 was to compel companies to release information even though "they don't want to do the disclosure" because (in the State's view) "they think they're going to be embarrassed by it."  Remarks of Sen. Wiener, Sen. Env'l Quality Comm. Hearing on S.B. 253 (Mar. 25, 2023) http://tinyurl.com/yf66mbdn (at 2:30:33–2:23:50).

29.     While the bills were pending, numerous business-organization representatives noted the significant costs of the bills and the difficulties associated with compliance, including Plaintiffs CalChamber, BizFed, BizFed CV, and WGA.

30.     For example, a "coalition of over 60 [business] organizations" explained that estimating certain greenhouse-gas emissions with "any degree of accuracy [was] not yet possible."  Sen. Judiciary Comm., Analysis of S.B. 253 (2023–2024 Reg. Sess.) Apr. 14, 2023 at 14–15.  Estimation methods were (and are) "still in [their] infancy stage" and, for that reason, any reporting would be "more of an art" than "a science."  *Id.* at 15.

31.     Business-organization representatives further explained that the burdens of the bills would fall disproportionately on small and medium businesses.  For example, many small and medium businesses, including family farms, "struggle to accurately measure their greenhouse gas emissions."  *Id.* at 14.  These difficulties, the representatives warned, could force "large businesses [to] stop doing business with small and medium businesses" that lack the resources to comprehensively report emissions to supply chain partners.  *Id.*  If a large business must publicly report, for instance, the "emissions associated with [its] entire supply chain," including the emissions of its suppliers, that business may have no choice but to cease its relationship with any small-to-medium suppliers that struggle to measure and report their own emissions.  *Id.*

32.     Governor Newsom expressly acknowledged many of these concerns in signing the bills into law.  For S.B. 253, for instance, the Governor stated that "the implementation deadlines in this bill are likely infeasible, and the reporting protocol specified could result in inconsistent reporting across businesses subject to the measure."  Signing Statement of Gov. Newsom, S.B. 253 (Oct. 7, 2023), http://tinyurl.com/4mz6by3p.  And for S.B. 261, he noted his "concern[s] about the overall financial impact of this bill on business" and that "the implementation deadlines fall short in providing the California Air Resources Board (CARB) with

sufficient time to adequately carry out the requirements in this bill." Signing Statement of Gov. Newsom, S.B. 261 (Oct. 7, 2023), http://tinyurl.com/ycy7vk2w. The Governor signed both laws anyway.

**B.     The New Laws Impose Massive Costs on Business.**

33.     Both laws compel a substantial amount of speech at significant expense.

### *Senate Bill 261*

34.     S.B. 261 is expected to apply to more than 10,000 businesses. Sen. Rules Comm., Analysis of S.B. 261 (2023–2024 Reg. Sess.) Sept. 12, 2023 at 5. It reaches any company with revenues exceeding $500 million that does *any* business in California. S.B. 261 § 2(a). There is no de minimis exception. That means that if an entity exceeds the revenue threshold, it is subject to S.B. 261 even if it conducts an immaterial amount of business in the State and even if the business it conducts in California lacks any plausible connection to activity related to climate change.

35.     S.B. 261 compels subjective speech on a topic, climate change, that the Supreme Court has deemed "controversial." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018).

36.     The law requires any covered entity to publicly state its opinion regarding various "climate-related financial risk[s]" and to post that opinion to the entity's website. S.B. 261 § 2(b)(1)(A), (c)(1). Under the law, companies must opine on any "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health." *Id.* § 2(a)(2).

37.     Companies must then provide a report discussing any "measures adopted to reduce and adapt to" any of the above climate-related risks. *Id.* § 2(b)(1)(A)(ii).

38.     Unless a company certifies that it has prepared an "equivalent" report for other reasons (*e.g.*, it was required by federal law or the law of another "government entity") the law requires companies to conform their reports to the "recommended framework" contained in the "Final Report of Recommendations of the Task Force on Climate-Related Financial Disclosures (June 2017) published by the Task Force on Climate-Related Financial Disclosures, or any successor thereto." *Id.* § 2(b)(1)(A), (4). Those recommendations provide detailed instructions on the content that reporting companies must include.

39.     Companies must publicly post their first disclosure on their "own internet website[s]" by January 1, 2026. *Id.* § 2(c)(1).

40.     S.B. 261 expressly acknowledges the political, and thus controversial, nature of the speech it requires companies to make, as it proclaims that addressing the risks of climate change is an important political issue and the subject of robust public debate. *See Id.* § 1(b) ("Global economic and climate policy leaders have conclusively established that the long-term strength of global and local economies will depend on their ability to withstand climate-related risks, including physical impacts, economic transitions, and policy and legal responses.").

41.     On the other hand, this speech is not commercial speech because S.B. 261 compels companies to post statements that are unconnected to proposing any commercial transaction.

42.     S.B. 261 also requires CARB to contract with a climate reporting organization to prepare its own report on disclosures. *Id.* § 2(b)(3). The organization must be a nonprofit that currently operates as a climate reporting organization for entities operating in the United States and must have experience with climate-related financial risk disclosure by entities operating in California. *Id.* § 2(a)(1). The report must include both a review of climate-related financial risk in various industries as well as an "[a]nalysis of the systemic and sectorwide climate-related financial risks facing the state based on the contents of climate-related financial risk reports,

including, but not limited to, potential impacts on economically vulnerable communities." *Id.* § 2(d)(1)(A)–(B).  The climate reporting organization is also responsible for regularly gathering stakeholder input on "current best practices regarding the disclosure of financial risks." *Id.* § 2(d)(2).

43.     CARB is authorized to impose administrative penalties of $50,000 per reporting year for violations of S.B. 261.  *Id.* § 2(e)(2).  The law requires covered entities to pay for the law themselves, with an annual fee being assessed on covered entities to defray CARB's costs in administering and implementing the law.  *Id.* § 2(c)(2)(A), (e)(2).  These fees will be deposited into the newly created "Climate-Related Financial Risk Disclosure Fund." *Id.* § 2(c)(2)(C).

### *Senate Bill 253*

44.     As with S.B. 261, S.B. 253 applies to any company exceeding a certain revenue threshold (in this case, $1 billion) that does any business in California. S.B. 253 § 2(b)(2).  The law is expected to directly cover more than 5,300 companies, Assembly Floor Analysis of S.B. 253 (2023–2024 Reg. Sess.) Sept. 7, 2023 at 2, although its impact will extend to many more companies, including small and primarily out-of-state businesses, as explained below.

45.     S.B. 253 also compels noncommercial speech because the speech it requires is not connected to proposing any commercial transaction.

46.     In addition to S.B. 261's requirement that companies opine on climate-related risks, S.B. 253 requires each covered entity to publicly state the "entity's" greenhouse-gas emissions.  S.B. 253 § 2(c)(1).

47.     S.B. 253 requires covered entities to publicly report three categories of greenhouse-gas emissions—Scope 1, Scope 2 and Scope 3:

     a.  ***'Scope 1 emissions'*** means all direct greenhouse gas emissions that stem from sources the reporting entity owns or directly controls, regardless of location." *Id.* § 2(b)(3).

b.  **'*Scope 2 emissions*'** means indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location." *Id.* § 2(b)(4).

c.  **'*Scope 3 emissions*'** means indirect upstream and downstream greenhouse gas emissions, other than Scope 2 emissions, from sources that the reporting entity does not own or directly control and may include" the emissions of upstream suppliers or downstream customers. *Id.* § 2(b)(5).

48.     The law requires each covered entity to "measure and report its emissions of greenhouse gases in conformance with the Greenhouse Gas Protocol standards and guidance, including the Greenhouse Gas Protocol Corporate Accounting and Reporting Standard and the Greenhouse Gas Protocol Corporate Value Chain (Scope 3) Accounting and Reporting Standard developed by the World Resources Institute and the World Business Council for Sustainable Development." *Id.* § 2(c)(1)(A)(ii).

49.     Although the law purports to require each company to report "its emissions," *id.*, the reported emissions actually include emissions from utility providers, upstream suppliers, downstream customers, and others. *Id.* § 2(c)(1).  Thus, S.B. 253 requires a company to falsely state that the emissions of other entities are its own.

50.     Moreover, by requiring reporting "in conformance with the Greenhouse Gas Protocol," the law requires materially misleading emissions reports because the Greenhouse Gas Protocol does not factor in "Scope 4" emissions—emissions that companies avoid, and which should therefore be deducted from Scope 1, 2, and/or 3 emissions, as appropriate.  For example, a company's Scope 4 emissions may include those avoided through purchases of energy-efficient equipment or reduction of mileage driven.  Thus, to the extent the law's purpose is to provide customers with clear and comprehensive information about companies' alleged contribution to global emissions,

it fails because the disclosures will exclude any evidence of steps companies have taken to avoid emissions.

51.     The reported emissions are not purely factual.  To the contrary, the proper calculation of the scope of a company's emissions—including, but not limited to, the need to include Scope 4 emissions—is subject to significant debate.  Emissions calculations necessarily turn on subjective judgments concerning the "advantages and disadvantages" of various approaches to estimation.  GREENHOUSE GAS PROTOCOL, TECHNICAL GUIDANCE FOR CALCULATING SCOPE 3 EMISSIONS 18 (version 1.0) (2013), http://tinyurl.com/2f9n52k2.  For Scope 3 emissions, moreover, those subjective judgments are not only those of the reporting entity, but also of *other* entities, both downstream and upstream in the supply chain.  *Id.* at 6.

52.     Estimating greenhouse-gas emissions is enormously burdensome.  The requirement to estimate and report Scope 3 emissions alone will cost many companies more than $1 million per year.  *See, e.g.*, Comment of the Williams Companies, Inc. 14, SEC File No. S7-10-22 (June 17, 2022), http://tinyurl.com/y99amdcd.  And as even the Securities and Exchange Commission acknowledges, the estimate in many instances may be inaccurate.  *See Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21,334, 21,387 (proposed Apr. 11, 2022) (acknowledging that, "in many instances, direct measurement of [greenhouse-gas] emissions at the sources, which would provide the most accurate measurement, may not be possible").

53.     The burden of estimating Scope 3 emissions flows up and down the supply chain.  Small businesses nationwide will incur significant costs monitoring and reporting emissions to suppliers and customers swept within the law's reach.  For example, scores of family farm members of AFBF will need to report emissions to business partners that do business with entities covered by S.B. 253.

54.     One small business owner so affected is Garrett Hawkins.  Mr. Hawkins is a third-generation farmer based in Appleton City, Missouri.  His farm, Triple H Farm,

which he operates with his father and brother, raises beef cattle and markets them in local family-owned livestock auctions. Mr. Hawkins is the President of the Missouri Farm Bureau Federation and is a member of AFBF.

55.     While Mr. Hawkins does not operate in California and does not sell directly to California companies, his cattle is in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253. For example, Mr. Hawkins' cattle will ultimately be bought by packers (slaughter-houses) that are subject to Scope 3 reporting under S.B. 253. And the grocery stores that the packers sell beef to similarly consist of companies that will be subject to Scope 3 reporting under S.B. 253.

56.     S.B. 253 will require those companies to report on Scope 3 emissions, which include Mr. Hawkins' farm. Mr. Hawkins is concerned that the documentation and recordkeeping required to supply his greenhouse gas emissions will be incredibly onerous and burdensome for his operation and farms like his. Mr. Hawkins fears that the requirements of S.B. 253 will have the potential to force rapid consolidation across agriculture, such that only the largest operations will survive.

57.     A similarly affected small business owner is Michael White. Mr. White is a fourth-generation farmer based in Wilbarger County, Texas. Mr. White and his brother and nephew raise wheat, cotton, hay and cattle on their family farm, White Farms and Cattle, which has been in operation for over one hundred years. Mr. White is a member of AFBF.

58.     Mr. White's farm is in the supply chain of many companies that will be subject to Scope 3 reporting under S.B. 253. For example, Mr. White retains ownership in his cattle up to the point they are sold to packers, most or all of which will be subject to Scope 3 reporting under S.B. 253. And the grocery stores that the packers sell beef to similarly consist of companies that will be subject to Scope 3 reporting under S.B. 253. The wheat, cotton, and hay Mr. White produces will also likely end up in the Scope 3 value chain of companies subject to S.B. 253.

Gibson, Dunn & Crutcher LLP

16

59.    S.B. 253 will require those companies to report on "their" Scope 3 emissions, which includes Mr. White's farm.  Like Mr. Hawkins, Mr. White is concerned that the documentation and recordkeeping required to supply his greenhouse emissions will be incredibly onerous and burdensome for his operation and farms like his.  Mr. White, like Mr. Hawkins, fears that the requirements of S.B. 253 will have the potential to force rapid consolidation across agriculture, such that only the largest operations will survive.

60.    S.B. 253 requires all covered entities not only to publicly report their emissions calculation, but also to file those reports with a newly established statewide reporting organization.  S.B. 253 § 2(c)(1).  The mandatory reports that companies are compelled to produce will be made publicly available by CARB.  *Id.* § 2(c)(2).  S.B. 253 also requires each reporting entity's disclosures to be independently verified by a third-party assurance provider, approved by CARB, that has expertise in greenhouse-gas emissions accounting.  *Id.* § 2(c)(1).  Assurance of Scope 1 and Scope 2 greenhouse-gas emissions will be required at a "limited assurance" level beginning in 2026 and at a "reasonable assurance" level beginning in 2030.  Scope 3 greenhouse-gas emissions may require assurance at a "limited assurance" level beginning in 2030.  *Id.* § 2(c)(1)(F)(iii).

61.    CARB is required to contract with an "academic institution," such as the University of California, "to prepare a report on the public disclosures made by reporting entities to the emissions reporting organization."  *Id.* § 2(d)(1).  That report will be posted to a digital platform created by the new emissions reporting organization, regardless of whether a given reporting entity wishes to have its reports shared with the public.  *Id.* § 2(d)(2), (e)(1)(A)–(B).

62.    Reporting entities are also forced to pay for their own compelled disclosures—the law requires them to pay a filing fee to cover the costs of administration and implementation of the new reporting requirements.  *Id.*

§ 2(c)(1)(G)(i).  These fees will be deposited in the newly created "Climate Accountability and Emissions Disclosure Fund."  *Id.* § 2(c)(1)(G)(iii).

63.    S.B. 253 authorizes CARB to assess administrative penalties of up to $500,000 for noncompliance.  *Id.* § 2(f)(2)(A).  It includes a safe harbor for Scope 3 emissions, which provides that penalties will not apply to Scope 3 misstatements made "with a reasonable basis and disclosed in good faith" and that, until 2030, Scope 3 penalties will be assessed only for failures to disclose.  *Id.* § 2(f)(2).

## C.    The Laws Violate the First Amendment.

64.    The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), and "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).  S.B. 253 and 261 violate this right by compelling companies to engage in costly speech on "climate change," an issue the Supreme Court has acknowledged is "controversial."  *Janus*, 138 S. Ct. at 2476.

65.    Courts apply different tiers of scrutiny to different types of compelled speech.  Where a state seeks to compel a business to speak *noncommercially* on *controversial political matters*, strict scrutiny applies.  *See Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2372–74 (2018).  "[S]uch speech occupies the highest rung of the hierarchy of First Amendment values and merits special protection."  *Janus*, 138 S. Ct. at 2476 (citations and quotation marks omitted).  Courts therefore apply "the most exacting form of review."  *IMDB.com Inc. v. Becerra*, 962 F.3d 1111, 1121 (9th Cir. 2020).  Laws subject to strict scrutiny "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *NIFLA*, 138 S. Ct. at 2371 (citations and quotation marks omitted).

66.    Strict scrutiny applies to S.B. 253 and 261 because both laws compel speech concerning the "controversial subject[]" of "climate change."  *Janus*, 138 S. Ct.

Gibson, Dunn & Crutcher LLP

at 2476.  They do not compel "purely factual and uncontroversial information" that could be subject to a lower standard than strict scrutiny.  *NIFLA*, 138 S. Ct. at 2372 (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)).

67.     The compelled speech is controversial on two levels.  First, the laws require companies to speak about the effects of, and proper response to, climate change, anything but uncontroversial topics.  *See Janus*, 138 S. Ct. at 2476.  And second, the specific speech compelled by S.B. 261 is controversial.  Whether, for example, a particular "wildfire[ ]," "sea level rise," "extreme weather event[ ]," or "extreme drought[ ]," S.B. 261 § 1(a), has anything to do with climate change, or to what extent, is a matter of significant debate and controversy.  Yet S.B. 261 requires companies to opine on the risks that will be specifically caused by climate change.

68.     The speech compelled by S.B. 253 and 261 also is not "factual."  *NIFLA*, 138 S. Ct. at 2372.  A company's compelled assessment of the "risk of harm to immediate and long-term financial outcomes" from a variety of events whose connection to climate change, if any, is subject to reasonable debate, S.B. 261 § 2(a)(2), is far from the recitation of a pure, rote "fact."

69.     Even the estimation of emissions is a matter of opinion.  The law's requirements do not provide for a readily verifiable way to calculate a company's total net emissions.  Many companies, for instance, believe that emissions that they helped avoid ("Scope 4" emissions) are relevant, and that simply disclosing Scope 1, Scope 2, and Scope 3 emissions will necessarily provide an incomplete and misleading picture about their emissions.  But the laws require companies to disclose emissions without considering avoided emissions.  Even within a particular scope of emissions, the calculation is anything but factual, especially for Scope 3 emissions by companies, individuals, and others who use or contribute to the provision of a good or service; any reported emissions require a subjective assessment (by the reporting entity and/or outside suppliers), based on numerous assumptions and estimations.

Gibson, Dunn &
Crutcher LLP

19

70.     Additionally, strict scrutiny applies because the speech compelled by S.B. 253 and 261 is not commercial.  Not all speech made by a business is "commercial speech."  *See, e.g.*, *NIFLA*, 138 S. Ct. at 2374.  Rather, commercial speech is "'usually defined as speech that does no more than propose a commercial transaction.'"  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).

71.     The speech that S.B. 253 and 261 mandate is required regardless of whether it is connected to proposing a commercial transaction.

72.     Because the speech compelled by S.B. 253 and 261 is noncommercial, not purely factual, and concerns a controversial political matter, strict scrutiny applies three times over.  Accordingly, the burden is on the State to prove that the laws "are narrowly tailored to serve compelling state interests."  *NIFLA*, 138 S. Ct. at 2371 (citations and quotation marks omitted).

73.     Both S.B. 253 and 261 fail to satisfy strict scrutiny.

74.     The speech compelled by S.B. 253 and 261 does not further any legitimate government interest of the State of California, let alone a compelling one. The legislation cites no evidence, for example, that the public's response to the disclosures would result in material changes in companies' emissions, or that any such changes would have a material impact on climate change, much less the climate of California.

75.     The legislation also makes no meaningful effort to restrict its scope to information that is needed to achieve any legitimate governmental purpose.  S.B. 253 and 261 apply to *any* "business entity" satisfying the revenue threshold, whether or not the entity is publicly traded or has outside investors, and regardless of the extent of its California operations.  S.B. 253 § 2(b)(2); S.B. 261 § 2(a)(4).  Nor does either law exempt companies that have low greenhouse-gas emissions or face negligible risks from climate change.

Gibson, Dunn &
Crutcher LLP

76.    The legislation is also not "narrowly tailored" because it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).  As noted above, S.B. 253's requirement to report Scope 3 emissions alone will cost many companies more than $1 million per year.  *See* Comment of the Williams Companies, Inc. 14, SEC File No. S7-10-22 (June 17, 2022) http://tinyurl.com/y99amdcd.

77.    The legislation is also not "narrowly tailored" because it unduly burdens the speech and threatens the business viability of small businesses far beyond California's borders, including Mr. Hawkins' farm, Mr. White's farm, and thousands of similarly situated members of AFBF and WGA.

78.    Even if a lower level of scrutiny were to apply, the laws are nonetheless unconstitutional.  Under any form of scrutiny, required disclosures cannot be "unjustified or "unduly burdensome." *NIFLA*, 138 S. Ct. at 2377 (citing *Zauderer*, 471 U.S. at 651).  S.B. 253 and 261 are both unjustified and unduly burdensome.

79.    For government-mandated speech to be justified, the State must show that "the harm" it seeks "to remedy" is "more than 'purely hypothetical,'" *NIFLA*, 138 S. Ct. at 2377, and that the required disclosures "will in fact alleviate [that harm] to a material degree," *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146 (1994).  But the State has not connected the disclosures required by S.B. 253 and 261 to any concrete, direct, and immediate interests, instead relying on vague, generalized statements, such as "stakeholders deserv[ing] transparency."  S.B. 253 § 1(e).

80.    The disclosures that S.B. 253 and 261 require are also unduly burdensome.  The requirement to disclose Scope 3 emissions will cost companies more than $1 million per year, and those disclosures are mandated for any "business entity," S.B. 261 § 2(a)(4), which is broader than the State's supposed interest in providing "investors" with certain climate-related information, *id.* § 1(c).

81.    The problems with these speech compulsions are compounded by the laws' vagueness.  Vague laws "allow arbitrary and discriminatory enforcement."

*O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016). And "[w]hen speech is involved, rigorous adherence to [the] requirement[]'" that "parties should know what is required of them" "is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations*, 567 U.S. 239, 253–54 (2012).

82. The definition of "climate-related financial risk" under S.B. 261, in particular, is broad and vague: any "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health." S.B. 261 § 2(a)(2).

83. On that expansive definition, the State is likely to be able to find something to fault in the disclosure (or lack of disclosure) of *any* company the State disfavors. This creates a risk that, among other things, companies whose climate-related practices do not conform to California's policy preferences will be subject to heightened investigation and enforcement. And because the laws authorize the imposition of substantial penalties, companies will be pressured to conform their risk assessments to the State's policy preferences.

### D. Senate Bills 253 and 261 Operate as Impermissible *De Facto* Regulations on Nationwide Greenhouse-Gas Emissions.

84. Because the new disclosure requirements of S.B. 253 and 261 operate as *de facto* regulations of greenhouse-gas emissions nationwide, they are precluded by the Clean Air Act and are invalid under the Dormant Commerce Clause and principles of federalism. *See* Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676; *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 403-10 (2023) (Kavanaugh, J., concurring). Under the Supremacy Clause, the Clean Air Act displaces state regulation of interstate greenhouse-gas emissions. Further, "[e]ach State's equal dignity and sovereignty under the Constitution implies certain

constitutional limitation[s] on the sovereignty of all of its sister States." *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1497 (2019).  One such limitation, which stems from each State's equal sovereignty, is that one State cannot project its laws into another State.

85.     Under the Supremacy Clause, U.S. Const., art. VI, cl. 2, "when Congress enacts a valid statute pursuant to its Article I powers, state law is naturally preempted to the extent of any conflict with a federal statute.  End of story." *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) (citation and quotation marks omitted).  In particular, "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," a state law attempting to regulate the same field is preempted.  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quotation marks omitted).  The Clean Air Act is "'an intricate regulatory regime intended to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population.'"  *City of N.Y. v. Chevron Corp.*, 993 F.3d 81, 87 (2d Cir. 2021) (quoting *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 319–20 (2d Cir. 2003)).

86.     Under the Clean Air Act, the federal government is empowered to implement programs to regulate pollution, including greenhouse gases.  *Chevron Corp.*, 993 F.3d at 87–88  Although the Act "envisions extensive cooperation between federal and state authorities," *id.* at 87 (citing 42 U.S.C. §§ 7401, 7411(c)(1), (d)(1)–(2)), when it comes to "regulating pollution sources beyond their borders," states are limited to "commenting on proposed [Environmental Protection Agency] rules or on another state's emission plan," *id* at 88.

87.     The legislation here does not limit reporting requirements to emissions produced in California or to companies' expected climate change financial risks in California—rather, both laws require companies to make sweeping reports about their emissions and risks everywhere they operate, whether in California, in other states, or

even abroad.  States may not regulate out-of-state emissions by requiring disclosure of data about such emissions in this manner.

88.    Nor, for that matter, may states enact measures to force actual reductions in out-of-state emissions, whether by disclosure or by any other legal tools.  While the laws do not directly require reductions in greenhouse-gas emissions in other states, "'[w]hat cannot be done directly cannot be done indirectly'" because "'[t]he Constitution deals with substance, not shadows.'"  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Cummings v. Missouri*, 71 U.S. 277, 325 (1867)).

89.    Although framed in terms of disclosure, these requirements are aimed at stigmatizing companies for the purpose of pressuring them to lower their emissions nation- and even world-wide.  *See, e.g.*, S.B. 253 § 1(f) ("United States companies that have access to California's tremendously valuable consumer market by virtue of exercising their corporate franchise in the state also share responsibility for disclosing their contributions to global [greenhouse-gas] emissions."); *id.* § 1(f), (h), (l) (claiming a need to encourage "investments in decarbonization strategies," to "develop means to reduce" emissions, and to "activate companies to improve risk management in order to move toward a net-zero carbon economy"); S.B. 261 § 1(j) (explaining that "mandatory and comprehensive" disclosures are needed to "address the climate crisis").

90.    In fact, activists and policymakers have repeatedly stated that they intend to use the compelled reporting to identify companies whose emissions they deem to be unsuitable, and to shame those companies into reducing their emissions.  As one sponsor noted, S.B. 253 "ensure[s] that corporate actors in [California] are aligned with [the Legislature's] goals and are working as diligently as [legislators] need them to be."  Remarks of Sen. Wiener, Debate on S.B. 253, Sen. Floor Sess. (May 30, 2023) http://tinyurl.com/225dekr5 (at 4:21:17–4:23:02).  A main function of the laws,

Gibson, Dunn &
Crutcher LLP

24

although framed in terms of reporting, is to facilitate public-pressure campaigns to coerce companies into reducing their emissions of greenhouse gases.

91.    It is immaterial whether such a policy is sound—under the Clean Air Act, the regulation of nationwide greenhouse-gas emissions is exclusively the domain of the federal government.  States may not engage in de facto regulation of greenhouse-gas emissions nationwide, running afoul of Congress's exclusive authority to regulate interstate commerce.  This legislation is therefore beyond the limits of what state law is allowed to do.

## FIRST CLAIM FOR RELIEF

### (Violation of the First Amendment Under 42 U.S.C. § 1983)

92.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

93.    S.B. 253 and 261 compel companies to publicly express a speculative, noncommercial, controversial, and politically-charged message that they otherwise would not express, and in the case of S.B. 261, expressly requires companies to communicate that message on their own websites.

94.    S.B. 261 requires companies to make public statements estimating their future risk from climate change.  This speech is necessarily speculative because it requires companies to estimate not only their risk of damage from future events like natural disasters, but also to speculate about whether those events will occur and will do so as a result of climate change.  And it is a politically controversial topic about which significant uncertainty is inevitable.

95.    S.B. 261 also fails to describe its key term—"climate-related financial risk"—with enough specificity to enable companies to comply.  The term is so ambiguous that companies will be forced to make high-stakes, public guesses about their future—with the aim, on the part of the State, to discourage investors and consumers from doing business with the companies based on that speculation.

96.     S.B. 253 requires companies to make public statements not only about their greenhouse-gas emissions, but also about the emissions of up- and downstream entities with which they do business.  Because companies must report these Scope 3 emissions as their *own* emissions, the law necessarily requires that a company falsely and inaccurately represent the provenance of these emissions.

97.     Moreover, this compelled speech requires companies to speculate about Scope 3 emissions.  Calculating Scope 3 emissions is a subjective undertaking, requiring myriad judgment calls about how to identify and quantify another entity's emissions.  Alternatively, companies will be forced to demand information from their non-covered partners in the supply chain.  Reporting companies under S.B. 253 might disagree with how upstream and downstream entities calculated their emissions, and thus may be forced to convey speech with which they disagree.

98.     Under S.B. 253, companies risk enormous penalties and public opprobrium should they happen to guess incorrectly.  The compelled reports of Scope 3 emissions are not purely factual but rather are full of subjectivity and guesswork.

99.     The laws violate the First Amendment to the United States Constitution, which protects both the freedom from being compelled to speak and the freedom to engage in speech.

**SECOND CLAIM FOR RELIEF**

**(Violation of the Supremacy Clause Under 42 U.S.C. § 1983)**

100.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

101.    S.B. 253 and 261 require companies to make sweeping reports about their emissions and risks everywhere they operate.

102.    The laws are not limited to companies that are headquartered or incorporated in the State of California; rather, they reach any company above a certain revenue threshold that does any business in California.

Gibson, Dunn &
Crutcher LLP

103.   Nor are the laws limited to reporting of emissions or risks within the State of California; rather, both S.B. 253 and 261 require companies to publicly speak about emissions and risks *wherever* they do business, and wherever their partners in the supply chain also do business—including other states or countries.

104.   By requiring companies to make speculative public statements about emissions and climate-related financial risk, the legislation enables activists and policymakers to single out companies for stigmatization, criticism, investigation, and boycotts.  It therefore functions to pressure companies to reduce their emissions of greenhouse gases, within the State of California and outside of it.

105.   Under the Clean Air Act and principles of federalism inherent in the structure of our federal Constitution, however, California lacks the authority to regulate greenhouse-gas emissions outside of its own borders.  Yet that is precisely what this legislation intentionally accomplishes, using a legal mechanism (requiring extensive disclosure of information about out-of-state emissions) that is itself precluded by the Clean Air Act and the Constitution, as part of a calculated program for mobilizing public pressure.

106.   Accordingly, this legislation violates the federal Constitution's Supremacy Clause.

## **THIRD CLAIM FOR RELIEF**

### **(Violation of Constitutional Limits on Extraterritorial Regulation Under 42 U.S.C. § 1983)**

107.   Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

108.   The Constitution vests Congress, not each of the fifty states, with authority to regulate interstate and foreign commerce.  The laws here intrude on that congressional authority and place upon interstate commerce a burden that far outweighs any benefits to the State of California.

Gibson, Dunn &
Crutcher LLP

109.    S.B. 253 and 261 impose significant burdens on interstate and foreign commerce.  The laws require companies to spend significant time and money, up to millions of dollars per company, making public statements regarding climate change. The laws will also subject companies, including those in the supply chain that have no intention of doing business in California, to significant political and economic pressure to conform their conduct to the policy preferences of the State of California.  And the laws "offend the Commerce Clause" by "'build[ing] up . . . domestic commerce' through 'burdens upon the industry of other States.'"  *Pork Producers*, 598 U.S. at 369 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).  S.B. 253 and 261 apply to any company that meets their respective revenue thresholds, regardless of what proportion of that revenue stems from California.  So out-of-state companies that do little business in California will be subject to the laws, even though in-state companies that have their entire business in California (but fall just below the revenue threshold) will not be.

110.    The benefits to California from the laws are slim to non-existent.  The State does not (and cannot reasonably) maintain that the laws will have a meaningful impact on climate change, a *global* phenomenon.  Nor does the State explain, let alone demonstrate, how the compelled speech would benefit anyone.  The State does not identify any risk of fraud or danger associated with any particular transaction and does not (and cannot) establish that the compelled speech (which applies to private as well as public companies) will be material to investors.

111.    Even if some of the compelled speech could theoretically be useful in some instances, the laws are so overbroad that their burden on interstate and foreign commerce eclipses any benefit to the State of California.  For example, so long as a company exceeds certain revenue thresholds, it, and all of its worldwide operations, is subject to S.B. 253 and 261 if it does *any* business in the State of California, even if that business is de minimis and is unlikely to have any impact in the State.  The State does not explain how it has a legitimate interest in compelling speech about activities outside of California that will often have no articulable connection to the State.

112.   Because the laws so heavily intrude on Congress's authority to regulate interstate and foreign commerce, and because the benefits to California are so limited, the laws are invalid under the Constitution's limitations on extraterritorial regulation, including the Dormant Commerce Clause.

## FOURTH CLAIM FOR RELIEF

### (Attorneys' Fees and Costs Under 42 U.S.C. § 1988 and All Other Applicable Statutes)

113.   Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 91 above.

114.   Under 42 U.S.C. § 1988(b), "[i]n any proceeding to enforce" 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of its costs."  Additionally, the court "may include expert fees as part of the attorney's fee."  42 U.S.C. § 1988(c).

115.   Plaintiffs are entitled to reasonable attorneys' fees, including expert fees and other costs, in this action and request that the Court award such fees under 42 U.S.C. § 1988 and all other applicable statutes.

## PRAYER FOR RELIEF

116.   WHEREFORE, Plaintiffs pray for an order and judgment:

a.   Declaring that S.B. 253 violates the First Amendment of the U.S. Constitution and is null, void, and with no force or effect;

b.   Declaring that S.B. 261 violates the First Amendment of the U.S. Constitution and is null, void, and with no force or effect;

c.   Declaring that S.B. 253 is precluded by federal law and is null, void, and with no force or effect;

d.   Declaring that S.B. 261 is precluded by federal law and is null, void, and with no force or effect;

Gibson, Dunn &
Crutcher LLP

29

e.      Declaring that S.B. 253 is invalid under the Constitution's limitations on extraterritorial regulation, including the Dormant Commerce Clause, and is null, void, and with no force or effect;

f.      Declaring that S.B. 261 is invalid under the Constitution's limitations on extraterritorial regulation, including the Dormant Commerce Clause, and is null, void, and with no force or effect;

g.      Enjoining the Defendants from implementing, applying, or taking any action whatsoever to enforce S.B. 253;

h.      Enjoining the Defendants from implementing, applying, or taking any action whatsoever to enforce S.B. 261;

i.      Awarding Plaintiffs their reasonable attorneys' and experts' fees incurred in bringing this action under 42 U.S.C. § 1988 and all other applicable statutes; and

j.      Granting such other and further relief as this Court deems just and proper.

Gibson, Dunn &
Crutcher LLP

30

DATED: February 22, 2024       Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*

Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Katherine Moran Meeks
(*pro hac vice*)
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

Daryl Joseffer (*pro hac vice*)
Tyler Badgley (*pro hac vice*)
Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

Gibson, Dunn &
Crutcher LLP

31