1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EUGENE SCALIA, SBN 151540
    escalia@gibsondunn.com
KATHERINE MORAN MEEKS
(*pro hac vice*)
    DC Bar No. 1028302
    kmeeks@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  202.955.8500
Facsimile:   202.467.0539

*Attorneys for Plaintiffs Chamber of
Commerce of the United States of
America, California Chamber of
Commerce, American Farm Bureau
Federation, Los Angeles County
Business Federation, Central Valley
Business Federation, and
Western Growers Association*

(*Additional counsel listed on next page*)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA,

## WESTERN DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California.<br><br>Defendants. | CASE NO. 2:24-cv-00801-ODW-PVC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS**<br><br>**HEARING:**<br>Date:        June 24, 2024<br>Time:       1:30 PM<br>Location:   Courtroom 5D<br>Judge:      Otis D. Wright II |

1   BRADLEY J. HAMBURGER,
2       SBN 266916
        bhamburger@gibsondunn.com
3   SAMUEL ECKMAN, SBN 308923
        seckman@gibsondunn.com
4   ELIZABETH STRASSNER,
5       SBN 342838
        estrassner@gibsondunn.com
6   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Ave.
7   Los Angeles, CA 90071-3197
    Telephone:  213.229.7000
8   Facsimile:   213.229.7520

9   BRIAN A. RICHMAN
    (*pro hac vice*)
10      DC Bar No. 230071
        brichman@gibsondunn.com
11  GIBSON, DUNN & CRUTCHER LLP
12  2001 Ross Ave., Suite 2100
    Dallas, TX 75201-2923
13  Telephone:  214.698.3100
    Facsimile:   214.571.2900
14

15  *Attorneys for Plaintiffs Chamber of Commerce of the United States of America,*
    *California Chamber of Commerce, American Farm Bureau Federation, Los Angeles*
16  *County Business Federation, Central Valley Business Federation, and*
    *Western Growers Association*
17

18  DARYL JOSEFFER
    (*pro hac vice*)
19      DC Bar No. 457185
        djoseffer@uschamber.com
20  TYLER BADGLEY
    (*pro hac vice*)
21      DC Bar No. 1047899
        tbadgley@uschamber.com
22  KEVIN PALMER
    (*pro hac vice*)
23      DC Bar No. 90014967
        kpalmer@uschamber.com
24  CHAMBER OF COMMERCE OF THE
    UNITED STATES OF AMERICA
25  1615 H Street, NW
    Washington, D.C. 20062-2000
26  Telephone:  202.659.6000
    Facsimile:   202.463.5302
27

28  *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................. 1

II. BACKGROUND ................................................................................................. 3

III. ARGUMENT ...................................................................................................... 5

    A.    For Counts II and III, Article III Standing Is Clear and This Case Is Ripe for Adjudication. .................................................................................. 5

          1.    Plaintiffs Have Article III Standing To Press Their Supremacy Clause and Extraterritoriality Arguments Because Their Members Will Suffer Actual Injury from S.B. 253 and 261 ................................................................................. 6

          2.    Plaintiffs' Supremacy Clause and Extraterritoriality Arguments Are Also Ripe with Respect to S.B. 253 ...................... 9

    B.    California Cannot Regulate Interstate and Global Emissions, and Plaintiffs Stated Valid Claims Under Federal Constitutional and Statutory Law. ..................................................................................... 11

          1.    S.B. 253 and 261 are Precluded by the Constitution and the Clean Air Act (Count II). .................................................. 11

          2.    Plaintiffs' Extraterritoriality Claims Survive (Count III). ............. 18

    C.    The Attorney General Cannot Escape This Court's Review. .................. 20

IV. CONCLUSION ................................................................................................. 21

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**CASES**

*Abbott Labs. v. Super. Ct. of Orange Cnty.*,
    467 P.3d 184 (Cal. 2020) ........................................................................... 20

*Am. Elec. Power Co., Inc. v. Connecticut*,
    564 U.S. 410 (2011) .............................................................. 12, 15, 16, 17, 18

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*,
    724 F.3d 243 (D.C. Cir. 2013) ................................................................... 6

*Arellano v. Clark Cnty. Collection Serv., LLC*,
    875 F.3d 1213 (9th Cir. 2017) ................................................................... 18

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................... 18

*Assurance Wireless USA, L.P. v. Reynolds*,
    2023 WL 2780365 (N.D. Cal. Mar. 31, 2023) ............................................. 7

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964) ................................................................................... 13

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013) ...................................................................... 17

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ............................................................................. 12, 13

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ................................................................................... 11

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*,
    476 U.S. 573 (1986) ................................................................................... 20

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ................................................................................... 11

*Cal. Med. Ass'n v. Aetna Health of Cal., Inc.*,
    532 P.3d 250 (Cal. 2023) ........................................................................... 20

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Cal. Trucking Ass'n v. Bonta*,
996 F.3d 644 (9th Cir. 2021) ........................................................................ 10

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981) ...................................................................................... 12

*City of New York v. Chevron Corp.*,
993 F.3d 81 (2d Cir. 2011) ................................................... 12, 13, 14, 17

*Comm. for Idaho's High Desert v. Collinge*,
148 F. Supp. 2d 1097 (D. Idaho 2001) ........................................................ 10

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
615 F.3d 291 (4th Cir. 2010) ........................................................................ 17

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ...................................................................................... 17

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ................................................................................. 15, 17

*Franchise Tax Bd. of Cal. v. Hyatt*,
139 S. Ct. 1485 (2019) .................................................................................. 11

*Gov't Suppliers Consolidating Servs., Inc. v. Bayh*,
975 F.2d 1267 (7th Cir. 1992) ........................................................................ 9

*Illinois v. City of Milwaukee*,
406 U.S. 91 .................................................................................................... 12

*Illinois v. City of Milwaukee*,
731 F.2d 403 (7th Cir. 1984) ........................................................................ 12

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987) ................................................................. 12, 15, 16, 18

*Italian Colors Rest. v. Becerra*,
878 F.3d 1165 (9th Cir. 2018) ...................................................................... 10

*Kansas v. Colorado*,
206 U.S. 46 (1907) ........................................................................................ 13

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Kong v. Trader Joe's Co.*,
   2022 WL 1125667 (9th Cir. Apr. 15, 2022)....................................................7

*Kurns v. R.R. Friction Prods. Corp.*,
   565 U.S. 625 (2012)........................................................................................13

*L.A. Branch NAACP v. L.A. Unified Sch. Dist.*,
   714 F.2d 946 (9th Cir. 1983) ..........................................................................20

*L.A. Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) ............................................................................6

*Logan v. U.S. Bank Nat'l Ass'n*,
   722 F.3d 1163 (9th Cir. 2013) ........................................................................20

*Los Altos Boots v. Bonta*,
   562 F. Supp. 3d 1036 (E.D. Cal. 2021) ..........................................................10

*Maness v. Meyers*,
   419 U.S. 449 (1975)..........................................................................................9

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)........................................................................................18

*Merrick v. Diageo Ams. Supply, Inc.*,
   805 F.3d 685 (6th Cir. 2015) ..........................................................................17

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958)........................................................................................14

*Namisnak v. Uber Techs.*,
   971 F.3d 1088 (9th Cir. 2020) ..........................................................................7

*Nat'l Ass'n of Mfrs. v. SEC*,
   800 F.3d 518 (D.C. Cir. 2015)........................................................................14

*Nat'l Lifeline Ass'n v. Batjer*,
   2023 WL 1281676 (9th Cir. Jan. 31, 2023)......................................................6

*Nat'l Pork Producers Council v. Ross*,
   143 S. Ct. 1142 (2023)....................................................................................19

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Pennhurst State Sch. & Hosp. v. Halderman*,
 465 U.S. 89 (1984)..................................................................................21

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
 __ F. Supp. 3d __, 2024 WL 1177999 (D. Or. 2024)..................................9

*Philip Morris USA v. Williams*,
 549 U.S. 346 (2007)................................................................................13

*R.J. Reynolds Tobacco Co. v. Bonta*,
 272 F. Supp. 2d 1085 (E.D. Cal. 2003) ......................................................8

*Retail Indus. Leaders Ass'n v. Fielder*,
 475 F.3d 180 (4th Cir. 2007) ..................................................................10

*San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*,
 359 U.S. 236 (1959)................................................................................14

*Shaw v. Delta Air Lines, Inc.*,
 463 U.S. 85 (1982)..................................................................................20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
 143 S. Ct. 2141 (2023)............................................................................13

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
 451 U.S. 630 (1981)..........................................................................11, 15

*Ting v. AT&T*,
 319 F.3d 1126 (9th Cir. 2003) ................................................................18

*U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*,
 487 U.S. 72 (1988)....................................................................................9

*Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*,
 346 F.3d 851 (9th Cir. 2003) ....................................................................9

*United States v. Locke*,
 529 U.S. 89 (2000)..................................................................................15

*Util. Air Regul. Grp. v. EPA*,
 573 U.S. 302 (2014)................................................................................16

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Van v. LLR, Inc.*,
  962 F.3d 1160 (9th Cir. 2020) .................................................................................... 8

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) ............................................................................................... 20

*West Lynn Creamery, Inc. v. Healy*,
  512 U.S. 186 (1994) ............................................................................................... 19

*Ex parte Young*,
  209 U.S. 123 (1908) .......................................................................................... 2, 20

*Zschernig v. Miller*,
  389 U.S. 429 (1968) ............................................................................................... 13

**STATUTES**

28 U.S.C. § 1331 ..................................................................................................... 20

42 U.S.C. § 7411 ............................................................................................. 15, 18

42 U.S.C. § 7416 ..................................................................................................... 17

42 U.S.C. § 7521 ..................................................................................................... 15

42 U.S.C. § 7545 ..................................................................................................... 16

42 U.S.C. § 7547 ..................................................................................................... 15

42 U.S.C. § 7571 ..................................................................................................... 15

42 U.S.C. § 7607 ..................................................................................................... 18

Cal. Bus. & Prof. Code § 17200 ........................................................................... 20

Cal. Bus. & Prof. Code § 17206 ........................................................................... 20

Cal. Health & Safety Code § 38532 ............................................................... 5, 9, 19

Cal. Health & Safety Code § 38533 ............................................................... 3, 5, 19

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

**REGULATIONS**

40 C.F.R. § 60, subpart OOOOa.........................................................................15

89 Fed. Reg. 21,698 (Mar. 28, 2024)...............................................................4, 8

Gibson, Dunn &
Crutcher LLP

# I.  INTRODUCTION

Two new California laws, S.B. 253 and 261, will impermissibly compel thousands of businesses to make costly and burdensome disclosures about "their operations, not just in California, but around the world," in an attempt to stigmatize those companies and shape their behavior on the politically fraught issue of climate change.  ECF No. 28 ("Am. Compl.") ¶ 1.  Both laws unconstitutionally compel speech in violation of the First Amendment and seek to regulate an area that is outside California's jurisdiction and subject to exclusive federal control by virtue of the Clean Air Act and federalism principles embodied in the U.S. Constitution.

S.B. 253 and 261 were designed to "create accountability" for those that are not, in the California Legislature's opinion, "doing their part to tackle the climate crisis."  *Id.* ¶ 4.  These laws will force every covered "entity," just by entering the California market in any respect, to publicly state its opinions regarding the risks associated with climate change, promote those opinions on its own website, and then disclose an inexact, misleading calculation of the "entity's" greenhouse-gas emissions.  *Id.*  The purpose of this compelled speech is to fuel political pressure campaigns against businesses: "For companies, the knowledge" that their compelled statements "will be publicly available might encourage them to take meaningful steps" to support the policy goals of the State.  *Id.*  By Governor Newsom's own reckoning, the legislation will have a negative "financial impact" on the more than 10,000 businesses covered, will impose deadlines that are "likely infeasible," and will deluge the public with "inconsistent" information.  *Id.*

The State does not contest in its motion to dismiss that the laws' compulsion of speech violates the First Amendment, that Plaintiffs have Article III standing to seek redress of those violations from this Court, or that this constitutional claim is ripe.  Instead, the State's motion raises misplaced objections—largely jurisdictional—to other aspects of the complaint.  This Court has jurisdiction over all claims here, and Plaintiffs

have stated plausible claims that S.B. 253 and 261 are both precluded by federal law and unconstitutionally extraterritorial.

Plaintiffs' Article III standing to challenge S.B. 253 and 261 on preemption and extraterritoriality grounds is clear.  Plaintiffs' members are the direct objects of the laws and are injured and burdened by the laws' requirements, and the hypothetical existence of other reporting regimes does not eliminate those burdens.  The State concedes that Plaintiffs' challenge to S.B. 261 is ripe; the S.B. 253 claim is also ripe for this Court's adjudication.  The California Air Resources Board ("CARB") has *no discretion* whether to promulgate regulations consistent with S.B. 253.  While CARB will eventually have to determine the penalty amount under S.B. 253 and certain other details, the reporting requirements themselves—the basis of Plaintiffs' objections—were set in stone by the California Legislature:  Plaintiffs' members *will* face a penalty in the future if they do not report emissions in the way S.B. 253 requires.  This claim is ripe for review.

On the merits, Plaintiffs' Supremacy Clause and extraterritoriality claims are sound.  Because the areas of nationwide environmental protection, interstate disputes, and foreign affairs are, based on the federal structure of the Constitution, committed to the supervision of the federal government exclusively, S.B. 253 and 261 are in conflict and must fall.  The Clean Air Act preempts both laws because it occupies the field of interstate-air-emissions regulation and preempts alternative remedial regimes (like California's).  And Plaintiffs' extraterritoriality claim is valid because both laws compel companies to speak on emissions that occur entirely outside California's borders.

Finally, Attorney General Bonta has no valid basis to escape this case.  The Attorney General has direct enforcement power for both laws under the California Unfair Competition Law.  Under *Ex parte Young*, 209 U.S. 123, 160-62 (1908), this Court has authority to enjoin him from violating Plaintiffs' members' constitutional rights.

The Court should deny the State's motion to dismiss.   Alternatively, at a minimum, the Court should grant leave to amend if it is inclined to dismiss any aspect of the Amended Complaint.

## II.  BACKGROUND

Throughout 2023, members of the California Legislature publicly stated that they intended to enact a reporting regime that would pressure companies to reduce greenhouse-gas emissions.  The legislators said they wanted to "create accountability for those that aren't" "doing their part to tackle the climate crisis."  Am. Compl. ¶ 23. And they claimed that "Californians . . . have a right to know who" is "destroying [their] planet" by "causing" climate change.  *Id.*  Companies, they explained, should be "encourage[d]" to conform their behavior to the State's policy preferences.  *Id.* ¶ 27.  If a company's opinions on emissions were "publicly available," they reasoned, then that "might encourage them to take meaningful steps to reduce [greenhouse-gas] emissions," lest they be publicly "embarrassed."  *Id.* ¶ 28.

With these goals in mind, California enacted S.B. 253 and 261.  "S.B. 253 requires covered entities to publicly report three categories of greenhouse-gas emissions—Scope 1, Scope 2 and Scope 3."  *Id.* ¶ 47.  S.B. 261, likewise, compels companies to opine on climate-related risks and "post that opinion to the entity's website."  *Id.* ¶ 36.  "Under the law, companies must opine on any 'material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health.'"  *Id.* (quoting Cal. Health & Safety Code § 38533(a)(2)). So long as a company exceeds the laws' revenue thresholds and does even a small amount of business in California, the company becomes obligated to speak about its *global* emissions and risks to global operations—to a global audience. *Id.* ¶¶ 34, 44.

Although framed in terms of disclosure, S.B. 253 and 261's requirements are aimed at stigmatizing companies by compelling their speech on subjective and controversial matters, for the purpose of politically coercing them to lower their emissions nationwide and even worldwide. *Id.* ¶ 89. As activists and policymakers repeatedly stated, they intend to use the compelled reporting to identify companies whose emissions they deem to be unsuitable, and to shame those companies into alignment with the Legislature's political positions. *Id.* ¶ 90. According to one sponsor, S.B. 253 "ensure[s] that corporate actors in [California] are aligned with [the Legislature's] goals and are working as diligently as [legislators] need them to be." *Id.*; *see also* ECF No. 38-1 ("Mot.") 3 ("Legislature sought . . . to ensure a sustainable . . . future.").

While the bills were pending, business organizations noted the significant costs and difficulties with implementation. Am. Compl. ¶¶ 29-31. Reporting certain greenhouse-gas emissions with "any degree of accuracy [is] not yet possible," *Id.* ¶ 30, and necessitates subjective decisionmaking. In particular, reporting Scope 3 emissions (emissions upstream and downstream in the supply chain) is "enormously burdensome" and is estimated to "cost many companies more than $1 million per year." *Id.* ¶ 52; *see also* 89 Fed. Reg. 21,698, 21,736 (Mar. 28, 2024) (SEC declining to require Scope 3 disclosures given the "burdens such a requirement could impose"). Likewise, companies would also have to "opine on the risks that will be specifically caused by climate change," even though determination of whether particular weather events are tied to climate change "is a matter of significant debate and controversy." Am. Compl. ¶ 67. And covered entities that do even small amounts of business in California would be forced to comply with the laws' onerous requirements. *Id.* ¶¶ 34, 44. In signing these acts into law, Governor Newsom acknowledged that "the reporting protocol specified could result in inconsistent reporting across businesses subject to" S.B. 253 and that he had "concern[s] about the overall financial impact of [S.B. 261] on business." *Id.* ¶ 32.

As the complaint alleges, S.B. 253 and 261 violate the federal Constitution in three ways.  First, unchallenged by the State's motion to dismiss, the laws compel speech in violation of the First Amendment.  *Id.* ¶¶ 64-83, 92-99.  Second, S.B. 253 and 261 violate the Supremacy Clause because the Constitution assigns the governance of interstate and international air pollution to the federal government and because the Clean Air Act preempts both laws.  *Id.* ¶¶ 84-91, 100-106.  And third, the statutes impose significant burdens on interstate commerce, to advantage California business, in violation of the federal Constitution.  *Id.* ¶¶ 84-91, 107-112.

### III.  ARGUMENT

**A.**     **For Counts II and III, Article III Standing Is Clear and This Case Is Ripe for Adjudication.**

The State's limited standing and ripeness arguments do not reach all of Plaintiffs' claims.  The State's motion "do[es] not address" Plaintiffs' First Amendment claims, Count I of the complaint.  Mot. 12 n.5.  Instead, the State makes two limited arguments with regard to Counts II and III.  First, the State argues that Plaintiffs lack standing on those claims, but even then, only in part.  Mot. 10-12.  The State concedes that with regard to S.B. 253, Plaintiffs have standing with respect to the requirement to disclose so-called Scope 3 emissions; accordingly, the State argues that Plaintiffs lack standing *only* with respect to Scope 1 and 2 emissions.  *See id.* at 12.  Second, although the State concedes that Plaintiffs' Supremacy Clause and extraterritoriality claims, Counts II and III, are ripe with regard to S.B. 261, the State maintains that the S.B. 253 challenge is "premature."  *Id.* at 8-10.  Both arguments fail.

S.B. 253 and 261 directly regulate Plaintiffs' members.  The laws apply to any company with revenue exceeding certain thresholds that does business in California.  Am. Compl. ¶¶ 34, 44; Mot. 3-4, 5; *see* §§ 38532(b)(2), 38533(a)(4).  There is no de minimis exception, and, as alleged, the laws require many of Plaintiffs' over 300,000 members to take concrete, burdensome steps to comply—a classic Article III injury.

Am. Compl. ¶¶ 9-10, 12-14, 20, 34, 54-59.   Under traditional standing principles, Plaintiffs' standing is unassailable, and this case is ripe for adjudication.

> **1.    Plaintiffs Have Article III Standing To Press Their Supremacy Clause and Extraterritoriality Arguments Because Their Members Will Suffer Actual Injury from S.B. 253 and 261.**

The State does not contest that Plaintiffs have standing to challenge S.B. 253's requirement that Plaintiffs' members report Scope 3 emissions. *See* Mot. 12.  The State challenges standing only with respect to S.B. 261 and a limited part of S.B. 253.  *See id.* at 10-12.  But the State's arguments miss the mark.

A "plaintiff is presumed to have constitutional standing to seek injunctive relief when it is the direct object of regulatory action challenged as unlawful." *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011).  Here, Plaintiffs allege that many of their members exceed the laws' revenue thresholds and do business in California, and therefore are directly regulated by S.B. 253 and 261.  Am. Compl. ¶¶ 9-10, 12-13, 20.  Among other mandates, the laws "require[ ]" covered entities, including Plaintiffs' members, "to prepare . . . climate-related financial risk report[s]," Mot. 5, and "measure and report [greenhouse-gas] emissions 'in conformance' with the 'Greenhouse Gas Protocol,'" *id.* at 4.  *See* Am. Compl. ¶¶ 36, 46.  As the State concedes, these "mandatory and comprehensive . . . requirements" go beyond "current reporting initiatives."  Mot. 3.  Although the State argues that the claimed injuries are "conclusory," *id.* at 11, Governor Newsom has *admitted* that the laws will likely have a negative "financial impact" on the more than 10,000 businesses covered, Am. Compl. ¶ 4.  Plaintiffs, who represent the legal and economic interests of their members (*id.* ¶¶ 9-10, 12-13, 20), have "an obvious interest in challenging [laws] that directly—and negatively—impact[ their] members." *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013); *see also Nat'l Lifeline Ass'n v. Batjer*, 2023 WL 1281676, at *2 (9th Cir. Jan. 31, 2023) (finding standing where

association's members were "the object of" regulation); *Assurance Wireless USA, L.P. v. Reynolds*, 2023 WL 2780365, at \*5-6 (N.D. Cal. Mar. 31, 2023) (similar).

The State's speculation—that the laws will impose no regulatory costs whatsoever, because *some of* Plaintiffs' members "may already" be making required disclosures "under other reporting regimes," Mot. 11, 12—flips the legal standard on its head.  At the motion-to-dismiss stage, the Court "construe[s] the complaint in favor of the complaining party," *Namisnak v. Uber Techs.*, 971 F.3d 1088, 1092 (9th Cir. 2020), and does not make unsubstantiated, speculative leaps in favor of the State, *cf. Kong v. Trader Joe's Co.*, 2022 WL 1125667, at \*1 (9th Cir. Apr. 15, 2022).  Here, Plaintiffs not only allege "many" of their members are "subject to S.B. 253 and 261," Am. Compl. ¶ 9; *accord id.* ¶¶ 10, 12-13; they identify particular members that are "affected and injured by the challenged laws," *id.* ¶ 20; *contra* Mot. 11, and explain how the laws require members to make disclosures "they otherwise would not," Am. Compl. ¶ 93. This factual content "allows the [C]ourt to draw the reasonable inference" that it is S.B. 253 and 261, *Kong*, 2022 WL 1125667, at \*1—not "other reporting regimes," Mot. 11— that are driving the compliance costs of Plaintiffs' members, which is more than enough to survive a motion to dismiss, regardless of the State's alternative theory.  *See Kong*, 2022 WL 1125667, at \*1 ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible," the complaint survives.).

In any event, the State's suggestion that "other reporting regimes" already require S.B. 253 and 261's disclosures is wrong.  Mot. 11.  The State's motion acknowledges that S.B. 253 and 261 are premised on the notion that "current reporting initiatives" are inadequate; the California laws thus require *more*.  *Id.* at 3; *see also id.* at 2 (S.B. 253 and 261 "*build* on existing . . . frameworks" (emphasis added; capitalization altered)).  Indeed, the legislative report cited by the State shows that no more than 10% of the "10,000 companies"—including Plaintiffs' members—swept up by the California laws,

State's RJN, Ex. 3, at 50, have signed up for the "voluntary framework" ("Task Force on Climate-Related Disclosure") cited in the State's motion, Mot. 3.

The State turns to a recent SEC rule (which has already been stayed pending litigation), and to one European regulation, Mot. 2-3, but it is unable to say that companies are already "preparing [relevant] data" under these regimes, *id.* at 12. The most the State can say is that some unspecified subset of companies "may" be. *Id.* But even still, the State overstates any overlap. The SEC itself acknowledges that it and California "apply different . . . standards." State's RJN, Ex. 2, at 41. While the SEC rule applies only to public companies, for instance, Mot. 3, the California laws apply to public *and* private companies, Am. Compl. ¶ 110. And although the SEC rule requires the disclosure of Scope 1 and Scope 2 emissions in certain circumstances, 89 Fed. Reg. at 21,670; California requires these *for all companies* subject to S.B. 253, and also requires reporting of Scope 3 emissions, which the SEC rule does not require, and which will "cost many companies more than $1 million per year" alone, Am. Compl. ¶ 52.

The State also ignores the various aspects of S.B. 253 and 261 that impose legally cognizable injuries, independent of other reporting regimes. The laws, for example, require companies to file reports with state-approved entities and pay fees to support the State's implementation, *id.* ¶¶ 43, 62; additionally, S.B. 261 requires companies to host climate-risk reports on their websites, *id.* ¶ 26. All this costs money and is undisputedly unique to S.B. 253 and 261; those costs are independently sufficient to confer Article III standing. *See, e.g.*, *Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020) (even "a dollar or two" is sufficient).

The State, moreover, does not dispute that S.B. 253 and 261 impose an "injury from compelled speech," Mot. 12 n.5, by forcing companies to state messages and information "they otherwise would not," Am. Compl. ¶ 93. Independent of any First Amendment injury, this compelled speech imposes "stigma and reputational harm" that separately confers standing to pursue the Supremacy Clause and extraterritoriality claims. *R.J. Reynolds Tobacco Co. v. Bonta*, 272 F. Supp. 2d 1085, 1093 (E.D. Cal.

2003) ("stigma and reputation harm" are independent Article III injuries); *see* Am. Compl. ¶ 89.  The compelled speech also forces companies to "reveal information" they would rather keep confidential, itself an Article III injury, *cf. Maness v. Meyers*, 419 U.S. 449, 460 (1975) (being compelled to "reveal information" causes "irreparable injury"); *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76 (1988) (witnesses have standing to challenge discovery orders); *see* Am. Compl. ¶ 66. And compelling speech is the method through which the State subjects companies to regulation—regulation that is preempted by federal law, *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, __ F. Supp. 3d __, 2024 WL 1177999, at \*8, 10 (D. Or. 2024); *see* Am. Compl. ¶¶ 89, 91—another independent Article III injury directly traceable to S.B. 253 and 261 and capable of being remedied by an injunction.

## 2.     Plaintiffs' Supremacy Clause and Extraterritoriality Arguments Are Also Ripe with Respect to S.B. 253.

Although the State concedes that Plaintiffs' challenge to S.B. 261 is ripe, the State argues, with respect to Plaintiffs' Supremacy Clause and extraterritoriality arguments, that the challenge to S.B. 253 is "premature" because CARB has not yet adopted its implementing regulations.  Mot. 8-10.  That argument is a red herring.

The statute itself says exactly what the regulations "shall" provide:  they "shall" require companies to disclose "scope 1 emissions, scope 2 emissions, and scope 3 emissions," and those disclosures "shall" be "in conformance with the Greenhouse Gas Protocol standards and guidance."  § 38532(c)(1), (c)(1)(A)(ii).  Given those statutory mandates, nothing CARB has the power to do could alleviate "Plaintiffs' current concerns."  Mot. 9.  Thus, there "is no need to wait for regulations" when "what the statutes authorize is clear."  *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267, 1276 (7th Cir. 1992).  Plaintiffs' challenge to S.B. 253 is ripe for adjudication. *See, e.g.*, *Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n*, 346 F.3d 851, 872 n.22 (9th Cir. 2003) (rejecting ripeness objection "because it is clear that any standard required" by the agency "would impermissibly burden interstate commerce," even though "no

standards" had yet been "issued"); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007) (finding claim ripe for review even though "regulations under the Act have not been promulgated" because the regulations "could not alter the Act's provisions, which clearly establish" the challenged requirements).

The State argues that Plaintiffs must "articulate[ ] a 'concrete plan' to violate the law" and that "prosecuting authorities [must] have communicated a specific warning or threat to initiate proceedings." Mot. 8. But this is not a case where Plaintiffs challenge a law that renders their conduct illegal. The State, here, is not *proscribing* conduct; it is imposing new, affirmative disclosure obligations. In any event, Plaintiffs' members' "current business practices" are "presently in conflict" with S.B. 253, *Los Altos Boots v. Bonta*, 562 F. Supp. 3d 1036, 1044 (E.D. Cal. 2021) (quoting *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021)), because the law requires disclosures Plaintiffs' members "otherwise would not" make, Am. Compl. ¶ 93. And while the State has not "communicated a specific [enforcement] warning," Mot. 8, the State "has not disavowed enforcement," either, "which is 'strong evidence' of a 'credible threat'" of enforcement, *Los Altos*, 562 F. Supp. 3d at 1045 (quoting *Cal. Trucking Ass'n*, 996 F.3d at 653); *see, e.g.*, *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1173 (9th Cir. 2018) (holding that plaintiff had standing in part because California had "not suggested" the challenged law would "not be enforced").

Lastly, if the Court were to require Plaintiffs to "wait" until S.B. 253 goes into effect, as the State suggests, "the Court [would] be forced to rule on an emergency basis," even though the issues would not be any clearer. *Comm. for Idaho's High Desert v. Collinge*, 148 F. Supp. 2d 1097, 1100 (D. Idaho 2001). These claims are fully ripe for judicial review now, and it would harm both Plaintiffs' constitutional interests and judicial economy to defer adjudication.

**B.** **California Cannot Regulate Interstate and Global Emissions, and Plaintiffs Stated Valid Claims Under Federal Constitutional and Statutory Law.**

The State's motion fares no better on Rule 12(b)(6) grounds.  The State does not contest that Plaintiffs have stated a claim under the First Amendment (Count I).  The State challenges only Plaintiffs' claims under Counts II and III, but under federal constitutional and statutory law, S.B. 253 and 261 are invalid because the State cannot use state law to regulate out-of-state emissions.

**1.** **S.B. 253 and 261 are Precluded by the Constitution and the Clean Air Act (Count II).**

In Count II, Plaintiffs adequately allege that S.B. 253 and 261 are precluded by the Constitution and the Clean Air Act.

**a.** **The Structure of the Constitution Reserves the Regulation of Greenhouse-Gas Emissions to Federal Law.**

The Supreme Court has long held—based on the structure of the U.S. Constitution—that "a few areas, involving uniquely federal interests, are so committed by the Constitution . . . to federal control that state law is pre-empted." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988).  In such "inherently federal" cases, "no presumption against pre-emption obtains." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001).

These exclusively federal areas include "interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations" and other areas "in which a federal rule of decision is 'necessary to protect uniquely federal interests'"; in such cases, "our federal system *does not permit* the controversy to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981) (emphasis added).  "[T]he Constitution implicitly forbids that exercise of power" because the interstate nature of the issue "makes it inappropriate for state law to control." *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1498 (2019).  This principle reflects the well-established premise that a State may not wield "its laws with

1  the intent of changing [a person's] lawful conduct in other States." *BMW of N. Am., Inc.*
2  *v. Gore*, 517 U.S. 559, 572 (1996).

3      The Supreme Court has explained that state law cannot regulate issues dealing
4  with "air and water in their ambient or *interstate* aspects"; in that context, application of
5  "the law of a particular State would be inappropriate." *Am. Elec. Power Co., Inc. v.*
6  *Connecticut*, 564 U.S. 410, 421-22 (2011) ("*AEP*") (emphasis added). The "basic
7  interests of federalism . . . demand[ ]" that the varying laws of the individual States
8  cannot govern such issues. *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6, 107 n.9
9  (1972); *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987) ("interstate . . .
10  pollution is a matter of federal, not state, law"); *City of Milwaukee v. Illinois*, 451 U.S.
11  304, 313 n.7 (1981) ("state law cannot be used").

12      Accordingly, "the basic scheme of the Constitution" requires that federal law
13  alone must govern issues concerning "air and water in their ambient or interstate
14  aspects" because they are not "matters of substantive law appropriately cognizable by
15  the states." *AEP*, 564 U.S. at 421. Federal common law may govern such issues absent
16  congressional legislation, but even still, a State "cannot apply its own state law to out-
17  of-state discharges" even after statutory displacement of federal common law. *Illinois*
18  *v. City of Milwaukee*, 731 F.2d 403, 409-11 (7th Cir. 1984); *see also City of New York*
19  *v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2011) ("For over a century, a mostly
20  unbroken string of cases has applied federal law to disputes involving interstate air or
21  water pollution.").

22      Thus, federalism and comity principles embodied in the Constitution preclude
23  California's attempt to regulate greenhouse-gas emissions "around the world." Am.
24  Compl. ¶ 1. Climate change is by its very nature global, caused by the cumulative effect
25  of factors, including greenhouse-gas emissions, far beyond the reach of any one State's
26  borders. *See AEP*, 564 U.S. at 422. Applying state law to attempt to regulate these
27  global emissions would necessarily violate the exclusivity of federal law. While
28  "*Congress* has ample authority to enact such a policy for the entire Nation, it is clear that

no single State could do so, or even impose its own policy choice on neighboring States." *BMW*, 517 U.S. at 571 (emphasis added); *see also Philip Morris USA v. Williams*, 549 U.S. 346, 352-53 (2007) ("[O]ne State[ ]" may not "impose" its "policy choice[s] . . . upon neighboring States with different public policies.").  Allowing state law to govern such areas would permit one State to "impose its own legislation on . . . the others," violating the "cardinal rule" that "[e]ach state stands on the same level with all the rest." *Kansas v. Colorado*, 206 U.S. 46, 97 (1907).

Nor may state law dictate our "relationships with other members of the international community." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964). Yet, that is exactly what S.B. 253 and 261 would do.  If those laws are allowed to stand, Plaintiffs' members will be subject to ongoing reporting obligations regarding their emissions around the globe, Am. Compl. ¶ 87, and associated international public pressure campaigns to reduce those emissions to levels approved by California.  As one Senate report put it, "[f]or companies, the knowledge" that their compelled disclosures "will be publicly available might encourage them to take meaningful steps" to support the policy goals of California.  *Id.* ¶ 4.  This is a paradigmatic example of state law improperly attempting to "regulat[e]" an industry's extraterritorial operations.  *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012); *cf. Zschernig v. Miller*, 389 U.S. 429, 440-41 (1968) (holding that state law was unconstitutional because it "affect[ed] international relations in a persistent and subtle way").

The State argues that S.B. 253 and 261 do not "*directly* require reductions in greenhouse-gas emissions," Mot. 13 (emphasis added), but "what cannot be done directly cannot be done indirectly" as "[t]he Constitution deals with substance, not shadows."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141, 2176 (2023).  When a state attempts to "regulate cross-border emissions in an indirect and roundabout manner, it [still] regulate[s] them nonetheless." *New York*, 993 F.3d at 93.

Gibson, Dunn &
Crutcher LLP

13

Here, the complaint plausibly alleges that, although S.B. 253 and 261 are "framed in terms of disclosure, these requirements are aimed at stigmatizing companies for the purpose of pressuring them to lower their emissions nation- and even world-wide." Am. Compl. ¶ 89.  As the complaint details, "activists and policymakers have repeatedly stated that they intend to use the compelled reporting to identify companies whose emissions they deem to be unsuitable, and to shame those companies into reducing their emissions."  *Id.* ¶ 90.  For example, as one sponsor noted, S.B. 253 "ensure[s] that corporate actors in [California] are aligned with [the Legislature's] goals and are working as diligently as [legislators] need them to be."  *Id.*  This pressure "can be, indeed is designed to be," as "potent [a] method of governing conduct and controlling policy" as direct regulation.  *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 247 (1959).

The State seeks refuge in the assertion that "any 'pressure' companies feel would come *from third parties*—investors, customers, and the like—not *from the State itself*." Mot. 13.  But the "crucial factor" here "is the interplay of governmental and private action."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958).  "[I]t is only *after* the initial exertion of state power represented by the" "compulsory disclosure" mandates "that private action takes hold."  *Id.* (emphasis added).  Legislators have openly admitted that the laws' purpose is to exert such state power.  *See, e.g.*, Am. Compl. ¶ 4.  That the laws "regulate *speech*," Mot. 13, moreover, does not mean that they do not *also* regulate conduct.  The use of speech compulsion "to stigmatize and shape behavior" makes the compulsion "more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015).

In the end, "[a]rtful" drafting of a statute "cannot transform [S.B. 253 and 261] into anything other than [regulations] over global greenhouse gas emissions." *New York*, 993 F.3d at 91.  Because S.B. 253 and 261 conflict with the federal government's responsibility for environmental protection, interstate disputes, and foreign relations, "it

Gibson, Dunn & Crutcher LLP

1  [is] inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641. Plaintiffs'

2  Supremacy Clause arguments, Count II, state a valid claim for relief.

3          **b.**     **The Clean Air Act Preempts S.B. 253 and 261.**

4        Plaintiffs' Supremacy Clause arguments in Count II also state a valid claim

5  because S.B. 253 and 261 are independently preempted by the Clean Air Act.

6        "[I]n the absence of explicit statutory language, state law is pre-empted where

7  it regulates conduct in a field that Congress intended the Federal Government to

8  occupy exclusively." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). "[T]he

9  longstanding rule [is] that the enactment of a uniform federal scheme displaces state

10  law." *United States v. Locke*, 529 U.S. 89, 103 (2000). Preemption is "presumed

11  when the federal legislation is sufficiently comprehensive to make reasonable the

12  inference that Congress left no room for supplementary state regulation." *Ouellette*,

13  479 U.S. at 491.

14        Through the Clean Air Act, Congress evaluated and balanced the societal

15  harms and benefits associated with extraction, production, processing, transportation,

16  sale, and use of fossil fuels, and has already regulated fossil fuels and greenhouse gas

17  emissions. For example, Title II of the Act governs greenhouse-gas emissions

18  standards for vehicles, aircraft, locomotives, motorcycles, and nonroad engines and

19  equipment. 42 U.S.C. §§ 7521(a)(1)-(2), (3)(E), 7571(a)(2)(A), 7547(a)(1), (5).

20        The statute also governs "whether and how to regulate carbon-dioxide

21  emissions from powerplants" and other stationary sources. *AEP*, 564 U.S. at 426; *see*

22  *also* 42 U.S.C. § 7411(b)(1)(A)-(B), (d). The EPA has issued comprehensive

23  regulations to control greenhouse gas emissions up and down the oil-and-gas supply

24  chain, which include: limiting emissions of methane (the second-most prevalent

25  greenhouse gas) and emissions from crude oil and natural gas production, *see* 40

26  C.F.R. § 60, subpart OOOOa; regulating carbon dioxide emissions from fossil fuel-

27  fired power plants; and requiring many major industrial sources to employ control

28  technologies constituting the best available system of emissions reduction to limit

greenhouse-gas emissions.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 329-31 (2014).

The Clean Air Act's Renewable Fuel Standard Program also regulates the consumption and use of fossil fuel products; specifically, the Program requires fuel companies to reduce the quantity of petroleum-based transportation fuel, heating oil, or jet fuel sold by blending in renewable fuels, resulting in lower greenhouse gas emissions on a lifecycle basis.  *See* 42 U.S.C. § 7545(o).  Thus, through the Clean Air Act and its implementing regulations, the federal government has balanced the benefits and harms relating to activities associated with greenhouse-gas emissions through an "informed assessment of competing interests," including the "environmental benefit potentially achievable," and "our Nation's energy needs and the possibility of economic disruption."  *AEP*, 564 U.S. at 427.

This comprehensive statutory system precludes supplemental state regulation of alleged harms arising from interstate greenhouse-gas emissions.

Decades ago, the Supreme Court concluded that the Clean Water Act "pre-empts state law to the extent that the state law is applied to an out-of-state point source."  *Id.* at 500.  The Clean Air Act shares all of the features of the Clean Water Act that led the Supreme Court to find preemption of state regulation of interstate pollution.  Both laws authorize "pervasive regulation" that entail a "complex" balancing of economic costs and environmental benefits, *id.* at 492, 494-95; both laws provide States with a circumscribed role that is "subordinate" to the EPA's role as the federal environmental regulatory agency, *id.* at 491; and both ensure that "control of interstate pollution is primarily a matter of federal law," *id.* at 492.  Given these statutory features, the Supreme Court held in *Ouellette* that the Clean Water Act "precludes a court from applying the law of an affected State against an out-of-state source" because doing so would "upset[ ] the balance of public and private interests so carefully addressed by the Act."  *Id.* at 494.

Because the structure of the Clean Air Act parallels that of the Clean Water Act, courts have consistently construed *Ouellette*'s interpretation of the Clean Water Act's saving clause to apply equally to the Clean Air Act's saving clause, meaning that the Clean Air Act preempts state law to the extent it purports to regulate air pollution originating out of state. *See, e.g.*, *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 692 (6th Cir. 2015); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 194-97 & n.6 (3d Cir. 2013); *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301-09 (4th Cir. 2010).  Here, as the complaint explained, S.B. 253 and 261 target emissions not only emanating from California, but from other states as well.  Am. Compl. ¶ 89.  S.B. 253 was explicitly hailed as "groundbreaking legislation with the potential to reach far beyond California's borders."  *Id.* ¶ 7.  And both laws expressly "require companies to make sweeping reports about their emissions and risks everywhere they operate, whether in California [or] in other states."  *Id.* ¶ 87.  The "state law[s'] actual effect," therefore, is to interfere with Congress's comprehensive regime of air emissions regulation.  *English*, 496 U.S. at 84.  Congress "designated an expert [federal] agency," not the State of California, "as best suited to serve as primary regulator of greenhouse gas emissions."  *AEP*, 564 U.S. at 428.

The State retreats to the Clean Air Act's saving clause, Mot. 15 (citing 42 U.S.C. § 7416), but that clause "is narrowly circumscribed" and permits application of state law "only" to "in-state polluters."  *New York*, 993 F.3d at 99-100.  The clause does not license California to regulate emissions "around the world."  Am. Compl. ¶ 1.

S.B. 253 and 261 also fail under conflict preemption because they are an "obstacle to the accomplishment or execution of the full purposes and objectives of Congress."  *English*, 496 U.S. at 79.  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

"[T]he Act itself need not 'speak directly to the issue'" for conflict preemption to occur. *Arellano v. Clark Cnty. Collection Serv., LLC*, 875 F.3d 1213, 1218 (9th Cir. 2017) (quoting *Ouellette*, 479 U.S. at 493). A "[c]onflict in technique can be fully as disruptive to the system Congress erected as a conflict in overt policy." *Arizona v. United States*, 567 U.S. 387, 406 (2012). "Thus, obstruction preemption focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective, taking into account the law's text, application, history, and interpretation." *Ting v. AT&T*, 319 F.3d 1126, 1137 (9th Cir. 2003).

In enacting the Clean Air Act, Congress chose to empower the EPA, a *federal* agency, to regulate interstate greenhouse-gas emissions from certain sources. *See Massachusetts v. EPA*, 549 U.S. 497, 528-32 (2007); *AEP* 564 U.S. at 424. "[T]he method chosen by Congress to effectuate that objective," *Ting*, 319 F.3d at 1137, was EPA rulemaking, whereby the EPA Administrator "establish[es] standards of performance for emissions of pollutants" and then "impose[s] administrative penalties for noncompliance," or even "criminal penalties" in some circumstances, *AEP*, 564 U.S. at 424-25. The Clean Air Act also empowers private civil enforcement actions in federal court. *Id.* at 425. While "EPA may *delegate* implementation and enforcement authority to the States," *id.* at 425 (citing 42 U.S.C. § 7411(c)(1), (d)(1)) (emphasis added), that authority does not allow states to create alternative methods of interstate enforcement. S.B. 253 and 261, however, in their attempt to "reduce [greenhouse-gas] emissions," Am. Compl. ¶ 28, do exactly that.

In the end, "[i]f [the] EPA does *not set* emissions limits for a particular pollutant or source of pollution, [California] may petition for a rulemaking on the matter." *AEP*, 564 U.S. at 425 (citing 42 U.S.C. § 7607(b)(1)) (emphasis added). What California may not do is enact statutes conflicting with the Clean Air Act.

### 2.  Plaintiffs' Extraterritoriality Claims Survive (Count III).

Count III, which comprises Plaintiffs' allegations regarding the State's improper extraterritorial regulation, also states a valid claim. This case presents the "familiar

concern," addressed by the Commerce Clause, of "preventing purposeful discrimination against out-of-state economic interests."   Mot. 17 (quoting *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1154 (2023)).   The State of California intended to regulate greenhouse-gas emissions and could, in certain ways, at least, have regulated emissions tied to California.   But a regulation tailored in that way, to California businesses, or to California products, would have put the State at a competitive disadvantage. *See, e.g.*, *Pork Producers*, 143 S. Ct. at 1156 ("Environmental laws often prove decisive when businesses choose where to manufacture their goods.").   So it tried a workaround.   By incorporating into S.B. 253 and 261 an unprecedented and unwarranted extraterritorial reach, the laws impose costs on businesses nationwide, thus "depriv[ing] businesses and consumers in other States" of the "competitive advantages" they would possess otherwise freed from California's overly burdensome regulatory scheme. *Id.* at 1155.

The "practical effect[s]" of the laws confirm their "discriminatory purpose." *Id.* at 1158.   Suppose a customer buys a pack of gum in California.   So long as the seller otherwise meets the laws' revenue thresholds, that de minimis transaction (doing "business in California," §§ 38532(b)(2), 38533(a)(4)) would trigger the full suite of S.B. 253 and 261's requirements for all of the seller's global operations.   Not only would the seller have to disclose emissions and other climate-related information related to the California transaction, the seller would have to disclose such information related to the seller's (*i.e.*, the "entity['s]," §§ 38532(c)(1), 38533(b)(1)(A)) nation- and even world-wide operations.   The State does not even attempt to explain what benefits flow to the State of California from this type of disclosure requirement, *see* Am. Compl. ¶ 110, which operates differently from requirements that have survived judicial review.   For example, unlike the pork regulations in *Pork Producers*, the California laws here concern not only the products sold *in* California, but products sold anywhere else (so long as there is some other, unrelated California triggering event).   In this way, S.B. 253 and 261 are like the laws the Supreme Court invalidated in *West Lynn Creamery, Inc. v.*

*Healy*, 512 U.S. 186, 194-96 (1994), and *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986), where the States used the existence of in-state transactions to force businesses to "surrender" pricing or cost advantages enjoyed in other states, *id.* at 580.  The State's motion to dismiss Count III should be denied.

## C.    The Attorney General Cannot Escape This Court's Review.

"It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1982) (citing *Young*, 209 U.S. at 160-62).  Accordingly, a "plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by" federal law—or violates the First Amendment—"presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Id.*  That is true regardless whether federal law creates a private cause of action.  *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 641-44 (2002).

The Attorney General tries to evade this straightforward application of federal jurisdiction by denying that he has "enforcement authority" with respect to S.B. 253 and 261 at all.  Mot. 22.  But unlike in the cases he cites, Mot. 21-22, in which the official had *no* enforcement role, *e.g.*, *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 714 F.2d 946, 953 (9th Cir. 1983), under California law, the Attorney General enforces S.B. 253 and 261 via the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq.*  Only he and certain other officials are permitted to collect penalties from UCL violations.  *Id.* § 17206(a); *Cal. Med. Ass'n v. Aetna Health of Cal., Inc.*, 532 P.3d 250, 257 (Cal. 2023).  And even among other officials empowered by the UCL, the Attorney General stands apart as "the ultimate locus of control and accountability for UCL actions." *Abbott Labs. v. Super. Ct. of Orange Cnty.*, 467 P.3d 184, 193 (Cal. 2020).

The Attorney General cannot escape the Court's "virtually unflagging obligation to adjudicate [the] controvers[y] properly before it," *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1166 (9th Cir. 2013), by "hold[ing] state officials responsible to 'the

supreme authority of the United States,'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984).

## IV.  CONCLUSION

The motion to dismiss should be denied, or, in the alternative, the Court should grant leave to amend.

DATED: May 1, 2024                    Respectfully submitted,

                                              GIBSON, DUNN & CRUTCHER LLP

                                             By:  */s/ Bradley J. Hamburger*
                                             Eugene Scalia, SBN 151540
                                             Bradley J. Hamburger, SBN 266916
                                             Katherine Moran Meeks
                                             (*pro hac vice*)
                                             Samuel Eckman, SBN 308923
                                             Brian A. Richman (*pro hac vice*)
                                             Elizabeth Strassner, SBN 342838

                                             *Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association*

                                             CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

                                             Daryl Joseffer (*pro hac vice*)
                                             Tyler Badgley (*pro hac vice*)
                                             Kevin Palmer (*pro hac vice*)

                                             *Attorneys for Plaintiff Chamber of Commerce of the United States of America*

1

**CERTIFICATE OF COMPLIANCE**

2      The undersigned, counsel of record for Plaintiffs Chamber of Commerce of the

3  United States of America, California Chamber of Commerce, American Farm Bureau

4  Federation, Los Angeles County Business Federation, Central Valley Business

5  Federation and Western Growers Association, certifies that this brief contains 6,870

6  words, which complies with the word limit of L.R. 11-6.1.

7  DATED: May 1, 2024          Respectfully submitted,

8                              GIBSON, DUNN & CRUTCHER LLP

9

10                             By:  /s/ Bradley J. Hamburger
                               Eugene Scalia, SBN 151540

11                             Bradley J. Hamburger, SBN 266916
                               Katherine Moran Meeks

12                             (*pro hac vice*)
                               Samuel Eckman, SBN 308923

13                             Brian A. Richman (*pro hac vice*)
                               Elizabeth Strassner, SBN 342838

14

15                             *Attorneys for Plaintiffs Chamber of Commerce*
                               *of the United States of America, California*

16                             *Chamber of Commerce, American Farm Bureau*
                               *Federation, Los Angeles County Business*

17                             *Federation, Central Valley Business Federation*
                               *and Western Growers Association*

18

19                             CHAMBER OF COMMERCE OF THE
                               UNITED STATES OF AMERICA

20

21                             Daryl Joseffer (*pro hac vice*)
                               Tyler Badgley (*pro hac vice*)

22                             Kevin Palmer (*pro hac vice*)

23                             *Attorneys for Plaintiff Chamber of Commerce*
                               *of the United States of America*

24

25

26

27

28

22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS
CASE NO. 2:24-CV-00801-ODW-PVC