ROB BONTA
Attorney General of California
GARY E. TAVETIAN (SBN 117135)
MYUNG J. PARK (SBN 210866)
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK (SBN 268861)
CAITLAN MCLOON (SBN 302798)
EMILY HAJARIZADEH (SBN 325246)
DYLAN REDOR (SBN 338136)
KATHERINE GAUMOND (SBN 349453)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6438
  Fax:  (916) 731-2128
  E-mail:  Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,
Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-ODW-PVC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I**<br><br>Date:          September 9, 2024<br>Time:          1:30 PM<br>Courtroom:  5D<br>Judge:         The Honorable Otis D. Wright, II<br>Trial Date:   Not Set<br>Action Filed: 1/30/2024 |

1

# TABLE OF CONTENTS

2

**Page**

Introduction.................................................................................................1

Background..................................................................................................2

    I.     Senate Bills 253 and 261 ...............................................................2

          A.    Reporting Obligations Are An Ordinary and Expected Part of Doing Business ............................................................2

          B.    Senate Bills 253 and 261 Build on Existing Corporate Climate-Related Reporting and Disclosure Practices in Wide Use.......................................................................3

          C.    Senate Bill 253 Requires the Largest Companies Doing Business in California to Report GHG Emissions in Accordance with Widely Accepted Protocols ...........................4

          D.    Senate Bill 261 Requires the Largest Companies Doing Business in California to Disclose Climate-Related Financial Risk in Accordance with Widely Accepted Protocols .................................................................5

    II.    Procedural History ........................................................................6

Legal Standard ..........................................................................................6

Argument ...................................................................................................7

    I.     Senate Bills 253 and 261 Compel Commercial Speech and Thus Are Subject to Review Under a Lower Level of Scrutiny...................7

    II.    The Disclosure Laws Are Constitutional Under Zauderer .................10

          A.    The required disclosures are "Purely Factual and Uncontroversial".................................................11

          B.    The Laws are Reasonably Related to a Substantial State Interest..................................................................14

          C.    The Laws are Neither Unjustified nor Unduly Burdensome ............................................................17

    III.   Alternatively The Disclosure Laws Are Constitutional Under *Central Hudson* ..........................................................................18

    IV.   The Regulatory Disclosure Requirements of Senate Bills 253 and 261 Are Not Subject to Strict Scrutiny .......................................20

    V.    Senate Bills 253 and 261 Would Survive Review Under Strict Scrutiny .....................................................................................22

Conclusion ...............................................................................................23

Certificate of Compliance........................................................................24

i

# TABLE OF AUTHORITIES

**Page**

Cases

*Am. Hosp. Ass'n v. Azar*
  983 F.3d 528 (D.C. Cir. 2020) ............................................. 8, 11, 15, 17

*Am. Meat Inst. v. U.S. Dep't of Ag.*
  760 F.3d 18 (D.C. Cir. 2014) ..................................................... 14, 15

*Ambat v. City & County of San Francisco*
  757 F.3d 1017 (9th Cir. 2014) ........................................................... 6

*Americans for Prosperity Found. v. Bonta*
  594 U.S. 595 (2021) ................................................................... 6, 18

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ........................................................................ 6

*Ariix, LLC v. NutriSearch Corp.*
  985 F.3d 1107 (9th Cir. 2021) ........................................................ 8, 9

*Bd. of Trs. of State Univ. of N.Y. v. Fox*
  492 U.S. 469 (1989) ....................................................................... 19

*Bolger v. Youngs Drug Prod. Corp.*
  463 U.S. 60 (1983) .......................................................................... 9

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
  447 U.S. 557 (1980) ................................................................ 7, 8, 19

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*
  596 U.S. 61 (2022) (Breyer, J., concurring) ..................................... 20

*City of Cincinnati v. Discovery Network, Inc.*
  507 U.S. 410 (1993) ........................................................................ 8

*CTIA – The Wireless Assoc. v. City of Berkeley*
  928 F.3d 832 (9th Cir. 2019) ................................................ 10, 12, 14

*Envtl. Def. Ctr. v. U.S. E.P.A.*
  344 F.3d 832 (9th Cir. 2003) ............................................... 11, 20, 21

**TABLE OF AUTHORITIES**
**(continued)**

Page

*First Resort, Inc. v. Herrera*
 860 F.3d 1263 (9th Cir. 2017) ...................................................... 8

*Glickman v. Wileman Bros. & Elliott, Inc.*
 521 U.S. 457 (1997) .................................................................... 20

*Iancu v. Brunetti*
 588 U.S. 388 (2019) ................................................................... 22

*Ibanez v. Fla. Dep't of Bus. & Prof. Regul., Bd. of Acct.*
 512 U.S. 136 (1994) .................................................................... 17

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*
 585 U.S. 878 (2018) .................................................................... 13

*Jordan v. Jewel Food Stores, Inc.*
 743 F.3d 509 (7th Cir. 2014) ...................................................... 9

*Mass v. EPA*
 549 U.S. 497 (2007) .................................................................... 13

*McSherry v. City of Long Beach*
 584 F.3d 1129 (9th Cir. 2009) .................................................... 6

*Moody v. NetChoice*
 144 S. Ct. 2383 (2024) ..................................................... 6, 18, 20

*Nat'l Ass'n of Wheat Growers v. Becerra*
 468 F. Supp. 3d 1247 (E.D. Cal. 2020) ...................................... 18

*Nat'l Ass'n of Wheat Growers v. Bonta*
 85 F.4th 1263 (9th Cir. 2023) .................................................... 14

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
 272 F.3d 104 (2d Cir. 2001) ...................................................... 15

*Nat'l Inst. of Fam. and Life Advocs. v. Becerra*
 585 U.S. 755 (2018) ............................................................ 12, 20, 22

*National Ass'n of Manufacturers v. SEC*
 800 F.3d 518 (D.C. Cir. 2015) .............................................. 12, 21

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

4

*Nationwide Biweekly Admin. v. Owen*
  873 F.3d 716 (9th Cir. 2017) .................................................. 10

5

6

*Ohralik v. Ohio State Bar Ass'n*
  436 U.S. 447 (1978) .................................................. 21

7

8

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*
  475 U.S. 1 (1986) .................................................. 12

9

10

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*
  487 U.S. 781 (1988) .................................................. 16

11

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*
  547 U.S. 47 (2006) .................................................. 21

12

13

*S.E.C. v. Wall St. Publ'g Inst., Inc.*
  851 F.2d 365 (D.C. Cir. 1988) .................................................. 21

14

15

*Sorrell v. IMS Health Inc.*
  564 U.S. 552 (2011) .................................................. 8

16

17

*State of Iowa, et al. v. SEC*
  24-1522 (8th Cir. Apr. 4, 2024) .................................................. 3

18

19

*Turner Broad. Sys., Inc. v. FCC*
  512 U.S. 622 (1994) .................................................. 15

20

*Turner Broad. Sys., Inc. v. FCC*
  520 U.S. 180 (1997) .................................................. 15

21

22

*United States v. Edge Broad. Co.*
  509 U.S. 418 (1993) .................................................. 15

23

24

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
  425 U.S. 748 (1976) .................................................. 1, 8

25

26

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*
  471 U.S. 626 (1985) ..................................................*passim*

27

28

iv

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3      **STATUTES**

4      Cal. Stat., Chapter 383

5          § 1 ............................................................................................................. 3, 4

6      California Corporations Code

7          § 1502 .......................................................................................................... 2
           § 1502.1 ....................................................................................................... 2

8          § 2117 .......................................................................................................... 2
           § 2117.1 ....................................................................................................... 2

9          § 25000 ........................................................................................................ 20

10

11     Health and Safety Code
           § 38530 ........................................................................................................ 20

12         § 38532(b)(2) .............................................................................................. 4

13         § 38532(b)(3)–(5) ....................................................................................... 4
           § 38532(b)(4) .............................................................................................. 4

14         § 38532(b)(5) .............................................................................................. 4
           § 38532(c)(1) ............................................................................................... 4

15         § 38532(c)(1)(A)(ii) ............................................................................... 4, 11

16         § 38532(c)(1)(D)(i) ................................................................................. 5, 18
           § 38532(c)(1)(F) ...................................................................................... 5, 11

17         § 38532(d)(1) ............................................................................................... 5

18         § 38532(e)(1) ............................................................................................... 5

19         § 38533(a)(2) ............................................................................................ 5, 16
           § 38533(a)(4)–(b)(1)(A) .............................................................................. 5

20         § 38533(b)(1)(A)(i) ...................................................................................... 5

21         § 38533(b)(4) ............................................................................................... 5
           § 38533(c)(1)–(2) ........................................................................................ 6

22         § 38533(e)(2) ............................................................................................... 5

23         § 38562 ........................................................................................................ 16
           § 38562.2 ..................................................................................................... 16

24         § 38566 ........................................................................................................ 16

25     **COURT RULES**

26

27     Federal Rules of Civil Procedure
           Rule 56(d) .................................................................... 7, 14, 18, 20

28

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**OTHER AUTHORITIES**

89 Federal Register 21,668, 21,736 (Mar. 28, 2024) ................................................. 3

Senate Bill
    253 ...................................................................................................... 1, 4
    261 ...................................................................................................... 1, 5

**INTRODUCTION**

Information forms the backbone of our political and economic system. Indeed, ensuring "the free flow of information" in an open marketplace of ideas serves core First Amendment goals: "enlighten[ing] public decisionmaking in a democracy," and allowing for "intelligent and well informed" economic decisions in a "predominantly free enterprise economy." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). Accordingly, the Constitution gives the government greater latitude when it acts to increase, rather than restrict, the free flow of information to the marketplace. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 650-52 (1985).

The Climate Corporate Data Accountability Act (Senate Bill 253) and the Climate-Related Financial Risk Act (Senate Bill 261) are designed to serve this very interest: "Information for the public." SSMF 2. The laws increase transparency and improve access to consistent, standardized information about the greenhouse gas (GHG) emissions and climate-related financial risks of the largest companies doing business in California. They do so to protect consumers and investors from fraudulent and misleading environmental claims and omissions, promote efficiency in the markets, SSMF 2, and correct "a massive blind spot for consumers, investors, and policymakers who are seeking to derive meaningful insights across the entire economy" in order to make informed decisions about where to spend their money, how to protect their investments from risk, and what to regulate in regards to one of the most pressing issues of our time. SSMF 92.

Neither law requires a reporting entity to take a position on any "politically salient" or "controversial" issue. MSJ 1. Indeed, they do not require statements on political or ideological issues at all. Rather, Senate Bill 253 simply asks companies to mathematically calculate their total GHG emissions and make that data public. And Senate Bill 261 asks companies to disclose corporate governance practices and risk management strategies—factual information increasingly requested by

1

insurance companies and underwriters, SSMF 93-94—so as to make data available about whether and to what extent those companies are planning for climate change. These disclosures require the application of traditional financial accounting principles that are widely accepted.  SSMF 95-100.  Indeed, many companies subject to the challenged laws already voluntarily report the required information using these same principles.  SSMF 101-110.

Here, where the laws compel only factual and noncontroversial information about commercial operations, and do not dictate the language of the disclosures or hamper companies' ability to present their own messages on climate change, settled precedent requires a lower level of First Amendment scrutiny.  *Zauderer*, 471 U.S. at 651-52.  But Senate Bills 253 and 261 would survive under any level of scrutiny. Plaintiffs' motion for summary judgment should be denied.

## BACKGROUND

### I. SENATE BILLS 253 AND 261

#### A. Reporting Obligations Are An Ordinary and Expected Part of Doing Business

All companies doing business in California are subject to reporting obligations.  Under the California Corporate Disclosure Act, every corporation qualified to do business in California must make annual disclosures to the California Secretary of State regarding the corporation's board of directors, officers and operations.  Cal. Corp. Code §§ 1502, 1502.1, 2117, 2117.1.  And publicly traded companies have to provide additional information regarding independent auditors, audit reports, annual compensation to directors and officers, loans made to members of the board at preferential loan rates, etc.  *Id.*

Under federal law, public companies are required to make a variety of disclosures to the SEC, all of which are made publicly available to investors.  These required disclosures include information about the company's operations, financial condition, and risk factors; factors that increase the risk of investing in the

2

company; the company's securities performance; management's discussion of the factors it believes have affected past performance and will affect future performance; etc.  *See* SSMF 111.  Among the risks that SEC-regulated companies have had to report are the impacts of the "Year 2000" (Y2K) problem, the Covid-19 pandemic, high rates of inflation, and Russia's war on Ukraine.  SSMF 112-113.

### B.    Senate Bills 253 and 261 Build on Existing Corporate Climate-Related Reporting and Disclosure Practices in Wide Use

Senate Bills 253 and 261 were enacted in late 2023 against the backdrop of an increasing number of voluntary and required climate-related disclosures. Multinational companies or U.S.-based companies with international subsidiaries are required—depending on size—to prepare emissions and climate risk reports pursuant to the EU's Corporate Sustainability Reporting Directive, and/or the International Sustainability Standards Board's IFRS Sustainability Disclosure Standards.  SSMF 114.  The SEC recently finalized a rule governing the reporting, by publicly traded companies, of climate-related financial risks and certain categories of GHG emissions.  89 Fed. Reg. 21,668 (Mar. 28, 2024).[1]  And thousands of companies have for years publicly reported their climate risks and other climate metrics under voluntary frameworks.  SSMF 101-110.  Under one such voluntary program, the CDP (formerly the Carbon Disclosure Project), over 23,000 firms—including 86% of companies in the S&P 500—disclosed GHG emissions and climate-related risk information in 2023.  SSMF 102.

In passing Senate Bills 253 and 261, the California Legislature built on these existing frameworks to create "the full transparency and consistency" needed by California residents, consumers, and investors "to fully understand [] climate risks." 2023 Cal. Stat., ch. 382 § 1 (S.B. 253); *see also* 2023 Cal. Stat., ch. 383 § 1 (S.B. 261).  The Legislature sought to solve the problem of inconsistent and misleading

---

[1] The SEC voluntarily stayed its rule pending judicial review. *See* Dkt. ID 5380534, *State of Iowa, et al. v. SEC*, 24-1522 (8th Cir. Apr. 4, 2024).

1   reporting among companies doing business in the State, 2023 Cal. Stat., ch. 382 §

2   1, and "set mandatory and comprehensive risk disclosure requirements for public

3   and private entities to ensure a sustainable, resilient, and prosperous future for our

4   state," 2023 Cal. Stat., ch. 383 § 1.  *See also* SSMF 115-116.

5   **C.   Senate Bill 253 Requires the Largest Companies Doing Business**
       **in California to Report GHG Emissions in Accordance with**
6      **Widely Accepted Protocols**

7        S.B. 253 directs the California Air Resources Board (CARB) to "develop and

8   adopt regulations" that will require "reporting entit[ies]" to disclose their GHG

9   emissions.  Cal. Health & Safety Code § 38532(c)(1).  "Reporting entit[ies]" are

10  those "do[ing] business in California" with total annual revenues in excess of one

11  billion dollars.  *Id.* § 38532(b)(2).  CARB has not yet adopted the implementing

12  regulations required by the statute.

13       Once CARB's implementing regulations are in place, reporting entities will

14  report three categories of GHG emissions: Scope 1, Scope 2, and Scope 3.  *Id.*

15  § 38532(b)(3)–(5).  Scope 1 emissions are GHG gas emissions from sources owned

16  or directly controlled by the reporting entity.  *Id.* § 38532(b)(3).  Scope 2 emissions

17  are indirect emissions associated with the company's use of electricity, steam,

18  heating, and cooling.  *Id.* § 38532(b)(4).  Scope 3 emissions include all other

19  indirect emissions, such as emissions from "purchased goods and services, business

20  travel, employee commutes, and processing and use of sold products."  *Id.*

21  § 38532(b)(5).

22       The law provides that entities measure and report all three categories of

23  emissions "in conformance" with the "Greenhouse Gas Protocol standards and

24  guidance," *id.* § 38532(c)(1)(A)(ii), a globally accepted protocol for emissions

25  accounting.  SSMF 95-96.  This Protocol provides that Scope 3 emissions can be

26  determined through collection of relevant data (e.g., directly from suppliers), *or*

27  estimated using "secondary data sources," including "industry average data, proxy

28  data, and other generic data." Cal. Health & Safety Code § 38532(c)(1)(A)(ii);

1    SSMF 117.[2]  The law "minimizes duplication of effort" by allowing reporting

2    entities to submit emissions data prepared to meet other national and international

3    reporting requirements.  Cal. Health & Safety Code § 38532(c)(1)(D)(i).

4         The law requires third-party assurances to ensure the quality and accuracy of

5    the data.  *Id.* § 38532(c)(1)(F).  To ensure the usefulness of the data for investors

6    and consumers, the law directs an outside organization to create a publicly

7    accessible digital platform featuring the emissions data, *id.* § 38532(e)(1), and

8    prepare a report summarizing the data, *id.* § 38532(d)(1).

9         **D.    Senate Bill 261 Requires the Largest Companies Doing Business
          in California to Disclose Climate-Related Financial Risk in
10         Accordance with Widely Accepted Protocols**

11        S.B. 261 requires U.S. entities with total annual revenues in excess of $500

12   million dollars that do business in California to prepare a biennial report disclosing

13   their climate-related financial risk and any measures adopted to reduce and adapt to

14   that risk.  Cal. Health & Safety Code § 38533(a)(4)–(b)(1)(A).  The bill defines

15   "[c]limate-related financial risk" as the "material risk of harm to immediate and

16   long-term financial outcomes due to physical and transition risks … ," such as

17   disruptions to operations, the provision of goods and services, and employee health

18   and safety.  *Id.* § 38533(a)(2).  The law directs entities to prepare their disclosures

19   in alignment with "the Final Report of Recommendations of the Task Force on

20   Climate-related Financial Disclosures," *id.* § 38533(b)(1)(A)(i), an widely adopted

21   investor-driven protocol.  SSMF 97-98, 118.  Entities must take "good faith

22   measures" to comply but need not adopt any particular climate-related risk

23   management strategy or take any particular climate-risk mitigation actions.  Cal.

24   Health & Safety Code § 38533(e)(2); SSMF 119-122.  Disclosures prepared under

25   another framework with consistent requirements can be used to fulfill these

26   requirements.  Cal. Health & Safety Code § 38533(b)(4).  Each reporting company

27

28        [2] Thus, Plaintiffs are incorrect that compliance costs would "flow up" the supply chain to
     family farmers or other small businesses.  *Cf.* MSJ 5.

1 must publish a copy of the report "on its own internet website." *Id.* at
2 § 38533(c)(1).

3 **II.  PROCEDURAL HISTORY**

4     Plaintiffs bring a facial challenge against Senate Bills 253 and 261 under the
5 First Amendment (Claim I), the "federal Constitution's Supremacy Clause" (Claim
6 II), and the "Constitution's limitations on extraterritorial regulation, including the
7 dormant commerce clause" (Claim III).  ECF No. 28.  Defendants moved to dismiss
8 Claims II and III.  ECF No. 38.  That motion remains undecided, and no discovery
9 has occurred.

10                                **LEGAL STANDARD**

11     The party moving for summary judgment bears the "burden of showing that
12 there are no genuine issues of material fact . . . ."  *Ambat v. City & County of San*
13 *Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014).  The Court must determine
14 "whether the evidence presents a sufficient disagreement to require submission to a
15 jury or whether it is so one-sided that one party must prevail as a matter of law."
16 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  "In making this
17 determination, [courts] view the evidence in the light most favorable to [the non-
18 movant].  All justifiable inferences are to be drawn in his favor and his evidence is
19 to be believed."  *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir.
20 2009).

21     A party bringing a facial challenge to invalidate a law under the First
22 Amendment must show that "a substantial number of [a law's] applications are
23 unconstitutional, judged in relation to the statute's plainly legitimate sweep."
24 *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (cleaned up).
25 The Supreme Court has "made facial challenges hard to win" because such
26 challenges "threaten to short circuit the democratic process" by "preventing duly
27 enacted laws from being implemented in constitutional ways."  *Moody v.*
28 *NetChoice*, 144 S. Ct. 2383, 2397 (2024) (cleaned up).

1

**ARGUMENT**

2       Senate Bills 253 and 261 require disclosure of only factual and

3   noncontroversial information about commercial operations and do not dictate the

4   language of the disclosures or hamper companies' ability to present their own

5   messages on climate change.  Thus, Plaintiffs' argument that the laws trigger strict

6   scrutiny fails.  *See Zauderer*, 471 U.S. at 637.  But in light of the compelling

7   government interest in ensuring the free flow of material information to market

8   participants, preventing fraud, and lowering GHG emissions, the laws would

9   survive First Amendment review under any level of scrutiny.  Thus, Plaintiffs'

10  motion for summary judgment must be denied.[3]

11  **I.   SENATE BILLS 253 AND 261 COMPEL COMMERCIAL SPEECH AND THUS
         ARE SUBJECT TO REVIEW UNDER A LOWER LEVEL OF SCRUTINY**

12

13      In urging strict scrutiny here, Plaintiffs attempt to minimize the fact that

14  Senate Bills 253 and 261 regulate only commercial speech.  Courts have long

15  examined regulations affecting commercial speech differently from those impacting

16  other speech (e.g., political speech)—applying a lower level of scrutiny or declining

17  to apply First Amendment protections entirely.  *Zauderer*, 471 U.S. at 637; *Cent.*

18  *Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561-

19  63 (1980).  The Constitution accords the government greater latitude to regulate

20  commercial speech, relative to other safeguarded forms of expression, because such

21  speech "occurs in an area traditionally subject to government regulation."  *Cent.*

22  *Hudson*, 447 U.S. at 562.

23      The need to afford the government greater room to regulate is especially

24  pronounced when the government action is intended to increase, rather than restrict,

25  the free flow of accurate information to consumers.  *See Zauderer*, 471 U.S. at 646.

26

27  _____

[3] If this Court does not deny summary judgment outright, then alternatively, it should grant Defendants' concurrently filed Motion to Deny or Defer Plaintiffs' Motion for Summary Judgment on Claim I Under Federal Rule of Civil Procedure 56(d), to provide Defendants the opportunity to conduct the identified discovery.

28

1    For that reason, although *restrictions* on commercial speech are generally subject to

2    intermediate scrutiny, *Cent. Hudson*, 447 U.S. at 563-66, the Supreme Court has

3    applied a lower level of review where the challenged law requires the *disclosure* of

4    factual and noncontroversial information, *Zauderer*, 471 U.S. at 651.  Because "the

5    extension of First Amendment protection to commercial speech is justified

6    principally by the value to consumers of the information such speech provides,"

7    *Zauderer*, 471 U.S. at 651, and the government has a "legitimate interest in

8    protecting consumers from 'commercial harms,'" commercial speech "can be

9    subject to greater governmental regulation than noncommercial speech," *Sorrell v.*

10   *IMS Health Inc.*, 564 U.S. 552, 566 (2011) (quoting *City of Cincinnati v. Discovery*

11   *Network, Inc.*, 507 U.S. 410, 426 (1993)); *see also Va. State Bd. of Pharmacy*, 425

12   U.S. at 763 (noting consumers' "keen" interest in the free flow of commercial

13   information).

14        Plaintiffs acknowledge that commercial speech is subject to a lower level of

15   scrutiny, but they suggest it is limited to speech proposing a "commercial

16   transaction."  MSJ 15 (citing *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115

17   (9th Cir. 2021)).  Commercial speech, however, is not so narrowly circumscribed.

18   *See Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (*Zauderer*

19   scrutiny is not "limited to restrictions on advertising and point-of-sale labeling").

20   Rather, the Supreme Court defines commercial speech to include "expression

21   related solely to the economic interests of the speaker and its audience."  *Cent.*

22   *Hudson*, 447 U.S. at 561.  This determination "is fact-driven, due to the inherent

23   difficulty of drawing bright lines that will clearly cabin commercial speech in a

24   distinct category."  *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir.

25   2017) (cleaned up).

26        Here, the Legislature passed both laws specifically in response to the

27   expressed desires of commercial audiences—consumers and investors—to inform

28   investment and purchasing decisions and prevent misrepresentations.  SSMF 123-

125.  Indeed, many businesses voluntarily disclose the same or similar metrics precisely for such commercial purposes: driving contract formation, obtaining insurance coverage, effectuating mergers and acquisitions, and responding to investors and consumers.  SSMF 110, 126-127.  The disclosures involved here require only factual information about (1) the emissions connected with an entity's business operations, and (2) the company's governance practices and business and financial plans pertaining to climate risk.  *See supra* Parts I.C, I.D.  This information is commercial speech.  *See Ariix*, 985 F.3d at 1116 (explaining that courts should "try to give effect to a common-sense distinction between commercial speech and other varieties of speech").

And even if Plaintiffs were correct that *Zauderer* applies only where the speech has a nexus to "commercial advertising," MSJ 16, there is such a connection here.  A vast swath of companies doing business in California are advertising their business as "green" or emissions-conscious.  SSMF 128.  Indeed, many of Plaintiffs' own member companies have advertised themselves as adhering to "net zero" emissions or other climate-related goals.  SSMF 129; *see Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014) ("An advertisement is no less 'commercial' because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or service.").  The disclosures required under Senate Bills 253 and 261 are, at least in part, a response to these potentially misleading statements, SSMF 2, and thus align with two of the "important guideposts" courts examine in identifying commercial speech: connection to advertisements and the "economic motivation" of the speaker.  *See Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983); *see also Ariix*, 985 F.3d at 1116 ("Courts have found commercial speech even when it involves indirect benefits, such as . . . improvements to a brand's image"); *Jordan*, 743 F.3d at 518 ("Modern commercial advertising is enormously varied in form and style.").

**II.    THE DISCLOSURE LAWS ARE CONSTITUTIONAL UNDER *ZAUDERER***

The test for analyzing the constitutionality of compelled commercial disclosures—as opposed to "outright prohibitions on speech"—is established in *Zauderer*. 471 U.S. at 650.  In that case, the Court found an attorney advertisement that claimed, "if there is no recovery, no legal fees are owed by our clients," had a "self-evident" capacity to mislead a layperson unaware of the distinction between legal fees and litigation costs. *Id.* at 652.  Although "unjustified or unduly burdensome disclosure requirements might offend the First Amendment," there is only a "minimal" constitutionally protected interest in not providing "factual and uncontroversial information" about one's business or services. *Id.* at 651.  "Under *Zauderer*, compelled disclosure of commercial speech complies with the First Amendment if the information in the disclosure is reasonably related to a substantial governmental interest[,] … is purely factual and uncontroversial," and is not unduly burdensome. *CTIA – The Wireless Assoc. v. City of Berkeley*, 928 F.3d 832, 845, 848-49 (9th Cir. 2019).

*Zauderer* and its progeny thus reflect the principle that "[t]he First Amendment does not generally protect corporations from being required to tell prospective customers the truth." *Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir. 2017).  Here, the compelled disclosures provide consumers and investors with more accurate and comparable data from companies choosing to do business in the state, facilitating informed market decisions.  SSMF 86, 131-132.  These disclosures do not require companies to act in a way that is inconsistent with their views about, or, indeed, to take any position on, climate change, SSMF 119; rather, these laws simply require the largest companies doing business in the state to disclose (1) quantitative data on emissions and (2) descriptive accounts of their internal risk planning.  These laws pass constitutional muster.

## A.   The Required Disclosures are "Purely Factual and Uncontroversial"

**1.** S.B. 253 requires companies to disclose objective, factual information: the quantity of their greenhouse gas emissions.  Cal. Health & Safety Code § 38532(c)(1)(A)(ii).  Entities must measure and report their emissions "in conformance" with the "Greenhouse Gas Protocol standards and guidance," *id.* § 38532(c)(1)(A)(ii), which is a "globally accepted reporting framework" and "aligned with traditional financial reporting principles."  SSMF 95-96.  Third-party firms review such data to ensure its quality and accuracy, further underscoring the factual nature of this information.  Cal. Health & Safety Code § 38532(c)(1)(F).

Plaintiffs argue that the emissions disclosures are "more conjecture than fact," because alleged "gaps in emissions measurement methodologies" and the need to make "judgment calls" renders the calculation anything but "purely factual."  MSJ 17-18.  But the use of estimates under longstanding financial accounting principles does not render the disclosures "matters of opinion."  SSMF 132-135, 141; *see Envtl. Def. Ctr. v. U.S. E.P.A.*, 344 F.3d 832, 849 (9th Cir. 2003) (citations omitted).  To conclude otherwise would call into question a host of financial disclosure requirements and other commercial documents, many of which similarly rely on judgment calls and estimates.  SSMF 136-140.

Nor are the disclosures "misleading" because companies must disclose the emissions of "upstream and downstream" suppliers, among others, or because the Greenhouse Gas Protocol standards do not cover "avoided emissions."  MSJ 18.  To the contrary, allowing firms to report just partial emissions, or their emissions reduction projects (i.e., "avoided emissions"), in lieu of disclosing their total emissions, would be highly misleading.  SSMF 142; *see Am. Hosp. Assoc.*, 983 F.3d at 541.  The Greenhouse Gas Protocol provides industry-standard methodologies for calculating accurate and transparent factual information.  SSMF 95-96, 132.

S.B. 261 similarly requires the disclosure of only factual statements about the reporting entities' own activities.  Companies must disclose their actual policies and actual planning pertaining to climate-related financial risks as assessed by the company.  SSMF 119-122, 143.  The law does not compel companies to address matters of opinion, or to take a particular policy position in regards to climate change—if an entity does not currently evaluate climate-related risks, its disclosure could state merely that (i.e., that it has no climate-related governance, strategy, risk management plans, or metrics and targets), and still comply with S.B. 261's disclosure requirements.  SSMF 119-121.  A company's decision whether and how to plan for climate-risks affecting its business is a subject of legitimate interest to investors.  SSMF 123-126.

**2.**  Nor are the disclosures at issue "controversial."  A statement of fact does not become controversial simply because it "can be tied in some way to a controversial issue," *CTIA*, 928 F.3d at 845, or because a listener may use the fact to form an opinion.  By contrast, courts have declined to apply *Zauderer* where the speaker was forced to convey a message to which they are morally, religiously, or ideologically opposed.  *See Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 585 U.S. 755, 768-69 (2018) (*NIFLA*); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15 n.12 (1986) (explaining states have "substantial leeway" to impose "appropriate information disclosure requirements" on companies, but may not "require corporations to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the [business]'s views").  For example, in *NIFLA*, California required clinics whose purpose was to oppose abortion to provide information about state-sponsored abortion services—a message "fundamentally at odds with [their] mission."  *CTIA*, 928 F.3d at 845.  And in *National Ass'n of Manufacturers v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (*NAM*), the rule required companies to post a statement about whether its

1    diamonds are "conflict free," an ideological statement intertwined with moral

2    responsibility.

3         Plaintiffs claim that "climate change is undisputedly a 'controversial topic,'"

4    and thus *Zauderer* does not apply.  MSJ 18 (cleaned up).  But even crediting

5    Plaintiffs' claim that aspects of climate change are controversial, neither law

6    requires a company to take sides on any such topic.  The disclosure of emissions

7    data does not implicate any particular view about climate change.  Nor does it

8    require a company to take any steps inconsistent with its view (i.e. reducing

9    emissions).  Similarly, the disclosure of risk planning (or the lack thereof) does not

10   require companies to conclude that they have any particular climate risks.  *See* MSJ

11   19.  Companies remain free to determine what—if any—"climate risks" may

12   materially impact their business.  SSMF 120.

13        For those reasons, the Court need not reach the question of whether climate

14   change is a controversial topic.  If it does, however, the Court should find that

15   neither law implicates a controversial issue, because there is no legitimate debate in

16   the scientific community regarding the reality of climate change.  SSMF 144-145;

17   *see also Mass v. EPA*, 549 U.S. 497, 521 (2007) (concluding that "[t]he harms

18   associated with climate change are serious and well recognized").  Notably,

19   Plaintiffs have provided no evidence to the contrary.  *See* MSJ 18 (relying

20   exclusively on dicta from *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.,

21   Council 31*, 585 U.S. 878, 913 (2018)).  Nor is there any legitimate debate in the

22   business community that climate-risk is a factual metric relevant to companies'

23   business planning and risk management activities.  SSMF 146.  Indeed, Plaintiffs

24   provide only a single declaration from a company subject to the laws, and that

25   company does not deny the reality of climate change or the relevance of climate

26   change risks to its business planning.  It states only that S.B. 261 "would force U-

27   Haul to convey to the public a philosophy of environmental sustainability that it

28   does not believe."  ECF No. 48-30, ¶ 30.  That is inaccurate, as S.B. 261 only

13

requires the disclosure of the company's own assessment of risks, it does not force companies to adopt *any* particular positions, much less on "environmental sustainability" at all.  The fact that Plaintiffs can present no evidence that climate change is a "hotly disputed" subject, MSJ 2, in either the scientific or business communities, is fatal to this aspect of their argument.[4]  *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1279 (9th Cir. 2023) (looking for a "strong scientific consensus" and indicating that "'uncontroversial' does not mean 'unanimous'").

Finally, relying on *NAM*, Plaintiffs claim that because "[a]ctivist groups" may use the disclosed data to "embarrass" companies and "hold them to account," the laws run afoul of the First Amendment.  MSJ 18-19.  But in *NAM*, the government required companies to apply to their products specific language that carried a political message.  Here, in contrast, there is no political message and, in fact, each company effectively dictates its own message.  SSMF 119-122.  That third parties could use the disclosed information to inform commercial choices or political actions does not make the compelled speech controversial.  *See Am. Meat Inst. v. U.S. Dep't of Ag.*, 760 F.3d 18, 21-22 (D.C. Cir. 2014).  Rather, it merely underscores the role that disclosure plays in furthering First Amendment goals by allowing consumers and investors to make decisions on the basis of accurate, factual information, unencumbered by the government's own policy views.

**B.    The Laws are Reasonably Related to a Substantial State Interest**

S.B. 253 and 261 easily survive *Zauderer* scrutiny because they are "reasonably related to a substantial governmental interest."  *CTIA*, 928 F.3d at 845.  Under *Zauderer*, the government need only show that its interest is "more than trivial."  *Id.* at 844.

---

[4] To the extent this Court disagrees, Defendants are entitled to discovery into Plaintiffs' claims.  *See* Rule 56(d) Motion.

1    In evaluating the government's interest, courts must give "substantial
2    deference to the predictive judgments of [the legislature]." *Turner Broad. Sys., Inc.*
3    *v. FCC*, 520 U.S. 180, 195 (1997) (cleaned up); *see also United States v. Edge*
4    *Broad. Co.*, 509 U.S. 418, 434 (1993) ("Within the bounds of the general protection
5    provided by the Constitution to commercial speech, we allow room for legislative
6    judgments"). Moreover, this Court can consider materials outside of the legislative
7    history, "to assure [itself] that, in formulating its judgments, [the Legislature] has
8    drawn reasonable inferences." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666
9    (1994); *see also Turner Broad. Sys.*, 520 U.S. at 196 (examining the government
10   interest based on "the evidence before Congress and . . . the further evidence
11   presented to the District Court on remand to supplement the congressional
12   determination").

13   The California Legislature identified at least three interests served by the laws.
14   *First*, California has a substantial interest in providing consistent, comparable,
15   and reliable information to investors, consumers, and employees, to enable them to
16   make informed judgments about the impact of climate-related risks on their
17   investment, consumer, and other economic choices. SSMF 86-87, 92, 123-124,
18   155-158. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001)
19   (describing as "significant" the government's interest in "better inform[ing]
20   consumers about the products they purchase"); *Am. Hosp. Ass'n*, 983 F.3d at 540
21   (describing as "legitimate" the government's interest in "promoting price
22   transparency and lowering healthcare costs"); *Am. Meat Inst.*, 760 F.3d at 23
23   (finding "substantial" the government's interest in country-of-origin labeling
24   because the labels "enable[d] consumers to choose American-made products" and
25   responded to consumer interest in such labeling). S.B. 253 and 261 clearly advance
26   this interest by requiring companies to disclose information that is considered
27   material by investors, consumers, and employees, and hence is "closely tethered" to
28   market transactions. SSMB 147,150,159-160. Investors have expressed that

1   "consideration of climate-related financial risk and other factors is a necessary

2   component of being an informed and responsible investor," SSMB 152.  And the

3   Legislature was well aware of the value of this information to each of these

4   stakeholders when passing the law.  SSMF 86-87; Cal. Health & Safety Code

5   § 38533(a)(2).

6        *Second*, California has a substantial interest in protecting its investors,

7   consumers, and other stakeholders from fraud or misrepresentation.  *See, e.g.*, *Riley*

8   *v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 792 (1988) ("interest

9   in protecting charities (and the public) from fraud is, of course, a sufficiently

10   substantial interest").  Lawmakers were aware of the prevalence of misleading

11   information on emissions and other metrics by companies doing business in the

12   state, and crafted SB 253 and 261 to prevent this behavior.  SSMF 2.  This problem

13   is not mere "conjecture," MSJ 9; evidence shows that voluntary disclosure leads to

14   selective disclosure, which is highly misleading, SSMF 162, and the volume of

15   misleading statements has exploded in recent years.  SSMF 161.  To prevent these

16   practices lawmakers appropriately required comprehensive disclosure of a firm's

17   overall carbon emissions—i.e. Scopes 1, 2, and 3—and climate risk reporting.

18   SSMF 164-165.

19        *Third*, the California Legislature considered that, by requiring greater

20   transparency about emissions and climate risks, S.B. 253 and 261 may encourage—

21   through the market forces of third parties' independent economic decisions and

22   actions—companies doing business in California to reduce their emissions and

23   thereby mitigate the risks California and its residents face from climate change.

24   SSMF 168.  This, too, is a substantial state interest, both because California has

25   committed to meeting certain emissions reduction goals over time and because of

26   the severity of the risks the state faces.  Health & Safety Code, §§ 38562, 38562.2,

27   38566.  Research demonstrates a connection between reporting frameworks and

28   improved environmental performance, including in particular between carbon

16

disclosure and GHG emissions reductions.  SSMF 166-167.  Importantly, these reductions come not through any *government* regulation of emissions at all,[5] or *government* pressure to align with particular policy views, but through the provision of material information to third-parties, who may then take intervening actions that lead to reduced emissions.  SSMF 169.

### C.   The Laws are Neither Unjustified nor Unduly Burdensome

A disclosure requirement could violate the First Amendment if it was so "unjustified or unduly burdensome" that it chills or restricts constitutionally protected commercial speech.  *Zauderer*, 471 U.S. at 651.  But neither is true here. As discussed in Section II.B, the effectiveness of emission and climate-risk disclosure laws at materially alleviating the harms identified by the government was considered by the Legislature, and is supported by evidence.  *Ibanez v. Fla. Dep't of Bus. & Prof. Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994).  Moreover, Plaintiffs have not provided any evidence to suggest that their *speech* would be burdened by either law.  Nor can they, as the laws do not interfere with any message companies may wish to convey.  *Am. Hosp. Ass'n*, 983 F.3d at 541 (examining whether law requires speaker "to endorse a particular viewpoint" or "prevents them from adding their own message"); *cf. Ibanez*, 512 U.S. at 146 (holding that a disclosure was "unduly burdensome" when it "effectively rule[d] out" the regulated entity's ability to speak).

The only burden that Plaintiffs allege is a "financial" one.  But Plaintiffs "must demonstrate a burden on *speech*," *Am. Hosp. Ass'n*, 983 F.3d at 541.  In any event, any administrative and financial burden here is not "undue."  For one, a large percentage of companies subject to the disclosure requirements already voluntarily disclose some or all of this data, or are subject to other reporting requirements, SSMF 101-109, reducing the marginal increase in cost for these companies to

---

[5] "[C]ourts routinely distinguish between pressure created by state laws and actual regulation by the State, and recognize only the latter as an actionable injury."  MTD 13 (ECF 38-1); *see also* Reply iso MTD 7-8.

1  report under SB 253 and 261.  Cal. Health and Safety Code §§ 38532(c)(1)(D)(i)

2  (avoiding duplication of reporting); 38533(b)(4) (same).  Moreover, because the

3  laws only apply to the largest companies, the vast majority of covered companies

4  already have the reporting infrastructure and data necessary to prepare the required

5  information with minimal burden, SSMF 172-179, and need expend only 0.025

6  percent of their annual revenue in preparing the data.  SSMF 170.  Indeed, the

7  frequency of voluntary reporting suggests that disclosures materially benefit many

8  companies.

9      Thus, even if financial burden were a relevant consideration, Plaintiffs fail to

10  establish that the laws will impose such burdens in "a substantial number of [their]

11  applications."  *Americans for Prosperity Foundation*, 594 U.S. at 615; *Moody*, 144

12  S. Ct. at 2398 (to evaluate a facial challenge to a law compelling speech a court

13  must ask "as to each thing covered, whether the required disclosures unduly burden

14  expression").  Plaintiffs' evidence of the financial burden of compliance is limited

15  to a statement by the Governor that expresses concern over the *possibility* that the

16  laws will have a negative "financial impact" on affected businesses and thus directs

17  CARB to "closely monitor the cost impact as it implements" the new laws, SSMF

18  23, 41, and anecdotal statements from only two companies purportedly covered by

19  the laws, SSMF 29, 62-65.  This is insufficient to satisfy Plaintiffs' burden on a

20  facial challenge.[6]

21  **III.  ALTERNATIVELY THE DISCLOSURE LAWS ARE CONSTITUTIONAL**
22  **UNDER *CENTRAL HUDSON***

23      If this Court does not apply *Zauderer* scrutiny because it finds the speech

24  compelled under S.B. 253 or 261 is not factual or uncontroversial, then "the court

25  should … proceed to examine the [laws] under *Central Hudson*'s intermediate

26  scrutiny."  *See Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247,

27  ───────────────
28  [6] If this Court disagrees and finds such evidence relevant, Defendants are entitled to
discovery into Plaintiffs' claims.  *See* Rule 56(d) Motion.

1258 (E.D. Cal. 2020).  Under *Central Hudson*, courts uphold government regulation of commercial speech where it directly advances a substantial government interest, and the regulation is no more restrictive than necessary to serve that interest.  447 U.S. at 564.  *Central Hudson* merely requires a "fit" between the government end and the means chosen to accomplish that end; that means need not be the "best disposition" of the government's interest, "but one whose scope is 'in proportion to the interest served.'"  *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 476-80 (1989).

S.B. 253 and 261 directly advance the government's substantial interests.  *See supra*, Argument Section II.B-C.  And the scope of these laws is appropriate for the interests served.  Plaintiffs argue that the laws are overbroad because they are not tied to "whether [a] company has investors," "whether climate change is likely to have a material impact on any product or service sold within the State," or whether the law will have an impact on climate change.  MSJ 20.  These criticisms are misplaced.  For one, the government's interest is not solely tied to investors, but also to protecting consumers and other stakeholders.  SSMF 5, 24, 26.  Moreover, the value of emissions and climate-risk information to California market participants concerns the financial performance of the company as a whole and whether the firm is an appropriate recipient of their money.  SSMF 154.  And evidence indeed supports that disclosure requirements can reduce emissions, with minimal burden compared to emission regulations.  SSMF 166-167.

While Plaintiffs argue the state can have no legitimate interest in information from a company that "engages in a single transaction within the State," MSJ 20, this concern appears to be purely hypothetical.  Plaintiffs offer no evidence that this concern applies to any entity covered by the laws—those with annual revenues of $500 million and $1 billion.  In any event, this concern is insufficient to demonstrate "facial" invalidity of the laws, as Plaintiffs can point to no evidence

1   that this phenomenon is significant enough to burden constitutional rights in "a

2   substantial number of [its] applications." *Moody*, 144 S. Ct. at 2397.[7]

3   **IV.   THE REGULATORY DISCLOSURE REQUIREMENTS OF SENATE BILLS 253
        AND 261 ARE NOT SUBJECT TO STRICT SCRUTINY**

4

5        Plaintiffs argue that S.B. 253 and 261 "trigger[] strict scrutiny" because,

6   Plaintiffs claim, these are "content-based" laws that "burden" political speech.  MSJ

7   7-8.  Plaintiffs' argument, however, depends on this Court first concluding that the

8   laws cover something other than commercial speech, as in the commercial speech

9   context even a content-based restriction on speech is subject to lesser scrutiny.

10  *NIFLA*, 585 U.S. at 768-69 (citing *Zauderer*, 471 U.S. at 651).  But even outside

11  the commercial speech context, the application of strict scrutiny is inappropriate

12  here.

13       *First*, the laws are part of a "broader regulatory apparatus" governing the

14  disclosure of commercial data.[8]  *Env't Def. Ctr.*, 344 F.3d at 850 n.26; *see also*

15  *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469 (1997) (evaluating

16  assessment "under the standard appropriate for the review of economic regulation"

17  rather than "under a heightened standard appropriate for the review of First

18  Amendment issues," because it was part of a broader "regulatory scheme").  While

19  courts "strictly scrutiniz[e] certain categories of laws that threaten to 'drive certain

20  ideas or viewpoints from the marketplace,'" "not all laws that distinguish between

21  speech based on its content fall into a category of this kind."  *City of Austin, Texas*

22  *v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 78-79 (2022) (Breyer, J.,

23  concurring).  Census reporting requirements, securities-related disclosures,

24  copyright infringement, tax disclosures, etc., arguably touch on the content of

25  speech, *id.*, but have been found not to implicate First Amendment concerns at all,

26

27   ───────────────
        [7] To the extent this Court disagrees, Defendants are entitled to discovery into Plaintiffs'
     claims.  *See* Rule 56(d) Motion.
28       [8] *See, e.g.*, Health & Safety Code, § 38530; Cal. Corp. Code § 25000, et seq. (California
     Corporate Securities Law of 1968).

much less implicate strict scrutiny. *See, e.g., S.E.C. v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457 (1978).

*Second*, the laws do not attempt to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force [companies] to confess by word or act their faith therein," and thus do not burden political speech. *Env't Def. Ctr.*, 344 F.3d at 849. California's laws require no affirmation, express or implied, of private agreement with a government-favored viewpoint or position. To be sure, certain policy responses to climate change are the subject of vigorous political debate; but these disclosures do not implicate these debates. And Plaintiffs cite to no case suggesting that third parties' later use of this information to make economic or policy decisions necessitates strict scrutiny in the disclosure of the underlying facts themselves. *See* MSJ 8.

Plaintiffs' other arguments for the application of strict scrutiny are equally unavailing. There is a long history of compelled commercial speech, in general, and corporate disclosures, in particular, that supports the measures California adopts here. MSJ 13; *see supra* Background I.A, I.B. Neither S.B. 253 or 261 compel companies to speak on California's terms, the concern expressed in *NAM*, 800 F.3d at 530. MSJ 13. Indeed, the laws leave the content of the disclosures to the speaker, which militates against the application of strict scrutiny. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) (only compelled speech that "dictate[s] the content" of the speaker's message or involves a "Government-mandated pledge or motto that the [speaker] must endorse" triggers constitutional scrutiny); *see also Env't Def. Ctr.*, 344 F.3d at 848 (regulations requiring distribution of educational materials did "not offend the First Amendment" because the "broad requirements" of the regulations did "not dictate a specific message"). And the laws are not vague—they integrate widely used and accepted metrics for preparing disclosures of a kind that are already in frequent use

1  across the market.  SSMF 95-98.  As such, implementation of the laws is

2  straightforward, and Plaintiffs' concerns are misplaced.

3  **V.    SENATE BILLS 253 AND 261 WOULD SURVIVE REVIEW UNDER STRICT
       SCRUTINY**

4

5       Ultimately, S.B. 253 and 261 survive review even under strict scrutiny, if

6  applied.  *Iancu v. Brunetti*, 588 U.S. 388, 402-03 (2019) (Breyer, J., concurring in

7  part and dissenting in part).  Both laws are "narrowly tailored" to serve the

8  government's "compelling state interests," including the prevention of fraud and

9  misrepresentation, and the correction of market inefficiencies.  *NIFLA*, 585 U.S. at

10  766.

11       The only means of alleviating the climate-related information asymmetries

12  that exist in the current market is by requiring companies to disclose complete and

13  accurate information. Without mandatory, comprehensive disclosures, companies

14  are incentivized to selectively disclose information, causing gaps in data that

15  prevent the markets from obtaining information necessary for investors, consumers,

16  and employees to make rational decisions.  The information obtained through S.B.

17  253 and 261 is (1) material to investors, SSMF 147, consumers, SSMF 159, and

18  employees, SSMF 160; (2) effective at reducing fraud, SSMF 164-165; and (3)

19  effective at reducing GHG emissions, SSMF 166-167.  And the usefulness of this

20  data is significantly improved by the inclusion of Scope 3 emissions, SSMF 180-

21  182, for which the burdens of disclosure are significantly less than Plaintiffs

22  suggest, MSJ 5, SSMF 170, 175.

23       Plaintiffs argue that the government could collect the information itself.  MSJ

24  12.  But "companies possess more detailed and accurate data about their own

25  internal operations and impacts than do external observations."  SSMF 171.

26  Plaintiffs suggest that the application of the law to any business entity satisfying the

27  revenue threshold regardless of investment status or connection to a product is too

28  broad; but Plaintiffs ignore that the revenue threshold *is* a significant limitation on

the application of the laws.  SSUF 183-188.  There is a genuine issue of material fact as to whether any business in California with over *$500 million* in annual revenue lacks outside investors, whether public or private.  SSUF 189.  And the application to companies that have low GHG emissions or face negligible financial risk does not render the laws overbroad, MSJ 12; rather, their data serves the government's interests in allowing stakeholders to consider this information in making financial decisions.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment should be denied.

Dated:  July 24, 2024                                Respectfully submitted,

ROB BONTA
Attorney General of California
GARY E. TAVETIAN
MYUNG J. PARK
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK
EMILY HAJARIZADEH
DYLAN REDOR
KATHERINE GAUMOND
Deputy Attorneys General


*/s/ Caitlan McLoon*


CAITLAN MCLOON
Deputy Attorney General
*Attorneys for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*

SA2024300503
66956020.docx

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for *Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*, certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

Dated:  July 24, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
GARY E. TAVETIAN
MYUNG J. PARK
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK
EMILY HAJARIZADEH
DYLAN REDOR
KATHERINE GAUMOND
Deputy Attorneys General


*/s/ Caitlan McLoon*

CAITLAN MCLOON
Deputy Attorney General
*Attorneys for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*

24

## <u>CERTIFICATE OF SERVICE</u>

Case Name:   **Chamber of Commerce of the United States of America, et al.
v. Liane M. Randolph, et al.**

Case No.:   **2:24-cv-00801-ODW-PVC**

I hereby certify that on <u>July 24, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>July 24, 2024</u>, at Los Angeles, California.

|  |  |
|---|---|
| Beatriz Davalos | /s/ Beatriz Davalos |
| Declarant | Signature |