ROB BONTA
Attorney General of California
GARY E. TAVETIAN (SBN 117135)
MYUNG J. PARK (SBN 210866)
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK (SBN 268861)
CAITLAN MCLOON (SBN 302798)
EMILY HAJARIZADEH (SBN 325246)
DYLAN REDOR (SBN 338136)
KATHERINE GAUMOND (SBN 349453)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6438
 Fax:  (213) 897-2802
 E-mail:  Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,*
*Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-FMO-PVCx<br><br>**DECLARATION OF PROFESSOR GEORGE S. GEORGIEV IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  September 9, 2024<br>Time:  1:30 p.m.<br>Courtroom:  6D<br>Judge:  The Honorable Otis D. Wright II<br>Trial Date:  Not Set<br>Action Filed: 1/30/2024 |

## <u>DECLARATION OF PROFESSOR GEORGE S. GEORGIEV</u>

I, Professor George S. Georgiev, hereby declare:

1. I have been retained by counsel for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta, in their official capacities, (Defendants) in connection with the above captioned litigation. I am over the age of 18 years and reside in Atlanta, Georgia. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

### Background and Experience

2. I hold a J.D. from Yale Law School, an M.A. in Economics from the University of Munich, and a B.A., summa cum laude, in Economics (honors) and International Relations, from Colgate University. I am an active member of the New York bar.

3. Between 2013 and 2016, I taught at the University of California, Los Angeles School of Law. Since 2016, I have been on the faculty of Emory University School of Law in Atlanta, Georgia, where I teach courses in Contracts, Business Associations, Advanced Corporate Law, Corporate Governance, and related subjects.

4. My scholarly research spans the fields of corporate governance and securities law, with a particular focus on questions of regulatory design and assessment. I have published a number of articles on corporate reporting and disclosure, climate-related disclosure, and the public-private distinction in securities law, among other topics. These works are directly relevant to the matters covered in my declaration and inform my conclusions.

5. Methodologically, my research relies on statutory and doctrinal analysis, law-and-economics tools, and historical and comparative perspectives. The normative positions reflected in my overall body of work have not been monolithic but, rather, have turned on the particular facts and underlying evidence. In the context

of disclosure rules, for example, I have written articles supportive of certain types of disclosure requirements as well as articles critical of other types of disclosure requirements.[1]

6.      My scholarship has been cited widely by legal and non-legal scholars. It has furthermore been recognized by the Ford Foundation, translated into foreign languages, and selected for inclusion in annual anthologies of leading law review articles. I am frequently invited to speak at academic and policy conferences, and I am an elected member of the executive committees of the Association of American Law Schools Section on Securities Regulation and the Section on Business Associations.

7.      Policymakers, legislators, and the media have also relied on my expertise on questions of disclosure, climate disclosure, and securities law. I have testified about climate disclosure before the U.S. House of Representatives Committee on Financial Services and before the U.S. Senate Climate Change Taskforce. My research has been cited by SEC Commissioners of both political parties, and I have also spoken before the SEC's Investor Advisory Committee. I have provided legal commentary for various media outlets, including the *New York Times*, *Los Angeles Times*, *Washington Post*, *Financial Times*, *The Guardian*, *USA Today*, Bloomberg, Bloomberg Law, Reuters, NPR, ABC, CNN, and the BBC.

8.      Before becoming an academic, I practiced in the area of corporate and securities law at Sullivan & Cromwell LLP and Clifford Chance LLP. A major part of my practice involved advising companies on compliance with U.S. and non-U.S. disclosure requirements, including requirements analogous in kind to S.B. 253 and

---

[1] *See, e.g.*, George S. Georgiev, *The Market-Essential Role of Corporate Climate Disclosure*, 56 U.C. DAVIS L. REV. 2105 (2023) (supporting the SEC's climate-related disclosure proposal on market efficiency grounds); Steven A. Bank & George S. Georgiev, *Securities Disclosure as Soundbite: The Case of CEO Pay Ratios*, 60 B.C. L. REV. 1123 (2019) (critiquing the federal pay ratio disclosure rule due to its inapt design). True and correct copies of these law review articles are attached as **Exhibits 2 and 3**, respectively.

S.B. 261. Through this work, I gained real-world insights into firms' compliance capabilities, strategies, and practices, which has complemented my academic study of those matters.

9.   My education, professional background, and publications are described in additional detail in my curriculum vitae, which is attached hereto as **Exhibit 1**.

## Introduction

10.   In 2023, California enacted two bills, S.B. 253 and S.B. 261 (together, the "Disclosure Laws"), which will require certain firms doing business in California to disclose objective climate-related information. The information is to be disclosed in accordance with established and carefully-designed frameworks that have been in use, both in the United States and overseas, for years.[2] Importantly, the Disclosure Laws require only disclosure—without any changes in conduct or strategy—and do not ask companies to take positions on contentious issues.[3] Many firms already collect and report the information in question, either voluntarily or pursuant to existing state and federal laws.[4] The policy environment on climate disclosure is dynamic and California is by no means an outlier: other states, the federal government, and numerous non-U.S. jurisdictions are considering, or have recently adopted, disclosure requirements that mirror California's Disclosure Laws.[5]

11.   This declaration presents several conclusions resulting from my analysis of the Disclosure Laws: (a) in all relevant respects, the Disclosure Laws are comparable to longstanding and well-accepted federal disclosure mandates, which suggests that the information required by the Disclosure Laws is conventional in nature, as are the sources and methods necessary for compliance; (b) the particular tailoring of the Disclosure Laws, including their applicability to certain large privately-held companies doing business in California, is necessary to ensure

---

[2] *See infra* ¶¶ 29-33.
[3] *See id.*; *see also infra* ¶¶ 20-27.
[4] *See infra* ¶¶ 30, 33, 50, 54.
[5] *See infra* ¶ 50.

4

effectiveness; and (c) as the implicit guarantor of California public pension funds' obligations to their beneficiaries, the California state government has a compelling interest in ensuring that public pension funds have the climate-related information relevant to their investment decisions and ultimate solvency.

**Methodology and Research**

12.    For purposes of this declaration, I performed a close analysis of the specific provisions of the Disclosure Laws and related legislative materials. In addition, I compared the legislative text against the descriptions of the Disclosure Laws contained in petitioners' submissions for the purpose of identifying specific features of the Disclosure Laws that may have been misunderstood.

13.    In my assessment of the design features of the Disclosure Laws, I have relied upon my review of the principal research studies and academic commentary on disclosure and securities regulation from the fields of law, accounting, and finance,[6] as well as numerous research studies and academic commentaries on climate disclosure. In addition, I have relied on the original research I conducted in connection with my publications and working papers.

14.    I have also relied upon my review of the comment file for the SEC climate-related disclosure proposal,[7] which covered similar subject matter as the Disclosure Laws.[8] The SEC comment file originated through the regular notice-and-

---

[6] I performed this review in 2023-24 in connection with the preparation of a book chapter titled "Disclosure as a Corporate Governance Tool: Channels & Challenges" in *The Oxford Handbook of Corporate Law and Governance* (2d Ed.) (Jeffrey Gordon & Wolf-Georg Ringe, eds., forthcoming 2024), a peer-reviewed, encyclopedic collection presenting the current state of academic learning in corporate law and governance authored by leading subject matter experts selected by the handbook's editors.

[7] *See* U.S. Sec. & Exch. Comm'n, Final Rule: The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21,668 (Mar. 28, 2024).

[8] The SEC rule requires disclosure of material climate-related risks and material climate-related impacts as well as Scope 1 and Scope 2 GHG emissions, a transition risk indicator, to the extent such emissions are financially material to the disclosing company. *See* 89 Fed. Reg. at 21670. The SEC rule does not require disclosure of Scope 3 emissions. *See id.* at 21675. Like all SEC disclosure rules, it applies only to

(continued…)

comment rulemaking process and contains over 4,500 detailed submissions from companies (both public and private), various investor types (institutional, retail, public pension funds, asset managers, and others), academics, corporate advisors, trade associations, non-governmental organizations, and others. The comment file reflects a broad range of perspectives and considerations pertaining to climate disclosure, including the perspectives of numerous California citizens, California communities, and California investors, which are relevant to the assessment of the Disclosure Laws.

15.	The materials and methods upon which I have relied in forming the opinions and conclusions stated herein are commonly and reasonably relied upon by legal, business, and other experts.

## I.	Federal Securities Regulation Commonly Requires the Disclosure of Business Information Similar in Type to the Information Sought Through the Disclosure Laws

16.	The federal securities laws, which date back to the 1930s,[9] require companies to disclose business information on a variety of topics and in a variety of different formats. Companies subject to these laws are required to disclose basic financial and operational information about their business, including information about the company's financial condition, descriptions of the company's operations, property, obligations, legal proceedings, and officers' and board members' compensation, among other things.[10]

companies that have elected to go public. On April 4, 2024, the SEC stayed the rule in light of litigation that is currently pending in the Eight Circuit. *See* U.S. Sec. & Exch. Comm'n, The Enhancement and Standardization of Climate-Related Disclosures for Investors; Delay of Effective Date, 89 Fed. Reg. 25804 (Apr. 12, 2024).

[9] As is well known, the federal securities disclosure regime traces its origins back to the 1930s and the Securities Act of 1933, passed by Congress in the aftermath of the stock market crash of 1929 and in the midst of the resulting Great Depression.

[10] The core disclosure rules are contained in Regulation S-K (17 C.F.R. § 229 (2024)), which sets out requirements for various financial and non-financial disclosures, and Regulation S-X (17 C.F.R. § 210 (2024)), which together with various accounting pronouncements establishes a common standard for the form

(continued…)

17. Firms are also routinely required to make disclosures that go beyond basic descriptions. For example, each company must disclose information about its corporate governance arrangements; the risks faced by the company or associated with investing in its securities; management's assessment of the factors it believes have affected past performance as well as known trends or uncertainties that are reasonably expected to impact future results in the near and long term; and even more esoteric topics, like "golden parachutes," the use of conflict minerals in the supply chain, mine safety, activities in breach of U.S. sanctions on Iran, and more.[11]

18. In the context of these federal securities disclosures, companies must frequently make reasoned judgments, and in some cases, rely on estimates, because the subject of the vast majority of corporate disclosure is not susceptible to direct observation. Moreover, companies participating in the securities markets are frequently required to disclose information regarding future risks and contingencies that could affect the company. Disclosures of this kind have long been understood to produce information highly valued by investors, by allowing companies to present a more complete picture of their business and financial condition than if they were limited to statements of readily observable phenomena alone.

### A. Disclosures of a Company's Assessed Future Risks Are Considered Accurate and Factual in the Federal Securities Context

19. Federal securities requirements have required companies to assess and disclose perceived risks and uncertainties, according to their business judgment, in a number of different arenas:

---

and substance of financial statement disclosure. The SEC disclosure requirements trace their origins to Schedule A of the Securities Act of 1933, Securities Act of 1933, 48 Stat. 74 (codified as amended at 15 U.S.C. § 77aa).
[11] *See, e.g.*, George S. Georgiev, *The Breakdown of the Public–Private Divide in Securities Law: Causes, Consequences, and Reforms*, 18 N.Y.U. J. L. & BUS. 221, 247-55 (2021) (providing an overview of the SEC disclosure regime). A true and correct copy of this law review article is attached as **Exhibit 4**.

a.　　　The Management's Discussion and Analysis (MD&A) section of annual and periodic disclosure reports elicits extensive analysis and disclosure of future risks and uncertainties pertaining to the company's *future financial condition and results of operations*. Management is required to discuss known trends, demands, commitments, events, or uncertainties that are reasonably likely to result in a material future impact on the company's liquidity, capital resources, or results of operations.[12] In practice, the rule requires disclosure about management's perspective on future performance, even if it involves a degree of uncertainty and relies on estimates. The goal is to provide a transparent and comprehensive view of the company's financial prospects, enabling investors to make informed decisions despite the uncertainties inherent in forward-looking information.

b.　　　The SEC has also required disclosure about the impact of highly specific events or trends on the company's future financial condition and results of operation. Relevant recent examples include requirements (issued in the form of a series of guidance documents) to describe the projected future impact of the *Covid-19 pandemic* on a firm's business and results of operations, [13] a May 2022 requirement to describe the projected impact of *Russia's war on Ukraine* on a firm's supply chain,[14] and a series of comment letters from 2023 asking firms to disclose and discuss the projected future impact of *high rates of inflation*.[15] Each of these

[12] Item 303, Regulation S-K, 17 C.F.R. § 229.303 (2024).
[13] U.S. Sec. & Exch. Comm'n, COVID-19 (last modified: Jan. 8, 2021), https://www.sec.gov/corpfin/corporation-finance-covid-19 (listing 15 guidance documents, statements, and interpretations by the Commission in connection with the Covid-19 crisis). A true and correct copy of the SEC's webpage regarding Covid-19 guidance documents, statements, and interpretations is attached as **Exhibit 5**.
[14] U.S. Sec. & Exch. Comm'n, Div. of Corp. Fin, Sample Letter to Companies Regarding Disclosures Pertaining to Russia's Invasion of Ukraine and Related Supply Chain Issues (May 3, 2022), https://www.sec.gov/rules-regulations/staff-guidance/disclosure-guidance/sample-letter-companies-regarding-disclosures. A true and correct copy of the SEC webpage displaying the sample letter is attached as **Exhibit 6**.
[15] *See* Cydney Posner, Cooley PubCo, *In Discussions of Inflation, SEC Staff Want the Details* (Aug. 16, 2023), https://cooleypubco.com/2023/08/16/staff-details-
(continued…)

disclosures require firms to look into the future and, to the best of their knowledge and ability, provide investors with relevant information.

c.    Notably, risk reporting has been required even for highly uncertain future events. Disclosure requirements from 1997 and 1998 pertaining to *Year 2000 ("Y2K") readiness* offer one such example. The SEC acknowledged that "[o]nly one thing is certain about the impact of the Year 2000—it is difficult to predict with certainty what truly will happen after December 31, 1999."[16] In the same breath, however, the SEC proceeded to require companies to make predictive statements about Y2K's impact on their operations. In particular, the SEC required disclosure both by companies that had not completed an assessment of their Y2K issues, and by companies that had completed their assessment and had determined that "the consequences of [their] Year 2000 issues would have a material effect on the company's business, results of operations, or financial condition, without taking into account the company's efforts to avoid those consequences."[17] For the latter, the SEC required disclosure of "(i) the company's state of readiness; (ii) the costs to address the company's Year 2000 issues; (iii) the risks of the company's Year 2000 issues; and (iv) the company's contingency plans."[18]

d.    The financial accounting rules on *loss contingency accounting and disclosure*, which are incorporated in the disclosure regime through the requirement to disclose financial statements, require firms to estimate, quantify, and disclose information about uncertain future events. The relevant rule, ASC 450, defines a "contingency" as "an existing condition, situation, or set of circumstances

---

inflation; Nicole M. White, Bloomberg, *SEC Urges Inflation Risk Disclosures as Price Increases Persist* (Aug. 14, 2023), https://news.bloombergtax.com/financial-accounting/sec-urges-inflation-risk-disclosures-as-price-increases-persist. True and correct copies of these news articles are attached as **Exhibits 7** and **8**, respectively.

[16] U.S. Sec. & Exch. Comm'n, Statement of the Commission Regarding Disclosure of Year 2000 Issues and Consequences by Public Companies, Investment Advisers, Investment Companies, and Municipal Securities Issuers, 63 Fed. Reg. 41394, 41396 (Aug. 4, 1998).

[17] *Id*. at 41395.

[18] *Id*.

involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur."[19] Pending or threatened litigation is one example of a loss contingency. When it considers the impact of pending or threatened litigation, a firm is required to make predictions about the future, including the likely actions of other parties (e.g., litigation opponents). And if it is unable to estimate the expected loss from a particular contingency, the firm is required to provide a description of the contingency and the analysis that led to the conclusion that estimation is not possible.[20]

20.    In each of these examples, the companies required to issue disclosures were merely required to present *factual information*, not opinions about the underlying contingencies or risks identified by the disclosure requirements themselves.

21.    When firms make disclosures relating to anticipated risks in compliance with applicable federal securities requirements, they are reporting their *business judgments* about the matters in question. The required disclosures are factual to the extent that they accurately report the firm's business judgments. Formulating such business judgments, in turn, requires no more than a reasonable basis predicated upon present information.[21] At core, the relevant questions in the context of disclosure of future risks and contingencies are only two. First, does the firm have a business

---

[19] FINANCIAL ACCOUNTING STANDARDS BOARD, CONTINGENCIES (TOPIC 450): DISCLOSURE OF CERTAIN LOSS CONTINGENCIES (2010). A true and correct copy of ASC 450 is attached as **Exhibit 9**.

[20] *See* George S. Georgiev, *Too Big to Disclose: Firm Size and Materiality Blindspots in Securities Regulation*, 64 UCLA L. REV. 602, 634 (2017). A true and correct copy of this law review article is attached as **Exhibit 10**.

[21] Federal securities litigation has defined the parameters of what is expected of management in the disclosure context. *See, e.g.*, *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 673 (3d Cir. 2002) ("[T]o give rise to section 10(b) liability for fraud, the mere second-guessing of calculations will not suffice . . . ."); *id.* (noting that "[securities disclosure] law does not expect clairvoyance"); *Polk v. Fritz (In re Fritz Cos. Sec. Litig.)*, No. C96-2712, 1998 U.S. Dist. LEXIS 23063, at *8 (N.D. Cal. Mar. 5, 1998) (noting that to establish securities disclosure violations, plaintiffs cannot use "later events . . . to support the falsity of earlier statements").

judgment regarding the impact of a particular future event, risk, or uncertainty on its own business, financial condition, or results of operations? And if so, what is the firm's business judgment? Both of these questions are purely factual.

22.     The government does not hold firms to account when their business judgments about future events turn out to have been incorrect. And management and boards of directors are protected from liability for poor business judgments, even when they result in significant losses, by virtue of the well-established business judgment rule.[22]

**B.     Disclosures Involving Estimates are Considered Factual in the Federal Securities Context**

23.     Firms also routinely disclose calculated and estimated information pursuant to federal requirements. Disclosure rules that commonly involve the use of estimates and methodological discretion include:

a.     *Oil and gas reserves*. Since 1978, public companies have been required to disclose information about the volume, value, and attributes of their oil and gas reserves and related matters.[23] This information is an essential aspect of the valuation of any company in the extractive industries and firms routinely have to make estimates and assumptions in order to calculate and report it. In the words of one large oil and gas company, "Nobody can know precisely how much oil exists under the earth's surface or how much it will be possible to produce in the future. All numbers are, at best, informed estimates."[24] Those estimates involve uncertain and

---

[22] According to the business judgment rule (BJR), even in cases where a business decision results in catastrophic losses, there is a presumption that the relevant decisionmakers acted on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the corporation. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). When the BJR applies, a court will not substitute its judgment for that of the board as long as the decision has a rational business purpose. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971).

[23] These disclosure requirements are currently contained in Item 1202 of Regulation S-K. *See* 17 CFR § 229.1202 (2024).

[24] *See* BP, Oil (and/or Gas) Reserve Definitions (2021) https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/energy-economics/statistical-review/bp-stats-review-
(continued…)

highly probabilistic judgments. Reserves, for example, are split into three broad categories—including *proven reserves*, *probable reserves*, and *possible reserves*.[25] These classifications and calculations are generally performed in line with the extensive methodological guidance promulgated by the Society of Petroleum Engineers (and associated bodies).[26]

b.    *CEO-to-median-worker pay ratio*. This disclosure requirement, mandated by Congress through the Dodd-Frank Act of 2010 and implemented by the SEC in 2018, afforded companies extensive flexibility to use estimates derived through "statistical sampling and/or other reasonable methods" and to apply a range of methodologies in the various aspects of the calculation process.[27] Instead of requiring the use of a specific methodology or attempting to ensure consistency across companies, the SEC only required firms to maintain a degree of internal consistency and have a reasonable basis for making the relevant methodological choices.[28]

c.    In the area of financial accounting, companies routinely rely on *critical accounting policies and practices* that require management to make judgments "about the effects of matters that are inherently uncertain."[29] Those, in turn, invariably entail *critical accounting estimates*. The use of critical accounting estimates and the development (and disclosure) of critical accounting policies

2021-oil-reserve-definitions.pdf. A true and correct copy of the statement posted by BP to its website is attached as **Exhibit 11**.
[25] *See* 17 C.F.R § 229.1202(a)(1) (2024).
[26] *See* Society of Petroleum Engineers, Petroleum Reserves and Resources Definitions (last accessed July 22, 2024), https://www.spe.org/en/industry/reserves. A true and correct copy of the Society of Petroleum Engineers' webpage is attached as **Exhibit 12**.
[27] *See* Regulation S-K, Item 402(u), Instruction 4(2), 17 C.F.R. § 229.402 (2017).
[28] *See* Bank & Georgiev, *supra* note 1, at 1150-63.
[29] PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, AUDITING STANDARD 1301: COMMUNICATIONS WITH AUDIT COMMITTEES (Appendix A), https://pcaobus.org/oversight/standards/auditing-standards/details/AS1301. A true and correct copy of PCAOB's webpage, which sets out Auditing Standard 1301, is attached as **Exhibit 13**.

promote accuracy and verifiability and are generally welcomed by the users of the information.[30]

24.     The accuracy of these disclosures is underwritten through the use of methodologies that involve sampling techniques, statistical methods, machine learning, informed estimates, and expert judgments. These methodologies are subject to ongoing refinement.

25.     The use of estimates and the ability to apply different methodologies promotes accuracy. Estimates allow for companies to present a more complete picture of their business and financial condition than would be possible if they were required to limit disclosure to non-estimates. The availability of different methodologies allows for the tailoring of reporting methods to companies' specific characteristics and their compliance capacity.

26.     The factual nature of information that involves estimates and methodological discretion is illustrated by the fact that both investors and companies *routinely rely* on such information in making investment and business decisions that involve large financial outlays. For example:

a.     In the context of acquisitions, the volume and valuation of a potential target's oil and gas reserves are of paramount importance. Indeed, the oil and gas M&A boom that occurred during the 1980s has been attributed directly to the disclosure of reserve information that resulted from the adoption of an SEC disclosure rule in 1978.[31]

---

[30] *See, e.g.*, CFA Institute & Council of Institutional Investors, Re: Proposed Rule: Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information (Apr. 28, 2020), https://www.cii.org/files/issues_and_advocacy/correspondence/2020/CFA%20and%20CII%20Response%20to%20SEC%20Proposal%20on%20MDA.pdf (stating that "the addition of disclosures regarding Critical Accounting Estimates in the early 2000s was a welcome improvement to the financial statements"). A true and correct copy of this letter is attached as **Exhibit 14**.

[31] *See, e.g.*, Michael Guttentag, *An Argument for Imposing Disclosure Requirements on Public Companies*, 32 FLA. ST. U. L. REV. 123, 135 (2005) (attributing the increase in merger and acquisition activity in the oil and gas sector

(continued…)

b. Investors rely on estimates in their valuation models. In the oil and gas sector, traditional cost accounting, which is backward-looking, does not provide adequate information about the future trajectory of the company, which depends in large part on current estimates of revenue streams, which are directly dependent on the value of oil and gas reserves.[32]

27. In sum, disclosure is not automatically rendered *inaccurate* or *non-factual* simply by virtue of the fact that it contains estimates and reflects methodological discretion. As long as estimates are presented as estimates and as long as the use of calculation and estimation methodologies is generally accepted, good faith disclosures are considered accurate and factual.

## II. Evidence Confirms that the Scope of the Disclosure Laws is Appropriate for the Interests Served

28. A series of standard considerations arise anytime a legislator or a regulator is designing a new disclosure provision. These include: What type of information should be covered? How should the reporting entity source this information and ensure its accuracy, completeness, and comprehensibility? Are there any already existing methodologies for producing and presenting the information and what is their quality?[33] In each of these respects, the choices made by the California legislature in designing the Disclosure Laws were logical, reasonable, and conventional.

---

during the 1980s to the SEC's 1978 rule requiring disclosure of the value of oil and gas assets). A true and correct copy of this law review article is attached as **Exhibit 15**.

[32] *See, e.g.*, Heather Timmons, N.Y. TIMES, *Shell Reduces Estimate of Reserves Again* (Mar. 19, 2004), at C1, available at: https://www.nytimes.com/2004/03/19/business/shell-reduces-estimate-of-reserves-again.html (noting that [r]eserve estimates are an important indicator of an energy company's worth and strength" and that revisions to the company's estimates had "rattled investors"). A true and correct copy of this news article is attached as **Exhibit 16**.

[33] On the desirable attributes of disclosure, see generally George S. Georgiev, Disclosure as a Corporate Governance Tool: Channels and Challenges, in *The Oxford Handbook of Corporate Law and Governance* (2d Ed.) (Jeffrey Gordon & Wolf-Georg Ringe, eds., forthcoming 2024).

## A.  S.B. 253

29.  The first disclosure bill, S.B. 253, requires reporting of greenhouse gas (GHG) emissions in line with the GHG Protocol. In existence since 1998, the GHG Protocol is the dominant methodology for emissions accounting. Partnerships with industry groups, including those representing producers of high-emissions products, such as aluminum, pulp and paper, and cement,[34] have allowed for the refinement of the GHG Protocol's methodologies and the development of industry-specific calculation tools and standards for producers and service providers in oil and gas, aluminum, iron and steel, cement, waste removal, pulp and paper mill, real estate, and office-based organizations. [35] Industry-specific standards have considerable advantages.[36]

30.  The best indicator of the GHG Protocol's quality is its widespread *voluntary* uptake by firms. A recent study found that approximately 82% of S&P 500 companies *already* report Scope 1 and Scope 2 figures under GHG Protocol methodologies. [37] This is particularly significant because the disclosures are frequently included in SEC-filed reports subject to securities law liability and, in many cases, subject to CEO and CFO certifications as to the veracity of the information.[38]

## B.  S.B. 261

31.  For purposes of climate risk disclosure in S.B. 261, the California legislature again chose the dominant framework in existence, which has been developed by the Taskforce on Climate-Related Financial Disclosures (TCFD). The

[34] Lynn LoPucki, *Corporate Greenhouse Gas Disclosures*, 56 U.C. DAVIS L. REV. 405, 432–34 (2022). A true and correct copy of this law review article is attached as **Exhibit 17**.
[35] *Id.*
[36] *See* U.S. Chamber of Commerce, Comment on SEC Disclosure Rule at 2, https://www.sec.gov/comments/climate-disclosure/cll12-8907271-244249.pdf. A true and correct copy of the U.S. Chamber of Commerce's comment letter is attached as **Exhibit 18**.
[37] LoPucki, *supra* note 34, at 439.
[38] Regulation S-K Items 307 & 308, 17 C.F.R. § 229.307–308 (2020).

TCFD framework was established in 2015 through a directive of the Financial Stability Board (FSB)—an intergovernmental organization whose mandate is to promote international financial stability and prevent a repeat of the Global Financial Crisis (2007-2009), which had devastating effects on economies worldwide, including in California. The United States has three governmental representatives on the FSB—senior officials from the Federal Reserve, the Department of the Treasury, and the SEC.[39]

32.    The TCFD framework leaves decisions about the presentation of the underlying information to the reporting entity. This principles-based approach conforms to the preferences expressed by industry groups.[40] As with the GHG Protocol, firms are already familiar with the TCFD framework and use it widely.[41] The TCFD completed its mission in 2023 and transferred its responsibilities with respect to the monitoring of disclosures under the TCFD framework to the International Sustainability Standards Board, which is part of the IFRS Foundation.

33.    The TCFD's leadership and the types of entities represented on the TCFD highlight its status as a mainstream, U.S.-led standard-setter with broad industry buy-in, which, in turn, underwrites the quality and legitimacy of the TCFD disclosure framework embedded in S.B. 261. The TCFD's secretariat was headed by a leader in the financial industry and an American, Mary Schapiro, who holds the unique distinction of having served as an SEC Commissioner, Chair of the SEC, Chair of the CFTC, and CEO of FINRA.[42] Furthermore, the TCFD's working groups included representatives of large investors (including BlackRock and UBS Asset

[39] *See* Financial Stability Board, Members of the FSB, https://www.fsb.org/about/organisation-and-governance/members-of-the-financial-stability-board. A true and correct copy of the FSB's webpage listing its members, is attached as **Exhibit 19**.
[40] *See* U.S. Chamber of Commerce, *supra* note 36, at 6.
[41] *See* TASK FORCE ON CLIMATE-RELATED FINANCIAL DISCLOSURES, 2023 STATUS REPORT ii-v (Oct. 12, 2023) https://www.fsb.org/wp-content/uploads/P121023-2.pdf. A true and correct copy of this report is attached as **Exhibit 20**.
[42] *Id*. at 121.

Management), banks (JP Morgan, Citibanamex), insurance companies (Aviva, Swiss Re, Axa), giant industrial firms (BHP, Eni, Tata Steel, Unilever), rating agencies (Moody's, S&P), accounting firms (Deloitte, E&Y), and others.[43]

### C.   The Scope of Both Disclosure Laws Is Appropriate

34.   Adequate entity coverage, i.e., tailoring, is essential to the effectiveness of any disclosure rule. If a given rule applies to some but not all relevant entities, it is said to be underbroad and its intended benefits fail to materialize. Underbroad disclosure rules are problematic for several reasons: Most obviously, the rule's beneficiaries would not have at their disposal information from the relevant entities that were not captured. In addition, when relevant entities are not covered, the interpretation of the information provided by the covered entities is distorted because information attains its full meaning only in context. Finally, when a disclosure rule does not cover two entities that are identical in relevant respects (e.g., size or economic impact), this creates a fairness concern that undermines the basic legitimacy of the rule. These problems occur both when regulators set under-inclusive criteria for coverage and also when relevant entities can easily evade the rules.

35.   Overbroad rules—those that capture entities that are not relevant to a rule's purpose—are also problematic because they may create undue compliance burdens.[44] As part of the process of disclosure rule design, therefore, legislators and regulators need to tailor the applicability of disclosure requirements so as to prevent both under- and over- inclusiveness problems.

---

[43] *See* TASK FORCE ON CLIMATE-RELATED FINANCIAL DISCLOSURES, 2021 STATUS REPORT 76-77 (2021), https://www.fsb.org/wp-content/uploads/P141021-1.pdf. A true and correct copy of this report is attached as **Exhibit 21**.

[44] In the area of disclosure, any given rule is more likely to be underbroad than overbroad. In other words, it is more likely that a rule would fail to cover relevant entities rather than that it would cover irrelevant entities. This is so because the benefits of disclosure are invariably diffuse whereas its costs are concentrated. The beneficiaries of disclosure, therefore, face collective action problems in lobbying to correct under-inclusiveness, whereas firms have a financial incentive to lobby against over-inclusiveness.

36.     The Disclosure Laws avoid these problems by conditioning compliance on a straightforward, objective, and easily measurable financial metric that does not lend itself to rote manipulation: annual revenues. As noted, S.B. 253 applies to entities with annual revenues exceeding $1 billion, while S.B. 261 applies to entities with annual revenues exceeding $500 million.[45] Moreover, both laws are limited to entities that "do business in California."[46]

37.     The fact that the Disclosure Laws employ revenue thresholds to determine applicability sets them apart from federal securities disclosure requirements, which apply only to "public" companies. California's choice better serves the government's interests here. The public company category increasingly fails to capture economically-significant entities due to a series of recent deregulatory and market developments.

38.     The difference in approach between the Disclosure Laws and federal securities disclosure requirements can be explained by California's interest in (i) capturing all relevant entities (i.e., all economically-significant companies that do business in California), and (ii) avoiding compliance loopholes. Because the effectiveness of any disclosure rule depends on adequate entity coverage, the particular tailoring of the Disclosure Laws is necessary to ensure effectiveness.

39.     The closest available alternative—conditioning the Disclosure Laws' applicability on public company status—is clearly inferior because it would be ineffective and more burdensome. As shown below, under this alternative the disclosure requirements will be *both* underbroad (failing to capture certain economically-significant entities) and overbroad (imposing compliance obligations on entities that are not economically significant).

---

[45] See Cal. Health & Safety Code §§ 38532(a)(2), 38533(a)(4).
[46] The term "doing business in California" is subject to further explication by CARB in implementing regulations required by S.B. 253. *See id.* §§ 38532(c)(1), (c)(3).

40.     Moreover, even though disclosure obligations are most often associated with public companies, no overarching rationale exists for confining the applicability of disclosure obligations to public companies. A revenue-based approach that does not distinguish between public and private companies, therefore, is conventional. As illustrated in the Appendix, multiple existing and recently-proposed disclosure requirements, including from California, from the federal government, and from non-U.S. jurisdictions, rely on the same objective annual revenue metric as the Disclosure Laws.[47]

41.     The alternative approach of conditioning compliance on public company status would be clearly underbroad because it would fail to capture all economically-significant entities. Even though both history and logic suggest that there might be a significant degree of overlap between the set of entities that are public companies and those that are economically significant, the two categories have diverged considerably in recent years due to deregulatory changes in federal securities law and the increased availability of private capital.[48] The total implied market valuation—a proxy for size and economic impact—of new U.S.-based private firms rose more than 11-fold between 2013 and 2023, while the absolute number of such firms rose more than 15-fold during the same period.[49]

42.     Achieving annual revenues above $1 billion—the threshold contained in S.B. 253—is a business accomplishment that is both significant and rare. According to a leading management consultancy, reaching such an annual revenue level generally requires "market acceptance" meaning that "[the firm's] product or service appeals to a broad set of customers, and the company has become adept at

[47] Item 1 in the Appendix to this declaration compares the California Disclosure Laws to existing disclosure obligations conditioned on annual revenues. Item 2 in the Appendix compares the California Disclosure Laws to proposed disclosure obligations conditioned on annual revenues.
[48] *See* Georgiev, *The Breakdown of the Public-Private Divide in Securities Law*, *supra* note 11, at 258-92.
[49] *See* Appendix, Item 3 (illustrating the rapidly-expanding universe of large private companies and the under-inclusiveness of a public company-only alternative).

courting and keeping them."[50] The same source estimates that of the approximately 225,000 companies founded over the past two decades, fewer than 250 were able to pass the $1 billion annual revenue threshold.[51] This means that, on average, any business established during this period had only a 1 in 900 chance of being economically significant enough to fall within the ambit of S.B. 253.

43.    The same is also likely to be true for any business with revenues in excess of $500 million (the threshold set by S.B. 261). In the analogous context of corporate reporting, for example, the SEC rules on "smaller reporting companies" have set *much lower* revenue thresholds. Any company with (i) a public float of $700 million or more and (ii) annual revenues of $100 million or more *does not* qualify for disclosure relief as a "smaller reporting company" and needs to comply with the full suite of federal securities disclosure obligations.[52] Even the most recent legislative proposal seeking to raise the annual revenue threshold required for "smaller reporting company" status suggested a threshold of $250 million,[53] i.e., half of the revenue threshold in S.B. 253 and a quarter of the revenue threshold in S.B. 261.

44.    An alternative approach to entity coverage that conditions compliance on public company status (i.e., only requires compliance of public companies, without regard to any revenue threshold) would be *overbroad* as well—it would have captured many entities that were not economically significant. This conclusion flows from an analysis of historical IPO data from the 10-year period between 2013 and 2022. Since 2012, private companies undertaking an IPO have had the option to take advantage of substantial disclosure exemptions for up to five years, as long as they

---

[50] Bain & Company, *Herd on the Street: So Many Unicorns, So Little Cash* (Nov. 9, 2023), https://www.bain.com/insights/herd-on-the-street-so-many-unicorns-so-little-cash. A true and correct copy of this news article is attached as **Exhibit 22**.
[51] *Id.*
[52] Regulation S-K Item 10(f)(1), 17 C.F.R. § 229.10(f)(1)(ii) (2024).
[53] H.R. 2603, 118th Cong., at 2 (2023), available at: https://www.congress.gov/118/bills/hr2603/BILLS-118hr2603ih.pdf. A true and correct copy of this bill is attached as **Exhibit 23**.

qualify as an "emerging growth company" (EGC).[54] Among other things, EGC status is conditioned on having annual revenues *below* $1 billion.[55] Since the EGC definition uses the same metric and the same numerical threshold as S.B. 253, firms that currently qualify as EGCs *would not* be subject to S.B. 253. Under an alternative approach conditioned on public company status, however, EGCs would have had to comply (because, by definition, they are public). In effect, the alternative approach would have captured a number of entities that are public but are not economically significant (i.e., do not have annual revenues above $1 billion). Historical data from 2012-2022 reveals that 89% of the private companies that were mature enough to undertake an IPO did not have the annual revenues that would have required compliance with S.B. 253.[56]

45.      The number of public EGCs in 2022 stood at 1,704.[57] This represents the total number of companies that would have been captured by a public-company-only alternative but that are not captured by the annual revenue threshold in S.B. 253. Moreover, according to federal government data, approximately 94% of EGCs have annual revenue below $400 million.[58] This means that, as tailored and adopted, the

---

[54] Jumpstart Our Business Startups Act, Pub. L. No. 112-106, § 101, 126 Stat. 306, 307 (2012). A true and correct copy of this public law is attached as **Exhibit 24**.

[55] *Id*. § 101(a)(19). The original $1 billion threshold is subject to periodic adjustment for inflation and was increased marginally to $1.07 billion in 2017 and then to $1.23 billion in September 2022, at the very end of the 10-year period under analysis. These variations in the annual revenue threshold do not change the magnitude of the predicted effect (in terms of over-inclusiveness) or the ultimate conclusion.

[56] *See* WILMER HALE, IPO REPORT (2023), https://www.wilmerhale.com/-/media/files/shared_content/editorial/publications/documents/2023-wilmerhale-ipo-report.pdf. A true and correct copy of this report is attached as **Exhibit 25**. The Wilmer Hale Report found that the average number of companies qualifying as an "emerging growth company" at the time of IPO between 2012 and 2022 (inclusive) was 89%. "Emerging growth company" status was available only to companies with annual revenues below $1 billion between 2012 and 2017 and below $1.07 billion between 2017 and 2022. *See* U.S. Sec. & Exch. Comm'n, Securities Act Release 33-11,098, Exchange Act Release 34-95,715, Inflation Adjustments under Titles I and III of the JOBS Act, 87 Fed. Reg. 57,394, 57,395 (Sept. 20, 2022).

[57] 87 Fed. Reg. at 57,397.

[58] PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, CHARACTERISTICS OF

(continued…)

21

Disclosure Laws do not capture a significant number of the public companies in existence today because those companies are not economically significant enough.

46.    In practice, the scale necessary to achieve annual revenues in excess of $1 billion or $500 million also suggests that any such business would already be subject to other compliance obligations, including various reporting requirements, and will therefore have a compliance function that can handle compliance with the Disclosure Laws.

47.    In terms of financial interconnectedness, any private company that falls within the scope of the Disclosure Laws can be expected to have multiple outside investors (likely both shareholders and bondholders), as well as bank creditors and other contractual counterparties. The reasons are many: The competitive business environment in the United States makes it unlikely that entrepreneurs can attain scale without capital outlays that are beyond the self-financing capabilities of the average entrepreneur. Even if it were possible to self-finance, it would be imprudent because raising capital from outside investors provides a desirable mechanism for risk-sharing and attracting additional expertise to the enterprise.[59] Finally, the effective removal of the restrictions that had previously limited broad-based investment in private companies means that no meaningful regulatory barriers exist to raising capital from outside investors.[60]

48.    The inclusion of private companies does not pose an undue burden for other reasons as well. If a business that falls within the scope of the Disclosure Laws

EMERGING GROWTH COMPANIES AS OF NOVEMBER 15, 2022, at 14, https://assets.pcaobus.org/pcaob-dev/docs/default-source/economicandriskanalysis/projectsother/documents/white-paper-on-characteristics-of-emerging-growth-companies-as-of-nov-15-2022.pdf. A true and correct copy of this white paper is attached as **Exhibit 26**.

[59] *See, e.g.*, Patrick Ungashick, Navix, *7 Situations Where Business Owners Should Consider Bringing In Outside Investors*, https://www.navixconsultants.com/the-exit-playbook/7-situations-where-business-owners-should-consider-bringing-in-outside-investors (illustrating conventional wisdom on the issue of outside investors). A true and correct copy of this advisory article is attached as **Exhibit 27**.

[60] *See* Georgiev, *supra* note 11, at 283-84.

already collects and reports climate-related information, the relevant inquiry is about the *marginal* burden imposed by the Disclosure Laws and not about their hypothetical overall burden. This is so because a business would need to calculate its GHG emissions and prepare a TCFD-compliant report only once in a given reporting period, *regardless* of whether it is required to share this information with *only one* regulator or with *multiple* parties, including regulators, investors, and contractual counterparties.

49.    In practice, if a private company *already* reports the information required under the Disclosure Laws, the marginal cost of data collection and reporting attributable to California would be zero.[61] And those economically-significant companies that *do not already* collect some or all of the information would likely be required to do so in the near term, irrespective of the California Disclosure Laws, due to the robust interest in climate-related reporting from non-California regulators, from investors, and from contractual counterparties. Put simply, a private company is unlikely to be able to save the expense of collecting and reporting the information required by the Disclosure Laws; at best, it might be able to defer this expense for a limited amount of time.

50.    The following non-exhaustive list of legislation (both adopted and proposed) and other developments on climate-related disclosure support these conclusions:

a.    The European Union's Corporate Sustainability Reporting Directive (CSRD), which entered into force on January 5, 2023, will require a number of U.S. companies, both public and private, with a presence in the European Union

---

[61] It should be noted that, in addition to the cost of data collection and reporting discussed here, the Disclosure Laws also impose filing fees. Those fees are yet to be determined, but it is unlikely that they will be material in the context of the compliance burden of a large and economically-significant entity. It is unlikely that those costs would be passed on to consumers directly, and it is even more unlikely that they would be passed only to California consumers instead of being spread across the entity's entire customer base.

to report Scope 1, 2, and 3 GHG emissions (akin to the requirements of S.B. 253) and information on climate-related financial risk (akin to S.B. 261).[62] As it pertains to U.S. companies, the reporting requirement becomes effective in 2029 and covers entities with EU-generated annual revenues above EUR 150 million.[63] Stated in U.S. dollars under current exchange rates, the annual revenue threshold is approximately $163 million, well below the threshold contained in the Disclosure Laws.

b.    The IFRS Foundation formed the International Sustainability Standards Board (ISSB) to develop sustainability disclosure standards and proposed requirements, which have since been adopted by individual jurisdictions and endorsed by the International Organization of Securities Commissions (IOSCO). The IFRS S2 standards are already operational and available for use in annual reporting cycles starting on or after January 1, 2024. IFRS S2 aims to mandate an organization to reveal details about its climate-associated risks and opportunities. This information

---

[62] Directive (EU) 2022/2464 of the European Parliament and of the Council of 14 December 2022 amending Regulation (EU) No. 537/2014, Directive 2006/4 3/EC and Directive 2013/34/EU, as Regards Corporate Sustainability Reporting ("CSRD"), Ch. 6a, Arts. 19a & Article 29b(2)(a), https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:32022L2464; *see also* European Commission, *Corporate Sustainability Reporting*, https://finance.ec.europa.eu/capital-markets-union-and-financial-markets/company-reporting-and-auditing/company-reporting/corporate-sustainability-reporting_en. True and correct copies of the CSRD and the European Commission webpage discussing the CSRD are attached as **Exhibits 28 and 29**, respectively.

[63] CSRD at Art. 40a(1); European Council, *Council Gives Final Green Light to Corporate Sustainability Reporting Directive* (28 Nov. 2022), https://www.consilium.europa.eu/en/press/press-releases/2022/11/28/council-gives-final-green-light-to-corporate-sustainability-reporting-directive. A true and correct copy of this press release is attached as **Exhibit 30**. The EU CSRD differs from the Disclosure Laws in that it requires disclosure only if the covered entity determines that the underlying information is material. While this may appear to suggest that the EU CSRD is more lenient, the reverse is true because the European Union uses a so-called double materiality approach which, unlike the approach adopted by the SEC, TCFD, and ISSB, must account for an entity's impact on the environment, stakeholders, and communities. As a result, EU-compliant climate risk reports will contain more information and will require more extensive data collection and analysis than the reports required by S.B. 261, which only need to follow the single-materiality approach reflected in the TCFD or ISSB frameworks.

is intended to assist users of general-purpose financial reports in making resource allocation decisions concerning the organization.[64]

c.     The National Association of Insurance Commissioners (NAIC) has endorsed the TCFD reporting framework for use in its annual Climate Risk Disclosure Survey. This is the same TCFD reporting framework that is at the heart of S.B. 261 and the endorsement was at the recommendation of a bipartisan group of state insurance regulators.[65] At present, 21 states (including California) as well as five U.S. territories and the District of Columbia require large insurers domiciled therein to complete NAIC's Climate Risk Disclosure Survey. The covered entities account for more than 80% of the U.S. insurance market and over $2 trillion in premiums written.[66] While on its face this reporting requirement applies only to insurance companies, which are exempt from S.B. 261, it has broader significance because effective compliance requires the covered insurers to collect and analyze climate-related risk information from the companies in their underwriting portfolios.

d.     Amendments to the Federal Acquisition Regulation, proposed in 2022 by the U.S. Department of Defense, the General Services Administration, and NASA, would require federal contractors with more than $50 million in annual federal contract obligations, whether public or private, to disclose Scope 1, 2, and 3 GHG emissions (akin to the requirements of S.B. 253) and climate-related financial

[64] IFRS, PROJECT SUMMARY: IFRS SUSTAINABILITY DISCLOSURE STANDARDS 2 (June 2023), https://www.ifrs.org/content/dam/ifrs/project/general-sustainability-related-disclosures/project-summary.pdf. A true and correct copy of this report is attached as **Exhibit 31**.
[65] *See* NAIC, *U.S. Insurance Commissioners Endorse Internationally Recognized Climate Risk Disclosure Standard for Insurance Companies* (Apr. 8, 2022), https://content.naic.org/article/us-insurance-commissioners-endorse-internationally-recognized-climate-risk-disclosure-standard. A true and correct copy of this press release is attached as **Exhibit 32**.
[66] CERES, CLIMATE RISK MANAGEMENT IN THE U.S. INSURANCE SECTOR: AN ANALYSIS OF CLIMATE RISK DISCLOSURES 9 (July 2023), https://www.ceres.org/resources/reports/climate-risk-management-us-insurance-sector. A true and correct copy of this report is attached as **Exhibit 33**.

risk in accordance with TCFD (akin to S.B. 261), and, in addition, set science-based reduction targets.[67]

e.    In addition to direct governmental reporting mandates, companies, including economically-significant private companies, face requests for climate-related information from their contractual counterparties who need to comply with various specialized climate-related reporting requirements of their own. These counterparties include not just insurers, as already discussed, but also California's two largest public pension funds, which are required under state law to report climate-related information about their investment portfolios,[68] EU investment companies, which need to provide similar reports pursuant to the EU's Sustainability Financial Reporting Directive,[69] and banks and other financial institutions which are encouraged by prudential regulators to focus on the management of climate-related risk within their portfolios and activities—a task that by definition requires counterparty data.[70] In each of these cases, the reporting entities simply cannot comply with the applicable disclosure mandates without obtaining information from their clients and counterparties.

51.    The climate disclosure landscape contains multiple overlapping reporting requirements and demands. Virtually all of them, however, entail GHG emissions reporting in line with the GHG Protocol (akin to S.B. 253) and climate-

---

[67] *See* Federal Acquisition Regulation: Disclosure of Greenhouse Gas Emissions and Climate-Related Financial Risk, 87 Fed. Reg. 68,312, 68,312-68,313 (proposed Nov. 14, 2022), https://www.federalregister.gov/documents/2022/11/14/2022-24569/federal-acquisition-regulation-disclosure-of-greenhouse-gas-emissions-and-climate-related-financial.

[68] Cal. Gov't Code § 7510.5.

[69] Regulation (EU) 2019/2088 of the European Parliament and of the Council of 27 November 2019 on Sustainability-Related Disclosures in the Financial Services Sector, Arts. 1-11, https://finance.ec.europa.eu/sustainable-finance/disclosures/sustainability-related-disclosure-financial-services-sector_en. A true and correct copy of this regulation is attached as **Exhibit 34**.

[70] *See* FSOC, CLIMATE-RELATED FINANCIAL RISK: 2023 STAFF PROGRESS REPORT 7-8 (July 28, 2023), https://home.treasury.gov/system/files/261/FSOC-2023-Staff-Report-on-Climate.pdf. A true and correct copy of this report is attached as **Exhibit 35**.

risk reporting in line with the TCFD framework (akin to S.B. 261). By adopting the prevailing frameworks, the Disclosure Laws contribute to standardization and promote compliance synergies, which ultimately redounds to the benefit of both the producers and the users of the information.

52. Thus, there are compelling reasons for California's decision to cover economically-significant entities regardless of whether they are public or private. If the Disclosure Laws were to apply only to public companies, then a substantial subset of relevant entities would be exempt from reporting, resulting in information gaps and interpretation difficulties. The burden on those private companies that are covered by the Disclosure Laws is not excessive.

**III. California has a compelling interest in ensuring the availability of climate-related information, since it serves as an implicit guarantor of its public pension funds' obligations**

53. Some of the primary beneficiaries of the Disclosure Laws are California investors, including California's public pension funds. By extension, this also includes the 4.6 million California citizens served by those public pension funds—California's current and retired public workers.[71] A number of unique characteristics of California's investor ecosystem illustrate the necessity of the Disclosure Laws.

54. California's two largest public pension funds are required by law to report on their exposure to climate-related risk, which in effect requires them to consider the effects of climate as part of their investment strategy.[72] California's public pension funds have been particularly vocal with respect to the inadequacy of existing voluntary disclosures, which are not consistent, comparable, or decision useful.

---

[71] Radhika Mehlotra & Patrick Murphy, Pub. Pol'y Inst. of Cal., *Public Pensions in California* (March 2019), https://www.ppic.org/wp-content/uploads/jtf-public-pensions-in-california.pdf. A true and correct copy of this report is attached as **Exhibit 36**.
[72] Cal. Gov't Code § 7510.5.

55.     California's public pension funds rely on a defined-benefit model, which means that their underlying commitments to plan participants are fixed and, therefore, that their investments need to generate sufficient returns for decades to come in order to meet those commitments and obligations.[73] As a result, California's public pension funds need to employ active investment strategies that depend on adequate information. California's defined-benefit plans are markedly different from the defined-contribution plans prevalent elsewhere, which can afford to invest passively and without regard to return. California's public pension funds invest in both public and private companies and in both domestic and non-U.S. firms. These strategies require adequate information, including climate-related information.

56.     Of the 100 public pension funds nationally that manage more than $5 billion in defined-benefit assets, 18 are California-based. The total assets represented by those 18 pension funds amount to $1.07 trillion. The share of California's total assets as a percentage of U.S. total assets is 23%.[74]

57.     The California state government has a compelling interest in maintaining the health and solvency of California's public pension funds because it functions as the guarantor of the funds' obligations.

/

/

/

/

---

[73] *See, e.g.,* Mike Enright, Wolters Kluwer Expert Insights, *Understanding Defined Benefit and Defined Contribution Plans* (Feb. 10, 2021), https://www.wolterskluwer.com/en/expert-insights/understanding-defined-benefit-and-defined-contribution-plans (noting, inter alia, that "[s]ince the employer makes a specific promise to pay a certain sum in the future, it is the employer who assumes the risk of fluctuations in the value of the investment pool"). A true and correct coy of this article is attached as **Exhibit 37**.
[74] *See* Appendix, Item 4 (highlighting California's public pension funds in comparative perspective).

I declare under penalty of perjury that the foregoing are true and correct. Executed on this day, the 23rd of July, 2024, in Atlanta, Georgia.

_George S. Georgiev_

GEORGE S. GEORGIEV

# Appendix: Selected Data, Figures, and Tables

**Item 1.   The California Disclosure Laws Compared to <u>Existing</u> Disclosure Obligations Conditioned on Annual Revenues**

| Name of Bill (Year) | Jurisdiction | Subject Matter | Annual Revenue Threshold[*] | Public & Private Co. Coverage |
|---|---|---|---|---|
| **S.B. 253 (2023)** | **California** | **climate (GHG emissions/ transition risk)** | **$1 billion** | **both** |
| **S.B. 261 (2023)** | **California** | **climate-related business risk (TCFD framework)** | **$500 million** | **both** |
| California Transparency in Supply Chains Act (2010) | **California**[**] | supply chains | $100 million | **both** (for retail manufacturers or sellers) |
| Corporate Sustainability & Reporting Directive (2023) | European Union | **climate-related business risk; GHG emissions**; firm's impact on climate | EU: €50 (~$54) million Non-EU: €150 (~$163) million | **both** |
| The Companies (Strategic Report) (Climate-related Financial Disclosure) Regulations (2022) | United Kingdom | **climate-related business risk (TCFD framework)** | £500 million (~$645 million) | **both** |
| Streamlined Energy and Carbon Reporting (SECR) (2018) | United Kingdom | **climate (GHG emissions/transition risk)** | £36 million (~$47 million) | **both** |
| Various Supply Chain Due Diligence Laws (2015-2022) | UK; Canada; various other jurisdictions | supply chains (controlling for issues such as conflict minerals, child labor, "modern slavery", etc. | in each case, lower than the California revenue thresholds | **both** |

*Notes:*

[*]  Some of the requirements listed here are conditioned on accounting metrics that are very similar but not identical to revenue. These include *proceeds* (California Supply Chains Transparency Act) and *turnover* (EU and UK requirements). In certain cases, applicability is conditioned on meeting another criterion, usually a low-threshold one, in addition to the revenue-based criterion.

[**] Bolded text highlights relevant parallels between the California Disclosure Bills and other disclosure requirements already in existence.

*Source:* Analysis of public laws by Professor George S. Georgiev.

A-1

**Item 2.    The California Disclosure Laws Compared to <u>Proposed</u> Disclosure
Obligations Conditioned on Annual Revenues**

| Name of Bill (Year) | Jurisdiction | Subject Matter | Annual Revenue Threshold* | Public & Private Co. Coverage |
|---|---|---|---|---|
| **S.B. 253 (2023)** | **California** | **climate (GHG emissions/ transition risk)** | **$1 billion** | **both** |
| **S.B. 261 (2023)** | **California** | **climate-related business risk (TCFD framework)** | **$500 million** | **both** |
| Federal Acquisition Regulation Amendments (2022) | U.S. federal government | **climate-related business risk; GHG emissions** | $50 million | **both** |
| New York Senate Bill S5437 (2023-24) | New York | **climate-related business risk; GHG emissions** | $500 million/ $1 billion | **both** |
| Illinois General Assembly HB4268 (2023-24) | Illinois | **GHG emissions** | $1 billion | **both** |
| Treasury Laws Amendment (Financial Market Infrastructure and Other Measures) Bill 2024 | Australia | **climate-related business risk; GHG emissions** | AU$50 million (~$33 million) | **both** |

*Notes:*

\* Some of the requirements listed here are conditioned on accounting metrics that are very similar but not identical to revenue. In certain cases, applicability is conditioned on meeting another criterion, usually a low-threshold one, in addition to the revenue-based criterion.

\*\* Bolded text highlights relevant parallels between the California Disclosure Laws and proposed disclosure requirements.

*Source:* Analysis of publicly available legislative records by Professor George S. Georgiev.

A-2

**Item 3.   The Rapidly-Expanding Universe of Large Private Companies and the Under-Inclusiveness of a Public Company-Only Alternative**



**Number and Aggregate Valuation of U.S.-based Unicorns (2013–2023)**

Source: Updated and adapted from George S. Georgiev, *The Breakdown of the Public–Private Divide in Securities Law: Causes, Consequences, and Reforms*, 18 NYU J. L. & Bus. 221 (2021) (data derived from historical CB Insights reports)

## Item 4.   California's Public Pension Funds in Comparative Perspective (Defined Benefit Assets)

| National Rank | Plan Sponsor | Total Defined Benefit Assets | |
|---|---|---|---|
| 1 | California Public Employees | $430.4 | billion |
| 2 | California State Teachers | $288.6 | billion |
| 18 | California University | $81.0 | billion |
| 21 | Los Angeles County Empl. | $67.6 | billion |
| 41 | San Francisco City & County | $32.4 | billion |
| 44 | Los Angeles Fire & Police | $26.9 | billion |
| 51 | Orange County | $19.9 | billion |
| 52 | Los Angeles City Employees | $19.8 | billion |
| 60 | Los Angeles Water & Power | $17.5 | billion |
| 67 | San Diego County | $14.4 | billion |
| 69 | San Bernardino County | $13.1 | billion |
| 73 | Sacramento County | $11.6 | billion |
| 76 | Alameda County | $10.4 | billion |
| 78 | San Diego City | $10.0 | billion |
| 80 | Contra Costa County | $9.9 | billion |
| 91 | Ventura County | $6.8 | billion |
| 98 | San Mateo County | $5.3 | billion |
| 99 | Fresno County | $5.3 | billion |

- Number of California public pension funds with defined-benefit assets above $5 billion: **18 funds**
- Total assets represented by those 18 pension funds: **$1.07 trillion**
- Share of California's defined-benefit assets as a percentage of U.S. states' total defined-benefit assets: **23%**

*Source:* Analysis of 2023 data on U.S. public pension fund assets under management (defined-benefit) from *Pensions & Investments*.

## Data Sources for Appendix

### Item 1:

| | | |
|---|---|---|
| California Transparency in Supply Chains Act (2010) | California | https://oag.ca.gov/sites/all/files/agweb/pdfs/cybersafety/sb_657_bill_ch556.pdf |
| Corporate Sustainability & Reporting Directive (2023) | European Union | https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:32022L2464 |
| The Companies (Strategic Report) (Climate-related Financial Disclosure) Regulations (2022) | United Kingdom | https://www.legislation.gov.uk/uksi/2022/31/made |
| Streamlined Energy and Carbon Reporting (SECR) (2023) | United Kingdom | https://assets.publishing.service.gov.uk/media/5de6acc4e5274a65dc12a33a/Env-reporting-guidance_inc_SECR_31March.pdf |
| Various Supply Chain Due Diligence Laws (2015-2022) | UK; Canada | https://www.legislation.gov.uk/ukpga/2015/30/contents/enacted; https://laws.justice.gc.ca/eng/acts/F-10.6/; |

### Item 2:

| | | |
|---|---|---|
| Federal Acquisition Regulation Amendments (2022) | U.S. federal government | https://www.federalregister.gov/documents/2022/11/14/2022-24569/federal-acquisition-regulation-disclosure-of-greenhouse-gas-emissions-and-climate-related-financial |
| New York Senate Bill S5437 (2023-24) | New York | https://www.nysenate.gov/legislation/bills/2023/S5437 |
| Illinois General Assembly HB4268 (2023-24) | Illinois | https://www.ilga.gov/legislation/103/HB/PDF/10300HB4268lv.pdf |
| Treasury Laws Amendment (Financial Market Infrastructure and Other Measures) Bill 2024 | Australia | https://www.aph.gov.au/Parliamentary_Business/Bills_Legislation/Bills_Search_Results/Result?bId=r7176 |

### Item 3:

Periodic editions of the *Complete List of Unicorn Companies*, CB Insights, https://www.cbinsights.com/research-unicorn-companies. Data presented in 2023 dollars.

### Item 4:

Pensions and Investments, *The P&I 1,000 largest U.S. retirement funds: 2023*, https://www.pionline.com/largest-us-retirement-plans/2023-full-list.