ROB BONTA
Attorney General of California
GARY E. TAVETIAN (SBN 117135)
MYUNG J. PARK (SBN 210866)
Supervising Deputy Attorneys General
M. ELAINE MECKENSTOCK (SBN 268861)
CAITLAN MCLOON (SBN 302798)
EMILY HAJARIZADEH (SBN 325246)
DYLAN REDOR (SBN 338136)
KATHERINE GAUMOND (SBN 349453)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6438
  Fax:  (916) 731-2128
  E-mail:  Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,*
*Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,**<br><br>Defendants. | 2:24-cv-00801-ODW-PVC<br><br>**DECLARATION OF THOMAS P. LYON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON CLAIM I**<br><br>Date:      September 9, 2024<br>Time:      1:30 p.m.<br>Courtroom:  5D<br>Judge:     The Honorable Otis D. Wright, II<br>Trial Date:  Not Set<br>Action Filed: 1/30/2024 |

1

1

2                        **DECLARATION OF THOMAS P. LYON**

3    I, Thomas P. Lyon, hereby declare:

4        1.    I have been retained by counsel for Defendants Liane M. Randolph,

5    Steven S. Cliff, and Robert A. Bonta, in their official capacities, (Defendants) in

6    connection with the above captioned litigation.  I have actual knowledge of the

7    matters stated in this declaration and can truthfully testify to the matters contained

8    herein.

9        2.    I am the Dow Chair of Sustainable Science, Technology, and

10   Commerce at the University of Michigan, with appointments in both the Ross

11   School of Business and the School for Environment and Sustainability (SEAS).  I

12   received my Bachelor's of Science in engineering from Princeton University and

13   my Masters and PhD degrees in Engineering-Economic Systems from Stanford

14   University.  I am the author of five books and over 70 journal articles, which have

15   been cited over 12,000 times.  I have served for 8 years as Faculty Director of the

16   Erb Institute for Global Sustainable Enterprise at University of Michigan, and for 5

17   years as President of the Alliance for Research on Corporate Sustainability

18   (ARCS).  I have been a visiting scholar at the University of Chicago, Stanford

19   University, the University of Paris, Resources for the Future, and the US

20   Department of Justice.  I received the Distinguished Scholar Award from the

21   Organizations and the Natural Environment Division of the Academy of

22   Management in 2022, and the World Sustainability Award from the MDPI

23   Sustainability Foundation in 2023.  A true and correct copy of my CV is attached

24   hereto as Exhibit (Ex.) 1.

25       3.    My research focuses on the drivers and the impacts of corporate

26   sustainability initiatives.  I have written articles on government regulation, industry

27   self-regulation, voluntary environmental programs, environmental information

28   disclosure, greenwashing, and corporate political responsibility.  My 2011 paper

with John Maxwell, *Greenwash: Corporate Environmental Disclosure under Threat of Audit*, in the *Journal of Economics and Management Strategy*, launched the serious scholarly study of greenwash, i.e. misleading corporate sustainability claims. I have since written five additional papers on the subject, and this corpus of work has been cited nearly 3,500 times.

4.     Greenwashing appeared to be in decline by 2016, but it has since surged as investment firms proliferated portfolios designed around environmental, social and governance (ESG) criteria and companies scrambled to produce "net zero" plans for decarbonization. Media are paying close attention: my work on greenwash has been profiled by the *Princeton Alumni Weekly*, the *San Francisco Chronicle*, the *Financial Times*, and the *American Association for the Advancement of Science*, and it featured prominently in my winning the World Sustainability Award in 2023.

5.     Methodology:

a.     I have been asked by the California Department of Justice to submit this declaration, based on my independent opinions and expertise, regarding the importance of information in markets, the roles of mandatory and voluntary disclosure, the relevance of environmental disclosure to investors and other stakeholders, the impacts of disclosure on environmental performance, and the dangers of greenwashing.

b.     I have read and am familiar with California Senate Bills 253 and 261 (S.B. 253 and S.B. 261).

c.     I have read and am familiar with the Motion for Summary Judgment filed by Plaintiffs United States Chamber of Commerce, et al. in the above captioned matter, and the supporting materials attached thereto.

d.     In developing my expert opinions for this declaration, I consulted a wide range of scholarly literature on the topics I am discussing, drawing from fields that include economics, management, accounting and finance. The key

research papers on which I rely are cited below and copies of them will be made available. I also reviewed work by consultants such as KPMG and non-profits such as InfluenceMap for their insights on these matters.

      e.     I have relied on information that is customarily reviewed and relied upon by experts in my field of corporate sustainability, which studies the causes and consequences of environmentally-friendly corporate actions. This is a field that has grown rapidly since I helped to found the Alliance for Research on Corporate Sustainability (ARCS), and hosted the first ARCS conference at the University of Michigan in 2009. There is now a large body of research on the factors driving corporate sustainability initiatives, as well as their environmental impact, and disclosure has been a major theme in this body of work.

      f.     I have also relied on my own personal knowledge, training, and experience in the field of economics, and in corporate sustainability in particular. As can be seen from my C.V., I have written numerous papers on the impacts of disclosure on financial and environmental performance, theoretical and empirical analyses of greenwashing, and the factors driving carbon emissions reductions at the facility level.

**<u>Summary</u>**

6.     In this declaration, I will provide support for the following conclusions: Markets cannot function efficiently without full information. Voluntary disclosure alone is generally insufficient to ensure that stakeholders receive full information and tends to lead to misleading environmental claims, or "greenwashing." Greenwashing harms a firm's stakeholders and undermines trust in markets more broadly. Disclosure of environmental performance (including a firm's carbon footprint[1]) is considered material by investors, consumers and

---

[1] A firm's carbon footprint is the sum total of greenhouse gas emissions for which the firm is responsible. I use the term in the way that life-cycle analysts use it, that is, to refer to all emissions associated with the production of the firm's products, from "cradle to grave," meaning the emissions associated with all inputs, the production process itself, distribution, use of the

employees, and hence is "closely tethered" to market transactions.  Carbon disclosure is already widely practiced by firms around the world.  Requiring the disclosure of emissions does not mandate any reduction in emissions, so it is very different from traditional regulatory approaches to emissions reduction.  Nevertheless, by closing the informational gap between polluters and their stakeholders, the simple disclosure of environmental performance tends to lead facilities to significantly reduce their emissions of pollutants.

**Markets cannot function efficiently without full information**

7.    One of the greatest accomplishments of the field of economics was to show that under certain conditions competitive markets deliver efficient outcomes in which it is impossible to make anyone better off without making someone else worse off.  The 1983 Nobel Prize in Economics was awarded to Gerard Debreu for his work establishing the conditions for general equilibrium.  Markets are extraordinarily valuable social institutions, to which we in capitalist countries owe much of our economic well-being.

8.    However, if the requisite conditions fail, then markets may perform poorly.  One of the critical requirements is that of full information.  Over the last 50 years, economic research has shown that if some individuals hold private information about key aspects of products and services, then market outcomes may be severely degraded.  The 2001 Nobel Prize in Economics was awarded to George Akerlof, Michael Spence, and Joseph Stiglitz for their work on markets with asymmetric information.  When sellers possess private information about the quality of the products on offer, high-quality goods may be driven out of the market, leaving only a "market for lemons."  George A. Akerlof, *The Market for 'Lemons': Quality Uncertainty and the Market Mechanism*, 84(3) Q. J. of Econ. 488, 488–500 (1970), attached hereto as Exhibit (Ex.) 2.  When employees possess

product, and disposal of the product at end of life.   The Greenhouse Gas Protocol is the most widely accepted methodology for measuring a firm's carbon footprint.  See further, Greenhouse Gas Protocol, https://ghgprotocol.org/ (last visited July 19, 2024).

private information about their own capabilities, employers may be unable to separate high-quality from low-quality employees, thereby driving down their productivity. Michael Spence, *Job Market Signaling*, 87(3) Q. J. of Econ. 355, 355–374 (1973), attached hereto as Ex. 3. When borrowers possess private information about their credit-worthiness, banks may be forced to ration credit, thereby reducing the productivity of capital markets. Joseph E. Stiglitz & and Andrew Weiss, *Credit Rationing in Markets with Imperfect Information*, 71(3) The Am. Econ. Rev. 393, 393–410 (1981), attached hereto as Ex. 4. In all of these cases, asymmetric information undermines market performance.

9.  Even that great apostle of "free markets," Milton Friedman, who argued in his famous New York Times Magazine opinion piece that, "there is one and only one social responsibility of business—to use its resources and engage in activities designed to increase its profits," recognized that this only works if business "*engages in open and free competition without deception or fraud*." Milton Friedman, *A Friedman Doctrine: The Social Responsibility of Business is to Increase Its Profits*, N.Y. Times, Sept. 13, 1970, https://www.nytimes.com/1970/09/13/archives/a-friedman-doctrine-the-social-responsibility-of-business-is-to.html, attached hereto as Ex. 5 (emphasis added). When some market participants are deprived of information about material facts relevant to business performance, then there is no longer any presumption that free markets produce efficient or desirable outcomes for society.

10.  Companies typically possess more detailed and accurate data about their own internal operations, the risks and opportunities they face, and the environmental impacts they create than do external observers. This private information might be termed "subjective" since it is only known truly by the firm, especially when it comes to assessing the risks and opportunities to which the company is exposed. Nevertheless, this private information is critically important for investors and other stakeholders. In fact, without this information, investors can

be taken advantage of by insiders, which is why the Securities Exchange Act of 1934 (the "Act") places strict rules on insider trading and requires publicly traded companies to disclose material information to present and potential shareholders. Because companies guard closely their private information, it is extremely difficult for government or external ratings organizations to estimate a firm's financial risks and opportunities as accurately as can the company itself. Hence the Act requires the companies to prepare the disclosures themselves. In similar fashion, S.B. 261 requires companies to disclose their climate-related financial risk and present the measures, if any, they have taken to reduce and adapt to it. In addition, because companies are closer to their own internal operations and their supply chains than anyone else, S.B. 253 requires companies to measure and disclose their carbon emissions.

**Voluntary disclosure is generally insufficient to provide full information**

11.    One might hope that companies with strong performance records and rosy prospects would have incentives to voluntarily disclose all relevant information to their investors and other stakeholders. Some of them do so. But the world of finance offers a long, sad litany of examples of financial chicanery and shenanigans, including such familiar examples as Enron, Tyco and WorldCom, companies that robbed many people of their life savings. This is why business school courses in financial accounting teach budding investors all the many ways companies can mislead them by manipulating earnings statements.

12.    In theory, and under certain special conditions, voluntary disclosure may be sufficient to provide full information to a market. To begin with, the receiver of information must be highly rational, sophisticated and utterly skeptical about corporate statements. She must assume the worst about any firms that fail to fully disclose all relevant information. And she must be able to costlessly verify the claims made by the company. If these conditions hold, then in theory voluntary disclosure can be sufficient to produce a so-called "unraveling" effect, whereby all

1  firms fully disclose in order that investors not assume the worst about them.  Paul

2  Milgrom & John Roberts, *Relying on the Information of Interested Parties*, 17(1)

3  The RAND J. of Econ. 18, 18–32 (1986), attached hereto as Ex. 6.

4          13.    In practice, however, the conditions for voluntary disclosure to create

5  full information seldom hold.  It is typically costly for receivers of information to

6  verify corporate claims, especially claims about environmental and social

7  performance.  In fact, for many environmental claims, it is essentially impossible

8  for most external stakeholders to verify a corporate claim.  How should an investor

9  verify claims about a firm's toxic chemical emissions?  How should a consumer

10  verify a firm's claims about its treatment of its employees in other countries?  How

11  should an employee verify a firm's claims about the safety of its workforce?

12  Moreover, there is a substantial body of research showing that in the real world,

13  investors are not always the paragons of steely, hard-headed rationality that they are

14  sometimes depicted as, and are in fact often easily misled.  James D. Westphal &

15  Edward J. Zajac, *The Symbolic Management of Stockholders: Corporate*

16  *Governance Reforms and Shareholder Reactions*, 43(1) Admin. Sci. Q. 127, 127–

17  153 (1998), attached hereto as Ex. 7.  Even though one might suppose that investors

18  fully and instantly make use of all publicly available information (this is the so-

19  called "efficient market hypothesis"), research shows that investors respond to

20  ratings and rankings that process publicly available information in new and more

21  convenient forms, something that would not happen if markets were already fully

22  efficient.  Thomas P. Lyon & Jay P. Shimshack, *Environmental Disclosure:*

23  *Evidence from Newsweek's Green Companies Rankings*, 54(5) Bus. & Soc'y 632,

24  632–675 (2015), attached hereto as Ex. 8.

25          14.    As voluntary disclosure grows more common, it becomes increasingly

26  possible for analysts to use data disclosed to the CDP to estimate the emissions of

27  non-disclosing firms using statistical models based on observable data, such as

28  industry, size, revenues, purchasing spend and similar measures.  Although it can

1  seem tempting to just rely on these estimates and not require the disclosure of

2  actual data, there are a number of problems with such an approach.  To begin with,

3  outside estimates can never be as accurate as actual reports.  One recent study found

4  that even for the relatively well-understood Scope 1 and Scope 2 emissions, the

5  correlations between estimates from different data providers were only between

6  0.63 and 0.79.  Patrick Bolton & Marcin Kacperczyk, *Do Investors Care About*

7  *Carbon Risk?*, 142 J. of Fin. Econ. 517, 521 (2021), attached hereto as Ex. 9.  Thus,

8  there are significant accuracy limitations to using estimated data instead of actual

9  reported data.

10      15.    In addition, it is important to recognize that all analyst estimates

11  extrapolate from data that either must be disclosed by law already (Scope 1

12  emissions disclosed to the EPA's GHG Reporting Program) or voluntarily disclosed

13  (which may include Scopes 1, 2, and 3), usually to CDP, by firms that do their own

14  internal homework to measure their emissions.  There is no guarantee that the firms

15  that choose to disclose are representative of the firms that refuse to do so.

16  Moreover, recent research shows that individual facilities are gradually cutting their

17  emissions over time, but at rates that vary depending upon local conditions.  Glen

18  Dowell & Thomas Lyon, *Beliefs Matter: Local Climate Concerns and Industrial*

19  *Greenhouse Gas Emissions in the United States*, J. of Bus. Ethics 1, 1–24 (2024),

20  attached hereto as Ex. 10.  Estimates will inevitably fail to capture this potentially

21  growing source of disparity across firms.

22      16.    Moreover, the old adage "you can't manage what you don't measure"

23  applies here.  Only by becoming conversant with the real emissions of their own

24  facilities and of their individual suppliers can businesses learn to manage their

25  emissions.  Leaving the job of estimation to external analysts shifts the

26  responsibility for measurement to third parties who cannot manage company

27  emissions.  Requiring disclosure incentivizes companies to develop capabilities for

28  both measuring and managing their emissions.  There is a substantial amount of

1 research that shows disclosure leads to emissions reductions, as I discuss in detail
2 below.

3    17.    In short, voluntary disclosure is generally insufficient to provide full
4 information in markets, especially for performance attributes that are difficult for
5 external observers to verify, such as environmental and social performance or
6 future business risks and opportunities.  Although the emissions of non-disclosers
7 can be estimated by outsiders, this process will always be imperfect and reliance on
8 external estimates will fail to incentivize companies to build the capabilities needed
9 to reduce emissions.

10    **Voluntary disclosure tends to lead to greenwashing**

11    18.    Not only is voluntary disclosure insufficient to ensure that markets
12 have full information, it can systematically distort market information in ways that
13 are highly misleading, a practice known as "greenwashing" when it involves
14 environmental information.  Thomas P. Lyon & John W. Maxwell, *Greenwash:*
15 *Corporate Environmental Disclosure under Threat of Audit*, 20(1) J. of Econ. &
16 Mgmt. Strategy 3, 3–41 (2011), attached hereto as Ex. 11; Eun-Hee Kim & Thomas
17 P. Lyon, *Strategic Environmental Disclosure: Evidence from the DOE's Voluntary*
18 *Greenhouse Gas Registry*, 61(3) J. of Env't Econ. & Mgmt. 311, 311–326 (2011),
19 attached hereto as Ex. 12.  Firms—like individuals---often have incentives to
20 disclose information that is favorable to them and to withhold information that is
21 damaging.  At best, this leads to an incomplete picture of the firm's overall
22 performance.  In practice, however, it is likely to lead to a misleadingly positive
23 view of firm performance, by creating a "halo effect" that leads stakeholders to
24 believe that unreported dimensions of performance are also likely to be positive.
25 (Declaration of Thomas P. Lyon in support of Defendants' Opposition to Plaintiffs'
26 Motion to Dismiss (Lyon Decl.), Ex. 11 at 5.)  This is especially likely for firms
27 with middling reputations.  Firms with flawless reputations have little negative
28 information to disclose, and firms with terrible reputations have little to lose by

exposing their dirty laundry, since they are already expected to be bad.  Firms with
middling reputations, however, may be able to improve their image through the
selective disclosure of good performance on certain dimensions of behavior.  *Id*. at
23–24.

19.    Empirical evidence supports the existence of a halo effect.  In 2010,
the Federal Trade Commission (FTC) contracted with Harris Interactive, a leading
market research firm, to conduct large-scale survey experiments of 3,777
respondents to study the extent of the halo effect.  They found that an unqualified
claim that a product is "green" led 27% of respondents to believe the product had
no environmental impacts at all, something that it literally impossible.  Even
carefully delimited and narrow claims led 17% of respondents to believe that the
product in question had no environmental impacts whatsoever.  Guides for the Use
of Environmental Marketing Claims, 75 Fed. Reg. 63552, 63562 (proposed Oct. 15,
2010) (to be codified at 16 CFR Part 260).  Even respondents who did not take such
an extreme view tended to believe that a narrow claim also implied a broader set of
green credentials.  With halo effects this strong, greenwashing is easy for firms with
an interest in misleading their consumers.

20.    Selective disclosure is among the most common ways in which firms
greenwash, but it is far from the only one.  Thomas P. Lyon & A. Wren
Montgomery, *The Means and End of Greenwash*, 28(2) Org. & Env't 223, 223–249
(2015), attached hereto as Ex. 13; Noémi Nemes et al., *An Integrated Framework to
Assess Greenwashing*, 14(8) Sustainability 4431 (2022), attached hereto as Ex. 14.
Other ways include the use of vague claims ("this product is green", "this product is
natural"), failing to provide substantiation for claims, making irrelevant claims
("our farm is fish friendly" even though there are no streams running through it),
liberally using the color green in advertising or promotions to suggest that a
company is environmentally friendly even when it is not, and making small
operational improvements while using political clout to block climate policy.  Lyon

Decl., Ex. 14; Thomas P. Lyon, et al., *CSR needs CPR: Corporate sustainability and politics*, 60(4) Cal. Mgmt. Rev. 5, 5–24 (2018), attached hereto as Ex. 15.

21.     Although greenwashing once seemed to be in decline, perhaps due to growing consumer awareness and sophistication, it has re-emerged with a vengeance in recent years.  A. Wren Montgomery, Thomas P. Lyon, & Julian Barg, *No End in Sight? A Greenwash Review and Research Agenda*, Org. & Env't 1, 1–3 (2023), DOI:10860266231168905, attached hereto as Ex. 16.  Figure 1, from Montgomery et al. (2023) (Ex. 16), shows a sharp increase in news stories about greenwashing since 2016, which the authors find is largely driven by unverifiable environmental, social and governance (ESG) claims and questionable corporate net zero plans.



Figure 1: News articles mentioning greenwash. Lyon Decl., Ex. 16 at 2.

22.     Although much of the concern about greenwashing focuses on direct corporate claims, even "intermediated" voluntary disclosures (i.e., those made through an intermediary that collects and presents the information) can involve greenwashing.  For example, the US Department of Energy's Voluntary Greenhouse Gas Registry, created by section 1605b of the Energy Policy Act of 1992, allowed firms great latitude in how to report their emissions reductions. Lyon Decl., Ex. 12 at 3.  The vast majority of firms reporting to the Registry (85%)

chose to report only the actions they had taken to reduce emissions (what plaintiffs dub "Scope 4" emissions) and chose not to disclose their actual carbon footprint. *Id*. at 10–11.  In fact, as shown in Figure 2 below, participants in the 1605b program reported substantial emissions reductions while their actual reductions were negative, i.e. their carbon footprints were growing rapidly.



Figure 2: Reported vs. Actual Reductions in the DOE's 1605b Program. Lyon Decl. Ex. 12 at 11.

23.     In addition, as shown in Figure 3, the firms that chose to report to the Registry at all were increasing their emissions over time, i.e., they had negative actual reductions, while those that did not report were decreasing their emissions over time, i.e. they had positive actual reductions.  Lyon Decl. Ex. 12 at 12.



Figure 3: Actual Reductions by Non-Participants and Participants in the 1605b Program.  Lyon Decl. Ex. 12 at 12.

24.     Overall, the voluntary nature of the DOE's 1605b program allowed firms to selectively disclose and thereby produce highly misleading reports.  In other words, the program itself facilitated greenwashing.  The experience with this program offers important insights for how to design future disclosure programs to prevent the possibility of greenwashing, and shows the dangers of focusing on corporate projects to reduce emissions (dubbed "Scope 4" emissions in plaintiffs' filing).

25.     Similar problems exist with other voluntary programs of intermediated disclosure.  For example, some firms reporting to CDP (formerly called the Carbon Disclosure Project) claim a reduction in emissions from one year to the next that is inconsistent with the difference in the firm's total emissions between the two years, apparently hoping that readers of the reports will not notice.  Patrick Callery & Jessica Perkins, *Detecting False Accounts in Intermediated Voluntary Disclosure*, 7(1) Acad. Of Mgmt. Discoveries 40, 40–56 (2021), attached hereto as Ex. 17.  Moreover, the firms that engage in this practice tend to do so on a regular basis, suggesting it is a strategic rather than an inadvertent effort at misleading the investors who rely on CDP reports.  *Id.* at 52–54.

26.     It is important to recognize that greenwashing can occur either through a failure to fully disclose a firm's actual carbon footprint (as occurred in the DOE's 1605b program), or through a failure to disclose the physical and transition risks to which a firm is exposed.  For example, a firm may discuss its "net zero plan" with great fanfare, implying that it is well prepared to deal with carbon-related financial risks.  However, if that plan is marred by greenwash, which recent research suggests is a common problem, then investors may be misled regarding the actual level of risk to which the firm is exposed.  Melissa Aronczyk, Patrick McCurdy, & Chris Russill, *Greenwashing, Net-Zero, and the Oil Sands in Canada: The Case of Pathways Alliance*, (112) Energy Res. & Soc. Sci. 103502, at 1–2 (2024), attached hereto as Ex. 18; Lyon Decl., Ex. 13 at 223–224 .

**Mandatory rules for disclosure are necessary to prevent greenwash**

27.     As explained above, experience with voluntary disclosure—either unmediated corporate claims or intermediated disclosure---shows that allowing firms to choose whether or how to report can be highly misleading.  In order to prevent misleading selective disclosure, it is necessary to prescribe certain aspects of disclosure.  Michael J. Fishman, & Kathleen M. Hagerty, *The Optimal Amount of Discretion to Allow in Disclosure*, (105)(2) The Q. J.of Econ. 427, 427–444 (1990), attached hereto as Ex. 19.  In the case of the DOE's Voluntary Greenhouse Registry, for example, this could have taken the form of requiring disclosure of a firm's overall carbon footprint.  Lyon Decl. Ex. 12, at 2.  Simply allowing firms to report their emissions reduction projects (what plaintiffs dub "Scope 4 emissions") without disclosing their overall footprint, was highly misleading.  In order to prevent this sort of greenwashing, mandatory rules that explicitly lay out required disclosures are needed to protect stakeholders.

28.     Mandatory disclosure on a consistent basis prevents greenwashing, ensures that stakeholders have comparable information about all the firms in their consideration set, enables stakeholders to make better decisions, and enables

markets to function efficiently.

**Greenwashing harms a firm's stakeholders, and the market more broadly**

29.    Greenwashing harms consumers, employees, investors, and citizens by depriving them of accurate information about the environmental impacts of products and companies.  This makes it impossible for these stakeholders to make informed choices that best satisfy their own preferences.  Consumers who are seeking to buy greener products end up buying products they did not prefer.  Ravi Dutta-Powell, Joshua J. Rhee, & Saul Wodak, *Two Interventions for Mitigating the Harms of Greenwashing on Consumer Perceptions*, 33 (2) Bus. Strategy & the Env't 882, 882–903 (2024), attached hereto as Ex. 20.  Employees who prefer to work for an environmentally friendly company end up working for companies whose practices do not align with their own values.  Jennifer L. Robertson, A. Wren Montgomery, & Timur Ozbilir, *Employees' Response to Corporate Greenwashing*, 32(7) Bus. Strategy & the Env't 4015, 4015–4027 (2023), attached hereto as Ex. 21.  Investors seeking to build a green portfolio inadvertently end up putting their money into brown investments.  Ellen Pei-yi Yu, Bac Van Luu, & Catherine Huirong Chen, *Greenwashing in Environmental, Social and Governance Disclosures*, (52) Res. in Int'l Bus.& Fin. 101192 (2020), attached hereto as Ex. 22. Citizens who want to see their country make progress on environmental protection are lulled into complacency by the belief that business is "taking care of things" on its own, and end up without the public policies that would ensure that even laggard firms make real progress.  Neil Malhotra, Benoît Monin, & Michael Tomz, *Does Private Regulation Preempt Public Regulation?*, 113(1) Am. Pol. Sci. Rev., 19, 19–37 (2019), attached hereto as Ex. 23.

30.    In addition to the harms that greenwashing imposes on consumers, employees, investors and citizens, it also harms rival firms that are authentically green.  These firms make the investments needed to reduce their environmental

impacts, but they are put at an unfair competitive disadvantage when they must compete with firms that make strong environmental claims but do not incur the costs of actually being green.  Stephen F. Hamilton & David Zilberman, *Green Markets, Eco-Certification, and Equilibrium Fraud*, 52(3) J. of Env'l Econ. and Mgmt. 627, 627–644 (2006), attached hereto as Ex. 24.  Moreover, greenwashing causes systemic damage because it undermines consumer trust in green markets more generally.  As consumers are exposed to more and more greenwash, they become increasingly skeptical of any green claims, making it more difficult for authentically green firms to deliver their messages in a convincing manner.  KPMG, *Avoiding the Greenwash Peril: Best Practices for the Asset Management Sector* (2023), https://assets.kpmg.com/content/dam/kpmg/ie/pdf/2023/01/ie-getting-ahead-of-greenwashing.pdf, attached hereto as Ex. 25.

**Environmental disclosure is considered material by investors, consumers and employees, and hence is "closely tethered" to market transactions**

31.    A large body of research shows that environmental performance is material to stakeholders, and hence disclosure is closely tethered to market transactions.

*Investors*

32.    With regard to investors, there is a large body of literature examining a range of different disclosure settings, which consistently find disclosure material to investors, in the sense that information about environmental performance influences share prices.  One of the most widely studied disclosure programs is the Toxic Release Inventory (TRI), which was created by the Emergency Planning and Community Right-to-Know Act of 1986 (42 USC §§ 11001 et seq.), authorized by Title III of the Superfund Amendments and Reauthorization Act and administered by the Environmental Protection Agency (EPA).  The Act requires that all facilities that produce more than a threshold level of a group of potentially toxic chemicals must disclose how much of each they emitted, and whether they released those

chemicals into air, land or water.  42 USC § 11002.  The first reporting year for the TRI was 1988, and research found that firms that emitted more TRI chemicals suffered larger reductions in share value in June 1989 when initial disclosures were made.  James T. Hamilton, *Pollution as News: Media and Stock Market Reactions to the Toxics Release Inventory Data*, 28(1) J.of Env't Econ.& Mgmt. 98, 98–113 (1995), attached hereto as Ex. 26; Shameek Konar & Mark A. Cohen, *Information as Regulation: The Effect of Community Right to Know Laws on Toxic Emissions*, 32(1) J. of Env't Econ. & Mgmt. 109, 109–1274 (1997), attached hereto as Ex. 27. The average firm with toxic emissions lost $4 million in share value on the day releases were first made public.  Lyon Decl., Ex. 26.  Subsequent work found that toxic emissions led to an intangible liability of roughly $380 million for the average firm in the S&P 500. Shameek Konar & Mark A. Cohen, *Does the Market Value Environmental Performance?*, 83(2) The Rev. of Econ. &Stat. 281, 281-289 (2001), attached hereto as Ex. 28.

33.    More general information about corporate environmental performance also moves share prices.  For the period from 1985 to 1991, and for all publicly traded firms on the New York Stock Exchange and the American Stock Exchange, firms winning environmental awards enjoyed share price increases of 0.63% on average, while firms experiencing environmental crises suffered share price drops of 1.5% on average.  Robert D. Klassen & Curtis P. McLaughlin, *The Impact of Environmental Management on Firm Performance*, 42(8) Mgmt. Sci. 1199, 1207–1209 (1996), attached hereto as Ex. 29.  Similarly, for all publicly traded firms in the United States over the period from 1980 to 2009, positive news stories about corporate environmental performance raised share prices while negative stories lowered them.  Caroline Flammer, *Corporate Social Responsibility and Shareholder Reaction: The Environmental Awareness of Investors*, 56(3) Acad. of Mgmt. J. 758, 758–781 (2013), attached hereto as Ex. 30.  When Newsweek issued its first Green Ratings for the 500 largest U.S. companies in 2009, firms in the top

100 experienced gains of between 0.6 – 1.0% compared to firms in the bottom 400.
Lyon Decl., Ex. 8 at 666.

34.    Investors definitely find climate information, in particular, to be
material.  In fact, the reason institutional investors created the Carbon Disclosure
Project (now called simply CDP) was because they considered climate information
material but were unable to get as much of it as they wanted.  Research clearly
shows that markets penalize firms for their carbon emissions.  Patrick Bolton &
Marcin Kacperczyk, *Do investors care about carbon risk?*, J. of Fin. Econ. 517,
517–549 (2021), attached hereto as Ex. 31; Ella Mae Matsumura, Rachna Prakash,
& Sandra C. Vera-Muñoz., *Firm-value effects of carbon emissions and carbon
disclosures*, 89(2) The Acct. Rev. 695, 695– 724, attached hereto as Ex. 32.
However, there is also evidence that voluntary disclosers are treated less harshly by
the financial markets than non-disclosers.  Ex. 32.  Moreover, earning higher CDP
scores can raise share prices (Yevheniia Antoniuk, *The Effect of Climate Disclosure
on Stock Market Performance: Evidence from Norway*, 31(2) Sustainable Dev.
1008, 1008–26 (2023), attached hereto as Ex. 33), and that simply being a discloser
to CDP can signal resilience to climate transition risks, raising share value when
shocks occur that increase the likelihood of climate regulation.  Eun-Hee Kim &
Thomas Lyon, *When Does Institutional Investor Activism Increase Shareholder
Value?: The Carbon Disclosure Project*, 11(1) The BE J. of Econ. Analysis &
Pol'y (2011), attached hereto as Ex. 34.  External ratings of firms' preparation to
deal with climate risks has been found to move share prices (Timothy Beatty & Jay
P. Shimshack, *The Impact of Climate Change Information: New Evidence from the
Stock Market*, 10(1) The BE J. of Econ. Analysis & Pol'y 10, no. 1 (2010), attached
hereto as Ex. 35), and a number of papers have found that greater exposure to
climate risk can raise a firm's financing costs.  Ex. 31; Patrick Bolton & Marcin
Kacperczyk, *Global Pricing of Carbon-Transition Risk*, 78(6) The J. of Fin. 3677,
3677–3754 (2023), attached hereto as Ex. 36; Gerhard Kling, et al., *The Impact of*

*Climate Vulnerability on Firms' Cost of Capital and Access to Finance*, 137 World
Dev. 105131 (2021), attached hereto as Ex. 37.  At the same time, there is some
evidence that participation in the U.S. government-sponsored Climate Leaders
program during the period 1993-2008 harmed share prices.  Karen Fisher-Vanden
& Karin S. Thorburn, *Voluntary Corporate Environmental Initiatives and
Shareholder Wealth*, 62(3) J. of Env't Econ. & Mgmt 430, 430–445 (2011),
attached hereto as Ex. 38.  This suggests that firms may only be rewarded for taking
climate action when climate risk is considered by investors to be material,
something that may not have been true 15 to 30 years ago.  Moreover, there is some
evidence that markets do not fully and efficiently factor climate issues into
valuation, with the implication that "[m]andatory and standardised information on
carbon performance would consequently not only increase market efficiency but
result in better allocation of capital within the real economy."  Andrea Liesen, et al.,
*Climate Change and Asset Prices: Are Corporate Carbon Disclosure and
Performance Priced Appropriately?*, 44(1-2) J. of Bus. Fin. & Acct. 35, 35 (2017),
attached hereto as Ex. 39.

35.    It is important to note that Scope 3 emissions are highly relevant for
investors, even though they are not "direct" emissions from a firm's own facilities.
Ex. 31.  Firms may protest that Scope 3 emissions are not "their" emissions because
they occur upstream in the supply chain, or downstream in the use phase of the
product.  Protestations that firms cannot control their supply chains ring hollow to
stakeholders, however.  For example, Nike famously protested that sweatshop labor
in its supply chain was not its responsibility, but stakeholders disagreed and held
Nike responsible for labor violations in its supply chain.  Ann Harrison & Jason
Scorse, *Multinationals and Anti-Sweatshop Activism*, 100(1) Am. Econ. Rev. 247,
247–273 (2010), attached hereto as Ex. 40.  Nike eventually realized that it was
smarter to take action to reduce sweatshop labor in its suppliers' facilities than to
simply complain that it had no responsibility for its supply chain.

36.    When it comes to their climate footprint, companies face very real risks from their Scope 3 emissions.  Suppose future climate policy requires upstream suppliers to make costly investments to cut their emissions; those costs will be partially passed through to downstream firms, whose sales and margins will shrink as a result.  Alternatively, suppose future climate policy requires that downstream users shoulder more responsibility for their carbon emissions, e.g. by requiring that more energy efficient appliances be produced and used; those changes will reduce the demand for energy (e.g. natural gas and electricity), and thereby affect the sales and profits of (upstream) energy companies.  Either way, investors naturally want to know the extent of such transition risks in the supply chains of firms in which they invest.

37.    It is also worth addressing directly the notion of "Scope 4" emissions and their relevance to investors and other stakeholders.  To begin with, it is important to recognize that there are multiple definitions of "Scope 4" emissions.  InfluenceMap, a UK-based non-governmental organization, defines Scope 4 emissions as a firm's "carbon policy footprint," that is, the extent to which the firm's political influence has been used to block or delay climate policy and thereby to indirectly increase global carbon emissions.  InfluenceMap, *Corporate Climate Policy Footprint: The 25 Most Influential Companies Blocking Climate Policy Action Globally*, Nov. 2022, https://influencemap.org/briefing/Corporate-Climate-Policy-Footprint-20137, attached hereto as Ex. 41.  InfluenceMap conducts extensive research to identify the full set of channels through which companies use their political clout to block climate policy, and provides letter grades to companies.  An example of their ratings is presented below in Figure 4.



Figure 4: InfluenceMap Ratings of Scope 4 Emissions from Companies and the

U.S. Chamber of Commerce from Thomas P. Lyon & William Mandelkorn,

*Measuring Corporate Political Responsibility*, *in Corporate Political*

*Responsibility*, 78 (T.P. Lyon ed., 2023), attached hereto as Ex. 42 at 78.

38.     Plaintiffs offer a very different definition of "Scope 4" emissions,

referring to them as "emissions that companies avoid, and which should therefore

be deducted from Scope 1, 2, and/or 3 emissions, as appropriate." Pls.' Mem.

Supp. Summ. J 14 (ECF 48-2). As mentioned earlier in my declaration when

discussing the DOE's 1605b Voluntary Greenhouse Gas Registry, this definition of

Scope 4 emissions focuses on a company's energy efficiency investments and other

emissions reduction projects. Such projects are worthy, and companies have every

right and every incentive to share information about those projects with

stakeholders in the appropriate forum. In fact, experience with the DOE's

Voluntary Greenhouse Gas Registry shows that companies are much more likely to

disclose these projects than to disclose their full carbon footprints.

39.     However, even if one accepts this alternative definition, it is important

to recognize that the assertion that "Scope 4" emissions should be deducted from

Scope 1, 2 and/or 3 emissions is fallacious, as doing so would lead to inaccurate

emissions data.  In fact, any projects that succeed in avoiding emissions will by definition reduce emissions from the first 3 scopes of a reporting entity, and hence will automatically be reflected in an accurate reporting of Scopes 1, 2 and 3 emissions.  There is no need to report so-called "Scope 4" emissions separately.  Moreover, reporting and subtracting "Scope 4" emissions from the total of Scopes 1, 2 and 3 emissions would be a misleading exercise in double counting and, in effect, a new form of greenwash.

40.    To make this point concrete, consider the example of a firm that emitted 1 million metric tons of CO2 equivalent (MMTCO2e) in 2020, with 500,000 tons of Scope 1 emissions, 250,000 tons of Scope 2 emissions, and 250,000 tons of Scope 3 emissions.  Now suppose that on January 1, 2021, it invests in more efficient equipment that brings its Scope 1 emissions down to 400,000 MMTCO2e.  Thus, for 2021 it reports Scope 1 emissions of 400,000 tons, Scope 2 emissions of 250,000 tons and Scope 3 emissions of 250,000 tons.  The efficiency improvement that reduced its Scope 1 emissions is already fully reflected in the firm's 2021 report.  Moreover, if the firm now reported 100,000 tons as a "Scope 4" emission in 2021, and proposed to subtract that amount from its total of 900,000 MMTCO2e, that would imply it was emitting only 800,000 tons, a misleading underestimate and a new form of greenwash.  The true carbon footprint is already disclosed through Scopes 1, 2 and 3.  There is no need to report on reduction efforts separately, although the firm is of course free to discuss these in its annual report, 10k, website, or other appropriate forum.

### Consumers

41.    Although investor views of environmental performance information have received more study, perhaps because share price information is readily available, research shows that consumers also consider environmental information to be material.  Markets have been growing rapidly for green products such as organic produce (Syed Badruddoza, Andrea C. Carlson, & Jill J. McCluskey, *Long-*

*Term Dynamics of US Organic Milk, Eggs, and Yogurt Premiums*, 38(1)
Agribusiness 45, 45–72 (2022), attached hereto as Ex. 43), sustainable seafood
(Frank Wijen & Mireille Chiroleu-Assouline, *Controversy Over Voluntary*
*Environmental Standards: A Socioeconomic Analysis of the Marine Stewardship*
*Council*, 32(2) Org. & Env't 98, 98–124 (2019), attached hereto as Ex. 44), and
sustainable coffee.  Juliane Reinecke, Stephan Manning, & Oliver Von Hagen, *The*
*Emergence of a Standards Market: Multiplicity of Sustainability Standards in the*
*Global Coffee Industry*, 33(5-6) Org. Stud. 791, 791–814 (2012), attached hereto as
Ex. 45.  Moreover, customers have also been shown to respond to carbon labeling
of groceries.  Jerome K. Vanclay, et al., *Customer Response to Carbon Labelling of*
*Groceries*, 34 J. of Consumer Pol'y 153, 153–160 (2011), attached hereto as Ex.
46.

### *Employees*

42.    A growing body of research shows that employees prefer to work for
environmentally friendly firms, so disclosure is material to them as well.  It is
increasingly understood that green firms can attract employees at lower salary
levels and be less likely to lose them to competitors.  Kjell Arne Brekke & Karine
Nyborg, *Attracting Responsible Employees: Green Production as Labor Market*
*Screening*, 30(4) Resource & Energy Econ. 509, 509–526 (2008), attached hereto as
Ex. 47.  Moreover, recent survey research shows that employees are aware of their
firms' greenwashing behaviors, which they view as corporate hypocrisy and which
can increase their turnover intentions.  Lyon Decl., Ex. 21.

### **Carbon Disclosure is Already Widely Practiced.**

43.    Carbon disclosure is already provided by thousands of firms around
the world.  Carbon emissions are commonly classified into three groups.  Scope 1
emissions are those that are emitted directly by a facility, typically by the
combustion of fossil fuels on site.  Scope 2 emissions are indirect emissions that
arise from the generation of electricity purchased from an electric utility.  Scope 3

emissions are indirect emissions that arise from either the upstream supply chain of a production process or the downstream "use phase" of the product.

44.    The U.S. Greenhouse Gas Reporting Program (USGHGRP) is a mandatory disclosure program that began collecting data in 2010.  It requires all facilities that emit over 25,000 tons CO2e (including upstream suppliers whose emissions would exceed this amount during the use phase) to disclose their emissions.  The focus is on Scope 1 emissions, and roughly 8,000 facilities report through the program, which is now in its fifteenth year of operation.

45.    The CDP (formerly the Carbon Disclosure Program) is a voluntary disclosure program founded in 2000 by institutional investors seeking more information about corporate climate risks and performance.  Today, over 800 institutional investors with $100 trillion in assets under management participate. Over 23,000 firms disclose climate information to CDP, including 86% of the S&P 500, and 40% of CDP disclosers already report Scope 3 emissions, as shown in Figure 5 below.



Figure 5: Share of CDP Participants Disclosing Scope 1, 2 and 3 Emissions.CDP, *CDP 2023 Disclosure Data Factsheet* (2023), https://www.cdp.net/en/companies/cdp-2023-disclosure-data-factsheet, attached hereto as Ex. 48 at 11.

46.    The fact that thousands of firms worldwide already disclose their emissions to CDP, and that all facilities with large Scope 1 emissions in the U.S. have been required to disclose those emissions for the past 15 years suggests strongly that disclosure is not as costly, burdensome or politicized as some observers suggest.  For the vast majority of S&P 500 firms, carbon disclosure is just a normal part of doing business, just like issuing an annual report and a 10k financial report.

**Although disclosure of environmental performance does not mandate any changes in company operations, it tends to lead companies to reduce their emissions of pollutants**

47.    Disclosure does not mandate any changes in company operations or environmental performance.  Thus, it is a very "light handed" approach that differs sharply from traditional regulatory approaches such as emissions standards, which mandate that emissions be reduced to a certain level, or market-based mechanisms such as carbon taxes, which mandate that polluters pay a fee for their emissions. Tom Tietenberg, *Disclosure Strategies for Pollution Control*, 11 Env't & Resource Econ. 587, 587–602 (1998), attached hereto as Ex. 49.  Disclosure merely closes the informational gap between polluters and their stakeholders.  Nevertheless, by informing stakeholders, who are empowered to act on their new information, disclosure may indirectly affect corporate environmental performance.  For example, consumers may choose to purchase greener products, employees may change jobs to work at greener companies, and investors may reallocate their investments towards greener companies.

48.    Research shows that disclosure does indeed lead to reductions in emissions.  As mentioned earlier in this declaration, TRI data are considered material by investors, and companies with greater toxic emissions suffer greater losses in shareholder value.  Research shows that the release of toxic emissions data also leads facilities to reduce their emissions.  Indeed, the firms that suffered the

largest drops in share price after the release of the TRI subsequently cut their emissions the most, suggesting that shareholder pressure motivated companies to change their environmental behavior.  Lyon Decl., Ex. 27.  Similar effects have been found in other settings, as well.  For example, state laws mandating disclosure of chemicals used in hydraulic fracking have led to improvements in surface water quality by 9-14%.  Pietro Bonetti, Christian Leuz, & Giovanna Michelon, *Internalizing externalities: Disclosure regulation for hydraulic fracturing, drilling activity and water quality*, No. w30842. Nat'l Bureau of Econ. Res., 2023, attached hereto as Ex. 50.

49.    Intriguingly, although disclosure of raw emissions levels has been shown to lead to reductions in overall toxic emissions, reports that weighted emissions by their impacts on human health were more successful in driving reductions of the most harmful toxic emissions.  Hyunhoe Bae, Peter Wilcoxen, & David Popp, *Information Disclosure Policy: Do State Data Processing Efforts Help More Than the Information Disclosure Itself?*, 29(1) J. of Pol'y Analysis & Mgmt. 163, 163–182 (2010), attached hereto as Ex. 51.  Other research has also found that ratings and rankings can lead to emissions reductions.  For example, India's Green Ratings Program led poor performers to reduce their emissions of pollutants into waterways.  Nicholas Powers, et al., *Does Disclosure Reduce Pollution? Evidence from India's Green Rating Project*, 50 Env't and Res. Econ. 131, 131–155 (2011), attached hereto as Ex. 52.

50.    Disclosure of greenhouse gas emissions is of particular interest in the present proceeding, and a number of research studies have found that disclosure leads to GHG emissions reductions.  Greater institutional ownership of a firm by investors that are CDP signatories increases the likelihood that a firm will disclose its carbon emissions to CDP, and that disclosure in turn leads to an estimated reduction in greenhouse gas emissions of 7 to 10%.  Shira Cohen, Igor Kadach, & Gaizka Ormazabal, *Institutional Investors, Climate Disclosure, and Carbon*

1    *Emissions*, 76(2-3) Journal of Accounting and Economics 101640 (2023), attached

2    hereto as Ex. 53.  Disclosure requirements in the UK led to an estimated 8%

3    reduction in greenhouse gas emissions.  Benedikt Downar, et al., *The Impact of*

4    *Carbon Disclosure Mandates on Emissions and Financial Operating Performance*,

5    26(3) Rev.of Acct. Stud. 1137, 1137–1175 (2021), attached hereto as Ex. 54.  The

6    creation of the USGHGRP had similar effects.  One study that focused strictly on

7    power plants found that the USGHGRP led to a 7% reduction in emissions.

8    Lavender Yang, Nicholas Z. Muller, & Pierre Jinghong Liang, *The Real Effects of*

9    *Mandatory CSR Disclosure on Emissions: Evidence from the Greenhouse Gas*

10   *Reporting Program*, No. w28984. National Bureau of Economic Research, 2021,

11   attached hereto as Ex. 55.  Another study, which studied the full range of facilities

12   required to disclose to the USGHGRP, found an average reduction in emissions of

13   7% across all reporting sectors.  Sorabh Tomar, *Greenhouse Gas Disclosure and*

14   *Emissions Benchmarking*, 61(2) J. of Acct. Res. 451, 451–492 (2023), attached

15   hereto as Ex. 56.

16       51.    In short, although disclosure of greenhouse gas emissions does not

17   mandate any reduction in emissions, simply closing the informational gap between

18   polluting facilities and their stakeholders tends to lead those facilities to make

19   significant reductions in their greenhouse gas emissions.

20

21       I declare under penalty of perjury that the foregoing are true and correct.

22   Executed on this day, the 22nd of July, 2024, in Ann Arbor, Michigan.

23

24

25

26                                    THOMAS P. LYON

27                                    Professor, U. of Michigan

28   SA2024300503