# Exhibit 56

# to Declaration of Thomas P. Lyon

# Greenhouse Gas Disclosure and Emissions Benchmarking

Exhibit 56 to Decl. of Lyon
1465

# Journal of Accounting Research



DOI: 10.1111/1475-679X.12473
Journal of Accounting Research
Vol. 61 No. 2 May 2023
*Printed in U.S.A.*

CHICAGO BOOTH

# Greenhouse Gas Disclosure and Emissions Benchmarking

SORABH TOMAR*

Received 22 September 2019; accepted 29 October 2022

ABSTRACT

I examine the effects of the U.S. Greenhouse Gas (GHG) Reporting Program, which requires thousands of industrial facilities to measure and report their GHG emissions. I show that facilities reduce their GHG emissions by 7.9% following the disclosure of emissions data. The evidence indicates that benchmarking—whereby facilities use the disclosures of their peers to assess their own relative GHG performance—spurs emission reductions. Firms' concerns about future legislation appear to motivate this behavior and measurement alone (without disclosure) seems not to reduce emissions.

*Southern Methodist University Cox School of Business

Accepted by Rodrigo Verdi. This paper is based on my dissertation. I thank my committee members—Hans Christensen (co-chair), Christian Leuz (co-chair), Mark Maffett, and Abbie Smith—for their invaluable guidance. I am also grateful to Ray Ball, Phil Berger, John Barrios, Jeremy Bertomeu, Neil Bhattacharya, Matthew Bloomfield, Michael Braun, Matthias Breuer, Joey Choi (discussant), Jung Ho Choi, Carolyn Deller, Hemang Desai, João Granja, Michael Greenstone, Matthew Gustafson (discussant), Jody Grewal (discussant), Doug Hanna, Russ Hamilton, Yanrong Jia, Ginger Jin (discussant), Jean-Marie Meier, Dan Millimet, Liz Moyer, DJ Nanda, Jing Pan, Rachna Prakash (discussant), Robbie Sanders, Doug Skinner, Mark Templeton, Wayne Taylor, Marcel Tuijn, Hayoung Yoon, an anonymous associate editor, two anonymous reviewers, and seminar participants at CUNY Baruch College, Deakin University, LSE, Southern Methodist University, UCLA, University of Chicago, AAA FARS Conference, FMCG Conference, NBER Measuring and Reporting Corporate Carbon Footprints Conference, RSFE, and University of Delaware Weinberg Center/ECGI Corporate Governance Symposium for helpful comments and suggestions. I thank U.S. EPA's Emissions Inventory and Analysis Group for providing much data necessary for this study and Nivedita Gupta for valuable research assistance. An online appendix to this paper can be downloaded at https://www.chicagobooth.edu/jar-online-supplements.

451

© 2023 The Chookaszian Accounting Research Center at the University of Chicago Booth School of Business.

Exhibit 56 to Decl. of Lyon
1466

452    s. tomar

My study highlights how mandatory GHG disclosure can create real effects for peers.

**JEL codes :** D72, M40, Q54, Q56

**Keywords:** disclosure; ESG; climate change; benchmarking; peer effects; real effects; political pressure

## 1. Introduction

This paper studies the U.S. Greenhouse Gas Reporting Program (U.S. Program) to understand how mandatory, granular disclosure affects the greenhouse gas (GHG) emissions of reporting entities. It highlights the role of *benchmarking* in producing real effects, whereby facilities reduce emissions after observing the GHG disclosures of their peers. Among environmental, social, and governance (ESG) topics, climate change has received substantial attention, given its potentially catastrophic risks (Eccles and Klimenko [2019], Hoegh-Guldberg et al. [2018]). GHG disclosure mandates are thus increasingly being adopted in different regions of the world. Notably, the U.S. Securities and Exchanges Commission (SEC) proposed an extensive climate-related disclosure rule in 2022. The impact of disclosure in areas such as toxic pollution (Chen, Hung, and Wang [2018], Hamilton [2005]) suggests potential benefits in the GHG setting.

Administered by the U.S. Environmental Protection Agency (EPA), the U.S. Program was implemented in 2010, broadly for use in guiding potential future GHG policies. It requires thousands of U.S. facilities to report their yearly emissions by GHG and production activity. Disclosure frequently extends to the process or unit level (boiler, furnace, etc.). In 2010, the U.S. Program covered over 6,200 facilities that together emitted 3.2 billion tons of carbon dioxide equivalent (T $CO_2$e), roughly half of total U.S. emissions. Importantly, although facilities began measuring GHG emissions in 2010, the data were not publicly disclosed until 2012. The U.S. Program therefore provides two years of pretreatment data for this study about the effects of public disclosure. Further, because most facilities did not previously disclose GHG emissions, the U.S. Program allows study of the impact of information provision rather than of the aggregation or dissemination of existing information.

Prosocial disclosure rules often aim to create an *action-cycle*, whereby disclosed information becomes embedded in the decisions of users, and user responses, in turn, feed back into disclosers' decisions (Hombach and Sellhorn [2019], Weil et al. [2006]). Although the U.S. Program provides a significant amount of new information, there are reasons to question whether it produces a firm-level action-cycle around GHG emissions. The U.S. Program's government website might lack salience to stakeholders, its facility-level data are difficult to aggregate and exclude emissions generated abroad, and the diffuse nature of global warming increases the coordination costs of stakeholder action around the disclosed data. Yet,

14756790, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1467

U.S. Program data are also granular and informative about operations. Facilities might therefore use their peers' disclosures to identify red flags and drive down their own emissions. Given these arguments, it bears empirical examination whether the U.S. Program reduces emissions.

I divide my analysis into three parts. First, I conduct difference-in-differences tests to examine whether the U.S. Program leads to GHG emission reductions. Second, I present evidence supporting benchmarking, whereby facilities use their peers' disclosures when reducing emissions. Third, I present supplementary evidence to more completely understand the U.S. Program's effects, including the role of external stakeholder pressure and whether facilities reduce emissions during the measurement phase of the U.S. Program (prior to disclosure).

My difference-in-differences tests show that GHG emissions decline by 7.9% following U.S. Program disclosure. Canadian facilities provide a plausible counterfactual—they share many commonalities with U.S. facilities and have been disclosing their GHG emissions since 2004. The estimation accounts for industry-specific trends and time-invariant facility characteristics. Additional tests show that emission reductions are not achieved by simply curbing or offshoring economic activity. Rather, firms are seen to increase capital expenditures, suggesting they make investments to reduce GHG emissions.

To assess benchmarking, I present four sets of supportive evidence. First, I show that measures of within-industry emissions dispersion fall by 20–31%. This is consistent with greater overlap in facilities' information following disclosure. Second, I show that a facility's carbon intensity, relative to that of its peers (and revealed through disclosure), predicts its subsequent emissions reduction. This is consistent with managers using disclosed data to assess whether their facilities are more or less carbon intensive than peers. This relation only emerges when carbon intensity is constructed using data publicly observable at that time (and not timelier data not yet publicly available at that time), which helps to rule out nondisclosure-based explanations.

Third, I classify some facilities as benchmarkers based on how much their owner-firms search for their peers' financial information, à la Bernard, Blackburne, and Thornock [2020]. Benchmarkers have significantly larger GHG emission reductions relative to nonbenchmarkers. Fourth, I employ a novel measure of industrial process-similarity using the techniques of Fetter et al. [2022]. GHG emission reductions are largest when peer facilities have lower initial similarity—this is consistent with the notion that preexisting diversity in processes provides more scope for benchmarking to reduce emissions. I also show that facilities in a peer group become more similar in terms of processes after U.S. Program disclosure. Further, they end up sharing more (less) processes with their carbon light (carbon intense) peers.

Turning to supplementary evidence about the U.S. Program's effects, I first explore the role of external pressure in motivating emission reductions and benchmarking. I find a larger U.S. Program treatment effect when

14756570, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1468

14753970, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

454    S. TOMAR

facilities have climate-progressive senators, supporting the idea that facilities are attentive to the prospect of climate change–related legislation. Because constituents can seek to influence climate policy (Gelles [2022]), I also consider the role of political connections forged through campaign contributions. The U.S. Program treatment effect is larger for facilities connected to their House representatives, consistent with these facilities being more concerned about legislation or trying to shed their representatives in a favorable environmental light. In comparison, I find no strong evidence of emissions pressure from capital markets, customers, or the general public around U.S. Program disclosure.

My other supplementary evidence concerns the impact of emissions measurement and anticipation of external pressure prior to U.S. Program disclosure. Using Bayesian methods, I estimate U.S. facilities' unobservable pre-U.S. Program $CO_2$ emissions (i.e., for years 2008 and 2009). Although I find a decline in $CO_2$ emissions after U.S. Program disclosure, there is no significant emissions response when facilities first start measuring and reporting their emissions nonpublicly to the EPA (prior to disclosure). These results underscore the importance of public disclosure in producing emission reductions.

Although GHG disclosure mandates are becoming increasingly common (see Australia, the European Union, and the United Kingdom for policy examples), little is known about their effects. My paper demonstrates that they can produce an important social benefit by reducing GHG emissions. Though such reductions are not always the intent—the SEC states that its proposed rule primarily informs investors—this paper nonetheless highlights several points that may be informative for policy-makers interested in emission reductions: (1) benchmarking can play an important role in reducing emissions, and considering the U.S. Program, this seems more likely when disclosed data are granular; (2) the prospect of climate legislation is a factor that facility managers likely consider when implementing emission reductions (Glazer and McMillan [1992], Maxwell, Lyon, and Hackett [2000], Suijs and Wielhouwer [2019]); and (3) measurement and reporting to the regulator alone might not affect emissions. Recent work also highlights the potential of GHG disclosure mandates to reduce emissions (Bauckloh et al. [2022], Downar et al. [2021], Jouvenot and Krueger [2021], Matisoff [2013], Yang, Muller, and Liang [2022]). Because these papers study emissions data that are already available in another venue prior to the disclosure rules they study, they measure an effect incremental to the one I measure.[1]

My paper also contributes to the literature on the real effects of ESG disclosure. First, it measures the initial impact of information provision

---

[1] Several papers also study the real effects of voluntary GHG emissions disclosures (e.g., Qian and Schaltegger [2017], Bolton and Kacperczyk [2021]). This paper differs by estimating a treatment effect unconditional on latent factors that might also drive emission reductions (e.g., a desire to create institutional legitimacy; Luo [2019]).

Exhibit 56 to Decl. of Lyon
1469

14753591, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    455

on the disclosed outcome, rather than the impact of aggregating or disseminating information available elsewhere (e.g., Bennear and Olmstead [2008], Christensen et al. [2017]). Second, it documents the effectiveness of disclosure with respect to an externality with large collective action costs and relatively low salience and immediacy, rather than a setting where emissions are toxic and local (i.e., where effects are salient and stakeholders have low coordination costs) (e.g., Chen et al. [2018], Delmas, Montes-Sanchom, and Shimshack [2010], Graham and Miller [2001], Hamilton [2005]). Lastly, it shows that ESG disclosure can facilitate benchmarking. Roychowdhury, Shroff, and Verdi [2019] note the difficulty of identifying peer effects, given Manski's [1993] reflection problem. Although there is some evidence that firms take cues from rivals' financial and operational disclosures (Durnev and Mangen [2009], Fetter et al. [2022], Grennan and Swanson [2020], Li [2016]), firms' ESG practices could vary markedly in motivation (stakeholder orientation, alignment with financial objectives, virtue signaling, etc.), leaving the utility of peers' ESG disclosures less clear. Cao, Liang, and Zhan [2019] show that firms improve their ESG performance after their peers pass ESG-focused resolutions. They highlight a competitive concern about peers' ESG performance but do not address the role of disclosure regulation in promoting benchmarking.

## 2. Setting: The U.S. GHG Reporting Program

The Consolidated Appropriations Act of 2008 provided funds for the U.S. EPA to develop a mandatory GHG reporting rule, covering most sectors of the U.S. economy. The U.S. Program's main goal is to collect data for use in potential GHG rule-making, including emissions pricing, which had considerable support at that time (Richardson [2012]). Based on its experiences with programs such as the Toxic Release Inventory (TRI), the EPA also recognized that the U.S. Program could raise awareness of emissions among stakeholders and emitters, which could facilitate emission reductions (US EPA [2009]). The EPA proposed a mandatory GHG reporting rule on April 10, 2009, and, after soliciting comments, finalized a rule on October 30, 2009. Over this period and the following year, the prospects for U.S. GHG emissions pricing dimmed significantly.[2] The U.S. Program, however, remained intact.

The U.S. Program took effect on January 1, 2010, with the first reports due for submission to the EPA on September 30, 2011. The 2010 data were publicly disclosed by the EPA on January 11, 2012. Figure 1 provides a timeline of the key dates as they relate to the empirical tests. The U.S. Program requires facilities to report their GHG emissions by specific gas, coming

---

[2] The posited reasons for this include high unemployment after the Great Recession, lobbying by high emitters, the Senate's refusal to vote on the Waxman-Markey Bill, the growing politicization of climate policy, and the Obama administration's pivot toward healthcare, financial regulation, and energy independence.

Exhibit 56 to Decl. of Lyon
1470

14756789x, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

456    S. TOMAR



Fig 1.—Timeline of important U.S. Greenhouse Gas Reporting Program events.

from any of 41 source categories. Disclosure thresholds vary by source category, but 25,000T $CO_2e$ is the most common threshold. Depending on the source category, facilities must disclose additional information at the sub-facility level (i.e., unit or process level). Thus, the U.S. Program provides very granular data.[3]

U.S. Program reports are self-certified by facilities (i.e., third-party verification is not required). Nonetheless, the U.S. Program does promote data quality. Its electronic reporting platform provides real-time feedback about potential errors to reporting facilities. The EPA then subjects reports to a series of electronic checks, after which it can question facilities to understand any irregularities. Furthermore, the U.S. Program is given force by the U.S. Clean Air Act, which lets the EPA levy penalties of up to $37,500 per day of a violation, which includes failure to report emissions, failure to retain adequate records, and report falsification. That said, the EPA has yet to take any enforcement action regarding the U.S. Program.

U.S. Program data are publicly accessible in multiple formats. One is an interactive map geared toward novice users. Facility-level data are also available in spreadsheet format. Advanced users can access the totality of U.S. Program data by querying the EPA's Envirofacts database. From direct communications with the EPA, the GHG portion of Envirofacts received over

---

[3] Examples of GHGs are carbon dioxide ($CO_2$) and methane—$CO_2$ is the chief GHG emitted by facilities. Examples of source categories are stationary combustion and cement manufacturing. 25,000T $CO_2e$ is equivalent to the emissions from the energy used by 2,200 homes in a year or 131 railroad cars of coal. To assess whether a facility falls below an inclusion threshold, the EPA requires a submission of pen-and-paper calculations based on the amount of resources consumed and default conversion factors. For facilities included in the U.S. Program, the EPA prescribes several measurement methods. For example, there are four measurement tiers for measuring $CO_2$ emissions from fossil fuel combustion. Larger emitting units must use higher tiers. Tier 1 is based on the mass of fuel used and default laboratory factors. Tier 4, in contrast, requires continuous emissions monitoring to directly measure $CO_2$ emissions at a fixed cost of $25,000–$75,000 (Singh et al. [2015]). When reporting on stationary combustion, facilities must report the following, among other things, for each combustion unit: its type (e.g., boiler, furnace), its maximum thermal input power, the types of fuel it uses, its emissions, and any relevant emissions calculations. This serves well to illustrate the granularity of U.S. Program data.

Exhibit 56 to Decl. of Lyon
1471

14753876, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

100,000 page-views from January 2013 to June 2020, indicating the data are frequently accessed. The EPA also provides the names of reporting facilities' highest level U.S. owners, though the naming conventions are often inconsistent across years.

## 3. Related Literature and Hypothesis Development

Prosocial disclosure mandates span many areas, including workplace safety, public health, and mineral extraction rights (Christensen et al. [2017], Jin and Leslie [2003], Johnson [2020], Dranove et al. [2003], Rauter [2020]). Often, their goal is to create an action-cycle, whereby disclosure affects the decisions of information users (e.g., restaurant customers), and disclosing firms anticipate these decisions and change their behavior accordingly.

As discussed in section 2, the EPA recognizes the potential for an action-cycle to emerge around the U.S. Program. Potential users include regulators, the public, investors, and, as will be discussed, peer facilities. In the environmental domain, mandatory disclosure has led listed Chinese firms to reduce toxic $SO_2$ and wastewater emissions (Chen et al. [2018]) and utilities to improve their environmental performance (Bennear and Olmstead [2008], Delmas et al. [2010]). The EPA's TRI is perhaps the most studied pollution disclosure rule and is credited for a dramatic decline in toxic emissions (Weil et al. [2006], Graham and Miller [2001]). The TRI and U.S. Program have similarities—both are administered by the EPA, do not target a specific stakeholder group, provide information at the facility level or finer, and span a wide range of industries. As such, the TRI serves as a useful reference point for conjectures about the U.S. Program's effects. The apparent success of the TRI and other disclosures in improving environmental outcomes suggests that disclosure can play a role in curbing GHG emissions too. This leads to the first hypothesis, expressed in alternate form as follows:

*H1*: Facilities reduce their GHG emissions following U.S. Program disclosure.

A number of factors, however, militate against H1. The U.S. Program's presence on a government website might lack the salience of financial statements or customer reports (Bennear and Olmstead [2008], Christensen et al. [2017]). Further, aggregation of facility-level data is cumbersome and incompletely depicts a firm's global emissions. Thus, the potential for external pressure at the firm level loses some force.[4]

---

[4] Online appendix A1.1 describes the 766 letters about general stationary fuel combustion (the largest GHG emissions source) that the EPA received after proposing the U.S. Program. The vast majority are from manufacturers arguing that reporting requirements are excessive and that reporting granularity should be no finer than the facility level, owing to financial and proprietary cost concerns. Environmental advocates submitted seven letters pushing for more comprehensive emissions reporting. A handful of state government agencies submitted letters

Exhibit 56 to Decl. of Lyon
1472

458    S. TOMAR

Additionally, GHGs are quite different pollutants to those covered by the TRI and similar EPA programs. The latter are toxic, making their effects (e.g., illness, acid rain) salient and likely to trigger outrage. They also act locally, reducing the coordination costs of stakeholder action (e.g., shaming, litigation; Coase [1960]). In contrast, GHG emissions are largely nontoxic, and reducing them entails global coordination costs: Each emitter contributes only marginally to the global temperature, and affected stakeholders are widely dispersed. Reducing emissions might also entail significant direct costs. Weighed against the cited disclosure research, these factors highlight the importance of empirically testing the relation between GHG disclosure and emissions.

Attention must also be paid to how emission reductions could occur. Firms can mimic the ESG behavior of their competitors, and target-setting plays an important role in GHG emission-reduction strategies (Cao et al. [2019], Ioannou, Li, and Serafeim [2016]). Connecting these ideas with the U.S. Program's significant granularity, one hypothesis is that facilities (perhaps with the help of engineering consultants) might be better able to assess their own relative GHG performance once they have access to the U.S. Program data of their peers. I call this *benchmarking*. My second hypothesis, expressed in alternate form, is as follows:

*H2*: Facilities use their peers' GHG emissions disclosures for benchmarking (i.e., to better assess their own GHG performance).

Benchmarking could be driven by pressure from environmentally conscious stakeholders, who have shown a concern for relative ESG performance (Clarkson et al. [2015], Hartzmark and Sussman [2019]). Fung and O'Rourke [2000] describe how journalists and environmentalists fixated on the worst TRI performers. Facilities could benchmark their GHG emissions because they expect that outsiders will likewise benchmark these emissions.

Firms take cues from their peers' disclosures in financial contexts (Foster [1989], Shroff et al. [2014]). They also occasionally forgo energy-efficiency improvements that have positive net present value, possibly because of incomplete information (McKinsey Global Energy and Materials [2009], Gerarden, Newell, and Stavins [2017]). Therefore, profit and efficiency motives could also drive benchmarking. Grennan and Swanson [2020] and Fetter et al. [2022] highlight such behavior in fracking and hospital settings. External pressure and profit/efficiency motives could coexist and interact, making it difficult to disentangle them. For example, external pressure could lead firms to discover profitable improvements. H2 therefore considers benchmarking generally.

---

requiring clarification of the rules, and a few GHG consulting firms made recommendations for measurement methods. No letters were from the investing community.

Exhibit 56 to Decl. of Lyon
1473

14753379x, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 4. GHG Emission Reductions Following Disclosure

### 4.1 CONTROL SAMPLE

A credible estimation of the U.S. Program's real effects must account for other factors that could lead facilities' GHG emissions to decline (e.g., changes in customer demand, input prices, and available production methods). To this end, I use Canadian facilities as a control group. Canadian facilities emitting over 100,000T (50,000T) $CO_2$e have been reporting their GHG emissions to Environment Canada since 2004 (2009). The scope of both reporting programs allows me to examine the U.S. Program's effect across a wide range of industries.[5]

Several features of the United States and Canada support their comparability in terms of facility-level GHG output. First, both are developed countries, and the United States is by far Canada's largest trading partner; online appendix A2, figure A1, shows that yearly percentage changes in both countries' GDPs move together closely. Thus, many general supply and demand shocks that affect GHG emissions should affect both countries similarly. Second, the countries are culturally similar. Online appendix A2, figure A2, shows the comovement of climate change interest in both countries (measured using Google Trends). This suggests that both countries' facilities face similar patterns in public pressure about GHG emissions. Third, both countries' energy markets are highly integrated through an extensive oil and gas pipeline network. Shocks to fossil fuel demand and supply should therefore propagate across both countries. Finally, the countries' environmental regulators co-operate in terms of non–climate change issues, which affects facilities' production costs and technologies used and, in turn, their GHG emissions (Weiss [1998]).

If the comparability arguments above hold, the time series of U.S. and Canadian facilities' emissions should bear out parallel trends prior to U.S. Program disclosure. Figure 2(a) supports the validity of the parallel trends assumption. The figure plots mean logged GHG emissions by country and year for this study's sample. The two countries' facilities' emissions share similar changes from 2010 to 2011, after which U.S. facilities' emissions steadily decline. To assess parallel trends going further back, I estimate $CO_2$ emissions for a subsample of U.S. facilities for the years 2008 to 2013. Section 6.3 discusses the estimation process. Figure 2(b) shows that the trends in both countries' facility $CO_2$ emissions are roughly parallel prior to disclosure and diverge noticeably following disclosure.

The availability of Canadian Program data does not necessarily negate the usefulness of U.S. Program data for benchmarking. First, the U.S. Program requires granular unit- and process-level disclosures, whereas the

_____

[5] Other potential control groups include U.S. facilities in state-level programs, U.S. power plants, and facilities owned by firms reporting to the Carbon Disclosure Project (CDP). Online appendix A2 discusses these groups and highlights institutional features that hinder their use as control groups.

Exhibit 56 to Decl. of Lyon
1474

14756796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

460    S. TOMAR





FIG 2.—Average logged emissions for U.S. and Canadian facilities. Figure 2(a) plots average annual GHG emissions (in logged T $CO_2$e) for U.S. and Canadian facilities that reported emissions to their national GHG reporting programs. Figure 2(b) plots average annual reported $CO_2$ emissions for Canadian facilities and estimated $CO_2$ for a subsample of U.S. facilities—the estimation is described in section 6.3. For visual consistency, both figures use a balanced panel and exclude Massachusetts facilities, which began emissions reporting and disclosure a year earlier than other U.S. facilities as part of a state-level program. Additional data filters are described in sections 4.2 and 6.3. The appendix provides variable definitions.

Canadian Program does not. Second, U.S. facilities can combine U.S. Program data with their knowledge about local peers (details about their output of goods, regulatory pressures, etc.) to set more relevant benchmarks.[6] U.S. facility managers arguably have less expertise about more distant Canadian facilities (Engelberg, Ozoguz, and Wang [2018]).

---

[6] For example, the manager of a U.S. cement-making facility might gauge how much cement a local peer produces as they compete in the same market. When U.S. Program data become public, the manager can then assess whether his or her own facility uses more or less fuel, per unit of cement produced, than the peer.

Exhibit 56 to Decl. of Lyon
1475

14756701, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

14753912, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING     461

## 4.2 DATA AND DESCRIPTIVE STATISTICS

The U.S. and Canadian Program's facility-level GHG emissions spreadsheets provide the main data used in this study.[7] Power plants (NAICS code 2211) are excluded because they are subject to detailed reporting requirements prior to the U.S. Program. They also face substantial regulatory incentives and scrutiny related to GHG emissions (see online appendix A2). Municipal waste facilities (NAICS code 5622) are excluded because they emit methane, with the emission rate driven by waste composition and by ambient conditions, including pressure, rainfall, and temperature (Héroux, Guy, and Millette [2010], Santhosh, Lakshmikanthan, and Sivakumar Babu [2017]). These factors potentially manifest differently across the United States and Canada. I exclude California facilities because California strictly regulates environmental issues, raising concerns about comparability with the rest of the sample (see online appendix A2). Lastly, noncorporate entities are excluded because benchmarking appeals to a notion of competition with peers. For noncorporate entities, it is unclear what the ultimate operating objective is (e.g., customer service, cost minimization, profit maximization, employment, or social welfare).

Tables 1a–c show data coverage across a range of industries and states/provinces. The five most common industries and states/provinces account for 58% and 36% of the sample. Though many industries have zero Canadian observations, 88% of observations share an industry-year with one or more observations from the other country. Table 2(a) shows that U.S. facilities compose 90% of the sample and emit roughly half the amount of GHGs per facility ($e^{11.0-11.8} - 1 = -0.55$), reflecting the larger size of the U.S. industrial sector and the U.S. Program's lower GHG reporting threshold. U.S. facilities faced a similar average gas price and fewer GHG efficiency regulations during the sample period.

## 4.3 RESEARCH DESIGN

To test H1, which predicts a reduction in GHG emissions following U.S. Program disclosure, I estimate the following difference-in-differences equa-

---

[7] In 2011, GHGs from 10 additional source categories (e.g., electronics manufacturing, fluorinated GHG production) became applicable for U.S. Program reporting. Emissions from these source categories are excluded to maintain comparability across years and because several of these categories were not included in the Canadian Program. To code facility ownership type, data are obtained from the U.S. and Canadian Programs about the highest parent owner from the respective country. I consider owners with $\geq 50\%$ facility ownership and use Bloomberg research reports to manually identify the global parent company. A global parent is coded as public if it has a GVKEY in the Compustat database or has a quoted stock price. It is coded as noncorporate if the parent's name includes words such as "county," "state," "city," or "university." The remaining global parents are coded as private. This process took between 50 to 100 hours, highlighting the difficulty (and likely imperfections) in cleanly aggregating U.S. Program emissions to the firm level.

Exhibit 56 to Decl. of Lyon
1476

14756761, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12373 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

462   S. TOMAR

**TABLE 1A**
*Facility-Year Frequency by Four-Digit NAICS Industry and Country*

| Industry | Canada $N$ | United States $N$ | GHG Mean ($10^5$T $CO_2$e) |
|---|---|---|---|
| Aerospace Product and Parts Manuf. | 0 | 90 | 40 |
| Agriculture, Construction, and Mining Machinery Manuf. | 0 | 28 | 45 |
| Alumina and Aluminum Production | 43 | 193 | 384 |
| Animal Food Manuf. | 0 | 14 | 54 |
| Animal Slaughtering and Processing | 0 | 299 | 36 |
| Architectural, Engineering, and Related Services | 0 | 6 | 36 |
| Basic Chemical Manuf. | 114 | 1,667 | 272 |
| Beverage Manuf. | 4 | 88 | 67 |
| Cement and Concrete Product Manuf. | 60 | 326 | 611 |
| Clay Product and Refractory Manuf. | 3 | 43 | 73 |
| Coal Mining | 59 | 93 | 82 |
| Coating, Engraving, Heat Treating, and Allied Activities | 0 | 16 | 73 |
| Colleges, Universities, and Professional Schools | 0 | 27 | 94 |
| Computer and Peripheral Equipment Manuf. | 0 | 8 | 6 |
| Converted Paper Product Manuf. | 0 | 19 | 65 |
| Dairy Product Manuf. | 0 | 52 | 31 |
| Electrical Equipment Manuf. | 0 | 12 | 2 |
| Engine, Turbine, and Transmission Equipment Manuf. | 0 | 21 | 33 |
| Fabric Mills | 0 | 8 | 97 |
| Facilities Support Services | 0 | 8 | 1,050 |
| Forging and Stamping | 0 | 36 | 45 |
| Foundries | 12 | 153 | 62 |
| Fruit and Vegetable Preserving and Specialty Food Manuf. | 9 | 134 | 45 |
| General Medical and Surgical Hospitals | 0 | 32 | 35 |
| Glass and Glass Product Manuf. | 8 | 345 | 79 |
| Grain and Oilseed Milling | 16 | 338 | 234 |
| Household Appliance Manuf. | 0 | 8 | 25 |
| Iron and Steel Mills and Ferroalloy Manuf. | 44 | 494 | 679 |
| Lessors of Real Estate | 0 | 8 | 69 |
| Lime and Gypsum Product Manuf. | 48 | 346 | 292 |
| Metal Ore Mining | 50 | 64 | 341 |
| Metalworking Machinery Manuf. | 0 | 8 | 53 |
| Motor Vehicle and Parts and Supplies Wholesalers | 0 | 8 | 448 |
| Motor Vehicle Manuf. | 18 | 138 | 62 |
| Motor Vehicle Parts Manuf. | 0 | 58 | 33 |
| Natural Gas Distribution | 24 | 73 | 214 |
| Nonferrous Metal (except Aluminum) Production | 32 | 136 | 110 |
| Nonmetallic Mineral Mining and Quarrying | 40 | 170 | 182 |
| Office Furniture (including Fixtures) Manuf. | 20 | 4 | 8 |
| Oil and Gas Extraction | 469 | 2,095 | 156 |
| Other Chemical Product and Preparation Manuf. | 6 | 60 | 119 |
| Other Electrical Equipment and Component Manuf. | 0 | 12 | 77 |

(*Continued*)

Exhibit 56 to Decl. of Lyon
1477

14757s9x, 2022, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    463

**TABLE 1 A**—*(Continued)*

| | | | |
|---|---|---|---|
| Other Fabricated Metal Product Manuf. | 0 | 15 | 23 |
| Other Food Manuf. | 0 | 86 | 58 |
| Other Miscellaneous Manuf. | 24 | 16 | 31 |
| Other Nonmetallic Mineral Product Manuf. | 7 | 145 | 81 |
| Other Pipeline Transportation | 0 | 6 | 22 |
| Paint, Coating, and Adhesive Manuf. | 0 | 12 | 1 |
| Pesticide/Fertilizer/Other Agricultural Chemical Manuf. | 35 | 197 | 640 |
| Petroleum and Coal Products Manuf. | 74 | 606 | 1,089 |
| Petroleum and Petroleum Products Merchant Wholesalers | 0 | 9 | 29 |
| Pharmaceutical and Medicine Manuf. | 0 | 113 | 62 |
| Pipeline Transportation of Crude Oil | 0 | 20 | 71 |
| Pipeline Transportation of Natural Gas | 49 | 1,835 | 55 |
| Plastics Product Manuf. | 11 | 52 | 75 |
| Printing and Related Support Activities | 0 | 12 | 22 |
| Pulp, Paper, and Paperboard Mills | 195 | 880 | 190 |
| Railroad Rolling Stock Manuf. | 0 | 8 | 46 |
| Resin, Synthetic Rubber, and Synthetic Fiber Manuf. | 12 | 342 | 301 |
| Rubber Product Manuf. | 3 | 78 | 40 |
| Sawmills and Wood Preservation | 0 | 21 | 10 |
| Scheduled Air Transportation | 0 | 8 | 47 |
| Scientific Research and Development Services | 0 | 30 | 64 |
| Seafood Product Preparation and Packaging | 0 | 8 | 36 |
| Semiconductor and Other Electronic Component Manuf. | 0 | 146 | 31 |
| Soap, Cleaning Compound, and Toilet Preparation Manuf. | 0 | 25 | 75 |
| Steel Product Manuf. from Purchased Steel | 8 | 50 | 79 |
| Sugar and Confectionery Product Manuf. | 8 | 108 | 188 |
| Support Activities for Mining | 0 | 297 | 47 |
| Textile and Fabric Finishing and Fabric Coating Mills | 0 | 24 | 39 |
| Textile Furnishings Mills | 0 | 31 | 45 |
| Tobacco Manuf. | 0 | 12 | 84 |
| Traveler Accommodation | 0 | 12 | 67 |
| Utility System Construction | 0 | 4 | 70 |
| Veneer, Plywood, and Engineered Wood Product Manuf. | 16 | 60 | 32 |
| Water, Sewage and Other Systems | 19 | 167 | 151 |
| All | 1,540 | 13,173 | 234 |

tion using ordinary least squares (OLS):

$$GHG_{it} = \beta_1 \mathbb{1}_{\{t \geq 2012\}t} + \beta_2 US_i + \beta_3 \mathbb{1}_{\{t \geq 2012\}t} * US_i + \gamma X_{it} + \eta_i + \eta_{kt} + \varepsilon_{it}. \quad (1)$$

I also conduct cross-sectional tests by estimating the following equation:

$$GHG_{it} = \beta_1 \mathbb{1}_{\{t \geq 2012\}t} + \beta_2 US_i + \beta_3 \mathbb{1}_{\{t \geq 2012\}t} * US_i$$
$$+ \beta_4 \mathbb{1}_{\{t \geq 2012\}t} * US_i * \mathbb{1}_{\{CROSS\text{-}SECTION\}it} + \gamma X_{it} + \eta_i + \eta_{kt} + \varepsilon_{it}, \quad (2)$$

Exhibit 56 to Decl. of Lyon
1478

464   S. TOMAR

**TABLE 1B**
*Facility-Year Frequency by U.S. State*

| State | United States N |
| --- | --- |
| Alabama | 430 |
| Alaska | 122 |
| Arizona | 112 |
| Arkansas | 370 |
| Colorado | 294 |
| Connecticut | 69 |
| Delaware | 32 |
| Florida | 184 |
| Georgia | 291 |
| Hawaii | 16 |
| Idaho | 106 |
| Illinois | 511 |
| Indiana | 421 |
| Iowa | 364 |
| Kansas | 278 |
| Kentucky | 285 |
| Louisiana | 1,129 |
| Maine | 57 |
| Maryland | 53 |
| Massachusetts | 90 |
| Michigan | 429 |
| Minnesota | 299 |
| Mississippi | 233 |
| Missouri | 184 |
| Montana | 73 |
| Nebraska | 154 |
| Nevada | 62 |
| New Hampshire | 16 |
| New Jersey | 130 |
| New Mexico | 198 |
| New York | 249 |
| North Carolina | 224 |
| North Dakota | 111 |
| Ohio | 560 |
| Oklahoma | 386 |
| Oregon | 143 |
| Pennsylvania | 586 |
| Rhode Island | 12 |
| South Carolina | 220 |
| South Dakota | 85 |
| Tennessee | 260 |

(*Continued*)

where $i$, $k$, and $t$ are the indices for facilities, four-digit NAICS industries, and years 2010 to 2013, respectively. *GHG* is logged tons of $CO_2e$ emitted. *US* indicates U.S.-located facilities, $\mathbb{1}_{\{t \geq 2012\}}$ indicates years 2012 and onward (2011 and onward for Massachusetts facilities, whose emissions were disclosed a year earlier through a state-level program), and $\mathbb{1}_{\{CROSS\text{-}SECTION\}}$

14756916, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12375 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1479

**TABLE 1B**—(Continued)

| State | United States N |
|---|---|
| Texas | 1,921 |
| Utah | 175 |
| Vermont | 16 |
| Virginia | 173 |
| Washington | 198 |
| West Virginia | 211 |
| Wisconsin | 280 |
| Wyoming | 371 |
| All | 13,173 |

**TABLE 1C**
*Facility-Year Frequency by Canadian Province*

| Province | Canada N |
|---|---|
| Alberta | 524 |
| British Columbia | 253 |
| Manitoba | 34 |
| New Brunswick | 36 |
| Newfoundland and Labrador | 28 |
| Northwest Territories | 16 |
| Nova Scotia | 27 |
| Ontario | 325 |
| Prince Edward Island | 4 |
| Quebec | 196 |
| Saskatchewan | 97 |
| All | 1,540 |

These tables count the observations used in the primary regression analysis (table 3, column 4) by four-digit NAICS industry-country and by Canadian province/U.S. state. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported GHG emissions to their national GHG reporting programs. Data filters are described in section 4.2.

indicates U.S. facilities of particular cross-sectional interest. GHG emissions are logged to account for scale differences across facilities; as such, $\beta_3$ approximates the percentage change in emissions following the U.S. Program's first data disclosure. $X$ denotes the control variables described below. The use of facility and industry-year fixed effects means the estimation accounts for persistent facility characteristics and industry-level shocks. The industry definition is granular (e.g., *3311: iron and steel mills and ferro-alloy manufacturing*). Standard errors are clustered by industry-year to account for shocks cross-sectionally correlated within industries.

Logged GDP (value-added) is included at the two-digit NAICS-country-year level to account for industry-region–specific shocks to demand and supply. The year-lagged-logged regional natural gas price is included to account for variation in incentives to use natural gas, which is more $CO_2$-efficient than oil. Given that U.S. natural gas production increased after 2005 on account of hydraulic fracturing, a concern is that greater avail-

Exhibit 56 to Decl. of Lyon
1480

14753958, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12373 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

14753679x, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

466   S. TOMAR

**TABLE 2**
*Descriptive Statistics*

(a) Facility level

| | | | | Canada | | | | |
|---|---|---|---|---|---|---|---|---|
| | $N$ | Mean | SD | q1 | q25 | q50 | q75 | q99 |
| *GHG* | 1,540 | 11.8 | 1.52 | 6.67 | 11.1 | 11.7 | 12.8 | 15.3 |
| *GDP* | 1,540 | 11.9 | 0.316 | 10.6 | 11.7 | 12.1 | 12.1 | 12.1 |
| *GAS_PRICE* | 1,540 | 1.29 | 0.204 | 0.891 | 1.12 | 1.31 | 1.45 | 1.56 |
| *REGULATIONS* | 1,540 | 6.39 | 2.37 | 2 | 6 | 7 | 8 | 10 |

| | | | | United States | | | | |
|---|---|---|---|---|---|---|---|---|
| | $N$ | Mean | SD | q1 | q25 | q50 | q75 | q99 |
| *GHG* | 13,173 | 11.0 | 1.52 | 10.3 | 10.9 | 10.9 | 11.8 | 14.9 |
| *GDP* | 13,173 | 13.90 | 0.793 | 12.5 | 13.0 | 14.5 | 14.5 | 14.5 |
| *GAS_PRICE* | 13,173 | 1.30 | 0.189 | 0.891 | 1.02 | 1.38 | 1.45 | 1.52 |
| *REGULATIONS* | 13,173 | 2.40 | 1.53 | 1 | 1 | 2 | 3 | 8 |

(b) Firm level

| | $N$ | Mean | SD | q1 | q25 | q50 | q75 | q99 |
|---|---|---|---|---|---|---|---|---|
| *CAPEX* | 1,189 | 0.081 | 0.080 | 0.003 | 0.032 | 0.055 | 0.101 | 0.448 |
| *GROSS_MARGIN* | 1,189 | 0.330 | 0.201 | 0.025 | 0.181 | 0.277 | 0.441 | 0.838 |
| *US* | 1,189 | 0.887 | 0.290 | 0.000 | 1.00 | 1.00 | 1.00 | 1.00 |
| *GDP* | 1,189 | 13.8 | 0.948 | 11.7 | 12.9 | 14.5 | 14.5 | 14.5 |
| *GAS_PRICE* | 1,189 | 1.30 | 0.189 | 0.891 | 1.08 | 1.38 | 1.43 | 1.52 |
| *REGULATIONS* | 1,189 | 2.56 | 1.82 | 1 | 1 | 2 | 3 | 8 |
| *LEVERAGE* | 1,189 | 0.597 | 0.217 | 0.146 | 0.477 | 0.587 | 0.698 | 1.272 |
| *MV* ($bn) | 1,189 | 22.6 | 43.8 | 0.060 | 1.60 | 5.48 | 23.4 | 211 |
| *MTB* | 1,189 | 3.25 | 24.2 | −5.06 | 1.23 | 1.83 | 2.72 | 16.5 |

Table 2(a) describes the observations used in primary regression analysis (table 3, column 4). Its sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported GHG emissions to their national GHG reporting programs. Table 2(b) describes the highest-level parent-firm of these facilities. Data filters are described in sections 4.2 and 4.4.2. The appendix provides variable definitions.

ability of natural gas might lead U.S. facilities to reduce their GHG emissions. I use prices from Dawn Ontario and AECO Storage in Canada's east and west, and Dominion South, Henry Hub, SoCal Border, and Kern River in the United States' northeast, south, west, and center. These data come from SNL Financial and Alberta Energy Regulator. Lastly, the number of efficiency incentives and regulations that are both applicable to a facility and implemented at the federal or state levels are included. The regulations typically relate to building energy use, and the incentives typically exist as rebates for energy efficiency improvements. These data come from North Carolina State University's DSIRE and Natural Resources Canada's Directory of Energy Efficiency and Alternative Energy Programs.

Exhibit 56 to Decl. of Lyon
1481

14753911, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    467

**TABLE 3**
*Facility GHG Emission Reductions Following U.S. Program Disclosure*

| VARIABLES | (1) GHG | (2) GHG | (3) GHG | (4) GHG |
|---|---|---|---|---|
| $\mathbb{1}_{[t \geq 2012]} * US$ | −0.302 | −0.121*** | −0.065** | −0.082** |
| | (0.255) | (0.039) | (0.027) | (0.033) |
| $\mathbb{1}_{[t \geq 2012]}$ | 0.067 | 0.136** | 0.035 | 0.051 |
| | (0.175) | (0.060) | (0.066) | (0.066) |
| $US$ | −0.605*** | | | |
| | (0.172) | | | |
| $GDP$ | | | | 0.220 |
| | | | | (0.420) |
| $GAS\_PRICE$ | | | | −0.021 |
| | | | | (0.342) |
| $REGULATIONS$ | | | | −0.007 |
| | | | | (0.008) |
| Observations | 15,041 | 14,791 | 14,713 | 14,713 |
| Adjusted $R^2$ | 0.028 | 0.897 | 0.902 | 0.902 |
| Facility & Year fixed effects | | Y | | |
| Facility & Ind-Year fixed effects | | | Y | Y |

Standard errors clustered by industry-year in parentheses; ***$p<0.01$, **$p<0.05$, *$p<0.1$. This table is discussed in section 4.4.1 and shows how U.S. facilities' logged GHG emissions change following the U.S. GHG Reporting Program's first disclosure of emissions data in January 2012. Canadian facilities provide the control. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG reporting programs. Data filters are described in section 4.2. The appendix provides variable definitions.

## 4.4 EMISSIONS REDUCTION FINDINGS

*4.4.1. GHG Emissions Levels.* Table 3 shows the results of estimating equation (1), which tests for a GHG emissions reduction for U.S. facilities following U.S. Program disclosure. Moving from column 1 to 2 shows that facility and year fixed effects explain a large portion of the GHG emissions variation. Column 3 shows that using industry-year fixed effects reduces the estimate on $\beta_3$ appreciably, highlighting the importance of controlling for industry-level shocks. Column 4 shows that including control variables slightly increases the estimated treatment effect. Column 4 provides the baseline result: Consistent with H1, U.S. facilities reduce emissions by 7.9% ($e^{-0.082} - 1$; p = 0.014), relative to Canadian facilities, following the first disclosure of U.S. Program data in 2012.[8] This is a 4.1% standard deviation

---

[8] For comparison, related papers—Downar et al. [2021], Jouvenot and Krueger [2021], and Yang, Muller, and Liang [2022]—estimate 14%, 12%, and 7% emission reductions. These studies capture the effects of dissemination and aggregation of existing information, whereas my paper estimates a treatment effect for facilities that largely had no emissions information available elsewhere. Online appendix A3 describes long-run emission patterns following disclosure. Facilities that eventually exit the U.S. Program see a large emissions reduction of 33.2%. Later entrants to the U.S. Program see a significant emissions increase of 10.3%, consistent with these facilities often being growing ones.

Exhibit 56 to Decl. of Lyon
1482

14756791x, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

468   S. TOMAR



FIG 3.—Emissions differences (U.S.−Canada) by year relative to the 2011 difference. As described in section 4.4.1, these figures plot the $\beta_{3,k}$s obtained from estimating the following OLS equation: $GHG_{it}$ or $CO2_{it} = \beta_1 US_i + \sum_{k \in 2008\ (or\ 2010)\ to\ 2013}^{\text{excluding 2011}} (\beta_{2,k} \mathbb{1}_{[t=k]} + \beta_{3,k} \mathbb{1}_{[t=k]} * US_i) + \gamma X_{it} + \eta_i + \eta_{jt} + \varepsilon_{it}$. The $\beta_{3,k}$s track how U.S. and Canadian facilities' emissions differ relative to their 2011 difference. U.S. $CO_2$ emissions are estimated as described in section 6.3. The sample comprises U.S. and Canadian facilities that reported GHG emissions to their national GHG reporting programs. Additional data filters are described in sections 4.2 and 6.3. The appendix provides variable definitions.

change in U.S. facilities' logged GHG emissions or a 21% standard deviation change when GHG emissions are residualized against the fixed effects (see DeHaan [2021]).

To explore the GHG emissions reduction dynamically, I estimate a version of equation (1) in which the $US$ dummy interacted with a sequence of dummies that indicate each sample year except for 2011 (the reference year). Figure 3(a) plots this sequence of interactions. It supports H1 by showing that the relative emissions differential stays close to zero until the U.S. Program's first disclosure, after which U.S. facilities display a relative decline in emissions. Figure 3(a) also supports the parallel trends assumption.

Online appendix A4, table A2, shows the GHG emissions reduction result is not driven by oil and gas facilities or the few states that have GHG

Exhibit 56 to Decl. of Lyon
1483

14751796x, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    469

emissions pricing. It is also robust to including noncorporate facilities and municipal waste facilities, extending the sample window forward to 2016, and using an entropy-balanced panel of facilities. Another concern might be that emission reductions are unlikely to materialize in a year. Longer lead-times do exist for emissions reduction changes, such as retrofits of complex equipment for a new fuel type—this is consistent with the continued decrease in emissions in figure 3(a) in 2013. However, less complex retrofits or replacements, maintenance, calibration, and optimization, and other behavioral changes can be implemented within a year.[9]

*4.4.2. Offshoring, Reduced Economic Activity, and Investments.* Facilities could reduce reported GHG emissions by moving emissions generation abroad, beyond the U.S. Program's reach. This explanation would not predict emission reductions in industries with less geographically mobile production (i.e., where the produced goods have a high weight-to-value ratio or are fragile, or the raw materials are immobile). To address this possibility, I estimate a version of equation (2) that measures an incremental emissions reduction for facilities in industries with less mobile production (e.g., cement and concrete).[10] Table 4, column 1, shows that emission reductions are concentrated in facilities with relatively immobile production, which is inconsistent with the idea that reductions are driven by offshoring.

Facilities could also achieve lower GHG emissions by curbing economic activity. To address this possibility, I first produce a facility-level measure of carbon intensity ($CO_2$ emissions per unit of goods produced). $CO_2$ is largely produced by burning fuels. Online appendix A5 details this measure. Summarized briefly, I use the emissions of pollutants that do *not* largely arise from burning fuels as a proxy for the quantity of goods produced. These data come from the EPA's National Emissions Inventory and Emissions Inventory System (U.S. NEI/EIS), which provides information about U.S. facilities' hazardous air emissions (not GHGs), and Environment Canada's National Pollutant Release Inventory. Importantly, the U.S. data are available at the facility-process-pollutant level. As an example, when paper and pulp facilities convert wood chips to pulp, a chemical treatment produces volatile organic compounds (VOCs). The idea is that producing the same amount of paper will produce the same amount of VOCs, even if the fuel combustion step that heats the wood chips becomes

---

[9] For example, Colket et al. [2012] report that a combustion control system and a sensor package retrofit for a 25 MMBtu boiler at Watervliet Arsenal in New York State resulted in a 4% reduction in $CO_2$ emissions. Full deployment, including commissioning, was completed in three days.

[10] These industries are cement and concrete product manufacturing; converted paper product manufacturing; glass and glass product manufacturing; metal ore mining; natural gas distribution; nonmetallic mineral mining and quarrying; oil and gas extraction; pipeline transportation of natural gas; pulp, paper, and paperboard mills; support activities for mining; and water, sewage, and other systems.

Exhibit 56 to Decl. of Lyon
1484

470   S. TOMAR

**TABLE 4**
*Offshoring, Reduced Economic Activity, and Investments*

| | Facility-Year Level | | | Firm-Year Level | |
|---|---|---|---|---|---|
| Variables | (1)<br>GHG | (2)<br>CARBON_INT | (3)<br>CARBON_INT | (4)<br>CAPEX | (5)<br>GROSS_MARGIN |
| $\mathbb{1}_{\{t \geq 2012\}} * US * \mathbb{1}_{\{LOW\ MOBILITY\}}$ | -0.147** | | | | |
| | (0.073) | | | | |
| $\mathbb{1}_{\{t \geq 2012\}} * US$ | -0.018 | -0.072** | -0.075 | 0.025** | 0.018 |
| | (0.024) | (0.034) | (0.050) | (0.012) | (0.013) |
| GAS_PRICE | -0.004 | 0.354 | 0.356 | 0.036 | -0.227* |
| | (0.343) | (0.320) | (0.329) | (0.120) | (0.129) |
| REGULATIONS | -0.011 | | -0.002 | -0.002 | -0.006* |
| | (0.008) | | (0.011) | (0.002) | (0.003) |
| GDP | 0.807 | | -0.045 | -0.023** | 0.060 |
| | (0.593) | | (0.534) | (0.010) | (0.037) |
| MV | | | | 0.065 | 0.186 |
| | | | | (0.101) | (0.220) |
| LEVERAGE | | | | -0.033 | -0.088*** |
| | | | | (0.031) | (0.030) |
| MTB | | | | -0.000 | 0.000 |
| | | | | (0.000) | (0.000) |
| Observations | 14,713 | 6,149 | 6,149 | 1,187 | 1,189 |
| Adjusted $R^2$ | 0.902 | 0.968 | 0.968 | 0.726 | 0.921 |
| Facility & Ind-Year fixed effects | Y | Y | Y | | |
| Firm & Ind-Year fixed effects | | | | Y | Y |

Standard errors clustered by industry-year in parentheses; *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in section 4.4.2. Column 1 shows how U.S. facilities' logged GHG emissions change following the U.S. GHG Reporting Program's first disclosure of emissions data in January 2012, with an emphasis on industries in which production is difficult to relocate. Columns 2 and 3 examine changes in U.S. facilities' carbon intensity. Columns 4 and 5 examine changes in U.S. firms' capital expenditures and gross margins. Canadian facilities/firms provide the control. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities (or their owners) that reported emissions to their national GHG reporting programs. Data filters are described in sections 4.3 and 4.4.2. The appendix provides variable definitions.

14714171, 2022, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12431 by University Of Michigan Library, Wiley Online Library on [24/02/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1485

14755796, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12373 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING      471

more efficient. Thus, $CO_2$ emissions can be scaled by VOC emissions to produce a carbon intensity proxy for paper and pulp facilities.

Carbon intensity should not respond to U.S. Program disclosure if facilities curb economic activity to reduce GHG emissions. To test this implication, I estimate a version of equation (1) that uses logged carbon intensity as the dependent variable. For this and all other dependent variables based on ratios, I winsorize at the first and 99th percentiles. I require a balanced panel because the U.S. reporting threshold for noncombustion pollutants varies across years.[11] My preferred specification excludes *GDP* and *REGULATIONS* as control variables. *GDP* captures industry supply and demand shocks, which should not affect carbon intensity. *REGULATIONS* varies at the state level, as does the regulation of noncombustion pollutants (Chemical Watch [2019]). If energy efficiency regulation/incentives and (non-GHG) pollution regulation are jointly determined by states, *REGULATIONS* has a potentially complicated relation with carbon intensity. Column 2 shows that U.S. facilities' carbon intensity falls by roughly 7% in response to U.S. Program disclosure; this is similar to the emissions *level* change of $-7.9\%$, suggesting that U.S. facilities do not reduce GHG emissions by simply curbing economic activity. Column 3 shows that the carbon intensity reduction remains similar in magnitude but loses statistical significance when including all control variables ($p = 0.14$).

To explore the idea that facilities instead make tangible investments to reduce GHG emissions, I examine firm-level capital expenditures (CAPEX). To aggregate my data to the firm level, I take weighted averages of the facility-level independent variables described in section 4.3, with weights based on each facility's 2011 GHG emissions. Because some firms have facilities in both Canada and United States, the *US* variable becomes continuous, ranging from zero to one. I then estimate the following OLS equation:

$$CAPEX_{jt} = \beta_1 \mathbb{1}_{\{t \geq 2012\}t} + \beta_2 US_j + \beta_3 \mathbb{1}_{\{t \geq 2012\}t} * US_j$$
$$+ \gamma X_{jt} + \eta_j + \eta_{kt} + \varepsilon_{jt}. \tag{3}$$

$j$ indexes a firm, and *CAPEX* is capital expenditures divided by lagged assets. $X$ contains the firm-level aggregates of the facility-level controls and a firm's market capitalization, leverage, and market-to-book ratio (to capture potential firm-level economies of scale in managing emissions, financing constraints, and growth opportunities; Kogan and Papanikolaou [2014], Myers [1977]).

Consistent with the idea that firms invest to reduce GHG emissions, column 4 shows that, following U.S. Program disclosure, U.S. firms' CAPEX increases by 2.5% of assets relative to Canadian firms. Tangible investments and other workflow changes could affect operational performance

---

[11] The years 2008, 2011, and 2014 are comprehensive years characterized by lower emissions reporting thresholds, and thus they cover more facilities. These years' data form part of the EPA's National Emissions Inventories. Emissions data for the noncomprehensive years—2009, 2010, 2012, and 2013—are found in the U.S. Emission Inventory System database and were provided directly by the EPA.

Exhibit 56 to Decl. of Lyon
1486

14751976, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

472    S. TOMAR

(e.g., by changing cost structure aspects). Consistent with Downar et al. [2021], however, column 5 shows no significant change in gross margins for U.S. Program firms.[12] These firm-level results require caveats. First, financial statement variables capture economic activity outside of the United States and from nonfacility aspects of a business, but U.S. Program data do not. Additionally, many manufacturing costs are recognized when sales are made, yet the associated GHG emissions can occur in earlier years. Therefore, these tests corroborate that facilities made real changes following U.S. Program disclosure, but they do not quantify the financial costs and benefits of these changes.

## 5. Benchmarking of GHG Emissions

This section presents evidence supporting H2, which states that facilities use their peers' GHG emission disclosures to benchmark their own GHG performance.

### 5.1 EMISSIONS DISPERSION

Grennan and Swanson [2020] show that the dispersion of negotiated prices paid by hospitals for supplies shrinks after the hospitals gain access to the purchase price history of their peers. Similarly, Berger, Choi, and Tomar [2022] document lower profitability dispersion when Korean firms provide detailed cost disclosures. If benchmarking under the U.S. Program facilitates a convergence in practices, I expect there to be less dispersion in GHG emissions after disclosure. I test this prediction by estimating the following OLS equation:

$$GHG\_DISP_{ckt} = \beta_1 \mathbb{1}_{\{t \geq 2012\}t} + \beta_2 US_c + \beta_3 \mathbb{1}_{\{t \geq 2012\}t} * US_c + \gamma X_{ckt}$$
$$+ \eta_{ck} + \eta_t + \varepsilon_{ckt}. \tag{4}$$

$c$ indexes country. $GHG\_DISP$ is the within-industry-country standard deviation, or 90th–10th percentile difference, of raw GHG emissions (in 1,000T $CO_2e$). $X$ contains the standard deviations of $GAS\_PRICE$ and $REGULATIONS$. I include industry-country and year fixed effects. Columns 1 and 2 of table 5 provide high-level evidence consistent with benchmarking. They show that the within-industry emissions standard deviation and 90th–10th percentile difference decline for U.S. industries, relative to Canadian ones, after U.S. Program disclosure. These reductions are 20% and 31% of the mean U.S. industry, preperiod emissions dispersion values ($p = 0.044$, $p = 0.038$). These results are silent, however, about whether poor GHG performers reduce their emissions more than others. Specifically, high-emitting facilities might nevertheless emit a low amount of GHGs per unit of goods produced.

---

[12] Online appendix A6, table A4, shows that, in the long run, the CAPEX increase becomes statistically insignificant, consistent with investments being a one-off. The change in gross margins remains statistically insignificant.

Exhibit 56 to Decl. of Lyon
1487

**TABLE 5**

*Benchmarking—GHG Emissions Convergence and the Effect of Relative Carbon Intensity on Emission Reductions*

| | Industry/Year Level | | Facility Level | | | |
|---|---|---|---|---|---|---|
| Variables | (1) GHG_SD | (2) GHG_P90_P10 | (3) CH_CO2_2012 | (4) CH_CO2_2012 | (5) CH_CO2_2012 | (6) CH_CO2_2012 |
| $\mathbb{1}_{[t=2012]}$ * US | −45.962** (21.937) | −63.004** (28.775) | | | | |
| CARBON_INT_2010 | | | −0.030** (0.012) | −0.070* (0.040) | −0.091*** (0.018) | −0.121*** (0.041) |
| CARBON_INT_2011 | | | | 0.053 (0.045) | | 0.041 (0.042) |
| GAS_PRICE | −494,360 (338,720) | −671,100 (444,313) | 1.652*** (0.125) | 1.647*** (0.123) | 1.647*** (0.159) | 1.643*** (0.158) |
| REGULATIONS | 8,219 (19,589) | 6,217 (25,696) | −0.058 (0.042) | −0.057 (0.041) | −0.062 (0.053) | −0.061 (0.053) |
| Observations | 392 | 392 | 1,111 | 1,111 | 545 | 545 |
| Adjusted $R^2$ | 0.961 | 0.960 | 0.263 | 0.264 | 0.200 | 0.201 |
| Ind-Country & Year fixed effects | Y | Y | | | | |
| Industry fixed effects | | | Y | Y | Y | Y |
| Carbon intense facilities | | | | | Y | Y |

Standard errors in parentheses (clustered by industry in columns 3 to 6); *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in sections 5.1 and 5.2. Columns 1 and 2 examine how the within-industry dispersion of U.S. facility GHG emission changes following the U.S. GHG Reporting Program's first disclosure of emissions data in 2012. They examine the standard deviation and 90th−10th percentile difference. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG Reporting Programs. Canadian facilities' emissions provide the control. Columns 3 to 6 show how the percentage change in U.S. facilities' carbon dioxide ($CO_2$) emissions from 2011 to 2012 responds to their 2010 within-industry-state rankings of carbon intensity ($CO_2$ emissions scaled by a proxy for goods produced). This ranking becomes publicly known in 2012. The sample comprises U.S. facilities only. These filters are described in sections 4.2, 5.1, and 5.2. The appendix provides variable definitions.

14753396, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1488

14756791, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12373 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

474    S. TOMAR

5.2 RELATIVE CARBON INTENSITY AS REVEALED THROUGH DISCLOSURE

Under the benchmarking hypothesis, facility managers will use available U.S. Program data—and not timelier data that is yet to be disclosed—to establish whether their facilities are more or less carbon intense than those of their peers. My next set of tests condition on emissions data in the same way. Given the previous results (i.e., emission reductions coupled with lower emissions dispersion), I predict that facilities revealed, through U.S. Program disclosure, to be more carbon intense than peers will have larger subsequent emission reductions.

My starting point is the facility-level carbon intensity measure used in section 4.4.2: $CO_2$ emissions scaled by emissions of a noncombustion pollutant proxy for the quantity of goods produced. For two reasons, I normalize this measure within industry-state so that the highest value becomes one (most carbon intense) and the lowest value becomes zero (most carbon light). First, it might be more useful to benchmark against industry-peers that compete in local markets. Second, many U.S. states directly regulate VOCs (the noncombustion pollutant most commonly used by my measure) to a greater extent than federal regulations require (Chemical Watch [2019]). I then test whether relative carbon intensity—based on 2010 values that were publicly disclosed at the start of 2012—predicts emission reductions in 2012 by estimating the following OLS equation:

$$CH\_CO2\_2012_i = \beta_1 CARBON\_INT\_2010_i + \beta_2 CARBON\_INT\_2011_i$$
$$+ \gamma X_i + \eta_k + \varepsilon_i. \quad (5)$$

$CH\_GHG\_2012$ is the percentage change in 2012 $CO_2$ emissions, relative to 2011, $CARBON\_INT\_2010$ is peer-normalized carbon intensity based on 2010 values, $X$ contains the year-lagged percentage change in natural gas price and the change in efficiency incentives and regulations. I include industry fixed effects. The observation level is a facility, and only U.S. facilities are considered.

Table 5, column 3, provides results consistent with benchmarking. Facilities that are revealed by U.S. Program disclosure to be relatively carbon intense reduce their $CO_2$ emissions more in 2012. This pattern, however, could be driven by natural technological convergence or mean reversion in carbon intensity and not disclosure. Additionally, facilities might have been aware of their GHG performance without benchmarking and merely waited until disclosure in 2012 to determine the discount attached to GHG intensity by external stakeholders. Under these alternatives, 2011 carbon intensity would be a better, more relevant predictor of 2012 emission reductions. From a disclosure perspective, however, the U.S. Program data needed to construct 2011 carbon intensity were not public in 2012.

Column 4 presents the results when both 2010 and 2011 carbon intensities are included as regressors. Consistent with a disclosure/benchmarking effect, it shows that 2010 carbon intensity is significantly associated with 2012 $CO_2$ reductions but that 2011 carbon intensity is not: Benchmarking requires observability of emissions data and not just their existence.

Exhibit 56 to Decl. of Lyon
1489

1475679x, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Columns 5 and 6 limit the sample to facilities with above-industry-median carbon intensity. The results become more striking.

Columns 4 and 6 identify benchmarking by exploiting the staggering in time of U.S. Program disclosure relative to the measurement date. Further, by exploiting purely within-U.S. facility variation, they allay the concern that table 3's results are driven purely by unobserved, time-varying differences between U.S. and Canadian facilities.

### 5.3 EFFECT OF A BENCHMARKING HISTORY

The next set of tests examines whether facilities with a propensity for benchmarking reduce their GHG emissions more following U.S. Program disclosure. Bernard et al. [2020] produce a novel measure of across-firm information flows based on the extent to which firms acquire their rivals' financial information from the SEC's EDGAR database. Using their EDGAR-search data, I classify a facility as a benchmarker if its owner searches for an above-industry-median number of other firms' financial information.[13] I then estimate a version of equation (2) that measures an incremental emissions reduction for benchmarker facilities.

The coefficient estimate on $\mathbb{1}_{\{BENCHMARKER\}}$ in table 6, column 1, shows that the incremental emissions reduction for benchmarkers is insignificantly negative. This test uses few observations, however, because of the low sample overlap between Bernard et al. [2020] and this study. Bernard et al. [2020] also provide a data set that is five times larger but with a 60% firm-identifier accuracy. Column 2 provides the results when using this larger sample. The estimate of $\beta_4$ is similar in magnitude and gains statistical significance—benchmarkers reduce their emissions by 7.4% ($e^{-0.077} - 1$) percentage points more than nonbenchmarkers do. Column 3 presents the results from estimating a version of equation (1) that measures a separate (nonincremental) emissions reduction for each tercile of U.S. facilities based on their benchmarking. The emissions reduction increases monotonically by tercile ($p = 0.060$ for the difference between high and low terciles).

These results further support the benchmarking channel.[14] They also help to address the possibility that facilities did not benchmark but in-

---

[13] I thank Darren Bernard, Terrence Blackburne, and Jacob Thornock for sharing their data.

[14] In terms of information flows between connected entities, online appendix A7, table A5, shows that 31% of the variation in (idiosyncratic) GHG emission changes following U.S. Program disclosure is common to facilities owned by the same firm. However, it is difficult to attribute this common variation purely to information flows across same-firm facilities (Manski [1993]). Online appendix A7, table A6, shows that emission changes for connected firms do not significantly predict emission changes for focal firms, defining connection based on common investors and overlapping board members. Online appendix A7, table A7, shows that emission reductions around U.S. Program disclosure are not significantly different when considering the following two proxies for information frictions within the firm: (1) the size of management guidance errors and (2) whether a facility is located far from its owner-firm's headquarters. In sum, the evidence about information flows between connected entities is less conclusive.

Exhibit 56 to Decl. of Lyon
1490

14753966, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

476   S. TOMAR

**TABLE 6**
*Benchmarking—Effect of Being a "Benchmarker" on Facility GHG Emission Reductions*

| Variables | (1) GHG | (2) GHG | (3) GHG |
|---|---|---|---|
| $\mathbb{1}_{\{t \geq 2012\}} * US * \mathbb{1}_{\{BENCHMARKER\}}$ | −0.077 | −0.077* | |
| | (0.062) | (0.040) | |
| $\mathbb{1}_{\{t \geq 2012\}} * US$ | −0.034 | −0.072* | |
| | (0.032) | (0.041) | |
| $\mathbb{1}_{\{t \geq 2012\}} * US * \mathbb{1}_{\{67th\text{-}100th\ pctile\ BENCHMARKER\}}$ | | | −0.171*** |
| | | | (0.064) |
| $\mathbb{1}_{\{t \geq 2012\}} * US * \mathbb{1}_{\{33rd\text{-}67th\ pctile\ BENCHMARKER\}}$ | | | −0.093* |
| | | | (0.055) |
| $\mathbb{1}_{\{t \geq 2012\}} * US * \mathbb{1}_{\{0th\text{-}33rd\ pctile\ BENCHMARKER\}}$ | | | −0.074* |
| | | | (0.040) |
| GDP | −0.063 | −0.036 | −0.042 |
| | (0.270) | (0.563) | (0.568) |
| GAS_PRICE | −0.595 | −0.951*** | −0.914*** |
| | (0.385) | (0.300) | (0.279) |
| REGULATIONS | 0.001 | −0.007 | −0.007 |
| | (0.007) | (0.009) | (0.009) |
| Observations | 2,988 | 5,289 | 5,289 |
| Adjusted $R^2$ | 0.954 | 0.930 | 0.930 |
| Ind-Year & Facility fixed effects | Y | Y | Y |

Standard errors clustered by industry-year in parentheses; *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in section 5.3. It explores whether the extent to which a facility's owner accesses the information of its peers affects the reduction in that facility's logged GHG emissions following the U.S. GHG Reporting Program's first disclosure of emissions data in 2012. A facility is classified as a "benchmarker" if its owner accesses an above-median amount of its peer firms' financial information from the U.S. SEC's EDGAR website (see Bernard et al. [2020]). The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG Reporting Programs. Canadian facilities' emissions provide the control. Data filters are described in sections 4.2 and 5.3. The appendix provides variable definitions.

stead began implementing emission reductions with long lead-times in 2010 (prior to disclosure) because of anticipated external pressure. This alternative explanation does not explain why the emission reductions are larger for benchmarkers. A caveat for these results is that they exploit cross-sectional variation that is not randomly assigned at the time of the U.S. Program (i.e., whether a facility's owner chooses to be a benchmarker). The results should therefore be viewed in the context of the other benchmarking results in section 5.

5.4  PROCESS CONVERGENCE

The last set of benchmarking tests explores whether the processes that facilities employ converge after U.S. Program disclosure. Returning to the process-level U.S. NEI/EIS data described in section 4.4.2, I focus on processes that burn fossil fuels or waste.[15] In the spirit of Fetter et al. [2022], I

[15] Online appendix A5 describes how I identified these processes. An example of a fuel combustion process is *External Combustion Boilers: Commercial/Institutional: Bituminous/Subbituminous Coal: Pulverized Coal: Wet Bottom (Subbituminous Coal).*

Exhibit 56 to Decl. of Lyon
1491

14756986, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING     477

**TABLE 7A**
*Benchmarking—Facility Process Convergence Statistics*

| Facilities and their... | % Chg. Similarity | $p$ Val |
|---|---|---|
| ...contemporaneous peers | 10.5 | 0.008 |
| ...prior carbon-light peers | 6.3 | 0.048 |
| ...prior carbon-intense peers | −3.4 | 0.037 |

then compute a Jaccard process-similarity index between each U.S. facility and its (hypothetical) representative state-industry peer in a given year. Online appendix A8 details this index's construction, but briefly, for a facility with one peer, the index divides the number of unique processes that both facilities employ by the number of unique processes they together employ (i.e., the intersection of their processes used divided by the union). When a facility has multiple peers, this computation also includes weights that capture the prevalence of a process across peer facilities.

Table 7a, row 1, presents the average *percentage* change in similarity when moving from 2010 to 2013 (the start and end of the main sample). Of the distinct processes used by a facility *or* its peers, the fraction used by the facility *and* its peers increases by roughly 10% (not percentage points), on average, after U.S. Program disclosure ($p = 0.008$). Meanwhile, the average similarity *level* changes insignificantly from 0.281 and 0.276 ($p = 0.27$). These percentage and level changes imply that facilities with low initial similarity to peers become more similar to their peers (relative to facilities that are already fairly similar to their peers).[16] To link these results to emission reductions, I estimate a version of equation (1) that measures a separate emissions reduction for each tercile of U.S. facilities based on their 2010 similarities with representative peers.

Consistent with the earlier argument, table 7b, column 1, shows that the U.S. Program treatment effect is largest for facilities in peer groups marked by low initial similarity and fades as initial similarity grows ($p = 0.035$ for the difference between high and low terciles). Benchmarking is more useful when there is a preexisting diversity in the processes used among peers. Similarly, Bernard et al. [2020] show that information flows better predict future R&D mimicking among firms with low product similarity.

To explore the benchmarking prediction that facilities shift their processes toward (away from) those of their carbon light (carbon intense) peers, I reemploy the relative carbon intensity measure used in section 5.2. When producing a facility's 2010 representative peer, I now require the constituent peer facilities to have a 2010 carbon intensity rank $\leq 0.33$

---

[16] The distinction between level changes and percentage changes in Jaccard similarity is important. If focusing on level changes, the results in this subsection become statistically insignificant. Some industries, however, might have more potential processes to choose from, giving them a different similarity baseline. A focus on percentage changes accounts for these baselines.

Exhibit 56 to Decl. of Lyon
1492

14756796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

478    S. TOMAR

**TABLE 7B**
*Benchmarking—Process Changes and Facility GHG Emission Reductions*

| Variables | (1) $CO2$ | (2) $CO2$ | (3) $CO2$ |
|---|---|---|---|
| $\mathbb{1}_{[t\geq2012]} * US * \mathbb{1}_{[\text{LOW SIMILARITY}]}$ | −0.192** | | |
| | (0.079) | | |
| $\mathbb{1}_{[t\geq2012]} * US * \mathbb{1}_{[\text{MED. SIMILARITY}]}$ | −0.119** | | |
| | (0.053) | | |
| $\mathbb{1}_{[t\geq2012]} * US * \mathbb{1}_{[\text{HIGH SIMILARITY}]}$ | −0.018 | | |
| | (0.043) | | |
| $\mathbb{1}_{[t\geq2012]} * US$ | | −0.102** | −0.101** |
| | | (0.044) | (0.044) |
| $\mathbb{1}_{[t\geq2012]} * US * \mathbb{1}_{[\text{IMPROVE}]}$ | | −0.070 | −0.112 |
| | | (0.047) | (0.090) |
| Observations | 7,096 | 3,528 | 3,497 |
| Adjusted $R^2$ | 0.936 | 0.950 | 0.947 |
| Ind-Year & Facility fixed effects | Y | Y | Y |

Standard errors clustered by industry-year in parentheses; ***$p < 0.01$, **$p < 0.05$, *$p < 0.1$. This table is discussed in section 5.4. Table 7a examines whether facilities become more (less) similar to their carbon light (carbon intense) peers following the U.S. GHG Reporting Program's first disclosure of emissions data in 2012. Column 1 of table 7b examines how the emission reductions of a facility varies with the degree of process-similarity across the facilities in its industry-state. Column 2 examines how the emissions reduction of a facility is affected when its processes become more similar to its more carbon light peers; Column 3 does the same, but further conditions on the facility becoming less similar to its carbon intense peers. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG reporting programs. Data filters are described in sections 4.2 and 5.4. The appendix provides variable definitions.

(i.e., carbon light peers). I then compute Jaccard similarities between (1) a facility in 2010 and its 2010 carbon light representative peer and (2) that facility in 2013 and its 2013 carbon light representative peer. Table 7a, row 2, presents the average percentage change when moving from the former similarity to the latter. After U.S. Program disclosure, facilities become 6.3% proportionally more similar to their carbon light peers (as these peers were in 2010; $p = 0.048$). I then recompute the percentage change in Jaccard similarity, except considering a facility's carbon intense representative peer (whose constituent facilities have a 2010 carbon intensity rank > 0.67). Table 7a, row 3, shows that facilities become 3.4% proportionally less similar to their carbon intense peers after U.S. Program disclosure ($p = 0.037$).

Table 7b presents the results from estimating a version of equation (2) that connects these last process-similarity results to $CO_2$ emission changes. Column 2 shows that, for facilities that shift their processes toward their carbon light peers, the incremental emissions reduction is a statistically insignificant 6.8% ($e^{-0.070} - 1$; $p = 0.142$). Column 3 provides a similar inference when focusing on facilities that also become less like their carbon intense peers (10.6% incremental reduction; $p = 0.212$).

My process convergence results echo those of Fetter et al. [2022], who show that mandatory disclosure induces fracking firms to shift their fracking chemical compositions toward those of their more productive peers. There are some caveats. First, there is likely to be variation within a

Exhibit 56 to Decl. of Lyon
1493

14755967, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    479

process as defined by the U.S. NEI/EIS. Thus, some process changes will not appear in the data, nor will behavioral changes (e.g., maintenance and calibration). This might explain why an emissions reduction is observed for the broader sample of facilities whose processes did not change in the U.S. NEI/EIS data. Second, the process convergence tests do not use a Canadian control sample (for which process-level data are not available). Thus, they are not provided as conclusive evidence of benchmarking but rather to give context to the other benchmarking results. Third, these results do not disentangle whether process convergence results from facilities embarking on a technological search after benchmarking or whether peers' GHG disclosures themselves provide technological cues. By whichever pathway, benchmarking prompts facilities to make real changes.

## 6. Supplementary Analyses

I now provide supplementary evidence about the U.S. Program's effects. I first explore sources of external pressure that might motivate emission reductions and benchmarking.

### 6.1 EXTERNAL PRESSURE: CONCERN ABOUT FUTURE LEGISLATION

A major U.S. Program aim is to aid future potential GHG-related rulemaking (see section 2). Thus, I study whether concern about future GHG legislation motivates emission reductions. Once U.S. facilities learn about their own GHG performance, they might self-regulate to avoid facing stringent legislation (e.g, Maxwell et al. [2000], Suijs and Wielhouwer [2019]). Sanchez, Matthews, and Fischbeck [2012], however, argue that the U.S. Program would be unlikely to yield benefits because U.S. climate policy lacked momentum at the time.

I proxy for GHG legislation pressure by exploiting geographic variation in political support for climate-progressive legislation. For a given legislator-year, I use League of Conservation Voters' Scorecards to compute the fraction of climate-progressive bills that federal legislator supported from 2008 to that year. For senators, I then take the within-state average. Highlighting the partisan nature of climate politics (e.g., McCright and Dunlap [2011]), Democratic Party membership explains 86% of senators' and House representatives' climate-progressiveness scores.

I then estimate a version of equation (2) that measures an incremental emissions reduction for facilities whose legislators have above-industry-median climate progressiveness. Table 8a, column 1, shows a 5.1% ($e^{-0.052} - 1$) incremental emissions reduction for facilities with climate-progressive senators, following U.S. Program disclosure. Column 2 reveals no statistically significant impact of representatives' progressiveness. Column 3 considers both groups of legislators simultaneously and yields the

Exhibit 56 to Decl. of Lyon
1494

14756765, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

480   S. TOMAR

**TABLE 8A**
*External Pressure—Climate Change Progressiveness of Legislators and Facility GHG Emission Reductions*

| Variables | (1) GHG | (2) GHG | (3) GHG | (4) GHG |
|---|---|---|---|---|
| $\mathbb{1}_{\{t \geq 2012\}t} * US$ | −0.057* | −0.081** | −0.059* | −0.050* |
| | (0.029) | (0.035) | (0.031) | (0.030) |
| $\mathbb{1}_{\{t \geq 2012\}t} * US * \mathbb{1}_{[CC\,HOUSE]}$ | | −0.004 | 0.006 | |
| | | (0.019) | (0.022) | |
| $\mathbb{1}_{\{t \geq 2012\}t} * US * \mathbb{1}_{[CC\,SENATE]}$ | −0.052* | | −0.053* | |
| | (0.028) | | (0.031) | |
| $\mathbb{1}_{\{t \geq 2012\}t} * SEN\_CC\_SCR$ | | | | −0.084** |
| | | | | (0.035) |
| $SEN\_CC\_SCR$ | | | | −0.033 |
| | | | | (0.077) |
| $GDP$ | 0.215 | 0.220 | 0.214 | 0.147 |
| | (0.423) | (0.419) | (0.423) | (0.397) |
| $GAS\_PRICE$ | −0.054 | −0.023 | −0.050 | −0.034 |
| | (0.338) | (0.344) | (0.336) | (0.337) |
| $REGULATIONS$ | −0.007 | −0.007 | −0.007 | −0.007 |
| | (0.007) | (0.008) | (0.007) | (0.007) |
| Observations | 14,713 | 14,713 | 14,713 | 14,713 |
| Adjusted $R^2$ | 0.902 | 0.902 | 0.902 | 0.902 |
| Ind-Year & Facility fixed effects | Y | Y | Y | Y |

Standard errors clustered by industry-year in parentheses; ***$p < 0.01$, **$p < 0.05$, *$p < 0.1$. This table is discussed in section 6.1. It examines how the climate change progressiveness of a facility's state senators and U.S. House representative affect that facility's reduction in logged GHG emissions following the U.S. GHG Reporting Program's first disclosure of emissions data in 2012. Legislators' climate change progressiveness is measured using those legislators' voting records on climate change progressive bills. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG reporting programs. Data filters are described in section 4.2. The appendix provides variable definitions.

same inferences as columns 1 and 2. Concern about GHG legislation outcomes at the Senate appears to motivate emission reductions.[17]

Senators frequently turn over and can adjust their stances on issues. To assess the impact of this variation on emissions, I estimate the following OLS equation:

$$GHG_{it} = \beta_1 \mathbb{1}_{\{t \geq 2012\}t} + \beta_2 US_i + \beta_3 \mathbb{1}_{\{t \geq 2012\}t} * US_i$$
$$+ \beta_4 SENATE\_CC\_SCORE_{it}$$
$$+ \beta_5 \mathbb{1}_{\{t \geq 2012\}t} * SENATE\_CC\_SCORE_{it} + \gamma X_{it} + \eta_i + \eta_{kt} + \varepsilon_{it}. \quad (6)$$

*SENATE_CC_SCORE* is the raw senatorial climate-progressiveness score described above (its value is set to zero for Canadian facilities). The use of facility fixed effects, which absorb average location effects, makes equa-

---

[17] Online appendix A7, table A5, shows that emission reductions associated with senatorial progressiveness are not common to facilities in other states owned by the same firm. That is, when reacting to concern about GHG legislation, firms consider their individual facilities' visibility to legislators.

Exhibit 56 to Decl. of Lyon
1495

14756796, 2022, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING        481

tion (6) akin to a changes specification. The estimate of $\beta_4$ in column 4 shows that changes in senatorial progressiveness are insignificantly negatively associated with GHG emissions before U.S. Program disclosure. The estimate on $\beta_5$, however, shows that this association becomes larger and statistically significant after disclosure. A one standard deviation change in *SENATE_CC_SCORE* (33.2%) implies a 3.9% GHG emissions reduction under disclosure—facilities respond more to concern about legislation once they can benchmark using peers' disclosures.

Facilities with political connections could face different emissions reduction incentives. Facilities might use their connections to stifle future GHG legislation (Gelles [2022], Weiss, Lefton, and Lyon [2010]). Connected facilities could then exhibit a muted emissions response to disclosure. Alternatively, in exchange for preferential treatment in other domains (e.g., Cooper, Gulen, and Ovtchinnikov [2010], Tahoun [2014]), facilities might reduce GHG emissions to cast their local legislators in a favorable environmental light. Connected facilities might also be more concerned about legislation generally (Hassan, Hollander, Tahoun, and van Lent [2019]). In these latter cases, politically connected facilities might reduce GHG emissions more once they can benchmark using U.S. Program data. To explore these possibilities, I estimate the following OLS equation:

$$GHG_{it} = \beta_1 \mathbb{1}_{\{t \geq 2012\}t} + \beta_2 US_i + \beta_3 \mathbb{1}_{\{t \geq 2012\}t} * US_i + \beta_4 \mathbb{1}_{\{LEGIS\_CONN\}it}$$
$$+ \beta_5 \mathbb{1}_{\{t \geq 2012\}t} * \mathbb{1}_{\{LEGIS\_CONN\}it} + \gamma X_{it} + \eta_i + \eta_{kt} + \varepsilon_{it}. \tag{7}$$

$\mathbb{1}_{\{LEGIS\_CONN\}}$ indicates U.S. facilities owned by firms that made campaign contributions to the senators or representatives of those facilities—I consider these facilities politically connected. To identify contributing firms, I use data provided by Hassan et al. [2019], which are based on data from OpenSecrets.org.[18] Only public firms in my sample can be matched to these data, and thus I exclude U.S. facilities not owned by public firms.

Table 8b, column 1, shows that a senator connection does not significantly affect facilities' GHG emissions, either pre- or post–U.S. Program disclosure (considering $\hat{\beta}_4$ and $\hat{\beta}_5$). Column 2 shows that a representative connection has a significantly greater negative effect on GHG emissions following disclosure (although $\hat{\beta}_4 + \hat{\beta}_5$ is insignificantly negative). Column 3 considers connections to senators and representatives simultaneously and yields the same inferences as columns 1 and 2. After being able to benchmark using U.S. Program disclosures, representative connected facilities worry more about GHG legislation, or they try to cast their representative in a favorable environmental light. Although the idea of political connections granting preferential treatment seems socially harmful, the contribution

---

[18] I thank Tarek Hassan, Stephan Hollander, Markus Schwedeler, Ahmed Tahoun, and Laurence Van Lent for sharing their data. Regarding timing, if firm A contributes to senator B's successful November 2010 election campaign, $\mathbb{1}_{\{LEGIS\_CONN\}}$ indicates firm A's facilities in senator B's state in 2011 and the remaining years of senator B's term.

Exhibit 56 to Decl. of Lyon
1496

14753976, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

482    S. TOMAR

**TABLE 8B**
*External Pressure—Political Connections and Facility GHG Emission Reductions*

| Variables | (1) GHG | (2) GHG | (3) GHG |
|---|---|---|---|
| $\mathbb{1}_{[t \geq 2012]} * US$ | −0.067* | −0.068* | −0.064* |
|  | (0.037) | (0.035) | (0.036) |
| $\mathbb{1}_{[t \geq 2012]} * \mathbb{1}_{[\text{SENATE CONN.}]}$ | −0.060 |  | −0.030 |
|  | (0.039) |  | (0.034) |
| $\mathbb{1}_{[\text{SENATE CONN.}]}$ | 0.029 |  | 0.017 |
|  | (0.036) |  | (0.036) |
| $\mathbb{1}_{[t \geq 2012]} * \mathbb{1}_{[\text{HOUSE CONN.}]}$ |  | −0.084** | −0.063** |
|  |  | (0.040) | (0.031) |
| $\mathbb{1}_{[\text{HOUSE CONN.}]}$ |  | 0.048 | 0.037 |
|  |  | (0.033) | (0.029) |
| Observations | 11,286 | 11,286 | 11,286 |
| Adjusted $R^2$ | 0.906 | 0.906 | 0.906 |
| Ind-Year & Facility fixed effects | Y | Y | Y |

Standard errors clustered by industry-year in parentheses; *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in section 6.1. It examines how the presence of U.S. GHG Reporting Program disclosure affects the relation between a facility's GHG emissions and its political connections. Political connections are measured using the existence of known election campaign contributions from facilities' owners to incumbent legislators. The sample spans 2010 to 2013 and comprises U.S. and Canadian facilities that reported emissions to their national GHG reporting programs. Data filters are described in section 4.2. The appendix provides variable definitions.

facilities provided in this latter case (lower GHG emissions) seems socially beneficial.[19]

A caveat for this subsection's results is that they are based on cross-sectional variation that is not randomly assigned at the time of the U.S. Program (i.e., a facility's location and its owner's choice to contribute to a legislator's campaign). Thus, they should be considered alongside the U.S. Program's broad purpose to provide guidance for future rule-making.

### 6.2 EXTERNAL PRESSURE: INVESTOR SCRUTINY

Although section 3 describes why the U.S. Program might not create a GHG emissions action-cycle at the firm level, given the recent growth in ESG investing, the willingness of capital market regulators to require emissions disclosures, and the tendency of capital markets to make across-firm comparisons (De Franco, Hope, and Larocque [2015]), I explore

---

[19] That facilities appear more responsive to the Senate regarding legislation pressure (table 8a) and more responsive to the House regarding connections (table 8b) is consistent with the literature. Diermeier, Keane, and Merlo [2005] suggest that the nonpecuniary, policy-shaping rewards to being in Congress are large, and especially so for senators. Meanwhile, Tahoun and van Lent [2019] find that voting in the House is associated with representatives' personal wealth interests, but the equivalent association is weaker for senators. Relatedly, Cooper, Gulen, and Ovtchinnikov [2010] show that firms contributing to legislators have positive future abnormal returns, and that there is an incremental House effect after controlling for the Senate effect.

Exhibit 56 to Decl. of Lyon
1497

14751596, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING        483



FIG 4.—External pressures—buy-and-hold industry-adjusted returns around GHG disclosure. These figures are described in section 6.2. They depict the buy-and-hold excess returns for two sets of firms over different windows relative to the date of the U.S. GHG Reporting Program's first data release. The sample comprises the owner-firms of U.S. facilities that reported GHG emissions. "GHG Intense" ("GHG Light") firms have above (below) industry-median GHG emissions divided by COGS (as computed for 2010). Data filters are described in sections 4.2 and 4.4.2.

whether investor pressure moderates the GHG emissions response to U.S. Program disclosure.

I begin by measuring firm-level GHG intensity for 2010 (constructible by the public in 2012) by aggregating facility emissions to the firm level and then dividing by cost of goods sold (a proxy for economic activity). I then split U.S.-facility–only firms into groups with above and below industry-median 2010 GHG intensity. Figure 4 plots the average buy-and-hold industry-adjusted returns for both groups of firms around U.S. Program disclosure. With the exception of a return runup for GHG intense firms from days −50 to −30 in figure 4(a), the two return time-series track each other and do not suggest a differential stock market reaction to disclosure. Online appendix A9.1, table A8, presents the related regression-based evidence. Echoing figure 4(a), the incremental buy-and-hold returns for GHG intense firms around disclosure are statistically insignificant.[20]

---

[20] In online appendix A9.1, table A9, I study the holdings of ESG-focused mutual funds and shareholder resolutions; I find no strong evidence of investor pressure. Online appendix A9.1, table A10, shows that the GHG emissions reduction around U.S. Program disclosure is larger for facilities owned by firms that are nonpublic or that report higher environmental political risk and climate change exposure to investors. Because these cross-sectional results can be interpreted in multiple ways, I place less weight on them. Online appendix A9.2, table

Exhibit 56 to Decl. of Lyon
1498

484    s. tomar

6.3 GHG EMISSION RESPONSES PRIOR TO U.S. PROGRAM DISCLOSURE

To understand the U.S. Program's effects more completely, I explore emission responses prior to disclosure. Facilities knew as early as April 2009 that their emissions would be publicly disclosed, and thus they might have anticipated stakeholder pressure (e.g., Fiechter, Hitz, and Lehmann [2022]). The U.S. Program's measurement requirements might also have improved managers' own-firm GHG information sets (e.g., Shroff [2017]). These forces could have led facilities to curb emissions prior to disclosure. Grennan and Swanson [2020] and Shroff [2020] also disentangle pre- and post-disclosure responses. In terms of information creation, my setting less resembles that of Grennan and Swanson [2020], where hospitals were arguably aware of the prices they paid to suppliers, and more resembles that of Shroff [2020], where firms possibly learned about their auditors' quality following PCAOB inspections.

To address a key empirical challenge—the absence of GHG emissions data for years prior to U.S. Program implementation (e.g., for 2008 and 2009)—I estimate U.S. facilities' $CO_2$ emissions by leveraging the physical relations underlying fossil fuel combustion. The key idea is that the same fuel burned under the same conditions should produce $CO_2$ (a GHG) and carbon monoxide (CO; toxic, not a GHG, and disclosed since 2008 in the U.S. NEI/EIS) in constant proportions (Gurney et al. [2009b]). The estimation is detailed in online appendix A11.1, and is briefly as follows. I employ a Bayesian linear model to relate U.S. facilities' logged $CO_2$ emissions to their process-level CO emissions. The model inputs are (1) facility-level $CO_2$ emissions from the 2014 U.S. Program, (2) process-level CO emissions from the 2014 NEI/EIS, and (3) a set of priors about the process-level $CO_2$-CO relations, provided by Gurney et al. [2009a]. I then combine the estimated $CO_2$-CO relations with U.S. facilities' process-level CO emissions from 2008 to 2013 to produce estimates of these facilities' logged $CO_2$ emissions.[21] To measure the U.S. Program's effect prior to disclosure, I extend

_____

A11, shows no significant evidence of pressure from the public or customers. The emissions reduction is not significantly different for facilities in (1) states with higher intensities of belief in human-caused climate change and (2) industries with relatively more business-to-customer economic activity. Regarding profit/efficiency motives, online appendix A10, table A12, shows that emission reductions for U.S. facilities near the Canadian border are muted when they have a nearby Canadian peer. These U.S. facilities possibly benchmarked their GHG emissions against their Canadian peers prior to the U.S. Program; given that their emissions were not subject to external pressure via disclosure at that time, this suggests benchmarking for profit/efficiency motives. However, the muted response is statistically insignificant—few U.S. facilities provide the needed variation by having nearby Canadian peers—leaving the result only suggestive.

[21] The estimation relies heavily on U.S. Program data and hence could not be conducted prior to the U.S. Program. Online appendix A11.1, figure A4, shows that the Bayesian estimates explain 42% of the variation in out-of-sample actual values. Variation in factors such as equipment specification, CO abatement technology, and fuel carbon content reduces the goodness of fit. For reference, naive OLS estimates explain 35% of the variation in actual

Exhibit 56 to Decl. of Lyon
1499

14759701, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

14753796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    485

the sample window back to 2008 and estimate the following OLS equation:

$$CO2_{it} = \beta_1 \mathbb{1}_{\{t \geq 2010\}t} + \beta_2 \mathbb{1}_{\{t \geq 2012\}t} + \beta_3 US_i + \beta_4 \mathbb{1}_{\{t \geq 2010\}t} * US_i$$
$$+ \beta_5 \mathbb{1}_{\{t \geq 2012\}t} * US_i + \gamma X_{it} + \eta_i + \eta_{jt} + \varepsilon_{it}. \qquad (8)$$

*CO2* is logged T $CO_2$ emissions, estimated as above for U.S. facilities and as reported by Canadian facilities. $\beta_4$ captures facilities' emission responses prior to U.S. Program disclosure. A balanced panel is required because the Canadian Program's reporting threshold fell from 100,000T to 50,000T $CO_2$e in 2009 and because the CO reporting thresholds are lower in 2008, 2011, and 2013 (see footnote 11).

Table 9, column 1, presents the results when facility and year fixed effects are included, and column 2 includes control variables and industry-year fixed effects. Both columns show no significant emissions response in 2010 and 2011, when facilities begin measuring and reporting emissions (absent disclosure); however, both show a significant emissions reduction after disclosure in 2012, consistent with table 3. The column 2 estimate of the emissions reduction following disclosure is 11.2% ($e^{-0.119} - 1$; p = 0.019). Figure 3(b), the expanded sample window analog of figure 3(a), mirrors this pattern of U.S. emissions relative to Canadian emissions. Figure 3(b) also provides further support for the parallel trends assumption.[22]

To assess pre-disclosure emission responses without using estimated data, I study firm-level emissions data voluntarily submitted to the CDP, a nonprofit organization that surveys firms annually about their GHG performance. During my sample period, CDP surveys are sent to S&P 500 firms and the 200 largest Canadian firms by market capitalization. I collect CDP data from years 2008 to 2013 for firms within the industries in my U.S. Program sample. I then estimate the following OLS equation:

$$GHG_{jt} = \beta_1 \mathbb{1}_{\{t \geq 2010\}t} + \beta_2 \mathbb{1}_{\{t \geq 2012\}t} + \beta_3 US_j + \beta_4 \mathbb{1}_{\{t \geq 2010\}t} * US_j$$
$$+ \beta_5 \mathbb{1}_{\{t \geq 2012\}t} * US_j + \gamma X_{jt} + \eta_j + \eta_{kt} + \varepsilon_{jt}. \qquad (9)$$

*GHG* is logged tons of Scope 1 (on-site, nonvehicular) GHG emissions reported to the CDP, and X contains a firm's market capitalization, leverage, and market-to-book ratio as controls (as in section 4.4.2). I use a balanced panel to mitigate concerns about selection effects related the CDP participation decision.

---

values (or 8% if treating negative, infeasible OLS fitted value as zeroes). The Bayesian approach fares better because it assigns sensible distributions to the parameters (e.g., no negative support) and incorporation of priors that shrink noisy parameter estimates toward plausible values.

[22] Because estimated $CO_2$ emissions are based on carbon monoxide data that come from the EPA's NEI/EIS, these tests also support the credibility of U.S. Program data. For this paper's results to be explained by misreporting, facilities would have to be shown to misreport not only their GHG emissions but also their toxic pollutant emissions and the processes they employ (which are also studied in section 5.4). Combined with the enforceability of the U.S. Program and U.S. NEI/EIS under the U.S. Clean Air Act, these tests make the misreporting explanation unlikely, given the extent of sustained legal and reputation risk it would entail.

Exhibit 56 to Decl. of Lyon
1500

14756706, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

486   S. TOMAR

**TABLE 9**
*Emission Responses Prior to U.S. Program Disclosure*

| Variables | (1) $CO2$ | (2) $CO2$ | (3) $GHG$ | (4) $GHG$ |
|---|---|---|---|---|
| $\mathbb{1}_{[t \geq 2012]} * US$ | −0.133*** | −0.119*** | −0.175** | −0.072 |
| | (0.038) | (0.045) | (0.078) | (0.118) |
| $\mathbb{1}_{[t \geq 2010]} * US$ | 0.017 | 0.037 | −0.055 | 0.042 |
| | (0.034) | (0.042) | (0.115) | (0.122) |
| GDP | | −0.152 | | |
| | | (0.429) | | |
| GAS_PRICE | | 0.059 | | |
| | | (0.204) | | |
| REGULATIONS | | −0.002 | | |
| | | (0.009) | | |
| MV | | | | −0.225 |
| | | | | (1.082) |
| LEVERAGE | | | | 0.668** |
| | | | | (0.313) |
| MTB | | | | −0.001 |
| | | | | (0.001) |
| Observations | 6,078 | 6,078 | 550 | 550 |
| Adjusted $R^2$ | 0.864 | 0.864 | 0.986 | 0.984 |
| Year and Facility fixed effects | Y | | | |
| Ind-Yr and Facility fixed effects | | Y | | |
| Year and Firm fixed effects | | | Y | |
| Ind-Yr and Firm fixed effects | | | | Y |

Standard errors clustered by industry-year in parentheses; *** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$. This table is discussed in section 6.3. It examines how U.S. facilities' GHG emissions change following the implementation of the U.S. GHG Reporting Program. Columns 1 and 2 examine logged $CO_2$ emissions (estimated for U.S. facilities as described in section 6.3). Columns 3 and 4 examine logged Scope 1 GHG emissions voluntarily disclosed by large firms under the Carbon Disclosure Project. The samples span 2008 to 2013, with Canadian observations forming the control. Data filters are described in sections 4.2 and 6.3. The appendix provides variable definitions.

Table 9, column 3, provides the results obtained when using firm and year fixed effects, and column 4 adds industry-year fixed effects and control variables. Although the column 4 estimate on $\beta_5$ is statistically insignificant, the results corroborate those in columns 1 and 2. Collectively, table 9 highlights uncertainty around whether measurement and private reporting of GHG emissions leads to emission reductions.[23] Yet, these same tests suggest

---

[23] For instance, the estimate of $\mathbb{1}_{[t \geq 2010]} * US$ in table 9, column 2—one of the more precise estimates—gives a 95% confidence interval of $(−3.1\%, 11\%)$. In online appendix A11.2, I assess pre-disclosure emission responses by exploiting only within-U.S. facility variation. Using the same techniques as in section 5.2, I show that 2010 carbon intensity rank does not significantly predict $CO_2$ emission reductions in 2011, as might be expected if U.S. Program measurement and private reporting to the EPA drives emission reductions. Columns 3 and 4 also raise the question of whether highly aggregated CDP data substitute for granular U.S. Program data in terms of driving emission reductions. Online appendix A12 explores facilities' emission reductions by CDP participation and disclosure status, and by whether facilities had peers participating in the CDP. The results support the nonsubstitutability of U.S. Program information with CDP information.

Exhibit 56 to Decl. of Lyon
1501

disclosure-driven effects. I leave it to future research to make a stronger claim about pre-disclosure emission responses.

## 7. Conclusion

I explore whether the mandatory, granular disclosures of the U.S. Program lead to GHG emission reductions. I find that U.S. facilities reduce emissions by 7.9% following U.S. Program disclosure. In contrast to much of the related research, I estimate a treatment effect for facilities that mostly had no other GHG emissions information in the public domain. My emissions and process-based tests are consistent with facilities using the U.S. Program data of their peers for benchmarking. Supplementary analyses suggest that concern about GHG legislation partly motivates emission reductions and that measurement alone (absent disclosure) does not significantly reduce emissions.

My paper contributes to the literature on the real effects of ESG disclosures. It also has policy relevance. The main implication is that an ESG disclosure mandate can produce real effects through benchmarking. Considering the nature of U.S. Program disclosures, data granularity can facilitate this process while also improving the usefulness of disclosed data for stakeholders interested in a subset of a firm's activities (e.g., regional legislators interested in GHGs produced locally). However, aggregation of ESG information can also produce real effects (e.g., Christensen et al. [2017]), suggesting a tradeoff around the level of granularity.

My paper leaves important avenues for future research. First, it considers the U.S. Program from a benefits perspective (i.e., emission reductions). A potentially significant cost of the program is the potential stifling of innovation through disclosure of proprietary information (e.g., Breuer, Leuz, and Vanhaverbeke [2022]). Further work assessing this cost would allow for a more rounded view of the U.S. Program's impact. Second, this paper examines the effect of a single reporting/disclosure event. Although recent work in this area is very beneficial, further research on other mandatory GHG disclosure settings will be valuable. Climate change affects many stakeholders, and variation in the institutional features studied in the future can highlight different economic channels that affect emission patterns.

14756761, 2022, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1502

14756790x, 2021, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

488    S. TOMAR

### APPENDIX: VARIABLE DESCRIPTION

*Facility-Level Analyses*

| Variable Name | Description |
|---|---|
| *CARBON_INT* | Logarithm of: $CO_2$ emissions in metric tons divided by noncombustion pollutant in metric tons |
| *CH_CO2_2012* | The percentage change in $CO_2$ emissions in 2012 relative to 2011 |
| *CO2* | $CO_2$ emissions in logged metric tons. In table 9, these are estimated for U.S. facilities. |
| *GHG* | Greenhouse gas (GHG) emissions in logged metric tons $CO_2$ equivalent |
| *GHG_SD* | Standard deviation of raw GHG emissions, in thousands of metric tons $CO_2$ equivalent, within country-industry-year |
| *GHG_P90_P10* | 90th minus 10th percentile of raw GHG emissions, in thousands of metric tons $CO_2$ equivalent, within country-industry-year |
| $\mathbb{1}_{\{t \geq k\}}$ | Indicates year $k$ ($k-1$ for Massachusetts observations) and beyond |
| $\mathbb{1}_{\{CROSS\text{-}SECTION\}}$ | Indicates U.S. facilities in a cross-section as described in the relevant section and table description |
| *CARBON_INT_201X* | $CO_2$ emissions over industry-specific noncombustion pollutant emissions in 201X, normalized within industry-state |
| *GAS_PRICE* | Yearly, regional, lagged natural gas price (logged) |
| *GDP* | Gross domestic product at the country-year two-digit NAICS industry level (logged value-added) |
| *REGULATIONS* | Number of energy reduction incentives/regulations applicable to a facility, implemented at the federal or state/province level |
| *SENATE_CC_SCORE* | For a U.S. state, the average of the following over each of its active senators: the percentage of climate-change progressive bills, since 2008, that senator has supported |
| *US* | Indicates a U.S. facility |

Exhibit 56 to Decl. of Lyon

1503

*Firm-Level Analyses*

| Variable Name | Description |
| --- | --- |
| *CAPEX* | Compustat item CAPX, over beginning total assets |
| *GROSS_MARGIN* | Gross profit over revenue |
| *LEVERAGE* | Total liabilities over total assets |
| *MV* | Market value of equity, in millions |
| *MTB* | Market value of equity over book value of equity |

Firm-level analogs of *US, GDP, GAS_PRICE,* and *REGULATIONS* are formed by taking weighted-averages of these variables across facilities within firm-year. Facilities' GHG emissions in 2011 form the weights.

*Regression Equation Indices*

| Index | Feature |
| --- | --- |
| *i* | Facility |
| *j* | Firm |
| *k* | Four-digit NAICS industry |
| *c* | Country |
| *t* | Year |

REFERENCES

BAUCKLOH, T.; C. KLEIN; T. PIOCH; and F. SCHIEMANN. "Under Pressure? The Link Between Mandatory Climate Reporting and Firms' Carbon Performance." *Organization and Environment* 0 (2022): 1-24.

BENNEAR, L. S., and S. M. OLMSTEAD. "The Impacts of the 'Right To Know': Information Disclosure and the Violation of Drinking Water Standards." *Journal of Environmental Economics and Management* 56 (2008): 117–30.

BERGER, P. G.; J. H. CHOI; and S. TOMAR. "Breaking It Down: Economic Consequences of Disaggregated Cost Disclosures." SSRN Working paper, 2022.

BERNARD, D.; C. BLACKBURNE; and J. THORNOCK. "Information Flows Among Rivals and Corporate Investment." *Journal of Financial Economics* 136 (2020): 760–79.

BOLTON, P., and M. KACPERCZYK. "Carbon Disclosure and the Cost of Capital." SSRN Working paper, 2021.

BREUER, M.; C. LEUZ; and S. VANHAVERBEKE. "Reporting Regulation and Corporate Innovation." NBER Working paper, 2022.

CAO, J.; H. LIANG; and X. ZHAN. "Peer Effects of Corporate Social Responsibility." *Management Science* 65 (2019): 5487–5503.

CHEMICAL WATCH. "Feature: US States Adopt Tough Line on Volatile Organic Compounds." 2019. Available at https://chemicalwatch.com/77489/feature-us-states-adopt-tough-line-on-volatile-organic-compounds.

CHEN, Y. C.; M. HUNG; and Y. WANG. "The Effect of Mandatory CSR Disclosure on Firm Profitability and Social Externalities: Evidence from China." *Journal of Accounting and Economics* 65 (2018): 169–90.

CHRISTENSEN, H. B.; E. FLOYD; L. Y. LIU; and M. MAFFETT. "The Real Effects of Mandated Information on Social Responsibility in Financial Reports: Evidence from Mine-Safety Records." *Journal of Accounting and Economics* 64 (2017): 284–304.

14751596, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Exhibit 56 to Decl. of Lyon
1504

14756795, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/09/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

490    S. TOMAR

CLARKSON, P. M.; Y. LI; M. PINNUCK; and G. RICHARDSON. "The Value Relevance of Greenhouse Gas Emissions Under the European Union Carbon Emissions Trading Scheme." *European Accounting Review* 24 (2015): 551–80.

COASE, R. H. "The Problem of Social Cost." *Journal of Law and Economics* 3 (1960): 1–44.

COLKET, M.; R. GARVEY; H. HOLLICK; D. LISCINSKY; J. MANTESE; G. PONCIA; and K. SWANSON. "High Efficiency - Reduced Emissions Boiler Systems for Steam, Heat, and Processing." Technical report, 2012, Environmental Security Technology Certification Program.

COOPER, M. J.; H. GULEN; and A. V. OVTCHINNIKOV. "Corporate Political Contributions and Stock Returns." *Journal of Finance* 65 (2010): 687–724.

DE FRANCO, G.; O. K. HOPE; and S. LAROCQUE. "Analysts' Choice of Peer Companies." *Review of Accounting Studies* 20 (2015): 82–109.

DEHAAN, E. "Using and Interpreting Fixed Effects Models." SSRN Working paper, 2021.

DELMAS, M.; M. MONTES-SANCHOM; and J. SHIMSHACK. "Mandatory Information Disclosure Policies: Evidence from the Electric Industry." *Economic Inquiry* 48 (2010): 483–98.

DIERMEIER, D.; M. KEANE; and A. MERLO. "A Political Economy Model of Congressional Careers." *American Economic Review* 95 (2005): 347–73.

DOWNAR, B.; J. ERNSTBERGER; S. REICHELSTEIN; S. SCHWENEN; and A. ZAKLAN. "The Impact of Carbon Disclosure Mandates on Emissions and Real Operating Performance." *Review of Accounting Studies* 26 (2021): 1137–75.

DRANOVE, D.; D. KESSLER; M. MCCLELLAN; and M. SATTERTHWAITE. "Is More Information Better? The Effects of "Report Cards" on Health Care Providers." *Journal of Political Economy* 111. (2003): 555–558.

DURNEV, A., and C. MANGEN. "Corporate Investments: Learning from Restatements." *Journal of Accounting Research* 47 (2009): 679–720.

ECCLES, R. G., and S. KLIMENKO. "The Investor Revolution." *Harvard Business Review* (2019): 106–16.

ENGELBERG, J.; A. OZOGUZ; and S. WANG. "Know Thy Neighbor: Industry Clusters, Information Spillovers, and Market Efficiency." *Journal of Financial and Quantitative Analysis* 53 (2018): 1937–61.

FETTER, T. R.; A. STECK; C. TIMMINS; and D. WRENN. "Learning By Viewing? Social Learning, Regulatory Disclosure, and Firm Productivity in Shale Gas." NBER Working paper, 2022.

FIECHTER, P.; J. M. HITZ; and N. LEHMANN. "Real Effects of a Widespread CSR Reporting Mandate: Evidence from the European Union's CSR Directive." *Journal of Accounting Research* 60 (2022): 1499–1549.

FOSTER, G. "Externalities and Financial Reporting." *Journal of Finance* 35 (1989): 521–33.

FUNG, A., and D. O'ROURKE. "Reinventing Environmental Regulation from the Grassroots Up: Explaining and Expanding the Success of the Toxics Release Inventory." *Environmental Management* 25 (2000): 115–27.

GELLES, D. "How Republicans Are 'Weaponizing' Public Office Against Climate Action." *New York Times.* August 5, 2022.

GERARDEN, T. D.; R. G. NEWELL; and R. N. STAVINS. "Assessing the Energy-Efficiency Gap." *Journal of Economic Literature* 55 (2017): 1486–1525.

GLAZER, A., and H. MCMILLAN. "Pricing by the Firm Under Regulatory Threat." *Quarterly Journal of Economics* 107 (1992): 1089–99.

GRAHAM, M., and C. MILLER. "Disclosure of Toxic Releases in the United States." *Environment: Science and Policy for Sustainable Development* 43 (2001): 8–20.

GRENNAN, M., and A. SWANSON. "Transparency and Negotiated Prices: The Value of Information in Hospital-Supplier Bargaining." *Journal of Political Economy* 128 (2020): 1234–68.

GURNEY, K. R.; D. L. MENDOZA; S. GEETHAKUMAR; Y. ZHOU; V. CHANDRASEKARAN; C. C. MILLER; A. GODBOLE; B. SEIB; W. ANSLEY; S. PERAINO; X. CHEN; U. MALOO; J. KAM; J. BINIOON; M. FISHER; and S. DE LA RUE DU CAN. "Vulcan Science Methods Documentation." 2009a. Available at http://vulcan.rc.nau.edu/assets/files/Vulcan.documentation.v2.0.online.pdf.

Exhibit 56 to Decl. of Lyon
1505

14753796, 2022, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12475 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

GREENHOUSE GAS DISCLOSURE AND EMISSIONS BENCHMARKING    491

GURNEY, K. R.; D. L. MENDOZA; Y. ZHOU; M. L. FISCHER; C. C. MILLER; S. GEETHAKUMAR; and S. DE LA RUE DU CAN. "High Resolution Fossil Fuel Combustion CO2 Emission Fluxes for the United States." *Environmental Science & Technology* 43 (2009b): 5535–41.

HAMILTON, J. *Regulation Through Revelation: The Origin, Politics, and Impacts of the Toxics Release.* Cambridge: Cambridge University Press, 2005.

HARTZMARK, S. M., and A. B. SUSSMAN. "Do Investors Value Sustainability? A Natural Experiment Examining Ranking and Fund Flows." *Journal of Finance* 74 (2019): 2789–2837.

HASSAN, T. A.; S. HOLLANDER; L. VAN LENT; and A. TAHOUN. "Firm-Level Political Risk: Measurement and Effects." *Quarterly Journal of Economics* 134 (2019): 2135–2202.

HÉROUX, M.; C. GUY; and D. MILLETTE. "A Statistical Model for Landfill Surface Emissions." *Journal of the Air and Waste Management Association* 60 (2010): 219–28.

HOEGH-GULDBERG, O.; D. JACOB; M. TAYLOR; M. BINDO; S. BROWN; I. CAMILLONI; A. DIEDHIOU; R. DJALANTE; K. L. EBI; F. ENGELBRECHT; J. GUIOT; Y. HIJIOKA; S. MEHROTRA; A. PAYNE; S. I. SENEVIRATNE; A. THOMAS; R. WARREN; and G. ZHOU. "2018: Impacts of 1.5°C Global Warming on Natural and Human Systems." pp. 175–311. Technical report, 2018, Intergovernmental Panel on Climate Change.

HOMBACH, K., and T. SELLHORN. "Shaping Corporate Actions Through Targeted Transparency Regulation: A Framework and Review of Extant Evidence." *Schmalenbach Business Review* 71 (2019): 137–68.

IOANNOU, I.; S. X. LI; and G. SERAFEIM. "The Effect of Target Difficulty on Target Completion: The Case of Reducing Carbon Emissions." *The Accounting Review* 91 (2016): 1467–92.

JIN, G., and P. LESLIE. "The Effect of Information Product Quality: Evidence from Restaurant Hygiene Grade Cards." *Quarterly Journal of Economics* 118 (2003): 409–51.

S JOHNSON, M.. "Regulation by Shaming: Deterrence Effects of Publicizing Violations of Workplace Safety and Health Laws." *American Economic Review* 110 (2020): 1866–1904.

JOUVENOT, V., and P. KRUEGER. "Mandatory Corporate Carbon Disclosure: Evidence from a Natural Experiment." SSRN Working paper, 2021.

KOGAN, L., and D. PAPANIKOLAOU. "Growth Opportunities, Technology Shocks, and Asset Prices." *Journal of Finance* 69 (2014): 675–718.

LI, V. "Do False Financial Statements Distort Peer Firms' Decisions?" *Accounting Review* 91 (2016): 251–78.

LUO, L. "The Influence of Institutional Contexts on the Relationship Between Voluntary Carbon Disclosure and Carbon Emission Performance." *Accounting and Finance* 59 (2019): 1235–64.

MANSKI, C. F. "Identification of Endogenous Social Effects: The Reflection Problem." *Review of Economic Studies* 60 (1993): 531.

MATISOFF, D. C. "Different Rays of Sunlight: Understanding Information Disclosure and Carbon Transparency." *Energy Policy* 55 (2013): 579–92.

MAXWELL, J. W.; T. P. LYON; and S. C. HACKETT. "Self-Regulation and Social Welfare: The Political Economy of Corporate Environmentalism." *The Journal of Law and Economics* 43 (2000): 583–618.

MCCRIGHT, A. M., and R. E. DUNLAP. "The Politicization of Climate Change and Polarization in the American Public's Views of Global Warming, 2001-2010." *Sociological Quarterly* 52 (2011): 155–94.

MCKINSEY GLOBAL ENERGY AND MATERIALS. "Unlocking Energy Efficiency Opportunities." Technical report, 2009, McKinsey & Company.

MYERS, S. C. "Determinants of Corporate Borrowing." *Journal of Financial Economics* 5 (1977): 147–75.

QIAN, W., and S. SCHALTEGGER. "Revisiting Carbon Disclosure and Performance: Legitimacy and Management Views." *British Accounting Review* 49 (2017): 365–79.

RAUTER, T. "The Effect of Mandatory Extraction Payment Disclosures on Corporate Payment and Investment Policies Abroad." *Journal of Accounting Research* 58 (2020): 1075–1116.

RICHARDSON, N. "Policy Significance of EPA's Greenhouse Gas Reporting Program." Technical report, 2012, Resources for the Future.

Exhibit 56 to Decl. of Lyon
1506

14756796, 2023, 2, Downloaded from https://onlinelibrary.wiley.com/doi/10.1111/1475-679X.12473 by University Of Michigan Library, Wiley Online Library on [24/06/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

492   S. TOMAR

ROYCHOWDHURY, S.; N. SHROFF; and R. S. VERDI. "The Effects of Financial Reporting and Disclosure on Corporate Investment: A Review." *Journal of Accounting and Economics* 68 (2019): 1–27.

SANCHEZ, M.; S. MATTHEWS; and P. FISCHBECK. "How Much Is United States Greenhouse Gas Emissions Certainty Worth?" *Energy Policy* 51 (2012): 259–63.

SANTHOSH, L. G.; P. LAKSHMIKANTHAN; and G. L. SIVAKUMAR BABU. "Laboratory Investigation of Large Scale MSW Reactor Under Anaerobic Conditions." *Indian Geotechnical Journal* 47 (2017): 395–409.

SHROFF, N. "Corporate Investment and Changes in GAAP." *Review of Accounting Studies* 22 (2017).

SHROFF, N. "Real Effects of PCAOB International Inspections." *Accounting Review* 95 (2020): 399–433. 1–63.

SHROFF, N.; R. S. VERDI; and G. YU. "Information Environment and the Investment Decisions of Multinational Corporations." *Accounting Review* 89 (2014): 759–90.

SINGH, N.; K. BACHER; R. SONG; M. E. SOTOS; and L. YIN. "Guide for Designing Mandatory Greenhouse Gas Reporting Programs." Technical report, 2015, Partnership for Market Readiness.

SUIJS, J., and J. L. WIELHOUWER. "Disclosure Policy Choices Under Regulatory Threat." *RAND Journal of Economics* 50 (2019): 3–28.

TAHOUN, A. "The Role of Stock Ownership by US Members of Congress on the Market for Political Favors." *Journal of Financial Economics* 111 (2014): 86–110.

TAHOUN, A., and L. VAN LENT. "The Personal Wealth Interests of Politicians and Government Intervention in the Economy." *Review of Finance* 23 (2019): 37–74.

US EPA. "Mandatory Reporting of Greenhouse Gases." *Federal Register (40 CFR Parts 86, 87, 89 et al.)* 74 (2009).

WEIL, D.; A. FUNG; M. GRAHAM; and E. FAGOTTO. "The Effectiveness of Regulatory Disclosure Policies." *Journal of Policy Analysis and Management* 25 (2006): 155–81.

L WEISS, A.. "An Analysis of the North American Agreement On Environmental Cooperation." *ILSA Journal of International & Comparative Law* 5 (1998): 185–218.

WEISS, D. J.; R. LEFTON; and S. LYON. "Dirty Money." 2010. Available at https://www.americanprogressaction.org/article/dirty-money/.

YANG, L.; N. Z. MULLER; and P. J. LIANG. "The Real Effects of Mandatory CSR Disclosure on Emissions: Evidence from the Greenhouse Gas Reporting Program." NBER Working paper, 2022.

Exhibit 56 to Decl. of Lyon
1507