1  EUGENE SCALIA, SBN 151540
2      escalia@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
3  1700 M. St. N.W.
   Washington, D.C.  20036
4  Telephone:  202.955.8500
   Facsimile:   202.467.0539
5

6  *Attorneys for Plaintiffs Chamber of
   Commerce of the United States of Amer-*
7  *ica, California Chamber of Commerce,*
   *American Farm Bureau Federation, Los*
8  *Angeles County Business Federation,*
   *Central Valley Business Federation,*
9  *and Western Growers Association*

10 (*Additional counsel listed on next page*)

11             IN THE UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA,

13                      WESTERN DIVISION

14

15 CHAMBER OF COMMERCE OF THE          CASE NO. 2:24-cv-00801-ODW-PVC
   UNITED STATES OF AMERICA,
16 CALIFORNIA CHAMBER OF               **MEMORANDUM OF POINTS
   COMMERCE, AMERICAN FARM            AND AUTHORITIES IN SUPPORT
17 BUREAU FEDERATION, LOS              OF PLAINTIFFS' MOTION FOR
   ANGELES COUNTY BUSINESS             PRELIMINARY INJUNCTION**
18 FEDERATION, CENTRAL VALLEY
   BUSINESS FEDERATION, and           **HEARING:**
19 WESTERN GROWERS ASSOCIATION,        Date:       May 5, 2025
                                       Time:       1:30 PM
20           Plaintiffs,               Location:   Courtroom 5D
                                       Judge:      Otis D. Wright II
21      v.

22 LIANE M. RANDOLPH, in her official
   capacity as Chair of the California Air
23 Resources Board, STEVEN S. CLIFF, in
   his official capacity as the Executive
24 Officer of the California Air Resources
   Board, and ROBERT A. BONTA, in his
25 official capacity as Attorney General of
   California.
26
             Defendants.
27

28

Gibson, Dunn &
Crutcher LLP

BRADLEY J. HAMBURGER,
    SBN 266916
    bhamburger@gibsondunn.com
SAMUEL ECKMAN, SBN 308923
    seckman@gibsondunn.com
ELIZABETH STRASSNER,
    SBN 342838
    estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

BRIAN A. RICHMAN
(*pro hac vice*)
    DC Bar No. 230071
    brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX  75201-2923
Telephone:  214.698.3100
Facsimile:   214.571.2900

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

STEPHANIE A. MALONEY
(*pro hac vice* forthcoming)
    DC Bar No. 104427
    smaloney@uschamber.com
KEVIN PALMER
(*pro hac vice*)
    DC Bar No. 90014967
    kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C.  20062-2000
Telephone:  202.659.6000
Facsimile:   202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

1

# TABLE OF CONTENTS

2

Page

3

I. INTRODUCTION ...................................................................................................1

4

II. FACTUAL BACKGROUND ................................................................................3

5

III. PROCEDURAL BACKGROUND ......................................................................7

6

IV. ARGUMENT.......................................................................................................8

7

    A.    Plaintiffs Are Likely to Prevail on the Merits..........................................8

8

          1.    The Case Is Appropriate for Facial First Amendment Review .......9

9

          2.    S.B. 253 and 261 Fail Strict Scrutiny in a Substantial

10

              Number of  Applications.................................................................10

11

          3.    The Laws Fail Any Degree of First Amendment Review .............16

12

    B.    The Balance of Equities Strongly Supports a Preliminary Injunction.....18

13

          1.    S.B. 253 and 261 Will Cause Irreparable Harm ...........................18

14

          2.    The Public Interest Strongly Supports a Preliminary

15

              Injunction .....................................................................................20

16

V. CONCLUSION....................................................................................................21

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' MEM. OF POINTS AND AUTHORITIES ISO MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 2:24-CV-00801-ODW-PVC

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**CASES**

4

*303 Creative LLC v. Elenis*,
5
    600 U.S. 570 (2023)...................................................................................... 10

6

*Am. Beverage Ass'n v. City and Cty. of San Francisco*,
7
    916 F.3d 749 (9th Cir. 2019) ..................................................................... 20

8

*Am. Meat Inst. v. USDA*,
9
    760 F.3d 18 (D.C. Cir. 2014) ........................................................ 10, 13, 17

10

*Associated Press v. Otter*,
11
    682 F.3d 821 (9th Cir. 2012) ..................................................................... 21

12

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) .............................................................. 18, 20

13

14

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ...................................................................... 11

15

*Bruni v. City of Pittsburgh*,
16
    824 F.3d 353 (3d Cir. 2010) ...................................................................... 16

17

*Cal. Chamber of Com. v. Becerra*,
18
    529 F. Supp. 3d 1099 (E.D. Cal. 2021) .................................................... 18

19

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
20
    29 F.4th 468 (9th Cir. 2022) ........................................... 1, 8, 9, 11, 12

21

*Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*,
    556 F.3d 1021 (9th Cir. 2019) ................................................................... 16

22

23

*Central Hudson Gas & Electric Corp. v. Public Service Commission*,
    447 U.S. 557 (1980)................................................................................... 12

24

25

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993)................................................................................... 12

26

*Elrod v. Burns*,
27
    427 U.S. 347 (1976)................................................................................... 18

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' MEM. OF POINTS AND AUTHORITIES ISO MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 2:24-CV-00801-ODW-PVC

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Entm't Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) ...................................................................... 10

*Farris v. Seabrook*,
677 F.3d 858 (9th Cir. 2012) ...................................................................... 15

*Green v. Miss U.S. of Am., LLC*,
52 F.4th 773 (9th Cir. 2022) ....................................................................... 10

*Hill v. Colorado*,
530 U.S. 703 (2000) ..................................................................................... 16

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ..................................................................................... 10

*Ibanez v. Fla. Dep't for Bus. and Pro. Regulation, Bd. of Accountancy*,
512 U.S. 136 (1994) ..................................................................................... 17

*Int'l Dairy Foods Ass'n v. Amestoy*,
92 F.3d 67 (2d Cir. 1996) ............................................................................ 14

*Iowa Pork Producers Ass'n v. Bonta*,
2022 WL 1042561 (C.D. Cal. Feb. 28, 2022) ........................................... 20

*Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*,
585 U.S. 878 (2018) .................................................................................. 3, 12

*Junior Sports Magazines Inc. v. Bonta*,
80 F.4th 1109 (9th Cir. 2023) ..................................................................... 14

*LGS Architects, Inc. v. Concordia Homes of Nevada*,
434 F.3d 1150 (9th Cir. 2006) .................................................................... 21

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024) ....................................................................... 9

*McIntyre v. Ohio Elections Commission*,
514 U.S. 334 (1995) ..................................................................................... 13

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) ...................................................... 2, 9, 10, 16, 17

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024)...................................................................................... 8

*Nat'l Ass'n of Manufacturers v. SEC,*
748 F.3d 359 (D.C. Cir. 2014)..................................................................... 15

*Nat'l Ass'n of Manufacturers v. SEC,*
800 F.3d 518 (D.C. Cir. 2015)............................................................... 12, 15

*Nat'l Ass'n of Wheat Growers v. Bonta,*
85 F.4th 1263 (9th Cir. 2023) ...................................................................... 16

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
585 U.S. 755 (2018)................................................................. 10, 12, 13, 17

*NetChoice, LLC v. Bonta,*
113 F.4th 1101 (9th Cir. 2024) ...................................... 1, 2, 3, 9, 11, 13, 15

*NetChoice, LLC v. Bonta,*
692 F. Supp. 3d 924 (N.D. Cal. 2023)................................... 1, 18, 19, 20

*Nken v. Holder,*
556 U.S. 418 (2009)...................................................................................... 20

*O'Brien v. Welty,*
818 F.3d 920 (9th Cir. 2016) ....................................................................... 16

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n,*
475 U.S. 1 (1986)........................................................................................... 10

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
461 U.S. 190 (1983)...................................................................................... 20

*Personal Care Products Council v. Bonta,*
2024 WL 3011001 (E.D. Cal. June 12, 2024) ........................................... 17

*United States v. Lopez,*
514 U.S. 549 (1995)...................................................................................... 14

*Vill. of Schaumburg v. Citizens for a Better Envm't,*
444 U.S. 620 (1980)...................................................................................... 14

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ................................................................................ 10

*X Corp. v. Bonta*,
   116 F.4th 888 (9th Cir. 2024) ............................................. 1, 2, 3, 8, 9, 12, 13, 15, 18

*Zauderer v. Office of Disciplinary Counsel*,
   471 U.S. 626 (1985) ................................................................................ 10

**STATUTES**

Cal. Penal Code § 484(a) ............................................................................... 14

# I. INTRODUCTION

Courts in this Circuit routinely enjoin California, on a preliminary basis, from enforcing speech compulsions while First Amendment questions are litigated. *E.g.*, *X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024); *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024); *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022). As litigation is now certain to continue beyond S.B. 253 and 261's effective date, this Court should follow that same approach here and preliminarily enjoin the laws.

The laws will begin to take effect in "less than a year" and, without an injunction, will compel companies to speak on the controversial issue of climate change. *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 964 (N.D. Cal. 2023) (granting injunction), *aff'd in relevant part*, 113 F.4th 1101 (9th Cir. 2024). S.B. 261 requires disclosures on or before January 1, 2026, and this Court has already found a "credible threat" of enforcement. Dkt. 77 at 11. With respect to S.B. 253, CARB recently confirmed that it will require companies to submit a "first report due in 2026" disclosing emissions for the prior year and instructed companies "to move toward full compliance as quickly as possible." Hamburger Decl., Ex. A ("CARB Enforcement Notice") at 1. And CARB has made clear that companies must take action *now* to demonstrate good-faith compliance efforts. *Id.* The laws thus are *already* imposing immediate and irreparable harm on covered companies. The Court should preserve the status quo while litigation proceeds.

As this Court recognized, "[t]here can be no dispute that the primary effect—and purpose—of SBs 253 and 261 is to compel speech." Dkt. 73 at 7. Being forced to speak against one's will is a classic, irreparable First Amendment injury warranting injunctive relief. And that injury *will* occur, absent preliminary relief. Although Plaintiffs promptly filed suit after the laws were enacted and filed an early summary-judgment motion, this Court concluded that it could not resolve Plaintiffs' First Amendment challenge as a matter of law and set the case for discovery. Dkt. 73 at 10-13. The discovery

1  process, however, will take many months to complete, and subsequent adjudication on

2  the merits—whether via summary judgment or trial—will take many months more.

3  Preliminary injunctions exist to preserve the status quo in this exact scenario.

4  Plaintiffs are "likely to succeed on the merits of [their] claim"; they are "likely to suffer

5  irreparable harm absent the preliminary injunction"; "the balance of equities tips in

6  [their] favor"; and "a preliminary injunction is in the public interest." *X Corp.*, 116 F.4th

7  at 897 (brackets in original).

8  Under the Ninth Circuit's framework for assessing preliminary injunctions in the

9  First Amendment context, Plaintiffs need only establish "a colorable claim that [their]

10  First Amendment rights . . . are threatened with infringement." *Meinecke v. City of Se-*

11  *attle*, 99 F.4th 514, 521 (9th Cir. 2024). Plaintiffs have done that, and therefore "the

12  burden shifts to the government to justify" the laws—a burden the government cannot

13  meet. *Id.* The laws plainly "[m]andat[e] speech," so strict scrutiny applies. And the

14  State can point to no real, legitimate interest the laws serve. Even if it could, the laws

15  compel speech in ways that are unrelated (rather than narrowly tailored) to any such

16  interest.

17  The laws, for example, require *every* covered company to make greenhouse-gas

18  related disclosures, even if the company has *never* made advertisements regarding green-

19  house-gas emissions, climate change, or being a "green" company. These statutes are

20  the opposite of narrowly tailored, given that they impose blanket obligations on any

21  companies that satisfy their revenue thresholds. As the Ninth Circuit recently held while

22  endorsing preliminary injunctions in a pair of compelled-speech cases—*X Corp.*,

23  116 F.4th 888, and *NetChoice*, 113 F.4th 1101—such across-the-board speech compul-

24  sions "are more extensive than necessary to serve the State's purported goal[s]" and

25  therefore "likely fail under strict scrutiny" and must be enjoined pending a final decision

26  on the merits. *X Corp.*, 116 F.4th at 903.

27  The State says this is permissible because the laws compel "commercial speech."

28  It invoked the same defense in *X Corp.*, and it lost. There, as here, the State sought to

compel companies to "reveal [their] policy opinion about contentious issues." 116 F.4th
at 899. But like the speech in *X Corp.*, none of the speech compulsions here "propose a
commercial transaction" or bear other "indicia of commercial speech." 116 F.4th at 901.
Instead, the speech compulsion "go[es] further," requiring companies to express
"view[s] about" climate change; about "whether a company believes" governments will,
or companies should, take action to mitigate its effects, *id.*; and about the emissions of
suppliers and customers who "the reporting entity does not own or directly control,"
Dkt. 48-16 at 4. None of this is commercial speech.

The State cannot escape strict scrutiny because a "business's opinion about" cli-
mate change is "not 'purely factual and uncontroversial.'" *NetChoice*, 113 F.4th at
1120. "[C]limate change" is the paradigmatic "controversial subjec[t]" requiring "'spe-
cial [First Amendment] protection.'" *Janus v. Am. Fed'n of State Emps., Council 31*,
585 U.S. 878, 913-14 (2018). In any case, the laws are so facially overinclusive, they
fail any degree of First Amendment scrutiny.

The Court should pause implementation of the laws while the litigation is re-
solved. There is simply no other means of forestalling a "colli[sion] with the . . . Con-
stitution" and the violation of Plaintiffs' members' constitutional rights. *X Corp.*,
116 F.4th at 904. Because discovery and full litigation on the merits will not be com-
pleted before CARB begins to enforce S.B. 253 and 261, and because companies are
already taking steps to prepare for compliance with these laws, only a preliminary in-
junction can save Plaintiffs' members from the impending constitutional injury "of con-
vey[ing] to the public" a message they "d[o] not believe." Shoen Decl. ¶ 41.

## II. FACTUAL BACKGROUND

There is "no dispute" that S.B. 253 and 261 "compel speech" and that their "ob-
ligations are expected to take effect in 2026." Dkt. 73 at 2, 7. As one legislator put it,
the goal is to compel companies to make climate-related statements "they don't want to"
because (in the State's view) they are "going to be embarrassed by" them. Dkt. 48-5 at
30:1-6.

**S.B. 261.**  Without a preliminary injunction, S.B. 261 will compel companies to begin speaking "[o]n or before January 1, 2026," § 2(b)(1)(A), and to begin incurring substantial compliance costs now.  The law "applies to any entity with total annual revenues over $500 million 'that does business in California.'"  Dkt. 73 at 4.  "The California Senate Rules Committee analysis estimates that over 10,000 companies would meet this threshold[.]"  *Id.*

S.B. 261 requires any covered entity to publicly state its opinion regarding various "climate-related financial risk[s]" and to post that opinion to the entity's website.  S.B. 261 § 2(b)(1)(A), (c)(1).  Under the law, companies must opine on any "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health."  *Id.* § 2(a)(2).  Companies must then provide a report discussing any "measures adopted to reduce and adapt to" any of the above climate-related risks.  *Id.* § 2(b)(1)(A)(ii).

Unless a company certifies it has prepared an "equivalent" report for other reasons, the law requires companies to conform their reports to the "recommended framework" contained in the "Final Report of Recommendations of the Task Force on Climate-Related Financial Disclosures (June 2017)."  *Id.* § 2(b)(1)(A), (4).  That framework provides detailed instructions on the "types of information that should be disclosed or considered" and how such information "should be presented."  Dkt. 48-23 at 5, 51.

**S.B. 253.**  S.B. 253 directly applies to any company exceeding $1 billion in annual revenue that does business in California.  S.B. 253 § 2(b)(2).  "One of the legislation's sponsors estimates that SB 253 would apply to approximately 5,300 United States businesses," Dkt. 73 at 2, although its impact will extend to many more companies that do business with the covered entities, including small businesses and businesses with no operations in California.

S.B. 253 requires each covered entity, by 2026, to publicly state the "entity's" greenhouse-gas emissions for the prior fiscal year. S.B. 253 § 2(c)(1). Each entity must "measure and report" three categories of greenhouse-gas emissions—Scope 1, Scope 2, and Scope 3—"in conformance with the Greenhouse Gas Protocol standards and guidance." *Id.* § 2(c)(1)(A)(ii). And although the law purports to require each company to report "its emissions," *id.*, "Scope 2" and "Scope 3" emissions are defined to include the emissions of *others*, including emissions from utility providers, upstream suppliers, and downstream customers. *Id.* § 2(c)(1). Thus, S.B. 253 requires a company to misleadingly represent that the emissions of other entities are its own. Moreover, by requiring reporting "in conformance with the Greenhouse Gas Protocol," the law requires companies to report emissions that are misleadingly high, because that protocol does not factor in emissions that companies avoid or offset.

The reported emissions are not purely factual. Aside from the problem that S.B. 253 forces a company to report others' emissions as its own, the proper calculation of a company's own emissions is itself subject to significant debate. Accordingly, as Governor Newsom acknowledged, "the reporting protocol specified" in S.B. 253 "could result in inconsistent reporting across businesses subject to the measure." Dkt. 48-15 at 1. Emissions calculations necessarily turn on subjective judgments concerning the "advantages and disadvantages" of various approaches to estimation. Dkt. 48-21 at 18. Even more so, the subjective estimates an entity reports as its Scope 3 emissions are those of other reporting entities altogether, both downstream and upstream in the supply chain. Dkt. 48-20 at 77. The resulting burden of estimating emissions flows up and down the supply chain. Dkt. 48-11 at 5. Small businesses nationwide, including family farms far outside of California, Dkt. 48-31 ¶¶ 2-3; Dkt. 48-32 ¶¶ 2-3, will incur significant costs monitoring and reporting emissions to suppliers and customers swept within the law's reach.

S.B. 253 originally required CARB to issue regulations requiring the specific disclosures by January 1, 2025. In September 2024, the legislature extended CARB's deadline to July 1, 2025. S.B. 219 § 1 (2024).

In December 2024, CARB issued an "Enforcement Notice" to explain how the agency would exercise its enforcement discretion in the first reporting year. CARB Enforcement Notice 1. CARB confirmed that "the first reports by reporting entities will . . . be due in 2026" and "will cover scope 1 and scope 2 emissions during the reporting entity's prior fiscal year." *Id.* Recognizing that companies "may need some lead time to implement new data collection processes," the agency explained that for the first year only, it would exercise "discretion" toward companies that it believes "make a good faith effort to retain all data relevant to emissions reporting for the entity's prior fiscal year." *Id.* In their 2026 report, companies can calculate their greenhouse-gas emissions for the prior fiscal year "from information [they] already posses[s] or [are] already collecting at the time [the] Notice was issued." *Id.* The notice explains that this policy is "aimed at supporting entities actively working toward full compliance," and it instructs companies to "move toward full compliance as quickly as possible." *Id.* Commentators, accordingly, are recommending that companies "begin to put the right measures in place to comply" now. Hamburger Decl., Ex. B (Loyti Cheng & David Zilberberg, *Climate Disclosure Spotlight Shifts To 2 Calif. Laws*, Law360 (Jan. 14, 2025)).

\*        \*        \*

"[S]ignificant effort" goes into "developing processes and collecting information needed for disclosing" climate-related information. Dkt. 48-28 at 4. For example, to comply with S.B. 253 and 261, companies will need to locate relevant information across their companies, adopt new policies and procedures, develop new tracking systems, and hire and train employees. Quaadman Decl. ¶ 8; Shoen Decl. ¶ 11. This process takes "years, not months." Shoen Decl. ¶ 10. Accordingly, Plaintiffs' member companies are "tracking and recording a vast amount of climate-related information"

1   and are incurring substantial compliance costs.  Quaadman Decl. ¶¶ 8-9; *see* Golombek

2   Decl. (CalChamber); Englin Decl. (BizFed LA); Lunde Decl. (WGA).

3                      **III.  PROCEDURAL BACKGROUND**

4          Three months after Governor Newsom signed S.B. 253 and 261, Plaintiffs sued

5   to enjoin the implementation or enforcement of the laws.  Dkt. 28.  Defendants moved

6   to dismiss Plaintiffs' complaint in part, but did not seek to dismiss the First Amendment

7   claim.  Dkt. 38.  The Court granted that motion.  Dkt. 77.

8          Plaintiffs also moved for summary judgment on their First Amendment claim.

9   Dkt. 46.  Though the Court deferred a final ruling on that motion pending further factual

10  development, the Court resolved several important questions.  Dkt. 73.  First, the Court

11  held "the First Amendment applies to SBs 253 and 261." *Id.* at 8.  As the Court recog-

12  nized, "'[i]t is well-established that the First Amendment protects the right to refrain

13  from speaking at all' and 'that the forced disclosure of information, even purely com-

14  mercial information, triggers First Amendment scrutiny.'"  *Id.* at 7 (internal quotation

15  marks omitted).  Moreover, the Court found, "the primary effect—and purpose—of SBs

16  253 and 261 is to compel speech." *Id.*  The Court therefore "distinguish[ed]" S.B. 253

17  and 261 from "statutes where the compelled speech was plainly incidental to the [law's]

18  regulation of conduct." *Id.*  The Court did not address whether Plaintiffs are likely to

19  prevail on the merits.

20         Since the Court ruled on the summary judgment motion, subsequent develop-

21  ments have compelled Plaintiffs to seek preliminary relief.  First, CARB issued its S.B.

22  253 Enforcement Notice confirming that companies must submit a "first report due in

23  2026" for the prior fiscal year and instructing companies "to move toward full compli-

24  ance as quickly as possible."  CARB Enforcement Notice 1.  In the absence of injunctive

25  relief, companies are (and will continue) incurring substantial costs.  Quaadman Decl.

26  ¶ 9; *see* Shoen Decl. ¶¶ 12, 27.  Moreover, it now is plain the laws will take effect before

27  litigation is completed.  Discovery has not begun, but the State has informed Plaintiffs

28  that it intends to seek expansive information on a range of topics, including any

1   documents Plaintiffs or their members have regarding climate risks and communications

2   between Plaintiffs and their members regarding S.B. 253 and 261.  Hamburger Decl.

3   ¶ 3.

4        Faced with the passage of time, the State's intended discovery, and the impending

5   compliance date as clarified by the Enforcement Notice, Plaintiffs bring this motion to

6   preserve the status quo until the case can be resolved on the merits.

7                       **IV.  ARGUMENT**

8        The Court should preliminarily enjoin Defendants from implementing or enforc-

9   ing S.B. 253 and 261.  Plaintiffs are "likely to succeed on the merits of [their] claim";

10   they are "likely to suffer irreparable harm absent the preliminary injunction"; "the bal-

11   ance of equities tips in [their] favor"; and "a preliminary injunction is in the public in-

12   terest." *X Corp.*, 116 F.4th at 897 (brackets in original).  The Court should maintain the

13   status quo until this litigation can be fully adjudicated on the merits—something that is

14   not likely to occur until after the laws go into effect.

15   **A.**    **Plaintiffs Are Likely to Prevail on the Merits**

16        Plaintiffs are likely to succeed in showing that S.B. 253 and 261 facially violate

17   the First Amendment.  That is, "'a substantial number of the law's applications are un-

18   constitutional, judged in relation to the statute's plainly legitimate sweep.'"  *Moody v.*

19   *NetChoice, LLC*, 603 U.S. 707, 723 (2024).  "As *Moody* clarified, a First Amendment

20   facial challenge has two parts:  first, the courts must 'assess the state laws' scope'; and

21   second, the courts must 'decide which of the laws' applications violate the First Amend-

22   ment, and . . . measure them against the rest.'"  *X Corp.*, 116 F.4th at 899 (ellipsis in

23   original) (quoting *Moody*, 603 U.S. at 724-25).

24        "Courts asked to issue preliminary injunctions based on First Amendment

25   grounds face an inherent tension: the moving party bears the burden of showing likely

26   success on the merits . . . and yet within that merits determination the government bears

27   the burden of justifying its speech-restrictive law." *Cal. Chamber*, 29 F.4th at 477.  Con-

28   sequently, the Ninth Circuit has "articulated a unique likelihood-of-success standard in

First Amendment cases: '[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech.'" *Meinecke*, 99 F.4th at 521 (quoting *Cal. Chamber*, 99 F.4th at 478).

Plaintiffs' First Amendment challenge to S.B. 253 and 261 is more than "colorable" and the State cannot, at this stage, meet its burden to justify either law remaining in effect during litigation.

### 1.    The Case Is Appropriate for Facial First Amendment Review

The first step in a facial analysis is "to assess the statute's scope." *Matsumoto v. Labrador*, 122 F.4th 787, 806 (9th Cir. 2024). Here, the laws' scope is evident "from the[ir] face." *X Corp.*, 116 F.4th at 899. The laws require "*every* covered . . . company" to speak to the *same* "state-specified categories of content." *Id.* (emphasis added). Specifically, S.B. 253 requires every covered company to estimate and report a certain set of greenhouse-gas emissions (including other entities' emissions) as its own, in compliance with the State's misleading and controversial directives. And S.B. 261 requires every covered company to opine on the risks of climate change.

These laws thus "raise the same First Amendment issues for every[one]"—namely, whether the State could constitutionally compel covered companies to convey the required messages. *X Corp.*, 116 F.4th at 899. And as the Ninth Circuit has recently (and repeatedly) held in closely analogous contexts, this type of the across-the-board speech compulsion lends itself to facial review. *See NetChoice*, 113 F.4th at 1116 (facial review warranted where "all" "covered businesses" are "under the same statutory obligation to opine on . . . the risk that children may be exposed to harmful or potentially harmful content"); *X Corp.*, 116 F.4th at 899 (same, where "every" required disclosure "must detail" the same type of "policies and actions").

### 2.    S.B. 253 and 261 Fail Strict Scrutiny in a Substantial Number of Applications

In a substantial number of applications, the laws infringe on companies' freedom "to remain silent." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). As the Supreme Court has emphasized, the freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), and it "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). "For corporations as for individuals," then, "the choice to speak includes within it the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n*, 475 U.S. 1, 16 (1986) (plurality).

Laws compelling speech are thus "presumptively unconstitutional" and almost always trigger strict scrutiny. *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 585 U.S. 755, 766 (2018). The burden shifts to the State to prove that the laws "are narrowly tailored to serve compelling state interests." *Id.* "These requirements are daunting," *Green v. Miss U.S. of Am., LLC*, 52 F.4th 773, 791 (9th Cir. 2022), and in a substantial number of these laws' applications, the State will not be able to meet the challenge.

#### a.    Strict Scrutiny Applies

The State cannot satisfy its burden of showing that an exception to strict scrutiny applies. *See Meinecke*, 99 F.4th at 521.

First, the limited exception recognized in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), is inapplicable. *Zauderer* held that the government can compel the disclosure of certain, rote "purely factual" information that is "noncontroversial," *NIFLA*, 585 U.S. at 769, such as "country-of-origin labels" on imports, *Am. Meat Inst. v. USDA ("AMI")*, 760 F.3d 18, 20 (D.C. Cir. 2014), and "whether a particular chemical is within any given product," *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006). The compelled speech here is neither purely factual nor uncontroversial,

and *Zauderer* has *never* been used to justify the type of full-blown reports—and substantial diligence and analysis—required here.

Disclosure of a company's "climate-related financial risk[s]," S.B. 261 § 2(b)(1)(A)(i), is not reporting of a rote, "pure" fact. It represents a company's compelled assessment of the "risk of harm to immediate and long-term financial outcomes" from a variety of events whose connection to climate change, if any, is subject to reasonable debate. *Id.* § 2(a)(2). This exercise "inherently involve[s]" the company's subjective "judgment" about unverifiable "future-oriented" events, Dkt. 48-23 at 53, including future policy responses ("transition risks") and effects on global "financial markets," S.B. 261 § 2(a)(2), and requires the weighing and balancing of numerous "factors that may be indicative of potential financial implications for climate-related risks and opportunities," Dkt. 48-23 at 35. "[U]ndertak[ing] [such] contextual analyses," and "weighing and balancing many factors," is "anything but the mere disclosure of factual information." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024). As the Ninth Circuit recently held in affirming a preliminary injunction against another California statute compelling speech, "a business's opinion" about the risk of potential harm "is not 'purely factual and uncontroversial.'" *NetChoice*, 113 F.4th at 1120.

The compelled disclosures here will also be misleading—the opposite of purely "factual." *Cal. Chamber*, 29 F.4th at 479 n.12. S.B. 253 requires companies to report "their" greenhouse-gas emissions. § 1(e), (f). But the law requires companies to acknowledge as "their" own the emissions of others, including the emissions of "electricity" providers (Scope 2) and other "upstream and downstream" suppliers and customers who "the reporting entity does not own or directly control" (Scope 3). § 2(b)(4), (b)(5). It is not accurate—and certainly not "uncontroversial"—to saddle companies with "responsibility" (S.B. 253 § 1(f)) for emissions they did not make and over which they have no control. By forcing companies to speak "in conformance with the Greenhouse Gas Protocol standards and guidance," S.B. 253 § 2(c)(1)(A)(ii), the law further misleads by requiring companies to report emissions numbers that do not factor in

"avoided emissions or [greenhouse-gas] reductions from actions taken to compensate for or offset emissions," Dkt. 48-20 at 6.  The State has no legitimate interest in slanting the debate on this contested policy issue.  *See Cal. Chamber,* 29 F.4th at 479.

*Zauderer* also "has no application" because a company's climate-related risks and emissions are "anything but an 'uncontroversial' topic."  *NIFLA*, 585 U.S. at 769.  "[C]limate change" is the paradigmatic "controversial subjec[t]" requiring "'special protection'" at "'the highest rung of'" the First Amendment ladder.  *Janus*, 585 U.S. at 913-14.  As the State has already conceded, "policy responses to climate change are the subject of vigorous political debate."  Dkt. 52 at 21.  Speech compelled by the laws inevitably will be used to "stigmatize" companies and to "shape [their] behavior"—the very features that doomed the SEC's compulsory conflict-minerals disclosure.  *Nat'l Ass'n of Manufacturers v. SEC*, 800 F.3d 518, 520, 530 (D.C. Cir. 2015).  The State acknowledges that the laws are partly designed to identify purported "greenwashing," anticipating that activists will flyspeck disclosures to criticize companies and call for increased regulation or other concerted action.  Dkt. 48-5 at 2:25-3:11.  The State's attempt to skew the debate by arming one side with ammunition for "'publi[c] condemn[ation]'" makes it even "'more constitutionally offensive.'"  *Nat'l Ass'n of Manufacturers*, 800 F.3d at 530.

Second, the general test for commercial speech from *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980), does not apply, because the speech here is both compelled and noncommercial.  "'[T]he test* for identifying commercial speech'" is "the proposal of a commercial transaction."  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993).  S.B. 253 and 261's speech compulsions are untethered from any economic transaction.

*X Corp.* is instructive.  There, the Ninth Circuit recognized that even if covered companies engaged in some commercial speech—*e.g.*, if their terms of service were commercial speech—compelled disclosures *about* those terms were not *also* commercial.  *Id.* at 901-02.  As here, the compelled speech in *X Corp.* concerning terms of

1    service lacked indicia of commercial speech.  It did not *itself* appear in advertisements;

2    nor did it "*merely* disclose existing commercial speech."  116 F.4th at 901; *cf.*

3    *NetChoice*, 113 F.4th at 1120 ("businesses do not have a clear motivation to provide [the

4    compelled] opinions").  Such speech is "non-commercial."  116 F.4th at 901.[1]

5          That remains true, even *if* (as the State argued here and in *X Corp.*) the disclosures

6    might inform "prospective consumers" about a "product" or were somehow designed to

7    ensure that no one is "misled about" company policies, State's *X Corp.* Br. 21, 35.

8    Where, as here, the compelled speech "convey[s]" companies' "views on intensely de-

9    bated and politically fraught topics," the speech is simply not commercial.  *X Corp.*,

10   116 F.4th at 902.  The fact that a company has certain "beliefs . . . does not, by itself,

11   convert expression about those beliefs into commercial speech. . . . [S]uch a rule would

12   be untenable.  It would mean that basically any compelled disclosure by any business

13   about its activities would be commercial and subject to a lower tier of scrutiny, no matter

14   how political in nature.  Protection under the First Amendment cannot be vitiated so

15   easily." *Id.*

16          **b.    S.B. 253 and 261 Cannot Survive Strict Scrutiny**

17          S.B. 253 and 261 fail strict scrutiny because the State cannot "prov[e] that the

18   [laws] are narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at

19   766.

20          ***State interests.***  S.B. 253 and 261 serve no compelling state interest.  There is no

21   compelling interest "simpl[y]" in providing "additional relevant information" for its own

22   sake. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 348 (1995); *see AMI*,

23   760 F.3d at 31 (Kavanaugh, J., concurring) ("it is plainly not enough for the Government

---

25   [1] In denying summary judgment, the Court observed that "if ninety-nine percent of the
26   regulated companies have made advertisements relevant to SB 253's and 261's required
     disclosure," that may show appropriate tailoring "*under at least rational basis review*."
27   Dkt. 73 at 12 (emphasis added).  By the same token, if *strict scrutiny applies*—which
     the State cannot avoid—the State's prospect of showing appropriate tailoring is nil, or
28   sufficiently close to nil that, in the context of a motion for preliminary injunction, interim
     relief should be granted.

1    to say simply that it has a substantial interest in giving consumers information"); *Int'l*

2    *Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 73 (2d Cir. 1996) (similar).

3    And while combatting fraud may be a compelling interest, the State has not iden-

4    tified even "a *single* instance" of climate-related fraud. *Junior Sports Magazines Inc. v.*

5    *Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023) (State may not burden speech "to prevent

6    something that does not appear to occur"). Nor has it—or can it—show that existing

7    laws are not *already* sufficient; state law already "punish[es] such [fraud] directly." *Vill.*

8    *of Schaumburg v. Citizens for a Better Envm't*, 444 U.S. 620, 637 & n.11 (1980); *see*

9    Cal. Penal Code § 484(a).

10    Moreover, the State's purported interest is not reflected in the operation of the

11    statutes. S.B. 253, for example, will require *every* covered company to state the level of

12    "sulfur hexafluoride" emitted by its employees commuting to work anywhere in the

13    world. S.B. 253 § 2(c)(1)(A)(ii); Dkt. 48-21 at 14. S.B. 261, likewise, will require *every*

14    covered company to opine on the likely economic impacts of government policy re-

15    sponses to climate change. Dkt. 48-27 at 1-2. The State has not met its burden to supply

16    evidence that any California consumer, investor, or employee would need to know any

17    of this—or more—to make an informed decision. The State's purported interest is illu-

18    sory—at least in a substantial number of the laws' applications, which is all facial inval-

19    idation requires.

20    At most, the State seems to believe that the laws may trigger boycotts that will

21    cause "companies doing business in California" to "reduce" their emissions and "thereby

22    mitigate the risks California and its residents face from climate change." Dkt. 52 at 16.

23    But to credit such a claim would require "pil[ing] inference upon inference." *United*

24    *States v. Lopez*, 514 U.S. 549, 567 (1995). In *National Association of Manufacturers v.*

25    *SEC*, the SEC similarly, and unsuccessfully, argued that a compelled "conflict free" dis-

26    closure might cause consumers to "boycott mineral suppliers having any connection to

27    [a specific] region of Africa," which would "decrease the revenue of armed groups . . .

28    [and] end or at least diminish the humanitarian crisis there." 800 F.3d 518, 525 (D.C.

Cir. 2015). But there, as here, the "major problem with this idea" was that it "is entirely unproven and rests on pure speculation." *Id.* The State here has cited *no* evidence—let alone enough to survive strict scrutiny—that consumers would change their purchasing habits based on a company's emissions or climate-change risks, that any such consumer sentiment would result in material changes in companies' emissions, or—critically—that any such changes would have a material impact on climate change. First Amendment rights may not be infringed through speculation. *See Farris v. Seabrook*, 677 F.3d 858, 867 n.9 (9th Cir. 2012) (affirming preliminary injunction in the First Amendment context where the "State ha[d] not provided any evidence" showing that regulation was necessary). As the State admits, climate change is a "global" phenomenon, Dkt. 48-10 at 2; combatting it requires a "*global* reduction of [emissions]," Dkt. 48-11 at 5 (emphasis added).

*Narrow tailoring.* In any event, in a substantial number of applications, the laws "likely fail under strict scrutiny because they are not narrowly tailored." *X Corp.*, 116 F.4th at 903. The Ninth Circuit has held that analogous tailoring defects compel a preliminary injunction against laws compelling speech. As in *NetChoice*, the "State could have" assessed the viability of "less restrictive means" to address concerns regarding potential misleading statements, such as by "relying on existing criminal laws that prohibit related . . . conduct." 113 F.4th at 1121. The State could have also considered limiting any disclosures to those companies that advertise on climate-related grounds, or required disclosures only on climate-related advertisements themselves. Those narrower speech compulsions, though still subject to First Amendment scrutiny, would not be the sort of blanket, one-size-fits-all mandates that S.B. 253 and 261 impose on all covered companies that satisfy the applicable revenue thresholds.

Rather than compelling speech, the State could also have compiled its own reports disclosing the "physical and transition risks," S.B. 261 § 2(a)(2), that companies in various industries face. *Cf. Nat'l Ass'n of Manufacturers v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014), *overruled on other grounds by AMI*, 760 F.3d 18. Or it could have provided

its own estimates of companies' greenhouse-gas emissions. Studies, after all, show that 90% of a company's emissions can be estimated with readily available information, such as industry, size, and earnings growth. *E.g.*, Dkt. 48-22 at 7. "California could . . . post [such] information . . . on its own website," without "co-opt[ing]" the speech of anyone else. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir. 2023). But the State has not "tried" *any* of these less-speech-restrictive alternatives, *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2010), much less carried its burden to show they would not satisfy the State's purported interest, *Meinecke*, 99 F.4th at 521.

    ***Vagueness concerns compound the problem.*** Vague laws "allow arbitrary and discriminatory enforcement," *O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016), and may have a significant chilling effect on speech. Here, the definition of "climate-related financial risk" is so broad and vague that California could almost certainly find fault in the disclosure (or lack of disclosure) of *any* company the State disfavors.[2] This vague, sweeping definition creates a substantial risk that companies whose climate-related practices do not conform to California's policy preferences will be subject to "arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1029 (9th Cir. 2019) (invalidating law regarding "reporting requirements" "triggered by *any* in-kind expenditure").

### 3.    The Laws Fail Any Degree of First Amendment Review

    Even under lesser scrutiny—*Zauderer* or *Central Hudson*—the laws fail. *Zauderer* provides that a "disclosure requirement cannot be 'unjustified'" or "'unduly burdensome'" and must "remedy a harm that is 'potentially real, not purely hypothetical.'" *NIFLA*, 585 U.S. at 776. A requirement is unduly burdensome when its coverage is

---

[2] This risk is defined as any "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health." S.B. 261 § 2(a)(2).

either "curiously narrow" or "broader than reasonably necessary." *Id.* at 777. These requirements are "stringent" and "demanding," and "tightly limi[t] mandatory disclosures to a very narrow class." *AMI*, 760 F.3d at 34 (Kavanaugh, J., concurring). And the State, not the plaintiff, "has the burden to prove that the [compelled speech] is neither unjustified nor unduly burdensome." *NIFLA*, 585 U.S. at 776. Because the laws do "not survive *Zauderer*," they "necessarily cannot survive *Central Hudson*." *Personal Care Products Council v. Bonta*, 2024 WL 3011001, at *7 n.5 (E.D. Cal. June 12, 2024).

First, the State has failed to "presen[t] a nonhypothetical justification" for the compelled speech. *NIFLA*, 585 U.S. at 777. As discussed, the State has not shown, and cannot show, that "the harm" it seeks "to remedy" (an alleged lack of information) is "more than 'purely hypothetical,'" *id.*, or that the required disclosures "will in fact alleviate [that harm] to a material degree," *Ibanez v. Fla. Dep't for Bus. & Pro. Regulation, Bd. of Accountancy*, 512 U.S. 136, 146 (1994). Nor, as explained, has the State "narrowly drawn" either measure. *R.M.J.*, 455 U.S. at 203. The laws are incredibly broad. They apply to any company over a certain revenue threshold that does business in California, regardless of whether that company has investors or climate change is likely to have a material impact on any product or service sold within the State. The State has no evidence the laws will materially curb climate change. And it cannot articulate a legitimate interest in forcing discussion of out-of-state, or even out-of-country, climate-related information merely because a company transacts within the State. S.B. 253 and 261 fail any level of First Amendment scrutiny.

\*     \*     \*

For these reasons, S.B. 253 and 261 likely facially violate the First Amendment. The State cannot carry its burden of justifying either law. *Meinecke*, 99 F.4th at 521. The laws compel speech on a controversial subject, and the compelled speech is not purely factual. Strict scrutiny applies, even *if* the compelled speech were commercial (it is not). And in all events, the laws are so overinclusive, they flunk any First Amendment test.

1    **B.      The Balance of Equities Strongly Supports a Preliminary Injunction**

2             Each of the remaining preliminary-injunction factors supports immediate relief.

3    Without interim injunctive relief, Plaintiffs and their members will be forced to speak

4    against their will on a matter of contentious public debate—a classic irreparable First

5    Amendment injury—and will continue to incur costs as the parties proceed through

6    months of discovery and litigation.  The public interest, too, tilts decisively in Plaintiffs'

7    favor; it is "always in the public interest to prevent the violation of a party's constitu-

8    tional rights.'"  *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).

9             **1.      S.B. 253 and 261 Will Cause Irreparable Harm**

10            "The loss of First Amendment freedoms, for even minimal periods of time, un-

11   questionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

12   Here, the Court should have "no difficulty finding that [Plaintiffs] ha[ve] established a

13   likelihood of irreparable harm," as the speech compulsions at issue begin to take effect

14   in "less than a year."  *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 964 (N.D. Cal.

15   2023), *aff'd in relevant part*, 113 F.4th 1101 (9th Cir. 2024).  "S.B. 253 and S.B. 261

16   will require a number of the Chamber's members" and other plaintiffs "to speak in

17   2026."  Quaadman Decl. ¶ 10; *see, e.g.*, Shoen Decl. ¶ 38 (UHHC "disagrees with in-

18   cluding this type of information on its public website"); Golombek Decl. ¶ 6; Lunde

19   Decl. ¶ 5; Englin Decl. ¶ 5.  Courts in this Circuit have repeatedly endorsed preliminary

20   injunctions against California's attempts to compel speech in violation of the First

21   Amendment in similar contexts.  *See, e.g.*, *X Corp.*, 116 F.4th at 903-04 (reversing de-

22   nial of preliminary injunction; "[b]ecause X Corp. has a colorable First Amendment

23   claim, it has demonstrated that it likely will suffer irreparable harm"); *Cal. Chamber of*

24   *Com. v. Becerra*, 529 F. Supp. 3d 1099, 1121 (E.D. Cal. 2021) (granting preliminary

25   injunction as "[i]rreparable harm is relatively easy to establish in a First Amendment

26   case"; "[b]ecause the Chamber has a 'colorable First Amendment claim,' it has demon-

27   strated it 'likely will suffer irreparable harm'"), *aff'd sub nom. Cal. Chamber of Com.*

28   *v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022).

The same relief is warranted here. S.B. 261 will require companies to begin speaking—to opine on climate-related risks, in clear violation of their First Amendment rights—"[o]n or before January 1, 2026." § 2(b)(1)(A). S.B. 253, likewise, will require companies to make their first inexact, misleading emissions reports "in 2026" for the prior fiscal year. CARB Enforcement Notice 1. Implementing regulations for S.B. 253 may be pending (as this Court has observed, Dkt. 77), but the State has made clear that reports "will still be due" no matter what. So, companies *will* soon be required to speak. *Id.* Speech obligations under S.B. 261 and 253 are thus "less than a year away" and "businesses already are expending time and funds preparing for enforcement." *NetChoice*, 692 F. Supp. 3d at 964. "[T]o make the disclosures required in 2026, companies must begin tracking and recording a vast amount of climate-related information now." Quaadman Decl. ¶ 8. For example, they "need to determine where the required information is located across their companies; adopt policies and procedures to collect and analyze that information; develop IT systems to track and aggregate the data; hire additional employees and train current ones; retain external consultants; and test their internal infrastructure." *Id.*

The State itself has exhorted companies to "move toward full compliance" with S.B. 253 "as quickly as possible." CARB Enforcement Notice 2. It readily acknowledges that "companies may need some lead time to implement new data collection processes to allow for fully complete scope 1 and scope 2 emissions reporting." *Id.* And even though CARB has not yet issued implementing regulations for S.B. 253, it has instructed companies to make "good faith efforts to comply"—including by "retain[ing] all data relevant to emissions reporting" for the current fiscal year. *Id.* at 1. In other words, CARB has made clear that companies, must take action *now* to demonstrate good faith compliance efforts.

Unsurprisingly, commentators are already recommending companies "begin to put the right measures in place to comply" now. Hamburger Decl., Ex. B (Cheng & Zilberberg, *supra*); *see also id.*, Ex. B (David R. Singh, *SB 253 puts companies on the*

*climate clock*, Daily Journal (Dec. 27, 2004)).  All those compliance costs—on emissions reporting alone—could top $1 million per firm.  *E.g.*, Shoen Decl. ¶ 12.  "Requiring businesses to proceed with such preparations without knowing whether [the laws are] valid 'would impose a palpable and considerable hardship' on them," further warranting the issuance of a preliminary injunction.  *NetChoice*, 692 F. Supp. 3d at 964 (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)); *see Iowa Pork Producers Ass'n v. Bonta*, 2022 WL 1042561, at *15 (C.D. Cal. Feb. 28, 2022) (compliance costs "can constitute irreparable injury").

Because discovery and full litigation on the merits will not be completed before S.B. 253 and 261 go into effect, and companies are already taking steps to prepare for compliance with these laws, *see, e.g.*, Quaadman Decl. ¶ 8; Shoen Decl. ¶ 11, only a preliminary injunction can save Plaintiffs' members from the impending constitutional injury of "convey[ing] to the public" a message they "d[o] not believe," *id.* ¶ 41.

### 2.  The Public Interest Strongly Supports a Preliminary Injunction

When "[g]overnment is the opposing party," the balance of equities and public interest "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  As the Ninth Circuit has recognized, "it is *always* in the public interest to prevent the violation of a party's constitutional rights.'"  *Baird*, 81 F.4th at 1042 (emphasis added).  The "fact that [Plaintiffs] have raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [Plaintiffs'] favor."  *Am. Beverage Ass'n v. City and Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019); *see Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (Courts "have consistently recognized the significant public interest in upholding First Amendment principles.")

The State, moreover, cannot credibly claim that delaying implementation of S.B. 253 and 261 threatens any urgent public interest.  The speech the State seeks to compel has *never* been required.  And existing law *already* prohibits misleading statements.  A preliminary injunction would simply "preserve the status quo until [this Court]

1  resolves the merits of this case." *LGS Architects, Inc. v. Concordia Homes of Nevada*,

2  434 F.3d 1150, 1157 (9th Cir. 2006).

3  ## V.  CONCLUSION

4          The Court should preliminarily enjoin defendants from implementing, applying,

5  or taking any action to enforce S.B. 253 or 261.

6

7  DATED: February 25, 2025          Respectfully submitted,

8                                    GIBSON, DUNN & CRUTCHER LLP

9                                     By:  */s/ Bradley J. Hamburger*

10                                    Eugene Scalia, SBN 151540
                                      Bradley J. Hamburger, SBN 266916

11                                    Samuel Eckman, SBN 308923
                                      Brian A. Richman (*pro hac vice*)

12                                    Elizabeth Strassner, SBN 342838

13                                    *Attorneys for Plaintiffs Chamber of Commerce*

14                                    *of the United States of America, California*
                                      *Chamber of Commerce, American Farm Bureau*

15                                    *Federation, Los Angeles County Business Fed-*
                                      *eration, Central Valley Business Federation*

16                                    *and Western Growers Association*

17                                    CHAMBER OF COMMERCE OF THE

18                                    UNITED STATES OF AMERICA

19                                    Stephanie Maloney (*pro hac vice* forthcoming)

20                                    Kevin Palmer (*pro hac vice*)

21                                    *Attorneys for Plaintiff Chamber of Commerce*
                                      *of the United States of America*

22

23

24

25

26

27

28

PLAINTIFFS' MEM. OF POINTS AND AUTHORITIES ISO MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 2:24-CV-00801-ODW-PVC

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association, certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

DATED: February 25, 2025          Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:  */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce
of the United States of America, California
Chamber of Commerce, American Farm Bureau
Federation, Los Angeles County Business Fed-
eration, Central Valley Business Federation,
and Western Growers Association*

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA

Stephanie Maloney (*pro hac vice* forthcoming)
Kevin Palmer (*pro hac vice*)

*Attorneys for Plaintiff Chamber of Commerce
of the United States of America*

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' MEM. OF POINTS AND AUTHORITIES ISO MOT. FOR PRELIMINARY INJUNCTION
CASE NO. 2:24-CV-00801-ODW-PVC