Rob Bonta
Attorney General of California
Myung J. Park (SBN 210866)
Laura J. Zuckerman (SBN 161896)
Supervising Deputy Attorneys General
Katherine Gaumond (SBN 349453)
Emily Hajarizadeh (SBN 325246)
M. Elaine Meckenstock (SBN 268861)
Dylan Redor (SBN 338136)
David Zaft (SBN 237365)
Caitlan McLoon (SBN 302798)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6438
 Fax:  (916) 731-2128
 E-mail:  Caitlan.McLoon@doj.ca.gov
*Attorneys for Defendants Liane M. Randolph,*
*Steven S. Cliff, and Robert A. Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, CALIFORNIA CHAMBER OF COMMERCE, AMERICAN FARM BUREAU FEDERATION, LOS ANGELES COUNTY BUSINESS FEDERATION, CENTRAL VALLEY BUSINESS FEDERATION, and WESTERN GROWERS ASSOCIATION,** | 2:24-cv-00801-ODW-PVC |
| | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | Date:       May 5, 2025 |
| | Time:       1:30 PM |
| | Courtroom:  5D |
| v. | Judge:       The Honorable Otis D. Wright, II |
| | Trial Date:  Not Set |
| **LIANE M. RANDOLPH, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,** | Action Filed: 1/30/2024 |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................ 1

Background ......................................................................................................... 3

    I.    Corporate Reporting Obligations Involving Estimation and Prediction Are Routine ................................................................. 3

    II.   The California Legislature Enacted S.B. 253 and 261 in Part to Respond to Widespread Inaccuracies in Statements by the Largest Companies Doing Business in California ................................ 4

        A.   S.B. 253 ............................................................................... 5

        B.   S.B. 261 ............................................................................... 6

    III.   Procedural History .......................................................................... 7

Legal Standard ................................................................................................... 7

Argument ............................................................................................................ 8

    I.    Plaintiffs' Challenge to S.B. 253 is Unripe ..................................... 8

    II.   Plaintiffs Are Unlikely to Prevail on the Merits ............................. 9

        A.   Plaintiffs Fail to Show that S.B. 253 and 261 Implicate the First Amendment ....................................................... 10

        B.   S.B. 253 and 261 Are Not Subject to Strict Scrutiny ............. 11

        C.   SB 253 and 261 Satisfy Any Level of Scrutiny ..................... 16

        D.   S.B. 261 is Not Unconstitutionally Vague ............................. 19

    III.   All Remaining Injunction Factors Weigh Against Plaintiffs ............. 19

        A.   Plaintiffs Have Not Established Irreparable Harm ................... 19

        B.   The Balance of the Equities and the Public Interest Militate Against Granting an Injunction ................................. 22

    IV.   Scope of Any Injunction ............................................................... 22

Conclusion ....................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page**

CASES

*303 Creative LLC v. Elenis*
    600 U.S. 570 (2023) ................................................................... 15

*Am. Hosp. Ass'n v. Azar*
    983 F.3d 528 (D.C. Cir. 2020) ....................................... 12, 15, 17

*Am. Meat Inst. v. USDA*
    760 F.3d 18 (D.C. Cir. 2014) .............................................. 14, 17

*Arce v. Douglas*
    793 F.3d 968 (9th Cir. 2015) ................................................... 19

*Ariix, LLC v. NutriSearch Corp.*
    985 F.3d 1107 (9th Cir. 2021) ................................................. 12

*Askins v. U.S. Dep't of Homeland Sec.*
    899 F.3d 1035 (9th Cir. 2018) ................................................. 10

*Baird v. Bonta*
    81 F.4th 1036 (9th Cir. 2023) ................................................. 19

*Bolger v. Youngs Drug Prod. Corp.*
    463 U.S. 60 (1983) ........................................................... 11, 12

*Caribbean Marine Servs. Co. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988) ............................................. 19, 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
    447 U.S. 557 (1980) ......................................................... 11, 16

*CTIA - The Wireless Ass'n v. City of Berkeley, California*
    928 F.3d 832 (9th Cir. 2019) ......................................... 1, 11, 13, 16

*Doe v. Harris*
    772 F.3d 563 (9th Cir. 2014) ..................................................... 9

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ................................................. 22

ii

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Env't Def. Ctr. v. EPA*

4

    344 F.3d 832 (9th Cir. 2003) ................................................................. 11

5

*Exxon Corp. v. Heinze*

6

    32 F.3d 1399 (9th Cir. 1994) ................................................................... 8

7

*Glickman v. Wileman Bros. & Elliott, Inc.*

    521 U.S. 457 (1997) .............................................................................. 11

8

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*

9

    515 U.S. 557 (1995) .............................................................................. 15

10

*Maryland v. King*

11

    567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ............................. 22

12

*Moody v. NetChoice, LLC*

13

    603 U.S. 707 (2024) ............................................................................ 2, 8

14

*Nat'l Ass'n of Wheat Growers v. Becerra*

15

    468 F. Supp. 3d 1247 (E.D. Cal. 2020) ............................................... 16

16

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*

17

    272 F.3d 104 (2d Cir. 2001) ............................................................ 1, 17

18

*Nat'l Inst. of Family & Life Advocates v. Becerra*

19

    585 U.S. 755 (2018) ........................................................................ 15, 16

20

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*

    538 U.S. 803 (2003) ............................................................................... 8

21

*National Ass'n of Manufacturers v. SEC*

22

    800 F.3d 518 (D.C. Cir. 2015) ............................................................ 14

23

*NetChoice v. Bonta*

24

    113 F.4th 1101 (9th Cir. 2024) ................................................ 2, 10, 15

25

*NetChoice v. Bonta*

26

    No. 5:24-CV-07885-EJD, 2024 WL 5264045 (N.D. Cal. Dec. 31,

27

    2024) ...................................................................................................... 8

28

# TABLE OF AUTHORITIES
## (continued)

**Page**

*NetChoice, LLC v. Bonta*
  No. 22-CV-08861-BLF, 2025 WL 807961 (N.D. Cal. Mar. 13,
  2025) ...................................................................................................... 19

*Nken v. Holder*
  556 U.S. 418 (2009) .............................................................................. 22

*Ohralik v. Ohio State Bar Ass'n*
  436 U.S. 447 (1978) .............................................................................. 10

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
  676 F.3d 829 (9th Cir. 2012) .................................................................. 8

*Reed v. Town of Gilbert, Ariz.*
  576 U.S. 155 (2015) (Breyer, J., concurring in judgment) ........................... 1, 11

*S.E.C. v. Wall St. Publ'g Inst., Inc.*
  851 F.2d 365 (D.C. Cir. 1988) ............................................................... 10

*Smith v. Helzer*
  95 F.4th 1207 (9th Cir. 2024) ............................................................... 19

*Sorrell v. IMS Health Inc.*
  564 U.S. 552 (2011) .............................................................................. 11

*Stutzman v. Armstrong*
  No. 2:13-CV-00116-MCE-KJN, 2013 WL 4853333 (E.D. Cal.
  Sept. 10, 2013) ..................................................................................... 12

*Turner Broad. Sys., Inc. v. FCC*
  512 U.S. 622 (1994) .............................................................................. 16

*Turner Broad. Sys., Inc. v. FCC*
  520 U.S. 180 (1997) .............................................................................. 16

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
  425 U.S. 748 (1976) ................................................................................ 2

*Video Software Dealers Ass'n*, 556 F.3d at 961-62 ...................................... 17

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Wash. State Grange v. Wash. State Republican Party*
   552 U.S. 442 (2008) ........................................................................ 2

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ................................................................ 2, 7, 20

*Wooley v. Maynard*
   430 U.S. 705 (1977) ..................................................................... 15

*X Corp. v. Bonta*
   116 F.4th 888 (9th Cir. 2024) ................................................. *passim*

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*
   471 U.S. 626 (1985) ..................................................... 1, 11, 16, 18

STATUTES

15 United States Code
   § 77aa ............................................................................................ 3
   § 78l ............................................................................................... 3

Cal. Stat., Chapter 382
   § 1 ................................................................................................. 4

Cal. Stat., Chapter 383
   § 1 ................................................................................................. 4

California Corporation Code
   § 1502.1 (2019) ............................................................................. 3
   § 1502 (2020) ............................................................................... 3
   § 2117.1 (2019) ............................................................................. 3
   § 2117 (2020) ............................................................................... 3

California Health and Safety Code
   § 38532 .................................................................................. *passim*
   § 38533 .................................................................................. *passim*
   § 38562 ....................................................................................... 18
   § 38562.2 .................................................................................... 18
   § 38566 ....................................................................................... 18

# TABLE OF AUTHORITIES
## (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

First Amendment ............................................................................*passim*

**COURT RULES**

Rule 26(f) .......................................................................................... 7

Rule 56(d) .......................................................................................... 7

**OTHER AUTHORITIES**

17 Code of Federal Regulations
    pt. 210 (2024) ............................................................................ 3
    pt. 229 (2024) ............................................................................ 3
    pt. 229.105(a) .......................................................................... 10

36 Federal Register, 13989, 13989 (July 29, 1971) ...................... 10

75 Federal Register 6290, 6290-91 (Feb. 8, 2010) ....................... 10

**INTRODUCTION**

Courts have long examined laws compelling factual commercial speech with a lower level of scrutiny than those compelling political or ideological speech. *See Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985). This is because a speaker has only "minimal" First Amendment interest in the disclosure of uncontroversial commercial information, as compared to the "value … of the information such speech provides." *Id.* at 651; *see also Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001) ("Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'"). Attempting to evade application of this precedent, Plaintiffs contend that the laws at issue here compel the disclosure of "policy opinion about contentious issues." Dkt. 78-1 at 2-3 (citing *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024)). These laws do nothing of the kind.

The Corporate Data Accountability Act (Senate Bill 253) requires covered entities to provide the government with greenhouse gas (GHG) emissions data produced via widely accepted accounting protocols. The Climate-Related Financial Risk Act (Senate Bill 261) requires the disclosure of industry standard business-risk assessments. This type of information—like that contained in securities registration statements or income tax statements—has historically merited minimal, if any, First Amendment concern. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 177 (2015) (Breyer, J., concurring in judgment). Plaintiffs contend that these disclosures are "controversial" merely because they relate to climate change. Dkt. 78-1 at 12. But a statement of fact does not become a contentious policy opinion simply because it "can be tied in some way to a controversial issue." *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 845 (9th Cir. 2019). The distinction between disclosures requiring a company to articulate *its position* on a contentious policy issue, and those providing factual information (from which a third party could form an opinion about that policy issue), is legally significant, and separates

1

the present disclosures from those at issue in both *X Corp.*, 116 F.4th at 888, 902-03, and *NetChoice v. Bonta*, 113 F.4th 1101, 1119-21 (9th Cir. 2024).

Moreover, the disclosures required here serve compelling government interests.  A majority of large companies are making climate reduction pledges, Decl. of Angela Hsu ¶ 8 (87% of sample), or disclosing their GHG emissions, Dkt. 53-8 at 402 (98% of sample); *see also* Decl. of Thomas P. Lyon ¶¶ 20-21.  And 96% of these statements are misleading.  Hsu Decl. ¶ 10.  The disclosures required here address this problem.  Lyon Decl. ¶¶ 57-61; Hsu Decl. ¶¶ 15-16; *see also* Dkt. 78-1 at 14 (conceding that combatting fraud is a compelling interest).  These disclosures will also correct "a massive blind spot for consumers, investors, and policymakers," Dkt. 48-5 at 10:23-24, who need this information to make "intelligent and well informed" economic decisions.  *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).

Plaintiffs cannot show a likelihood of success on the merits.  They chose to bring this suit through the "disfavored" mechanism of a facial challenge.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008); *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (noting that "facial challenges [are] hard to win").  And they now seek the "extraordinary remedy" of a preliminary injunction, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), without any further factual development from when this Court denied their motion for summary judgment on this same claim, Dkt. 73 at 10-11.  As noted above, Defendants' evidence shows that, under any level of scrutiny, the plainly constitutional applications of these laws—e.g., to entities making misleading environmental claims—outweigh any arguably unconstitutional ones.

Plaintiffs also fail to present any plausible claim of imminent irreparable harm, or even a ripe claim as to Senate Bill (S.B.) 253.  The implementing agency has not adopted the regulations that are a condition precedent to any obligation on the reporting entities under that statute, *see* Dkt. 77 at 11-12, much less identified a date

by which covered entities must speak.  This case may well be resolved first.  Dkt. 87 at 6-7 (joint request for summary judgment hearing in July 2026).  As to S.B. 261, disclosures are not due for nearly eight months.  *Id.* § 38533(b)(1)(A) (2024).  Moreover, Plaintiffs' *single* declaration from a company that will be subject to these disclosure requirements lacks foundation and is riddled with errors and speculation.  Plaintiffs' evidence does not support the extraordinary relief they seek.

## BACKGROUND

### I.    CORPORATE REPORTING OBLIGATIONS INVOLVING ESTIMATION AND PREDICTION ARE ROUTINE

All companies doing business in California, both public and private, are subject to state reporting obligations.  *See, e.g.*, Cal. Corp. Code §§ 1502 (2020), 1502.1 (2019), 2117 (2020), 2117.1 (2019).  Federal law also requires public companies to make a variety of disclosures to various regulatory agencies, such as the Securities and Exchange Commission (SEC).  *See, e.g.*, 15 U.S.C. §§ 77aa, 78*l*; 17 C.F.R. pt. 229 (2024); 17 C.F.R. pt. 210 (2024).  These mandatory disclosures include information about a company's operations and financial condition; factors that increase the risk of investing in the company; factors management believes affected past company performance and will affect future performance; etc.  *See* Dkt. 54 ¶ 17.[1]  Among the risks that SEC-regulated companies have had to report are the impacts of the "Year 2000" (Y2K) problem, the Covid-19 pandemic, high rates of inflation, and Russia's war on Ukraine.  *Id.* ¶¶ 19(b), 19(c).

To prepare such disclosures, companies are routinely required to make estimates and predictions and to assess and disclose perceived risks.  Decl. of James P. Burton ¶ 32 (noting U-Haul's use of estimates and assumptions in financial disclosures).  Disclosures pertaining to the potential impacts of a global conflict on

---

[1] Defendants hereby incorporate by reference the evidence, including declarations, that was submitted with the briefing on Plaintiffs' motion for summary judgment (*e.g.* Dkt. Nos. 48, 52-57).

a company's supply chain, the projected impact of high rates of inflation, or the impact of pending or threatened litigation necessarily involve uncertainty.  Dkt. 54 ¶ 19.  Nonetheless, these disclosures are understood to be "factual information" reflecting the reporting entities' well-reasoned "business judgments" on the relevant metrics.  *Id.* ¶¶ 20-22.  This is particularly so when the disclosed information is developed pursuant to established "accounting policies and practices."  *Id.* ¶¶ 23-25.  Indeed, "both investors and companies *routinely rely* on such information in making investment and business decisions that involve large financial outlays."  *Id.* ¶¶ 26-27 (emphasis in original).

## II.    THE CALIFORNIA LEGISLATURE ENACTED S.B. 253 AND 261 IN PART TO RESPOND TO WIDESPREAD INACCURACIES IN STATEMENTS BY THE LARGEST COMPANIES DOING BUSINESS IN CALIFORNIA

S.B. 253 and 261 were enacted in late 2023 to, among other things, respond to concerns that California investors and consumers lacked accurate, verifiable data about GHG emissions and climate-risk assessment—information needed to make prudent financial decisions—from the largest companies doing business in the state. 2023 Cal. Stat., ch. 382 § 1 (S.B. 253); 2023 Cal. Stat., ch. 383 § 1 (S.B. 261); *see also* Dkt. 48-7 at 2:7-3:1; Dkt. 48-9 at 3:10-15.  While a significant portion of the largest companies already prepare climate-related disclosures or statements of some form, Dkt. 53 ¶ 14, the lack of reliable and assured data has made it easy for companies to provide misleading or fraudulent information, Lyon Decl. ¶¶ 53-61. Indeed, a recent study of 4,131 companies found that 87% of them made emissions claims, and of these, 96% of them were misleading or inaccurate.  Hsu Decl. ¶¶ 8-10.  CalPERS, California's largest public-defined-benefit pension fund, considers "[c]limate risk [to be] investment risk," and finds that "the current disclosure regime for corporate reporting falls short of [investors'] expectations … ."  Dkt. 52-5 ¶¶ 13, 19.  Because investors have "extensive exposure to private sector companies"—in the case of CalPERS, "more than $150 billion" worth—investors

"see[] the same risks and would benefit from the same climate related disclosures" from both public and private companies.  *Id.* ¶ 16.

## A.    S.B. 253

S.B. 253 does not directly require companies to disclose anything.  Instead, it directs the California Air Resources Board (CARB) to "develop and adopt regulations" that *will* require "reporting entit[ies]" to disclose their GHG emissions to CARB or a designated emissions reporting organization.  Cal. Health & Safety Code § 38532(c)(1).  CARB has not yet proposed these implementing regulations.  Decl. of Caitlan McLoon ¶ 2.

"Reporting entit[ies]" will be those that "do[] business in California" and have total annual revenues in excess of $1 billion.  *Id.* § 38532(b)(2).  A recent analysis estimated that 1,971 companies could be covered by the law, 75% of them public companies.  McLoon Decl. Ex. 2 at 11.

Once CARB's implementing regulations are in place, reporting entities will report three categories of GHG emissions: Scope 1, Scope 2, and Scope 3.  Scope 1 emissions are those from sources owned or directly controlled by the reporting entity.  *Id.* § 38532(b)(3).  Scope 2 encompasses indirect emissions associated with the reporting entity's use of electricity, heating, and cooling.  *Id.* § 38532(b)(4).  Scope 3 includes all other indirect emissions, such as those from "purchased goods and services, business travel, employee commutes, and processing and use of sold products."  *Id.* § 38532(b)(5).  Scope 3 emissions can be determined through collection of relevant data (e.g., from suppliers), *or* estimated using "secondary data sources," including "industry average data, proxy data, and other generic data."  *Id.* § 38532(c)(2)(A)(ii).  Entities must measure and report all three categories of emissions "in conformance" with the "Greenhouse Gas Protocol standards and guidance," *id.*, a globally accepted protocol for emissions accounting, Dkt. 53 ¶¶ 10, 14, 17, 19-25, 28.

S.B. 253 "minimizes duplication of effort" by allowing reporting entities to submit emissions data prepared to meet other national and international reporting requirements. Cal. Health & Safety Code § 38532(c)(1)(D)(i). The law requires third-party assurances to ensure the quality and accuracy of the data, *id.* § 38532(c)(2)(F)(i), and makes the data accessible to the public, *id.* § 38532(d)(1), (e)(1).

Scope 1 and Scope 2 emissions reports are not due until 2026 "on or by a date to be determined by the state board." *Id.* § 38532(c)(2)(A)(i)(I). In December 2024, CARB issued an Enforcement Notice stating that "for the first report due in 2026," covered entities may submit reports based solely on emissions data "that can be determined from information the reporting entity already possesses or is already collecting at the time" the Notice issued. Dkt. 78-6 at 2. Scope 3 reporting will not begin until 2027. Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

**B.    S.B. 261**

S.B. 261 requires U.S. entities with total annual revenues in excess of $500 million that "do[] business in California" to prepare a biennial report disclosing climate-related financial risks they have identified and any measures they have adopted to reduce and adapt to those risks. *Id.* § 38533(a)(4)–(b)(1)(A). A recent analysis projects that 2,675 companies will be covered by the law, 73% of them public companies. McLoon Decl. Ex. 2 at 11.

The bill defines "[c]limate-related financial risk" as the "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks … ," such as disruptions to operations or impacts on employee health and safety. Cal. Health & Safety Code § 38533(a)(2). The law directs entities to prepare their disclosures in alignment with "the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures" ("TCFD"), *id.* § 38533(b)(1)(A)(i), a widely adopted investor-driven protocol. Dkt. 53 ¶¶ 11, 14, 17, 19, 21-25, 36, 37(c). Each reporting company must publish a copy of the report

6

"on its own internet website."  Cal. Health & Safety Code § 38533(c)(1).  These disclosures are first due on January 1, 2026.  *Id.* at § 38533(b)(1)(A).

Under the TCFD, "risks" and "financial impacts" subject to disclosure include "[i]ncreased operating costs," "[r]educed demand for products and services," "change in revenue mix and sources," "[i]ncreased production costs due to changing input prices," and "[i]ncreased insurance premiums."  Dkt. 48-23 at 19-20.  Entities need not adopt any particular climate-related risk management strategy or take any particular climate-risk mitigation actions.  Dkt. 53 ¶¶ 35, 38-39; Dkt. 54 ¶¶ 19-21, 29-33.

## III.  PROCEDURAL HISTORY

Plaintiffs sought summary judgment on their First Amendment claim on May 24, 2024, before discovery opened.  Dkt. 48.  In November 2024, this Court denied that motion and granted Defendant's Rule 56(d) motion on the ground "that further development of the facts are needed for [the Court] to evaluate" Plaintiffs' claim.  Dkt. 73 at 12.  Before the parties had held their Rule 26(f) Conference, Plaintiffs brought this Motion for Preliminary Injunction on the same claim.  Dkt. 78.

Separately, on February 3, 2025, this Court issued an order granting Defendants' motion to dismiss Plaintiffs' second and third claims under the Supremacy and dormant Commerce Clauses.  Dkt. 77.  In that order, the Court concluded that those claims were not ripe as to S.B. 253, and that Plaintiffs had failed to state those claims as to S.B. 261.  *Id.* at 11-24.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.  The moving party must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Id.* at 20.

1  A party bringing a facial challenge to invalidate a law under the First

2  Amendment must show that "the law's unconstitutional applications substantially

3  outweigh its constitutional ones." *X Corp.*, 116 F.4th at 898 (quoting *Moody*, 603

4  U.S. at 724).  Facial challenges are "hard to win" because they "threaten to short

5  circuit the democratic process" by "preventing duly enacted laws from being

6  implemented in constitutional ways." *Moody*, 603 U.S. at 723 (cleaned up).

7  **ARGUMENT**

8  **I.   PLAINTIFFS' CHALLENGE TO S.B. 253 IS UNRIPE**

9  As a preliminary matter, Plaintiffs' challenge to S.B. 253, and especially the

10  provisions pertaining to Scope 3 emissions reporting, is prudentially unripe.  As this

11  Court previously explained, "SB 253, on its own, does not mandate any action from

12  any of Plaintiffs' members or any other reporting entity," and CARB has not yet

13  adopted the implementing regulations for S.B. 253 that are a prerequisite to any

14  obligation to act.  Dkt. 77 at 11.  Plaintiffs' request for extraordinary relief thus

15  seeks premature adjudication of claims that do not yet have a concrete impact on

16  the parties. *Exxon Corp. v. Heinze*, 32 F.3d 1399, 1404 (9th Cir. 1994); *see*

17  *NetChoice v. Bonta*, No. 5:24-CV-07885-EJD, 2024 WL 5264045, at *4 (N.D. Cal.

18  Dec. 31, 2024) (finding First Amendment challenge unripe).

19  Prudential ripeness requires the Court "to first consider the fitness of the issues

20  for judicial review, followed by the hardship to the parties of withholding court

21  consideration." *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d

22  829, 837 (9th Cir. 2012).  Plaintiffs' challenge to S.B. 253 is not fit for review

23  because "further factual development"—namely, the implementing regulations—

24  "would significantly advance [the Court's] ability to deal with the legal issues

25  presented." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)

26  (cleaned up); *see* McLoon Decl. Ex. 1 (identifying topics for regulatory

27  development).  And Plaintiffs cannot show they or their members will suffer any

28  hardship if the Court withholds its consideration of this challenge, as the

requirements are not in effect until some unspecified date in 2026 for Scopes 1 and 2, and 2027 for Scope 3.  Health and Safety Code § 38532(c)(1), (2)(A)(i).  Moreover, CARB issued an Enforcement Notice stating that entities need not collect any new data "for the first report due in 2026."  Dkt. 78-6 at 2-3.

## II.    PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS

On the merits, the central question before this Court is what level of First Amendment scrutiny to apply.  Plaintiffs contend that the challenged laws merit strict scrutiny because they compel the disclosure of policy opinions on contentious issues.  But Plaintiffs fail to demonstrate that the laws compel a single company to state a political opinion, much less that a substantial number of reporting entities must do so.  This contrasts with *X Corp.*, 116 F.4th at 899, where the facial challenge succeeded because "every covered social media company" had to "reveal its policy opinion about contentious issues," thereby implicating heightened First Amendment concerns "in every application" of the law.  Rather, the disclosures that will be required under these laws closely resemble those that fall into a "long … tradition" of reduced constitutional concern.  *Id.* at 901; *see also* Dkt. 52 at 20:13-21:3.  In fact, these laws are best understood either as governing an area of economic regulation that merits no First Amendment concern, or as compelling the disclosure of commercial data and business information that merits a form of rational basis or intermediate review.

In any event, as addressed below, S.B. 253 and 261 satisfy any level of scrutiny.  *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (noting the plaintiff has the initial burden of showing that a challenged law implicates the First Amendment, while the government has the subsequent burden of showing that the challenged law satisfies the appropriate level of scrutiny).  Thus, Plaintiffs cannot establish a likelihood of success on the merits.

### A.   Plaintiffs Fail to Show that S.B. 253 and 261 Implicate the First Amendment

This Court is free to reexamine its previous conclusion that these laws implicate the First Amendment. *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) ("The law of the case doctrine does not preclude a court from reassessing its own legal rulings in the same case.").  And it should, as the Court's earlier reliance on *NetChoice*, 113 F.4th at 1118, was misplaced.  Dkt. 73 at 7-8.  In *NetChoice* the Court concluded the First Amendment applied because the laws in question compelled companies to make speech imbued with political opinion and also to "serv[e] as censors for the State."  113 F.4th at 1118.  Here, however, the laws require a type of speech—disclosure of commercial data and financial risks—that has not traditionally garnered constitutional concern.

Most of the entities regulated by S.B. 253 and 261 are subject to SEC rules requiring the disclosure of factors that may "make an investment … speculative or risky," 17 C.F.R. pt. 229.105(a), including environmental-related risks, 36 Fed. Reg. 13989, 13989 (July 29, 1971); 75 Fed. Reg. 6290, 6290-91 (Feb. 8, 2010).  Securities filings of this kind, like tax returns or census data, contain speech that has historically fallen outside the boundaries of First Amendment coverage entirely, or has merited minimal judicial scrutiny.  *See, e.g., S.E.C. v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) ("If speech employed directly or indirectly to sell securities were totally protected, any regulation of the securities market would be infeasible—and that result has long since been rejected."); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457 (1978) (explaining that "the exchange of information about securities" and "corporate proxy statements" may be regulated without offending the First Amendment).  There is no rational reason the present laws should be treated differently.

Additionally, the laws here are directed at a "broader regulatory apparatus" governing the disclosure of commercial data, and thus regulate conduct, not speech.

1   *Env't Def. Ctr. v. EPA*, 344 F.3d 832, 850 n.26 (9th Cir. 2003); *see also Glickman*

2   *v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469 (1997).  Accordingly, the First

3   Amendment does not apply.

4       **B.   S.B. 253 and 261 Are Not Subject to Strict Scrutiny**

5       To the extent the Court finds that the First Amendment applies, at the very

6   least the "strong presumption against constitutionality" urged by Plaintiffs "has no

7   place" here.  *Reed*, 576 U.S. at 177 (Breyer, J., concurring in judgment).

8       Courts have long examined regulations affecting commercial speech

9   differently from those impacting other speech (e.g., political speech)—applying a

10  lower level of scrutiny to the former.  *Zauderer*, 471 U.S. at 637; *Cent. Hudson Gas*

11  *& Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561-63 (1980).

12  The need to afford the government greater room to regulate is especially

13  pronounced when the government action is intended to increase, rather than restrict,

14  the free flow of accurate information to the public.  *Zauderer*, 471 U.S. at 646; *see*

15  *also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).

16      Under *Zauderer*, "compelled disclosure of commercial speech complies with

17  the First Amendment if the information in the disclosure is reasonably related to a

18  substantial governmental interest[,] … is purely factual and uncontroversial," and is

19  not unduly burdensome.  *CTIA*, 928 F.3d at 845, 848-49.  Plaintiffs argue the

20  disclosures at issue here are not commercial, uncontroversial, or factual.  These

21  arguments fail.

22      ***Commercial speech.***  There are no "bright line[]" rules for determining what

23  constitutes "commercial speech."  *X Corp.*, 116 F.4th at 900.  Rather, courts

24  employ a "common-sense" and "fact-driven" analysis, *id.*, focused on "the *nature*

25  of the speech," *id.* at 901 n.9.  Three characteristics, when present, lend "strong

26  support" to the conclusion that speech is commercial: (1) the speech is an

27  advertisement, (2) the speech refers to a particular product, and (3) the speaker has

28  an economic motivation.  *Id.* at 900 (citing *Bolger v. Youngs Drug Prod. Corp.*, 463

U.S. 60, 66-67 (1983)).  However, the absence of these factors is "not dispositive." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021).

Plaintiffs argue that the speech involved here lacks the "indicia of commercial speech" because it "d[oes] not *itself* appear in advertisements" or "*merely* disclose existing commercial speech."  Dkt. 78-1 at 13 (emphasis in original).  But Plaintiffs take too narrow a view.  A formal "advertisement" is not required; rather "[c]ourts have found commercial speech even when it involves indirect benefits, such as … improvements to a brand's image."  *Ariix*, 985 F.3d at 1117; *see also Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (noting commercial speech is not "limited to restrictions on advertising and point-of-sale labeling").

Companies speak publicly about their emissions and sustainability practices to attract business.  Lyon Decl. ¶¶ 11-27.  At least 82% of the largest companies in North America make such statements.  Hsu Decl. ¶ 8; Dkt. 53-8 at 402; Lyon Decl. ¶ 21 (noting increasing attention given to climate risk in corporate earnings calls).  Even U-Haul, Plaintiffs' sole covered entity declarant, is doing so.  Burton Decl. ¶ 36-37, Ex. 1, Ex. 6.  This speech is advertising—even if it is advertising the company, rather than a product—and has a clear economic motive.  Thus, the disclosures required under S.B. 253 and 261 satisfy two of the three *Bolger* factors.  That suffices to establish commercial speech.  *See* Dkt. 73 at 11 (citing *Stutzman v. Armstrong*, No. 2:13-CV-00116-MCE-KJN, 2013 WL 4853333, at *18 (E.D. Cal. Sept. 10, 2013)).  But in any event, the *Bolger* factors are not dispositive, and these disclosures plainly concern only firm-level operational information—such as that found in SEC disclosures—that is commercial in nature.  *X Corp.*, 116 F.4th at 900 (explaining courts ultimately "try to give effect to a common-sense distinction between commercial speech and other varieties of speech") (cleaned up).

***Uncontroversial speech.***  Plaintiffs argue that the compelled speech here cannot be "commercial" in nature because it "conveys companies' views on intensely debated and politically fraught topics."  Dkt. 78-1 at 13 (cleaned up).  But

neither law requires a company to express its policy views on *any* topic, much less one that is politically fraught. *See* Dkt. 53 ¶¶ 35, 38-39; *see also* Dkt. 53-20 at 1199-1201, Dkt. 53-21 at 1251-1255, and Dkt. 53-22 at 1262-1383 (example disclosures). Far from requiring companies to opine on whether and how certain categories of controversial content "should be defined and proscribed," *X Corp.*, 116 F.4th at 901, these laws require companies to follow widely accepted protocols and definitions to disclose uncontroversial data and information.

The distinction between a policy position and a business fact is well understood in the field of corporate disclosure. A company asked to disclose its business risks related to the war in Ukraine, for example, is not expected to state its policy view on the war or how the government should respond to the conflict; rather, the company is expected to disclose facts pertaining to potential disruptions in its supply chain or increased costs which in its reasonable estimation might result from the conflict. Similarly, under S.B. 261, companies need not opine on whether a government should adopt "carbon-pricing" policies; rather, companies need only disclose costs and risks they have determined may flow from such policies, including "[i]ncreased operating costs." Dkt. 48-23 at 10. Similarly, under S.B. 253 a company need not opine on whether its emissions contribute to climate change; rather, it need only provide the numerical accounting of emissions associated with its operations. And indeed, many companies already do so in service of business objectives. Dkt. 53 ¶ 14.

Plaintiffs claim that these disclosures are "controversial" because they touch on climate change and because the information disclosed could be used to "stigmatize" companies. Dkt. 78-1 at 12. A factual statement does not, however, become controversial simply because it "can be tied in some way to a controversial issue," *CTIA*, 928 F.3d at 845, or because a listener may use the fact to form an

13

opinion.[2]  Plaintiffs cite *National Ass'n of Manufacturers v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015), but there, companies engaged in diamond sales were required to state whether their diamonds were "conflict free" or "not conflict free," a statement the court found to be both ideological and intertwined with moral responsibility.  *Id.*  But whereas those labels forced companies to communicate whether their product was "ethically tainted," *id.*, irrespective of the companies' own views of their moral responsibility, the S.B. 253 and 261 disclosures do not require speech that conveys a political message, Dkt. 53 ¶¶ 35, 38-39.  These laws provide data; they do not label companies as "good for the climate" or "bad for the climate."  That third parties could take a further step and use the disclosed information to inform commercial choices does not make the compelled speech controversial.  *See Am. Meat Inst. v. USDA*, 760 F.3d 18, 21-25 (D.C. Cir. 2014).  Rather, it underscores the role that disclosure plays in furthering First Amendment interests, such as ensuring access to robust, accurate information, unencumbered by the government's own policy views.

**Factual speech.**  Finally, Plaintiffs argue that lower scrutiny does not apply to either law, because the information provided is not "rote, 'pure' fact." Dkt. 78-1 at 10-11.  But emissions calculations arrived at using standardized accounting methodologies—like the Greenhouse Gas Protocol—are purely factual in nature, even if reliant on estimation.  Dkt. 53 ¶¶ 23-28.  And Plaintiffs are incorrect that the disclosures under S.B. 253 are "misleading" because they contain the "upstream and downstream" emissions of suppliers and do not include a company's "avoided emissions." Dkt. 78-1 at 11-12.  To the contrary, the freedom to selectively report just Scope 1 and 2 emissions, or to subtract out their alleged "avoided emissions," has resulted in the current marketplace of highly misleading disclosures.  Lyon

---

[2] In any event, Plaintiffs concede elsewhere that climate change as a scientific reality is uncontroversial. Dkt. 59 at 6:24-25.

Decl. ¶¶ 33-42; Dkt. 56 ¶¶ 18-26, 39; Dkt. 52-5 ¶ 14; *see Am. Hosp. Assoc.*, 983 F.3d at 541.

S.B. 261's disclosures are similarly factual. Companies need only disclose their existing risk-assessments and mitigation strategies concerning climate-related financial risks. Dkt. 53 ¶¶ 35, 38-39; Dkt. 54 ¶¶ 19-22, 31-33. Companies are not required to adopt any particular policy or express their views regarding climate change. Dkt. 53 ¶¶ 35, 38-39. If an entity does not currently evaluate climate-related risks, its disclosure can simply state that. *Id*. The business judgments regarding risk disclosed under S.B. 261 are not meaningfully distinct from other financial risks routinely disclosed by large companies. And they bear no resemblance to the "political opinion[s]" at issue in *NetChoice*, 113 F.4th at 1120, which involved a law requiring companies to *weigh in* on highly divisive national debate about what type of speech is harmful to children, and then act to censor that speech.

Because S.B. 253 and 261 do not require the affirmation of a government-favored viewpoint, the cases Plaintiffs cite are inapposite. *See 303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (requirement that companies convey anti-discrimination statement); *Wooley v. Maynard*, 430 U.S. 705 (1977) (required dissemination of ideological message on license plate); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) (requirement to present alternative viewpoints in organization's parade); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) (regulation requiring clinics opposed to abortion to disseminate notice of abortion services). Plaintiffs have not adequately demonstrated how requiring disclosure of emissions data and corporate risks burdens constitutionally protected speech at all, much less in a substantial number of its applications. Plaintiffs' argument that the laws trigger strict scrutiny fails.

### C.    SB 253 and 261 Satisfy Any Level of Scrutiny

Applying *Zauderer* review, the government need only show that "the information in the disclosure is reasonably related to a substantial governmental interest," *CTIA*, 928 F.3d at 845, is neither unjustified nor unduly burdensome on speech, and "remed[ies] a harm that is 'potentially[real, not purely hypothetical,'" *NIFLA*, 585 U.S. at 776.  Alternatively, if this Court finds the speech compelled under S.B. 253 or 261 is not factual or uncontroversial, "the court should then proceed to examine the [laws] under *Central Hudson*'s intermediate scrutiny."  *See Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1258 (E.D. Cal. 2020).  Under *Central Hudson*, government regulation of commercial speech must directly advance a substantial government interest and be no more restrictive than necessary to serve that interest.  447 U.S. at 564.

Defendants can meet either standard here.  In fact, these laws would survive even strict scrutiny, as they "are narrowly tailored to serve compelling state interests."  *NIFLA*, 585 U.S. at 766.  California's Legislature identified three interests served by the laws, which are supported by the legislative history and evidence. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665-66 (1994); *see also Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997).

*First*, California has an interest in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation.  *See Zauderer*, 471 U.S. at 638 ("The States . . . are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading[.]").  Plaintiffs concede this is a compelling state interest; they dispute only that the State has demonstrated that any such misleading speech exists.  Dkt. 78-1 at 21.  But Defendants' evidence shows that 96% of companies with emissions targets engage in misleading speech, Hsu Decl. ¶ 10, of a kind that standardized disclosures of the type required by SB 253 and 261 will prevent.  Lyon Decl. ¶¶ 56-61; *see also* Hsu Decl. ¶¶ 15-16.  As Defendants show that "the recited harms are real, not merely conjectural, and that the regulation will

in fact alleviate these harms in a direct and material way," Defendants have satisfied their burden. *Video Software Dealers Ass'n*, 556 F.3d at 961-62 (cleaned up).

Plaintiffs argue that existing state laws criminalizing fraud are "sufficient" to address this interest. Dkt. 78-1 at 14. But the prevalence of misleading environmental claims demonstrates the insufficiency of existing law to address the problem. Hsu Decl. ¶ 10; Lyon Decl. ¶¶ 30-55. Nor is the problem limited to *actionable* fraud, Lyon Decl. ¶ 28; investors and consumers rely on the data disclosed through S.B. 253 and 261 to make sound market decisions, and the inaccuracies and inconsistencies in the existing data undercuts these purposes. Dkt. 52-5 ¶¶ 18-22. In order to identify companies that may be vulnerable, or profitable, based on their emissions exposure, firm-wide data about emissions and climate risks is necessary. *Id.*; Lyon Decl. ¶¶ 6-10. Moreover, given the pervasiveness of the misleading speech, and the varying forms in which it appears, Lyon Decl. ¶¶ 29-32, it is unworkable to limit the laws' application only to those firms making such claims in formal advertising. Nor do Plaintiffs explain how a company would attach a complete report to the "climate-related advertisements themselves," other than posting it to their own website. Dkt. 78-1 at 15.

*Second*, California has a compelling interest in reliable information that enables investors and consumers to make informed judgments about the impact of climate-related risks on their economic choices. *See Am. Meat Inst.*, 760 F.3d at 23 (government has "substantial" interest in labeling products to serve consumer interest); *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 115 (government interest supported by "better inform[ing] consumers about the products they purchase"); *Am. Hosp. Ass'n*, 983 F.3d at 540 (government has "legitimate" interest in "promoting price transparency and lowering healthcare costs"). Studies confirm consumers' interest in this information. Lyon Decl. ¶¶ 23-26. Moreover, these laws serve investors' critical needs: "[b]oth the physical impacts and the transition risks have the power

1    to affect our fixed assets, disrupt supply chains and increase volatility in the

2    financial markets." Dkt. 52-5 ¶¶ 11-12. Indeed, investors "demand a premium

3    from firms that are saddled with climate risk." Lyon Decl. ¶ 14; *see also id.* ¶¶ 13-

4    16.

5        These laws are narrowly tailored to the interests of investors and consumers:

6    they apply investor-driven accounting protocols to those firms most likely to be

7    subject to outside investment. Dkt. 54 ¶¶ 34-52. Plaintiffs' assertion that "the State

8    could [] have compiled its own reports" with this information is unavailing. Dkt.

9    78-1 at 15-16. The very problem the State seeks to address is the *lack* of complete

10   and reliably assured data in existing voluntary disclosures and databases. Dkt. 52-5

11   ¶ 19; Dkt. 48-5 at 9:19-10:1. High-level, industry-wide reports utilizing existing

12   publicly available data would not fill these gaps.

13       *Third*, by requiring greater transparency about emissions data and business

14   forecasts of climate risks, S.B. 253 and 261 may encourage companies doing

15   business in California to reduce their emissions and thereby mitigate the risks

16   California and its residents face from climate change. Dkt. 48-4 at 1; Dkt. 48-9 at

17   7:3-8. This, too, is a compelling state interest, both because California has

18   committed to meeting certain emissions reduction goals over time and because of

19   the severity of the climate risks the state faces. Health & Safety Code, §§ 38562,

20   38562.2, 38566. Plaintiffs do not challenge the adequacy of this interest, but rather

21   argue that "[t]he State here has cited *no* evidence" that these disclosures would

22   make any material impact on emissions. Dkt. 78-1 at 14-15. To the contrary,

23   Defendants have presented evidence demonstrating that disclosures of this type lead

24   to a reduction in emissions of 7 to 10%. Dkt. 56 ¶ 50; Lyon Decl. ¶ 62; *see also*

25   Dkt. 48-4 at 1.

26       Thus, S.B. 253 and 261 would survive strict scrutiny, intermediate scrutiny,

27   and certainly, the lesser standard of review under *Zauderer*. And Plaintiffs clearly

28   cannot show "that the applications of the statute that fail [the applicable level of]

scrutiny are substantial in comparison to any applications of the statute that do not," as required in a facial challenge. *NetChoice, LLC v. Bonta*, No. 22-CV-08861-BLF, 2025 WL 807961, at *13 (N.D. Cal. Mar. 13, 2025). Defendants have demonstrated that a "substantial number" of companies subject to the laws engage in misleading speech which these disclosures would prevent.

### D.    S.B. 261 is Not Unconstitutionally Vague

Plaintiffs claim that the definition of "climate-related financial risk" in S.B. 261 is unconstitutionally vague. A statute is impermissibly vague if it "fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015). This standard "does not require 'impossible standards of clarity.'" *Id.*

S.B. 261 defines "climate-related financial risk" with reference to the TCFD, Cal. Health & Safety Code § 38533(b)(1)(A)(i), a globally accepted reporting framework well aligned with traditional financial reporting principles, which provides ample guidance to reporting entities, Dkt. 53 ¶ 11. Large, sophisticated companies like those covered by this statute already have risk management departments performing this type of work. Dkt. 53 ¶¶ 19, 22, 34(c), 37; Lyon Decl. ¶ 37. Indeed, a majority of companies are already disclosing these very risks under this very protocol. Dkt. 53 ¶ 14.

### III.    ALL REMAINING INJUNCTION FACTORS WEIGH AGAINST PLAINTIFFS

Given that Plaintiffs cannot show a likelihood of success on the merits, this Court's analysis can end there. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *Smith v. Helzer*, 95 F.4th 1207, 1215 (9th Cir. 2024). But Plaintiffs also fail to satisfy the remaining preliminary injunction factors.

### A.    Plaintiffs Have Not Established Irreparable Harm

Plaintiffs fail to establish an "immediate threatened injury," that entitles them to provisional relief. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674

(9th Cir. 1988); *see also Winter*, 555 U.S. at 22 (plaintiffs must demonstrate that the claimed harms are both "likely" to occur and are imminent).  Their claims amount to no more than "mere allegations" of "[s]peculative" harm and are therefore insufficient.  *Caribbean Marine Servs.*, 844 F.2d at 674, 676.

**S.B. 253**.  Plaintiffs claim that S.B. 253 will require their members to suffer constitutional harm before this case is resolved.  Dkt. 78-1 at 18:15-17.  But, as discussed above, Plaintiffs cannot establish that they will suffer any constitutional harm, as Plaintiffs' challenge to S.B. 253 is not ripe and is unlikely to succeed on the merits.  In any event, Plaintiffs cannot establish that any alleged harm is imminent.  CARB has not yet issued the regulations that will implement S.B. 253, nor established reporting deadlines.  McLoon Decl. ¶ 2; Health and Safety Code § 38532(c)(2)(A)(i)(I) (Scope 1 and 2 emissions not due until 2026), (2)(A)(i)(II) (Scope 3 emissions not due until 2027).  This case will likely be resolved before Plaintiffs must speak.  Dkt. 87 at 3-4 (noting case will likely be resolved by dispositive motions filed in April 2026).

Plaintiffs claim the compliance costs associated with S.B. 253 constitute immediate irreparable harm.  But CARB issued an Enforcement Notice stating that entities need not collect any new data "for the first report due in 2026."  Dkt. 78-6 at 2-3.  In any event, Plaintiffs' evidence is conclusory and insufficient to support their claim.  The President and Chairman of U-Haul, Edward J. Shoen—Plaintiffs' sole covered-entity declarant—claims that compliance with S.B. 253 and S.B. 261 will "require approximately 30 additional dedicated team members … at an estimated cost exceeding $3,000,000 per year."  Dkt. 78-3 ¶ 12.  But most companies subject to S.B. 253 perform similar reporting with just 3-5 team members, Burton Decl. ¶ 13, and Mr. Shoen's conclusory statements do not explain why U-Haul's efforts would be orders of magnitude higher, especially in light of U-Haul's existing reporting infrastructure, *id.* ¶¶ 14, 23-29, 38.  Moreover, the bulk of

the costs Mr. Shoen purports to identify are for data collection that the law likely will not require. *Id.* ¶¶ 14-29.

Moreover, Mr. Shoen does not distinguish between costs attributable to S.B. 253 and S.B. 261, nor those associated with Scope 1 and 2 reporting from those associated with Scope 3. As each law—and each part—must be considered separately for purposes of resolving Plaintiffs' Motion, U-Haul's single, undifferentiated estimate of purported compliance costs is insufficient. Indeed, the majority of U-Haul's estimated costs appear to be associated with Scope 3 emissions reporting, *see* Dkt. 78-3 ¶¶ 17-29, which is not due until 2027 and thus irrelevant to Plaintiffs' request for provisional relief.

And the Quadmaan declaration fares no better. Mr. Quadmaan claims only that "[u]nless S.B. 253 and 261 are enjoined, a number of the Chamber's members … will be forced to incur significant costs in the next several months and overcome substantial implementation challenges." Dkt. 78-4 ¶ 7. This conclusory, vague, and speculative statement is insufficient to obtain an extraordinary remedy.

**S.B. 261**. Plaintiffs cannot establish irreparable harm here simply by claiming their members' First Amendment rights will be violated; as shown above, Plaintiffs have not established that is so.

And Plaintiffs' allegations of economic harm similarly fail, as they have not offered any evidence regarding the specific costs attributable to compliance with S.B. 261. Instead, Mr. Shoen simply claims—without foundation or detail—that U-Haul will "have to begin building the systems and contracts to comply with S.B. 261 immediately and at great cost and commitment of personnel hours." Dkt 78-3 ¶¶ 37-38. But U-Haul already makes TCFD aligned disclosures, and therefore almost certainly has a risk-management department equipped to do the assessment and reporting required by S.B. 261. Burton Decl., ¶¶ 34-40. Thus, U-Haul may not need to incur additional costs of any significance, and its declaration does not establish otherwise.

## B.    The Balance of the Equities and the Public Interest Militate Against Granting an Injunction

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest," but these factors "merge" when the government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Enjoining these laws would prevent the State from pursuing the vital public interests served here.  *See supra* at 16-18.  Moreover, an injunction would inflict irreparable harm on California by preventing enforcement of statutes enacted by the people's representatives.  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

## IV.  SCOPE OF ANY INJUNCTION

Finally, to the extent the Court concludes Plaintiffs are entitled to a preliminary injunction of either law, or any part thereof, it should enjoin only that law or that part.  And it should do so only as to U-Haul, as Plaintiffs have not established that any other member company is similarly situated.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for preliminary injunction should be denied.

Dated:  April 7, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Caitlan McLoon*

CAITLAN MCLOON
Deputy Attorney General
*Attorneys for Defendants Liane M. Randolph, Steven S. Cliff, and Robert A. Bonta*

1

**CERTIFICATE OF COMPLIANCE**

2

The undersigned, counsel of record for Defendants Liane M. Randolph,

3

Steven S. Cliff, and Robert A. Bonta, certifies that this brief contains 6,996 words,

4

which complies with the word limit of L.R. 11-6.1.

5

6

Dated:  April 7, 2025                                   Respectfully submitted,

7
                                                        ROB BONTA
                                                        Attorney General of California
8

9                                                       /s/ Caitlan McLoon

10                                                      CAITLAN MCLOON
                                                        Deputy Attorney General
11                                                      *Attorneys for Defendants Liane M.*
                                                        *Randolph, Steven S. Cliff, and Robert*
12                                                      *A. Bonta*

13

14

15       SA2024300503
         67548006.docx
16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

Case Name:   **Chamber of Commerce of the United States of America, et al.
v. Liane M. Randolph, et al.**

Case No.:    **2:24-cv-00801-ODW-PVCx**

I hereby certify that on <u>April 7, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 7, 2025</u>, at Los Angeles, California.

|  |  |
|---|---|
| Beatriz Davalos | */s/ Beatriz Davalos* |
| Declarant | Signature |

SA2024300503
66591334.docx

24