1  EUGENE SCALIA, SBN 151540
2      escalia@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
3  1700 M St. N.W.
   Washington, D.C.  20036
4  Telephone:  202.955.8500
   Facsimile:  202.467.0539
5

6  *Attorneys for Plaintiffs Chamber of*
   *Commerce of the United States of Amer-*
7  *ica, California Chamber of Commerce,*
   *American Farm Bureau Federation, Los*
8  *Angeles County Business Federation,*
   *Central Valley Business Federation,*
9  *and Western Growers Association*

10  (*Additional counsel listed on next page*)

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA,

13                      WESTERN DIVISION

14

15  | CHAMBER OF COMMERCE OF THE | **PRELIMINARY INJUNCTION** |
    | UNITED STATES OF AMERICA, | **APPEAL** |
16  | CALIFORNIA CHAMBER OF | |
    | COMMERCE, AMERICAN FARM | CASE NO. 2:24-cv-00801-ODW-PVC |
17  | BUREAU FEDERATION, LOS | |
    | ANGELES COUNTY BUSINESS | **NOTICE OF APPEAL OF** |
18  | FEDERATION, CENTRAL VALLEY | **PLAINTIFFS CHAMBER OF** |
    | BUSINESS FEDERATION, and | **COMMERCE OF THE UNITED** |
19  | WESTERN GROWERS ASSOCIATION, | **STATES OF AMERICA,** |
    | | **CALIFORNIA CHAMBER OF** |
20  | Plaintiffs, | **COMMERCE, AMERICAN FARM** |
    | | **BUREAU FEDERATION, LOS** |
21  | v. | **ANGELES COUNTY BUSINESS** |
    | | **FEDERATION, CENTRAL** |
22  | LIANE M. RANDOLPH, in her official | **VALLEY BUSINESS** |
    | capacity as Chair of the California Air | **FEDERATION, and WESTERN** |
23  | Resources Board, STEVEN S. CLIFF, in | **GROWERS ASSOCIATION** |
    | his official capacity as the Executive | |
24  | Officer of the California Air Resources | |
    | Board, and ROBERT A. BONTA, in his | |
25  | official capacity as Attorney General of | |
    | California. | |
26  | | |
    | Defendants. | |
27

28

Gibson, Dunn &
Crutcher LLP

BRADLEY J. HAMBURGER
    SBN 266916
    bhamburger@gibsondunn.com
SAMUEL ECKMAN
    SBN 308923
    seckman@gibsondunn.com
ELIZABETH STRASSNER
    SBN 342838
    estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:    213.229.7520

BRIAN A. RICHMAN
(*pro hac vice*)
    DC Bar No. 230071
    brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX  75201-2923
Telephone:  214.698.3100
Facsimile:    214.571.2900

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

KEVIN PALMER
(*pro hac vice*)
    DC Bar No. 90014967
    kpalmer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C.  20062-2000
Telephone:  202.659.6000
Facsimile:    202.463.5302

*Attorney for Plaintiff Chamber of Commerce of the United States of America*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association appeal to the United States Court of Appeals for the Ninth Circuit from the Order Denying Plaintiffs' Motion for Preliminary Injunction entered on August 13, 2025. ECF No. 112. A true and correct copy of that order is attached hereto as Exhibit A.

DATED: August 20, 2025

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*
Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation and Western Growers Association*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

Kevin Palmer (*pro hac vice*)

*Attorney for Plaintiff Chamber of Commerce of the United States of America*

Gibson, Dunn & Crutcher LLP

# REPRESENTATION STATEMENT
Ninth Circuit Rule 3-2(b)

**Attorneys for Plaintiffs:**

EUGENE SCALIA, SBN 151540
   escalia@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M St. N.W.
Washington, D.C.  20036
Telephone:  202.955.8500
Facsimile:   202.467.0539

BRADLEY J. HAMBURGER, SBN 266916
   bhamburger@gibsondunn.com
SAMUEL ECKMAN, SBN 308923
   seckman@gibsondunn.com
ELIZABETH STRASSNER, SBN 342838
   estrassner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

BRIAN A. RICHMAN (*pro hac vice*)
   brichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Ave., Suite 2100
Dallas, TX  75201-2923
Telephone:  214.698.3100
Facsimile:   214.571.2900

ROBERT EDWARD DUNN, SBN 275600
   rdunn@eimerstahl.com
COLLIN JAMES VIERRA, SBN 322720
   cvierra@eimerstahl.com
EIMER STAHL LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
Telephone:  408-889-1668 (Vierra)
Telephone:  408-889-1690 (Dunn)
Facsimile:   312-692-1718

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

STEPHANIE A. MALONEY (*pro hac vice*)
   smaloney@uschamber.com
KEVIN PALMER (*pro hac vice*)
   kpalmer@uschamber.com

Gibson, Dunn & Crutcher LLP

DARYL L. JOSEFFER (*pro hac vice*)
    djoseffer@uschamber.com
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
1615 H Street, NW
Washington, D.C.  20062-2000
Telephone:  202.659.6000
Facsimile:  202.463.5302

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*

**Attorneys for Defendants:**

CAITLAN LISETTE MCLOON, SBN 302798
    caitlan.mcloon@doj.ca.gov
OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
DEPARTMENT OF JUSTICE
300 S. Spring Street
Suite 1702
Los Angeles, CA 90013
Telephone:  213-269-6438
Facsimile:   916-731-2128

DYLAN CHARLES REDOR, SBN 338136
    dylan.redor@doj.ca.gov
OFFICE OF THE ATTORNEY GENERAL
300 S. Spring St.
Ste 11th Floor
Los Angeles, CA 90013
Telephone:  213-269-6706

Margaret Elaine Meckenstock, SBN 268861
    Elaine.Meckenstock@doj.ca.gov
CALIFORNIA DEPARTMENT OF JUSTICE
1515 Clay Street 20th Floor
Oakland, CA 94612-1492
Telephone:  510-879-0299
Facsimile:   510-622-2270

*Attorneys for Defendants Liane M. Randolph, in her official capacity as Chair of the California Air Resources Board, Steven S. Cliff, in his official capacity as the Executive Officer of the California Air Resources Board, Robert A. Bonta, in his official capacity as Attorney General of California*

DATED: August 20, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Bradley J. Hamburger*

Eugene Scalia, SBN 151540
Bradley J. Hamburger, SBN 266916
Samuel Eckman, SBN 308923
Brian A. Richman (*pro hac vice*)
Elizabeth Strassner, SBN 342838

*Attorneys for Plaintiffs Chamber of Commerce of the United States of America, California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

Kevin Palmer (*pro hac vice*)

*Attorney for Plaintiff Chamber of Commerce of the United States of America*

# Exhibit A

August 13, 2025 Order Denying Plaintiffs' Motion for
Preliminary Injunction

Notice of Appeal
August 20, 2025

*Chamber of Commerce of the United States of America, et al. v. Randolph, et al.,*
Case No. 2:24-cv-00801-ODW-PVC (C.D. Cal.)

**O**

# United States District Court
# Central District of California

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA et al.,

Plaintiffs,

v.

CALIFORNIA AIR RESOURCES
BOARD et al.,

Defendants.

Case № 2:24-cv-00801-ODW (PVCx)

**ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION [78]**

## I.      INTRODUCTION

Plaintiffs Chamber of Commerce of the United States of America ("U.S. Chamber"), California Chamber of Commerce, American Farm Bureau Federation, Los Angeles County Business Federation, Central Valley Business Federation, and Western Growers Association bring this action challenging California Senate Bills ("SB" or "SBs") 253 and 261 for violation of the First Amendment.  (*See* First Am. Compl. ("FAC")  ¶¶ 92–112, ECF No. 28.)   Plaintiffs move for a preliminary injunction to enjoin both laws.  (Mot. Prelim Inj., ECF No. 78; Mem. P. & A. ISO Mot. Prelim. Inj. ("Motion" or "Mot."), ECF No. 78-1.)  For the reasons below, the Court **DENIES** Plaintiffs' Motion.

## II.      BACKGROUND

**A.      Factual Background**

On October 7, 2023, Governor Gavin Newsom signed SBs 253 and 261 into law.  (FAC ¶ 3.)  A brief description of each law follows.

*1.      Senate Bill 253*

SB 253 applies to any entity with total annual revenues over $1 billion "that does business in California."  Cal. Health & Safety Code §§ 38532(b)(2), (c)(1).  SB 253 originally directed that, by January 1, 2025, the California Air Resources Board ("CARB") "shall develop and adopt regulations" for these entities.  Cal. Health & Safety Code §§ 38532(b)(2), (c)(1).  After the FAC was filed, California delayed this deadline to July 1, 2025.  (Notice Amends. SBs 253 & 261 ("Not. Amends."), ECF No. 72.)  A recent report estimated that SB 253 would apply to 1,971 companies.  (Decl. Caitlan McLoon ISO Opp'n ("McLoon Decl.") Ex. 2 ("Ceres Report") at 11, ECF Nos. 89-3, 89-5.)[1]

SB 253 requires CARB to develop regulations that require reporting entities to annually disclose their "Scope 1," "Scope 2," and "Scope 3" emissions.  (FAC ¶ 47); Cal. Health & Safety Code § 38532(c)(1).

- Scope 1 emissions are "all direct greenhouse gas emissions that stem from sources that a reporting entity owns or directly controls, regardless of location, including, but not limited to, fuel combustion activities." (FAC ¶ 47a); Cal. Health & Safety Code § 38532(b)(3).

- Scope 2 emissions are "indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location."  (FAC ¶ 47b); Cal. Health & Safety Code § 38532(b)(4).

- Scope 3 emissions are "indirect upstream and downstream greenhouse gas emissions, other than scope 2 emissions, from sources that the reporting entity does not own or directly control and may include, but are not limited to, purchased goods and services, business travel, employee

---

[1] This report reduced the prior estimate of 5,300 companies.  (*See* Ceres Report 3; FAC ¶ 44.)

commutes, and processing and use of sold products."  (FAC ¶ 47c); Cal. Health & Safety Code § 38532(b)(5).

SB 253 does not mandate entities to report avoided emissions, or so-called "Scope 4 emissions."  (FAC ¶¶ 50–51, 69.)

SB 253 requires CARB to ensure that its regulations mandate entities to measure and report Scope 1, Scope 2, and Scope 3 emissions "in conformance with the Greenhouse Gas protocol standards and guidance."  (*Id.* ¶ 48); Cal. Health & Safety Code § 38532(c)(2)(A)(ii); (*see* Decl. Bradley J. Hamburger ISO Mot. Summ. J. ("Hamburger SJ Decl.") Ex. 18 ("Greenhouse Gas Protocol"), ECF Nos. 48-3, 48-21.)  The law further directs CARB to develop and adopt regulations to "minimize[] duplication of effort" by allowing entities "to submit to the emissions reporting organization . . . reports prepared to meet other national and international reporting requirements."  Cal. Health & Safety Code § 38532(c)(2)(D)(i).  CARB must also develop and adopt regulations that ensure reporting entities obtain third-party assurances as to the quality and accuracy of the reported emissions.  *Id.* § 38532(c)(2)(F).  These emissions data will be publicly available, and CARB will ensure the creation of a public report on the disclosures.  (FAC ¶ 61); Cal. Health & Safety Code §§ 38532(d)(1), (e).

While CARB has yet to issue the specified regulations, it has sent an enforcement notice stating that it "has decided to exercise its enforcement discretion" under SB 253.  (Decl. Bradley J. Hamburger ISO Mot. Ex. A ("Enforcement Notice") 5, ECF No. 78-6.)  For the first reporting period in 2026, CARB will require reporting entities to "submit scope 1 and scope 2 emissions from the reporting entity's prior fiscal year that can be determined from information the reporting entity already possesses or is already collecting at the time" of the Enforcement Notice.  (*Id.* (internal quotation marks omitted).)  During the first reporting cycle, CARB "will not take enforcement action for incomplete reporting against entities, as long as the companies make a good faith effort to retain all data relevant to emissions reporting

for the entity's prior fiscal year."  (*Id.* at 5–6.)  Reporting Scope 3 emissions will come later, as SB 253 requires CARB to issue regulations regarding disclosure of these emissions for the 2027 reporting year.  Cal. Health & Safety Code § 38532(c)(2)(A)(i)(II).

  *2. Senate Bill 261*

  SB 261 applies to any entity with total annual revenues over $500 million "that does business in California."  (FAC ¶ 34); Cal. Health & Safety Code § 38533(a)(4).  A recent report estimated that SB 261 would apply to 2,675 companies.[2]  (Ceres Report.)

  Starting on January 1, 2026, SB 261 will mandate each applicable entity to biennially disclose on its website two categories of "climate-related financial risk information."  "Climate-related financial risk information" is defined as information related to "material risk of harm to . . . financial outcomes due to physical and transition risks" to the business.  (*Id.* ¶¶ 36, 39); Cal. Health & Safety Code § 38533(a)(2).[3]  These two categories are:

- The entity's climate-related financial risk, in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures (June 2017), (Hamburger SJ Decl. Ex. 20 ("TCFD Framework"), ECF No. 48-23; FAC ¶ 36), Cal. Health & Safety Code § 38533(b)(1)(A)(i); and

- The entity's measures adopted to reduce and adapt to climate-related financial risk disclosed in its biennial report, (FAC ¶ 37), Cal. Health & Safety Code § 38533(b)(1)(A)(ii).

---

[2] This report reduced the prior estimate of over 10,000 companies.  (*See* Ceres Report 3; FAC ¶ 34.)

[3] The legislation's full definition of "climate-related financial risk" is as follows: "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks, including, but not limited to, risks to corporate operations, provision of goods and services, supply chains, employee health and safety, capital and financial investments, institutional investments, financial standing of loan recipients and borrowers, shareholder value, consumer demand, and financial markets and economic health."  Cal. Health & Safety Code § 38533(a)(2).

The TCFD Framework is structured around four areas of disclosure—governance, strategy, risk management, and metrics and targets.  (TCFD Framework 14; *see also* Decl. James P. Burton Opp'n Mot. Summ J. ("Burton SJ Decl.") Ex. 5 ("Implementing the TCFD Framework"), ECF Nos. 53, 53-5.)  For governance, the TCFD Framework asks each company to disclose its "governance around climate-related risks and opportunities."  (TCFD Framework 14 fig. 4.)  For strategy, the TCFD Framework asks each company to disclose "the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material."  (*Id.*)  For risk management, the TCFD Framework asks each company to disclose how it "identifies, assesses, and manages climate-related risk."  (*Id.*)  And, for metrics and targets, the TCFD Framework asks each company to disclose the metrics and targets it uses "to assess and manage relevant climate-related risks and opportunities where such information is material."  (*Id.*)

**B.    Procedural Background**

Plaintiffs initiated this action against Defendants CARB Chair Liane M. Randolph, CARB Executive Officer Steven S. Cliff, and California Attorney General Robert A. Bonta (the "State").  (FAC ¶¶ 15–17.)  Plaintiffs bring a facial challenge to both laws on First Amendment grounds.  (*Id.* ¶¶ 92–99).

In its FAC, Plaintiffs assert four causes of action under 42 U.S.C. § 1983.  In Count I, Plaintiffs allege that SBs 253 and 261 violate the First Amendment.  (FAC ¶¶ 92–99.)  In Count II, Plaintiffs assert that the Constitution and federal law preempt SBs 253 and 261.  (*Id.* ¶¶ 100–06.)  In Count III, Plaintiffs claim that the laws violate the Constitution's limits on extraterritorial regulation, including the dormant Commerce Clause.  (*Id.* ¶¶ 107–12.)  Lastly, in Count IV, Plaintiffs seek payment of attorneys' and expert fees.  (*Id.* ¶¶ 113–15.)  As relief, Plaintiffs seek judicial declarations that SBs 253 and 261 are "null, void, and with no force or effect," and an

injunction enjoining the State from "implementing, applying, or taking any action whatsoever to enforce" SBs 253 and 261.  (*Id.*, Prayer for Relief ¶ 116.)

Before discovery began, Plaintiffs moved for summary judgment on their First Amendment claim, (Mot. Summ. J., ECF No. 48), and the State moved to deny or defer the motion under Federal Rule of Civil Procedure ("Rule" or "Rules") 56(d), (Mot. Den. Defer Mot. Summ. J., ECF No. 57).  The Court granted the State's motion to defer Plaintiff's motion for summary judgment and provided Plaintiffs leave to re-file their motion after the close of discovery.  (*See* Order Summ. J., ECF No. 73.)

The State separately moved to dismiss Plaintiffs' Supremacy Clause and extraterritoriality claims under Rules 12(b)(1) and 12(b)(6).  (Mot. Dismiss, ECF No. 38.)  The Court granted the motion and dismissed those claims as to SB 253 under Rule 12(b)(1) and as to SB 261 under Rule 12(b)(6).  (Order Mot. Dismiss, ECF No. 77.)  Although given the opportunity to amend some of these claims, (*id.* at 23–24), Plaintiffs declined to do so.  On March 17, 2025, the State filed an Answer. (Answer, ECF No. 85.)

On April 8, 2025, the Court issued a scheduling order setting the deadline to file renewed motions for summary judgment for March 23, 2026, the pretrial conference for September 21, 2026, and trial for October 20, 2026.  (Scheduling & Case Mgmt. Order 2, ECF No. 93.)

Plaintiffs now bring a Motion for Preliminary Injunction, asking the Court to preliminary enjoin SBs 253 and 261 on First Amendment grounds.  (Mot.)  The Motion is fully briefed.  (Opp'n Mot., ECF No. 89; Reply, ECF No. 97.)  On July 1, 2025, the Court held a hearing on the Motion.  (Hr'g Mins., ECF No. 102; Hr'g Tr., ECF No. 106.)

### III.        LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To obtain a preliminary injunction, a movant must establish that they are likely to succeed on the

merits, they are likely to suffer irreparable harm absent an injunction, the balance of equities tips in their favor, and an injunction is in the public interest.  *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115 (9th Cir. 2024) (citing *Winter*, 555 U.S. at 20).  "Because 'the party opposing injunctive relief is a government entity' here, the third and fourth factors 'merge.'"  *X Corp. v. Bonta*, 116 F.4th 888, 898 (9th Cir. 2024) (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023)).  "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech."  *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (internal quotation marks omitted).

## IV.     DISCUSSION

### A.     Whether Plaintiffs' SB 253 Challenge Is Ripe

As a threshold matter, the State argues that Plaintiffs' challenge to SB 253 is prudentially unripe because SB 253, without CARB regulations, does not impose any requirements on Plaintiffs' members.  (Opp'n 8–9.)  The State contends that further factual development, including CARB's implementing regulations, are needed for the Court to rule on the constitutionality of SB 253.  (*Id.*; *see* McLoon Decl. Ex. 1 ("CARB Letter"), ECF No. 89-4 (listing topics of potential regulation).)  Additionally, the State argues that Plaintiffs cannot show their members will face hardship, as covered companies will not be required to report Scope 1 and Scope 2 emissions until 2026 and Scope 3 emissions until 2027.  (Opp'n 8–9); *see* Cal. Health & Safety Code § 38532(c)(1), (2)(A)(i).

In analyzing the prudential components of ripeness, courts consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000).

Earlier in this case, when considering the State's motion to dismiss Plaintiffs' Supremacy Clause and extraterritoriality claims, the Court found those challenges to SB 253 were not justiciable. (Order Mot. Dismiss 13.) However, the Court's reasoning there does not apply to Plaintiffs' First Amendment claim. First, courts apply "the requirements of ripeness and standing less stringently in the context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). Second, since the Court's prior ruling, the parties have offered CARB's Enforcement Notice, stating that CARB "has decided to exercise its enforcement discretion" under SB 253, including that CARB will require covered companies to submit Scope 1 and 2 emissions in 2026. (Enforcement Notice 5.)

Here, Plaintiffs' First Amendment challenge is fit for judicial decision. Courts find an issue is fit for review when "the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Tingley v. Ferguson*, 47 F.4th 1055, 1070 (9th Cir. 2022). While CARB has yet to issue implementing regulations for SB 253, the Court finds that SB 253 is clear that covered companies will be required to report Scope 1, 2, and 3 emissions. This positions the Court to rule on the Motion without further factual development by the State. *See* Cal. Health & Safety Code § 38532(c)(2)(A)(i)(I)–(II). To the extent further factual development is needed in this case, (*see* Order Mot. Summ. J. 11–12), it is the type of development accomplished through typical discovery, not through CARB's issuance of regulations.

Additionally, Plaintiffs have demonstrated hardship to their members if the Court declines to review their First Amendment challenge now. It appears that U-Haul Co. of California ("UHCA"), a subsidiary of U-Haul Holding Company ("UHHC") and member of Plaintiff U.S. Chamber, will be subject to SB 253's requirements. (*See* Decl. Edward J. Shoen ISO Mot. ("Shoen Decl.") ¶ 3, ECF

No. 78-3 (declaring that UHHC has an annual total revenue exceeding $1 billion).)[4] UHHC's president and chairman has declared that it will take years for it to build systems to comply with SB 253, for example, by developing systems and processes to collect, store, and analyze climate-related information.  (*Id.* ¶ 11.)  He estimates that it will cost at least $3 million per year to comply with SBs 253 and 261, demonstrating that UHCA would suffer hardship if the Court does not consider the Motion.  (*Id.* ¶ 12; *see id.* ¶¶ 13–29 (detailing cost and burdens of complying with SB 253).)

Accordingly, Court finds that Plaintiffs' challenge to SB 253 is ripe for review and declines to dismiss it on prudential ripeness ground.  *See Anchorage Equal Rts. Comm'n*, 220 F.3d at 1142 ("Prudential considerations of ripeness are discretionary . . . .").

## B.    Application of the First Amendment

Before analyzing whether SBs 253 and 261 violate the First Amendment, the Court must first decide whether the First Amendment even applies.

In its summary judgment order, the Court considered—and rejected—the State's argument "that the laws escape First Amendment scrutiny because they are 'part of a broader regulatory apparatus.'"  (Order Summ. J. 7–8.)  In ruling that the First Amendment applies to the laws, the Court concluded that the laws' primary effect and purpose is to compel speech.  (*Id.*)  In opposing the instant Motion, the State asks the court to revisit this conclusion.  (Opp'n 10–11.)

The State argues that the Court erred because the laws here "require a type of speech—disclosure of commercial data and financial risks—that has not traditionally garnered constitutional concern."  (Opp'n 10.)  The State notes that securities filings

---

[4] The State objects to Shoen's declaration that "[i]f UHCA's activities in California are attributable to UHHC such that UHHC 'does business' in California as a 'Reporting Entity' under S.B. 253 . . , then UHHC would be subject to the requirements of S.B. 253."  (Def's Obj. Pls.' Evid ¶ 3, ECF No. 89-1.)  The State contends that this statement is a legal conclusion.  (*Id.*)  Even if it is, and even if it cannot be confirmed whether UHCA will be subject to SB 253's requirements until CARB issues implementing regulations, CARB has stated that it will begin enforcing SB 253 in 2026 and UHCA has demonstrated that it will need to begin preparing to comply with the law before CARB issues any clarification as to its applicability to UHCA.

requiring disclosure of investment-related risks "ha[ve] historically fallen outside the boundaries of First Amendment coverage entirely, or ha[ve] merited minimal judicial scrutiny." (*Id.*) Relatedly, the State again argues that because the laws are directed at a "broader regulatory apparatus" governing disclosure of commercial data, the laws regulate conduct, not speech. (*Id.*)

The Supreme Court has identified "[n]umerous examples" of types of "communications that are regulated without offending the First Amendment," including "the exchange of information about securities" and "corporate proxy statements." *Ohralik v. Ohio St. Bar Ass'n*, 436 U.S. 447, 456 (1978). But to the extent this means that such communications are not subject to First Amendment review, this principle does not extend to SBs 253 and 261. The State's mere assertion that a regulation is like a securities filing or directed at a "broader regulatory apparatus" does not automatically end a court's First Amendment inquiry. To read these exceptions "broadly would allow [the government] to easily regulate otherwise protected speech using the guise of securities laws." *Nat'l Ass'n of Mfrs. v. S.E.C. (NAMF I)*, 748 F.3d 359, 372 (D.C. Cir. 2014), *subsequent opinion after reh'g*, 800 F.3d 518 (D.C. Cir. 2015); *cf. Nat'l Ass'n of Mfrs. v. S.E.C. (NAMF II)*, 800 F.3d 518, 521 (D.C. Cir. 2015) (rejecting argument that an SEC rule requiring companies to disclose whether its products are "conflict-free" "is valid because the United States is thick with laws forcing '[i]ssuers of securities' to 'make all sorts of disclosures about their products'").

Here, the State asserts that the legislature enacted SBs 253 and 261 "to, among other things, respond to concerns that California investors and consumers lacked accurate, verifiable data about [greenhouse gas] emissions and climate-risk assessment . . . from the largest companies doing business in the state." (Opp'n 4.) The State also offers that CalPERS, California's largest public-defined-benefit pension fund, believes "[c]limate risk is investment risk" and finds the information the laws' require companies to disclose to be valuable to its investment decisions. (Decl.

Peter Cashion ISO Opp'n Mot. Summ. J. ("Cashion Decl.") ¶¶ 13–16, 22, ECF No. 52-5; Opp'n 4.)   Therefore, per the State, these laws are like typical securities disclosure regimes geared toward consumer protection that escape First Amendment review.  (*See* Opp'n 4.)

The problem with the State's comparison is twofold.  First, at the same time it argues the purpose of these laws are to correct misleading data and provide investors with accurate information to evaluate climate risks, (*id.*), the State also proffers that the laws further its interest for "companies doing business in California to reduce their emissions" so that California can "meet[] certain emissions reduction goals over time," (*id.* at 18).  While certainly a compelling state interest, this is more akin to the conflict-mineral disclosures in *NAMF* than traditional securities disclosures.

Second, and more fundamentally, the scope of SBs 253 and 261 is broader than typical securities disclosures.  The laws apply to any company that hits certain annual revenue thresholds and "does business in California."  Cal. Health & Safety Code §§ 38532(b)(2), 38533(a)(4).  The laws do not differentiate between private and public companies or from those offering the sale of securities and those that do not.  (*See* Ceres Report 11 (estimating that of the companies covered by SBs 253 and 261, 23% and 27% are private companies, respectively).)  This is not to say that the State's proffered interests in SBs 253 and 261 are ingenuine or not compelling, or that they violate the First Amendment.  Rather, the laws' application to public and private companies and those with and without investors, not just those typically subject to securities-based rules, invites First Amendment review.  Otherwise, the State would be permitted to "to easily regulate otherwise protected speech using the guise of securities laws," *NAMF I*, 748 F.3d at 372, even if the law's purpose goes beyond the reasons for traditional securities disclosure requirements and the types of companies to which such requirements usually apply.

At bottom, "the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny."  *NetChoice*, 113 F.4th at 1117.

While there may be exceptions for certain types of disclosures, *see Ohralik*, 436 U.S. at 456, none of those exceptions apply to the laws at issue here in their current form. Therefore, the Court declines to alter its prior conclusion that SBs 253 and 261 are subject to First Amendment review.  (*See* Order Summ. J. 7–8.)

## C.    Plaintiffs' Facial Challenge

Plaintiffs assert a First Amendment facial challenge to SBs 253 and 261. "[C]ourts usually handle constitutional claims case by case, not en masse." *X Corp.*, 116 F.4th at 898 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)). Because facial challenges "often rest on speculation about the law's coverage and its future enforcement" and "threaten to short circuit the democratic process," the Supreme Court "has therefore made facial challenges hard to win." *Moody*, 603 U.S. at 723 (internal quotation marks omitted).

However, in First Amendment cases, the Supreme Court has "lowered th[e] very high bar" of a typical facial challenge.  *X Corp.*, 116 F.4th at 898 (quoting *Moody*, 603 U.S. at 723).  "'[I]f the law's unconstitutional applications substantially outweigh its constitutional ones,' then a court may sustain a facial challenge to the law and strike it down." *Id.* at 898–99 (alteration in original) (quoting *Moody*, 603 U.S. at 724).  As such, "a First Amendment facial challenge has two parts: first, the courts must 'assess the state laws' scope'; and second, the courts must 'decide which of the laws' applications violate the First Amendment, and . . . measure them against the rest." *Id.* at 899 (alteration in original) (quoting *Moody*, 603 U.S. at 725).   The Supreme Court recently admonished that courts cannot treat facial challenges "more like as-applied claims than like facial ones." *Moody*, 603 U.S. at 724.

The scope of SBs 253 and 261 appears straightforward for purposes of the Motion.  SB 253 requires CARB to adopt regulations that will require all domestic companies with total annual revenues more than $1 billion and that "do[] business in California" to annually report the company's Scope 1, Scope 2, and Scope 3 emissions, in conformance with the Greenhouse Gas Protocol and guidance.  Cal.

Health & Safety Code § 38532(a)(2), (c).  CARB must require covered entities to "publicly disclose" these figures to CARB or a contracted third party.  *Id.* § 38532(c).  Meanwhile, SB 261 requires all domestic companies with total annual revenues more than $500 million and that "do[] business in California" to "prepare a climate-related financial risk report disclosing" the company's "climate-related financial risk," in accordance with the TCFD Framework and "[i]ts measures adopted to reduce and adapt to [this] climate-related financial risk."  *Id.* § 38533(a)(4), (b).  Covered companies must make the biennial report available on its website.  *Id.* § 38533(c)(1).  In short, all covered companies—those with total annual revenues over a certain threshold and that do business in California—must report the same information.  *See NetChoice*, 113 F.4th at 1116 (finding that "all" covered companies "are under the same statutory obligation"); *X Corp.*, 116 F.4th at 899 (finding that the relevant provisions "compel every covered social media company to reveal" the same information).

"The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest."  *Project Veritas v. Schmidt*, 125 F.4th 929, 961 (9th Cir. 2025) (quoting *Moody*, 603 U.S. at 725).  This analysis is less complicated where the legislation "raise[s] the same First Amendment issues" as to every covered company.  *X Corp.*, 116 F.4th at 899.  That is not the case here.  While the laws apply equally to all covered companies, the parties reveal differences among the covered companies that may impact the First Amendment analysis.

The State asserts "an interest in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation."  (Opp'n 16.)  At the same time, the State's evidence suggests that neither SB 253 nor SB 261 applies only to companies engaged in green advertising or accepting investment.  (*See* Decl. Angel Hsu ISO Opp'n ("Hsu Decl.") ¶¶ 8–9, ECF No. 89-18 (finding that 82% of North American companies in a dataset have made "green pledges" to reduce emissions); Ceres Report

at 11 (estimating that of the companies covered by SBs 253 and 261, 23% and 27% are private companies, respectively).)  Plaintiffs attack the laws on this very basis, arguing that because the laws are not limited to covered companies that engage in green advertisement or are open for investment, they are not sufficiently tailored to protect this government interest.  (*See* Reply 7.)  The distinction between covered companies—those who engage in green advertising (and those who do not) and those who have investors (and those who do not)—may result in differing analyses to determine whether specific applications of SBs 253 and 261 violate the First Amendment.

*NetChoice* is instructive as to how the difference in covered companies implicates the Court's analysis of Plaintiffs' First Amendment facial challenge.  In that case, the Ninth Circuit evaluated whether the California Age-Appropriate Design Code Act ("CAADCA") should be preliminary enjoined on First Amendment grounds.  *NetChoice*, 113 F.4th at 1108.  Among the provisions the court considered was one that required online businesses to create a "report identifying, for each offered online service, product, or feature likely to be accessed by children, any risk of material detriment to children that arise from the data management practices of the business."  *Id.* at 1109 (internal quotation marks omitted).  In affirming the district court's enjoinment of this provision based on a facial challenge, the Ninth Circuit held that this "report requirement, in every application to a covered business, raises the same First Amendment issues," namely, whether the State can require covered businesses to "ask whether the new service may lead to children viewing or receiving harmful or potentially harmful materials."  *Id.* at 1116.  However, in evaluating other of the CAADCA's provisions, the court found it "less certain" whether NetChoice was likely to succeed on its facial challenge.  *Id.* at 1122.

For example, as to some provisions, the Ninth Circuit found that the district court erred in its facial analysis because it "focused on possible applications of these provisions to social media companies—a subset of the businesses covered by the

CAADCA—and speculated about how that subset of applications could ultimately have a substantial effect on those companies' editorial discretion or the expression of their third-party users." *Id.* at 1123. And as to a provision requiring online businesses to provide "privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children," the Ninth Circuit found it "unclear from the record below whether a substantial majority of those applications are likely to fail First Amendment scrutiny," because "all or most of the speech compelled by this provision is likely to be purely factual and non-controversial." *Id.* at 1123–24.

Consistent with *NetChoice*, to entertain Plaintiffs' facial challenge here, the Court must analyze all the laws' applications. Thus, the Court must analyze whether the applications to green-advertising companies survive First Amendment scrutiny, whether applications to non-advertising companies survive First Amendment scrutiny, and then determine whether a substantial majority of the laws' applications likely fail First Amendment scrutiny. *See Moody*, 603 U.S. at 725 (explaining that the court must "ask, . . . as to each thing covered, whether the required disclosures" survive First Amendment scrutiny and "it is not hard to see how the answers might differ as between regulation of Facebook's News Feed (considered in the courts below) and, say, its direct messaging service (not so considered)"); *Ariz. Att'ys for Crim Just. v. Mayes*, 127 F.4th 105, 110–12 (9th Cir. 2025) (rejecting facial challenge where plaintiffs challenged the prohibition on contacting victims in only one of the law's various applications). Similarly, the Court must analyze whether the laws' applications to companies with investors survive First Amendment scrutiny, whether applications to companies without investors survive First Amendment scrutiny, and then determine whether a substantial majority of the laws' applications likely fail First Amendment scrutiny. *See Moody*, 603 U.S. at 725. However, before the Court can consider these questions, it must first determine what level of scrutiny applies.

**D.    Level of Scrutiny**

The parties disagree about which level of scrutiny applies to SBs 253 and 261. Plaintiffs argue that the laws must survive strict scrutiny to survive their First Amendment challenge.  (Mot. 10–13.)  Conversely, the State argues that, if the laws compel speech, they are subject to the lowest standard of review.  (Opp'n 11–12.)

When the First Amendment applies, compelled speech must typically be reviewed under strict scrutiny.  However, "[l]aws regulating commercial speech are generally subject to a lesser standard than strict scrutiny."  *NetChoice*, 113 F.4th at 1119.  "Commercial speech is generally subject to intermediate scrutiny."  *X Corp.*, 116 F.4th at 900; *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (articulating standard).  However, if commercial speech requires disclosure of "purely factual and uncontroversial information," then it is subject to the lowest standard of review as set forth in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 585 U.S. 755, 768 (2018).

Accordingly, to determine which level of review applies to SBs 253 and 261, the Court must decide whether the laws compel commercial speech of purely factual and uncontroversial information.

*1.    Commercial Speech*

"Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'"  *X Corp.*, 116 F.4th at 900 (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)).  But this is "just a starting point." *Id.*  Indeed, "speech that does not propose a commercial transaction on its face can still be commercial speech."  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021).  Courts "try to give effect to a common-sense distinction between commercial speech and other varieties of speech."  *X Corp.*, 116 F.4th at 900 (internal quotation marks omitted).  This is a "fact-driven" analysis, "due to the inherent

difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Id.*

Given this difficulty, "in close cases," courts consider three factors outlined by the Supreme Court in *Bolger v. Youngs Drug Products Corporation*, 463 U.S. 60 (1983). *NetChoice, LLC*, 113 F.4th at 1119. The *Bolger* factors consider whether (1) "the speech is an advertisement," (2) "the speech refers to a particular product," and (3) "the speaker has an economic motivation." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011). Courts have found that, if the speech meets two of the three *Bolger* factors, then it "weighs in favor of finding" the "speech is commercial." *Stutzman v. Armstrong*, No. 2:13-cv-00116-MCE-KJN, 2013 WL 4853333, at *18 (E.D. Cal. Sept. 10, 2013); *cf. Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 959 (9th Cir. 2012) (not commercial speech where "does not fulfill two of the three *Bolger* factors"); *X Corp.*, 116 F.4th at 901 (same). However, while these factors are "important guideposts, . . . they are not necessarily dispositive." *X Corp.*, 116 F.4th at 900; *see Ariix,* 985 F.3d at 1116 (concluding that two of the factors "do[] not shed much light" on whether the publication in question was commercial speech).

The State argues that the required disclosures are commercial speech. (Opp'n 11–12.) While the State does not contend that the disclosures refer to a particular product, it does argue that the compelled disclosures satisfy the remaining *Bolger* factors. (*Id.* at 12.) In support, the State offers expert declarations. (*Id.*; Decl. Thomas P. Lyon ISO Opp'n ("Lyon PI Decl."), ECF No. 90; Hsu Decl.) First, Angel Hsu, a professor of environmental policy, reports that 82% of North American companies in her dataset, which includes the Forbes 200 publicly listed companies and the one hundred largest privately-owned companies, have made "green pledges," meaning a pledge to reduce emissions with a report of at least one emissions target. (Hsu Decl. ¶¶ 8–9.) Next, Thomas Lyon, a professor of engineering-economic systems, opines "that companies have incentives to communicate information about their carbon emissions to investors because investors are concerned about climate risk

and demand a premium from firms that are saddled with climate risk." (Lyon PI Decl. ¶¶ 2, 22.)  He further declares that companies make climate pledges to "influence consumer behavior."  (*Id.* ¶ 23.)  Based on this, the State contends that the speech the laws compel—even if referring to a company as a whole—is advertising.  (Opp'n 12.)  Also, the State asserts that the advertising has an economic motive, as companies engage in this speech to appear more attractive to consumers and investors.  (*Id.*)

Plaintiffs see the speech differently.  First, they argue that the Court should not even look to the *Bolger* factors because the "usual definition of commercial speech is speech that does no more than propose a commercial transaction," (Reply 4 (quoting *X Corp.*, 116 F.4th at 901) (cleaned up)), and the State does not argue that the speech here meets that definition, (*id.*).  Second, Plaintiffs argue that, even considering the *Bolger* factors, they are not met: the compelled disclosures are not themselves advertisements, do not refer to a particular product, and the companies have no economic motivation to provide these compelled disclosures.  (*Id.*)

The Court rejects these arguments and finds that SBs 253 and 261 regulate commercial speech.  First, the Ninth Circuit has held that "speech that does not propose a commercial transaction on its face can still be commercial speech."  *Ariix*, 985 F.3d at 1115.  Accordingly, in this case, the State is not conceding that the speech here is non-commercial simply because it does not explicitly state that the speech "does no more than propose a commercial transaction."  *See, e.g.*, *Zauderer*, 471 U.S. at 637 (acknowledging that "the precise bounds of . . . commercial speech" are "subject to doubt"); *Cent. Hudson*, 447 U.S. at 561 (defining "commercial speech" as "expression related solely to the economic interests of the speaker and its audience"); *cf. X Corp.*, 116 F.4th at 901 (recognizing exceptions to the "usual definition" of commercial speech (alterations omitted)).

Second, the *Bolger* factors weigh in favor of finding the speech here commercial.  This is so even though the State does not argue the disclosures refer to a particular product.  (*See* Opp'n 12.)  Plaintiffs are also correct that SBs 253 and 261

do not compel speech in the form of advertisements, in the sense that the required disclosures will not be included in targeted advertisements. However, these disclosures regarding a company's emissions and climate-related risk function as advertisements in the sense that SBs 253 and 261 compel disclosure of the same type of information that a substantial number of companies use to advertise their brands, which they have an economic motive to provide. (*See* Lyon PI Decl. ¶¶ 11–26.)

For example, some "[f]irms communicate their planned emissions reductions because investors penalize firms for carbon risk." (*Id.* ¶ 13.) Of the S&P 500, more than 400 companies have set emissions reduction targets. (*Id.* ¶ 17.) Thousands of other companies, including a substantial number of the Forbes 2000 publicly listed companies, have done the same. (*See* Hsu Decl. ¶ 8.) Firms are increasingly discussing climate-related information with investors. (Lyon PI Decl. ¶ 21.) Also, from 2018 to 2023, nearly 16,000 companies disclosed environmental data, including emissions data and climate-related risks, to CDP (formerly, the Carbon Disclosure Project), an investor-driven disclosure project. (*Id.* ¶¶ 36–37.) Of those companies, 49% disclosed Scope 3 emissions. (*Id.*) In 2022, more than 71% of companies surveyed by the American Institute of Certified Public Accountants used the TCFD Framework for climate-related reporting, and 58% of public companies surveyed by the Financial Stability Board disclosed at least five of the TCFD's recommended climate-risk disclosures. (*See* Burton SJ Decl. ¶ 14.) Indeed, in the "Sustainability" section of its website, UHHC—the only member company offering a declaration in support of the Motion—lists as one of its goals to "[d]evelop and implement comprehensive climate-change strategies to manage and mitigate our greenhouse gas (GHG) emissions." (Decl. James P. Burton ISO Opp'n ("Burton PI Decl.") Ex. 6 ("UHHC Website") at 381, ECF Nos. 89-6, 89-12.) UHHC continues that "[s]hort-term gains may result in long-term losses, both in terms of profitability and in terms of future generations being able to meet their needs." (*Id.*)

While it is true that, on their face, SBs 253 and 261 are not limited to only those companies that advertise greenhouse gas emissions and low climate-related risk, this is more appropriately addressed when applying the appropriate standard of review—e.g., whether the legislation is appropriately tailored to the state's interest—not when determining what standard to apply—e.g., whether the regulated speech is commercial.

Ultimately, in this "fact-driven" analysis considering SBs 253 and 261 and the *Bolger* factors, the "'common-sense distinction' between commercial speech and other varieties of speech," *X Corp.*, 116 F.4th at 900, supports a finding that SBs 253 and 261 compel disclosure of commercial speech. Specifically, SB 253 mandates disclosure of commercial data—a company's direct and indirect greenhouse gas emissions—that many companies routinely disclose and stakeholders consider relevant to the long-term success of the business. And SB 261 requires companies to disclose information related to climate-related risks to a company's own business. Even if companies are not already required to report these precise risks, many companies already report certain risks to their business through SEC disclosures and other requirements. With respect to the type of information many companies already report, SB 261's requirements, while perhaps different in degree, are not different in kind.

For these reasons, the Court finds that SBs 253 and 261 regulate commercial speech.[5]

---

[5] Plaintiffs' reliance on *X Corp.* is misplaced. (*See* Mot. 12–13.) That opinion focused extensively on the Ninth Circuit's conclusion that the legislation at issue required "a company to recast its content-moderation practices in language prescribed by the State." *X Corp.*, 116 F.4th at 901. For example, the court held that a company's "opinions about and reasons for" its content moderations policies "would require a social media company to convey the company's policy views on intensely debated and politically fraught topics, including hate speech, racism, misinformation, and radicalization, and also convey how the company has applied its policies." *Id.* at 901–02 (footnote omitted). At the same time, the court distinguished compelled disclosures in the case from a "platform's existing [Terms of Service] and content moderation policies" and laws that require platforms to disclose "how they moderate and promote content" and content-moderation "standards"

Having found the laws regulate commercial speech, the Court must determine whether SBs 253 and 261 are subject to intermediate scrutiny or the less searching standard of review under *Zauderer*. "Commercial speech is generally subject to intermediate scrutiny." *X Corp.*, 116 F.4th at 900. However, such speech can qualify for the lower-level *Zauderer* review if the compelled commercial speech at issue discloses "purely factual and uncontroversial information." *NIFLA*, 585 U.S. at 768.

### 2.    Factual Information

As a first step, courts consider whether information is "factually accurate." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023). "[B]ut that alone is not enough to qualify for the *Zauderer* exception." *Id.* A statement that is "literally true but nonetheless misleading" is not factual. *Id.* In *National Association of Wheat Growers*, the Ninth Circuit considered a requirement that a business must provide a warning before it "knowingly and intentionally exposes any individual in California to a chemical known to the state to cause cancer." *Id.* at 1268 (cleaned up). While glyphosate was "known" to the state to cause cancer according to the statutory definition, there was substantial scientific debate on whether it actually caused cancer. *Id.* at 1278. Accordingly, the Ninth Circuit concluded that the glyphosate warning was not purely factual because "the technical meaning of the word 'known' in the warning is different from the meaning an average consumer would give the word 'known.'" *Id.* at 1279.

### a.    SB 253—Factual Information

As to SB 253, Plaintiffs argue that the disclosures required are not factual, but are in fact misleading, for two reasons. First, companies must report "their" greenhouse-gas emissions, SB 253 §§ 1(e), (f), but Scope 2 emissions are emissions of electricity providers and Scope 3 emissions are emissions of upstream and downstream sources that the reporting entity does not directly control. (Mot. 11).

---

and "rule changes," without mention of controversial topics. *Id.* at 901, 903. Here, SBs 253 and 261 do not require companies to recast their practices in language prescribed by the State.

Second, SB 253 does not factor in a company's Scope 4 (avoided) emissions, so any reported emissions will provide a misleading picture of a company's total emissions. (*Id.* at 11–12.)

SB 253's Scope 1 emissions disclosure requirement is undisputedly factual and not misleading; Plaintiffs do not challenge this conclusion. (*See* Mot.; Reply.)  The Scope 2 and Scope 3 emissions disclosures are also factual in nature, in that they are both are defined and have recognized methods of computation.  *See* Cal. Health & Safety Code § 38532(c)(1)(A)(ii) (adopting Greenhouse Gas Protocol standards); (Lyon PI Decl. ¶ 37 & fig.5 (reporting that more than 5,500 entities disclose Scope 3 emissions using these standards)).  The question then is whether it is misleading to require companies to report Scope 2 and Scope 3 emissions when the emissions being reported are not the company's own direct omissions and do not include Scope 4 avoided emissions. (*See* Mot. 11.)

The Court concludes that these requirements are not misleading.  SB 253 simply mandates that covered entities report Scope 1, Scope 2, and Scope 3 emissions using recognized methodology.  SB 253 does not require companies to take responsibility, as Plaintiffs argue, for Scope 2 and Scope 3 emissions.  Nor does it prohibit covered entities from separately calculating and publicizing its Scope 4 avoided emissions, or from taking the position that their Scope 4 emissions can offset their Scope 1, Scope 2, and Scope 3 emissions.  *See* Cal. Health & Safety Code § 38532; (Burton PI Decl. ¶ 20 (identifying one company that already publicizes its Scope 4 avoided emissions).)  This is not like *National Association of Wheat Growers*; SB 253 does not require companies to state that they are causing the emissions, and there is no evidence that the definitions of Scope 2 and Scope 3 emissions include misleading language like the word "known," where the technical meaning of the word is different from the meaning the average consumer would give the word.  *See* 85 F.4th at 1278–79.  SB 253 does not even require companies to report a "total" number of emissions.

Accordingly, the Court finds that SB 253 requires reporting of only factual—and not misleading—information.  As discussed further below, because SB 253's disclosures are factual, the Court must analyze whether they are also uncontroversial to determine whether SB 253 qualifies for review under *Zauderer*.

### b.  SB 261—Factual Information

As to SB 261, Plaintiffs argue that company's climate-related financial risk is not factual, because it comprises a company's assessment of the risk of harm to immediate and long-term financial outcomes, which requires companies to speculate as to future technological and policy developments.  (Mot. 11.)  The State counters that companies that "do[] not currently evaluate climate-related risks . . . can simply state that." (Opp'n 15.)  The State describes the required disclosures under SB 261 as "not meaningfully distinct from other financial risks routinely disclosed by large companies." (*Id.*)

The Court finds that SB 261's compelled disclosures are not factual.  Although the State refers to the disclosure as a company's "assessment[]," (Opp'n 15), by definition, an assessment about the effect of current *and future* events on a company cannot be factual.  *See Assessment*, Black's Law Dictionary (12th ed. 2024) ("The process by which, after careful thought, one makes a judgment about a person or situation.").  The State argues that SB 261's disclosures are not like the disclosures in *NetChoice*, which required companies to "weigh in on [a] highly divisive national debate about what type of speech is harmful to children" and thus did not qualify for *Zauderer* review.  (Opp'n 15 (emphasis omitted).)  But that distinction relates to the analysis of the controversial nature of the compelled *NetChoice* speech, not its *factual* character.  *See NetChoice*, 113 F.4th at 1120 ("[A] business's opinion about how its services might expose children to harmful content online is not 'purely factual and uncontroversial.'").  The State argues that SB 261 only requires companies that evaluate climate-related risks to speak and does not require companies that do not evaluate those risks to begin to do so.  (Opp'n 15.)  But this does not transform the

otherwise subjective and predictive opinion into a factual disclosure.  *See X Corp.*, 116 F.4th at 902 (rejecting California's argument that a "transparency measure" warrants lower scrutiny).

Accordingly, the Court finds that SB 261 compels disclosure of more than factual information, and thus is not subject to *Zauderer* review.

### 3.    Uncontroversial Information

As the Court finds that SB 253 compels disclosure of factual information, it is subject to *Zauderer* review so long as SB 253 also compels disclosure of "uncontroversial information."  *NIFLA*, 585 U.S. at 768.[6]  To qualify for *Zauderer* review, the compelled disclosure must be "uncontroversial information."  *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1275.  If the required disclosure is of controversial information, intermediate scrutiny applies.  *See id.*

Plaintiffs contend that SBs 253's compelled disclosures are controversial because "a company's climate-related risks and emissions 'are anything but an "uncontroversial" topic.'"  (Mot. 12 (quoting *NIFLA*, 585 U.S. at 769).)  In support, they cite the State's prior acknowledgement that "policy responses to climate change are the subject of vigorous political debate."  (*Id.* (quoting Opp'n Mot. Summ. J. 21).)  Plaintiffs also argue that the laws' compelled disclosures are like the conflict-mineral disclosures—which required companies to report whether their products are "conflict-free"—that the D.C. Circuit struck down in *NAMF*, because both would be used to "stigmatize companies" and "shape their behavior."  (*Id.* (cleaned up).)

In response, the State contends that merely because a disclosure concerns a controversial issue or may lead consumers to form an opinion about a company does not make a factual statement controversial.  (Opp'n 13.)  The State also distinguishes the conflict-mineral disclosures, highlighting that those disclosures required companies to categorize their diamonds as "conflict free" or "not conflict free," which

---

[6] As SB 261's disclosures are not factual, and thus not subject to *Zauderer* review, the Court need not consider whether those compelled disclosures are controversial.

is an ideological and moral statement, regardless of the companies' views about their own moral responsibility. (*Id.* at 14.) Conversely, the State asserts, SBs 253 and 261 require companies to report data and climate-related risks without labeling themselves, the companies, as "good" or "bad" for the climate. (*Id.*)

In *NIFLA*, upon which Plaintiffs rely, (*see* Mot. 12), the Supreme Court found that a law requiring clinics that oppose abortion to provide information about state-sponsored services, including abortion, compelled controversial speech for purposes of First Amendment review. 585 U.S. at 769. However, as the Ninth Circuit has commented, the Supreme Court did not "broadly [say] that any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019). Rather, the Ninth Circuit characterized *NIFLA* as concerning "compelled speech [that] took sides in a heated political controversy, forcing the clinic to convey a message fundamentally at odds with its mission." *Id.*

Here, companies subject to SB 253 are not required "to take sides in a heated political controversy," *id.* at 848, no matter the amount of debate surrounding the existence of and policy responses to climate change. SB 253 merely requires companies to report data on emissions. It does not require companies to say whether they are "responsible" for those emissions or advocate for any (or no) policy response to climate change. This distinguishes SB 253 from the conflict-minerals disclosures, where companies were required to characterize their products as "conflict free" or otherwise. *See NAMF II*, 800 F.3d at 529–30. While the State may take the position that companies are "responsible" for Scope 1, Scope 2, and Scope 3 emissions, (*see* Lyon PI Decl. ¶ 40; SB 253 § 1(g)), companies are not required to agree or even comment on that debate. And SB 253 does not require companies to label themselves or their products as "environmentally sustainable." *NAMF II*, 800 F.3d at 530 (indicating that such compelled disclosure would be impermissible).

That some may look favorably or unfavorably on a company based on its emissions report does not transform an otherwise non-controversial disclosure into a controversial one.  Indeed, courts have upheld regulations that were intended to shape consumer behavior.  *See Am. Meat Inst. v. U.S. Dep't of Agriculture (AMI)*, 760 F.3d 18, 27 (D.C. Cir. 2014) (requiring country-of-origin labels "to enable consumers to choose American-made products").  If disclosures that provide consumers with information that makes a product undesirable to them qualified a disclosure requirement as controversial, then an untold number of disclosure requirements would be subject to a higher standard of review.  *See, e.g.*, *CTIA*, 928 F.3d at 845 ("requiring cell phone retailers to disclose information to prospective cell phone purchasers about the federal government's radio-frequency radiation exposure guidelines relevant to cell phone use"); *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 753 (9th Cir. 2019) (requiring that certain sugar-sweetened beverages contain a disclosure about potential health risks).  Therefore, the Court finds that SB 253 does not mandate disclosure of controversial information.

Accordingly, SB 253's requirement that companies disclose data about Scope 1, Scope 2, and Scope 3 emissions is "factual and uncontroversial," and therefore subject to *Zauderer* review.  Conversely, because SB 261 concerns non-factual disclosures, that law is subject to intermediate scrutiny.

**E.    Application of Scrutiny**

Having determined that SB 253 is subject to *Zauderer* review, and SB 261 is subject to intermediate scrutiny, the Court must consider whether the laws survive the applicable review.  This is where the implications of Plaintiffs' decision to raise a facial challenge become material.  As discussed, to determine whether Plaintiffs' facial challenge against each law succeeds, the Court must evaluate SB 253's and SB 261's applications separately, considering the State's asserted purposes concerning both companies with green-advertising and companies with investors.

First, the Court must analyze whether each law's applications to green-advertising companies survive First Amendment scrutiny, then analyze whether the laws' applications to non-advertising companies survive First Amendment scrutiny, and finally determine whether a substantial majority of those applications likely fail First Amendment scrutiny. *See Moody*, 603 U.S. at 725. Second, the Court must similarly analyze whether the laws' applications to companies with investors survive First Amendment scrutiny, whether the laws' applications to companies without investors survive First Amendment scrutiny, and finally determine whether a substantial majority of those applications likely fail First Amendment scrutiny. *See id.*

### 1.    SB 253

As SB 253 is subject to *Zauderer* review, the required disclosures "compl[y] with the First Amendment if the information in the disclosure is reasonably related to a substantial government interest."  *CTIA*, 928 F.3d at 845.  The "disclosure requirement cannot be 'unjustified or unduly burdensome.'"  *NIFLA*, 585 U.S. at 776 (quoting *Zauderer*, 471 U.S. at 651).  The disclosures also must "remedy a harm that is 'potentially real, not purely hypothetical'" and "extend 'no broader than reasonably necessary.'"  *Id.* (first quoting *Ibanez v. Fl. Dept. of Bus. & Prof. Regul., Bd. of Accountancy*, 512 U.S. 136, 146 (1994); and then quoting *In re R.M. J.*, 455 U.S. 191, 203 (1982)).

The State offers three interests to support SB 253's compelled disclosure of Scope 1, Scope 2, and Scope 3 emissions.

### a.  Reliable Information

The State asserts an interest "in reliable information that enables investors and consumers to make informed judgments about the impact of climate-related risks on their economic choices."  (Opp'n 17.)  This interest implicates both investors and consumers and thus warrants discussing both.

As to consumers, the State asserts that "[s]tudies confirm consumers' interest in this information." (*Id.*) The State offers that "to signal their performance to customers," a "growing number of firms" obtain third-party certifications that show their products are carbon neutral and market their products as carbon neutral. (Lyon PI Decl. ¶ 23–24 (providing examples, including "Lime scooters, Bulldog Skincare, Microsoft Xbox consoles, and Logitech products").) The State also cites studies to support that consumers are willing to pay more for low-carbon products. (*Id.* ¶ 25.) Plaintiffs counter that investors and consumers' mere desire for information does not support a substantial government interest. (Reply 8.)

As the State demonstrates, courts have found that consumers' desire for information can support a substantial government interest. (Opp'n 17 (citing cases).) In *National Electrical Manufacturers Association v. Sorrell*, the Second Circuit held that Vermont had a substantial interest in requiring manufacturers to label certain products as containing mercury that, "on disposal, should be recycled or disposed of as hazardous waste." 272 F.3d 104, 107, 115 (2d Cir. 2001). This is because Vermont had an interest in "increasing consumer awareness of the presence of mercury in a variety of products'" "to reduce the amount of mercury released into the environment." *Id.* at 115. The court found it "probable that some" purchasers "will properly dispose of [the products] and thereby reduce mercury pollution." *Id.* Similarly, in *AMI*, the D.C. Circuit found a substantial government interest in requiring county-of-origin disclosures because of "the demonstrated consumer interest in extending country-of-origin labeling to food products." 760 F.3d at 23. And in *American Hospital Association v. Azar*, the D.C. Circuit found the government had a substantial interest in requiring hospitals to make public a list of "standard charges" to "promot[e] price transparency and lower[] healthcare costs. 983 F.3d 528, 530, 540 (D.C. Cir. 2020).

Like in those cases, investors and consumers' purported interest in emissions is not simply for the sake of gaining information, but so that they can "make informed judgments about the impact of climate-related risks on their economic choices."

(Opp'n 17); *see Sorrell*, 272 F.3d at 115 (consumer interest tied to goal of reducing amount of mercury in environment); *AMI*, 760 F.3d at 23 (consumer interest considered in "the context and long history of country-of-original disclosures to enable consumers to choose American-made products" and "the individual health concerns and market impacts that can arise in the event of a food-borne illness outbreak"); *Am. Hosp. Assoc.*, 983 F.3d at 540 (consumer interest in promoting price transparency to lower healthcare costs).

Nevertheless, the State has not met its burden to show that SB 253 is reasonably related to consumers' interest in this information. The State's evidence of consumer interest in company-wide emissions for purposes of determining whether to purchase products or services is based on companies marketing products as green and studies describing consumer behavior in Germany and China. (*See* Lyon PI Decl. ¶¶ 23–26.) Even assuming this shows a consumer interest, the State has not demonstrated that SB 253 is rationally related to this interest. The State's evidence relates to product carbon labels, not a company's total emissions. (*See id.*) SB 253 does not require companies to label products, nor does it provide consumers with information to determine their purchasing impact on the environment. For example, a company may have large total emissions, but smaller emissions on a product-by-product basis.

However, a different conclusion results with respect to the State's interest "in reliable information that enables investors . . . to make informed judgments about the impact of climate-related risks on their economic choices." (Opp'n 17.) The State has provided sufficient evidence that investors have this interest. For example, CalPERS "has long been a proponent" of "Scope 1 and Scope 2 emissions, because it is crucial in making investment[]" decisions. (Cashion Decl. ¶ 13.) "CalPERS also supports requiring disclosure of Scope 3 emissions because it is material in all companies," as "[o]mitting Scope 3 emissions . . . would not allow an investor like CalPERS to assess the total emissions profile" of companies. (*Id.* ¶ 14.) As one of the State's experts explains, "[h]igher carbon emissions expose firms to greater levels of risk, because,

among other things, governments may regulate emissions, impose carbon taxes on emissions, create a system of marketable emissions permits, or take other actions to reduce global warming."    (Lyon PI Decl. ¶ 13.)    The State's authorities also demonstrate that investors demand a premium from stocks with carbon risks.  (*Id.* at 14–15 (citing studies).)

Plaintiffs argue that SB 253 is not appropriately tailored to this "investor" interest because "the laws are not limited to companies seeking investments." (Reply 7.)    If the legislation was tailored to providing investors with information about climate-related financial risk, Plaintiffs argue, then California "might have applied the laws only to companies seeking investors or to those engaging in transactions for which consumers need the information the laws require."  (*Id.*)  The State contends that SB 253 is appropriately tailored because conditioning the law on public company status would be "both underbroad (failing to capture certain economically-significant entities) and overbroad (imposing compliance obligations on entities that are not economically significant)."  (Decl. George S. Georgiev ISO Mot. Summ. J. ("Georgiev Decl.") ¶ 39, ECF No. 54 (emphasis omitted).)

SB 253 is not tailored to the State's interest in providing investors with climate-related risk information *to the extent the law compels disclosure from companies that have no California investors*.  (*Cf.* Reply 7 (complaining that "the laws are not limited to companies seeking investments").)  Therefore, the State's interest in providing investors with reliable information may not support SB 253 surviving a First Amendment challenge to the extent a company has no investors.  If Plaintiffs were companies with no California investors and brought an as-applied challenge, then the fact that the law does not apply only to companies with investors may have proved fatal to SB 253.  But Plaintiffs "chose to litigate th[is] case[] as [a] facial challenge[], and that decision comes at a cost."  *Moody*, 603 U.S. at 723.  As explained, "'[I]f the law's unconstitutional applications substantially outweigh its constitutional ones,' then a court may sustain a facial challenge to the law and strike it

down." *X Corp.*, 116 F.4th at 898–99 (alteration in original) (quoting *Moody*, 603 U.S. at 724).    This means that the Court must weigh the constitutional applications of SB 253 (as applied to companies with California investors) against the potentially unconstitutional applications (as applied to companies without California investors) and determine whether the unconstitutional applications substantially outweigh its constitutional ones.

As a starting point, over 75% of companies covered by SB 253 are estimated to be public companies. (*See* Ceres Report 11.)  The State offers an expert declaration that any private company covered by SB 253 "can be expected to have multiple outside investors (likely both shareholders and bondholders)" because "[t]he competitive business environment in the United States makes it unlikely that entrepreneurs can attain scale without capital outlays that are beyond the self-financing capabilities of the average entrepreneur." (Georgiev Decl. ¶ 47; *see* Cashion Decl. ¶ 16 (declaring that CalPERS has more than $150 billion exposure to private companies).)  Additionally, "[e]ven if it were possible to self-finance, it would be imprudent because raising capital from outside investors provides a desirable mechanism for risk-sharing and attracting additional expertise to the enterprise." (Georgiev Decl. ¶ 47.)  Given that a large percentage of SB 253's covered companies are public and the likelihood that most, if not all, of the private companies have California investors, the Court concludes, "on this record, that a substantial majority of its applications" are not likely to "fail First Amendment scrutiny." *NetChoice*, 113 F.4th at 1123 (reversing preliminary injunction as to facial attack where district court "focused on possible applications" of provisions to only "a subset of the businesses covered by the" legislation "and speculated about how that subset of applications could" violate the First Amendment).

Accordingly, on this basis, the Court finds that Plaintiffs are unlikely to succeed in their facial challenge to SB 253 and the State's "investor" interest.

### b. Emissions Reductions

Separately, the State asserts a second substantial interest in the disclosures: in companies "reduc[ing] their emissions and thereby mitigat[ing] the risks California and its residents face from climate change . . . . because California has committed to meeting certain emissions reduction goals over time and because of the severity of the climate risks the state faces." (Opp'n 17.) Plaintiffs do not contest that this interest is substantial. (Mot. 14–16; Reply); *see CTIA*, 928 F.3d at 844 (holding that *Zauderer* review is not limited to "the prevention of consumer deception," but that "the governmental interest in furthering public health and safety is sufficient under *Zauderer* so long as it is substantial"). Instead, Plaintiffs argue that "[t]he State here has cited *no* evidence . . . that consumers would change their purchasing habits based on a company's emissions or climate-change risks, that any such consumer sentiment would result in material changes in companies' emissions, or . . . that any such changes would have a material impact on climate change." (Mot.15.)

For the reasons discussed, the State has not shown that SB 253's required disclosures would alter consumer behavior such that it would lead to a material decrease in covered companies' emissions. However, companies lower emissions for reasons other than altering consumer behavior. The State cites four studies to support its claim that SB 253's mandatory disclosures may lead to a reduction in emissions.

In one study, the authors found a statistically significant relationship between voluntary disclosure of climate-related information—including disclosure of Scope 1, Scope 2, and Scope 3 emissions—and decrease in corporate $CO_2$ emissions. (Decl. Thomas Lyon ISO Opp'n Mot. Summ. J. ("Lyon SJ Decl.") Ex. 53 at 1347, 1355–56, ECF Nos. 56, 56-53.) For example, the study found a drop of between 7% and 10% of a company's Scope 1 emissions within three years of disclosure, and a drop in Scope 2 and 3 emissions by year 3 of 4% and 2%, respectively. (*Id.* at 1355–57, tbl. 5, 1373, tbl. OD.9.) While this study only concerns voluntary disclosures, (*id.* at 1348), the State cites three other studies regarding mandatory reporting requirements.

In two studies, authors investigated the effect of disclosures required by the U.S. Greenhouse Gas Reporting Program ("GHGRP") on emissions.  (*See* Lyon SJ Decl. Ex. 55 at 1422–24, ECF No. 56-55; Lyon SJ Decl. Ex. 56 at 1466–68, ECF No. 56-56.)  The GHGRP requires certain facilities in the United States that emit more than 25,000 tons of $CO_2$ per year to report emissions, including Scope 1 and Scope 2 emissions, to the Environmental Protection Agency.  *See, e.g.*, 40 C.F.R. §§ 98.2, 98.3, 98.6, 98.33 (2009).  The studies found that power plants subject to the GHGRP decreased emissions between 7% and 7.9% after reporting.  (*See* Lyon SJ Ex. 55 at 1438, 1448; Lyon SJ Ex. 56 at 1482.)  In one final study, the authors examined the effects of a United Kingdom requirement that public companies report Scope 1 and Scope 2 emissions.  (*See* Lyon SJ Decl. Ex. 54 at 1382, ECF No. 56-54.)  The authors found that companies subject to the mandatory disclosures reduced Scope 1 emissions by about 8% compared to companies not subject to the reporting requirement.  (*Id.* at 1390, 1399.)

These studies do not support that SB 253's disclosure requirement will definitively lead to a reduction in emissions.  But the State need not provide definitive results to survive *Zauderer* review.  Even under a more searching review, the Supreme Court has accepted "reference to studies and anecdotes" and justifications "based solely on history, consensus, and simple common sense."  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (internal quotation marks omitted); *cf. Edenfield v. Fane*, 507 U.S. 761, 771 (1993) (holding that government did not demonstrate that a ban on solicitations advanced government's asserted interests of preventing fraud where it "present[ed] no studies" and did not "disclose any anecdotal evidence" demonstrating such dangers existed).  Thus, the State provides sufficient evidence to support a finding that SB 253's disclosure requirements are reasonably related to the State's substantial government interest in reducing emissions and that Plaintiffs have not shown a likelihood that they will succeed on their First Amendment challenge.

c.  Misleading Speech

The State raises a third interest: that "California has an interest in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation." (Opp'n 16.)  Plaintiffs do not dispute that this is a substantial state interest.  (*See* Mot.; Reply); *Zauderer*, 471 U.S. at 638 (explaining that the government may "prevent the dissemination of commercial speech that is false, deceptive, or misleading").  Instead, Plaintiffs challenge whether the disclosures required by SB 253 are reasonably related to this interest and argue that these requirements are unduly burdensome.  (Mot. 13–17; Reply 7.)

The State contends that the required disclosures are reasonably related to the interest because they will help correct companies' misleading speech.  (Opp'n 16–17.) In support, the States cites to the declaration of one of its experts, Hsu, who presents evidence that "96% of companies with emissions targets exhibit at least one indicator of greenwashing."  (Hsu Decl. ¶ 10.)  Hsu defines "greenwashing" as a company's emissions reduction pledge or statement that "mislead[s] stakeholders about the environmental integrity of their actions."  (*Id.* ¶¶ 7, 10; *see* Lyon PI Decl. ¶ 29 fig. 4 (listing ten indicators of greenwashing).)  She identifies seven indicators of greenwashing, including when a company reports no near or short-term emissions targets "that would indicate near-term action" or fails to make meaningful progress toward their stated emissions reduction target.  (Hsu Decl. ¶ 11.)[7]

Plaintiffs argue that Hsu's indicators of "greenwashing" do not equate to false or misleading speech.  (Opp'n 8.)  For example, Plaintiffs argue that whether a company engaged in lobbying activity does not affect whether their emissions targets

---

[7] The seven indicators are: a company that (1) reports no near or short-term emissions targets "that would indicate near-term action"; (2) excludes Scope 3 emissions from reduction targets; (3) does not provide a publicly available plan detailing the steps the company will take to meet its stated emissions reduction goals; (4) relies on offsets to achieve its pledge without specifying conditions or that fails to disclose where offsets will be used; (5) pledges "net zero" or "GHG neutrality," but limits its target to only carbon dioxide emissions; (6) actively engages in lobbying activity that undermines climate action; and (7) fails to make meaningful progress toward their stated emissions reduction target.  (Hsu Decl. ¶ 11.)

are misleading. (*Id.* at 8–9.) Further, Plaintiffs contend the laws are broader than reasonably necessary because they apply to all companies over the revenue threshold that do business in California, not to those making climate pledges or engaging in misleading speech. (*Id.* at 7.)

Plaintiffs are correct. In its summary judgment order, the Court explained that it "needs a record on whether SBs 253 and 261 regulate a substantial number of companies that do not make potentially misleading environmental claims." (Order Mot. Summ. J. 11.) By way of example, the Court stated that "if ninety-nine percent of the regulated companies have made advertisements relevant to SBs 253's and 261's required disclosures, that may support a finding that SBs 253 and 261 are appropriately tailored to the State's aims under at least rational basis review." (*Id.* at 11–12.) The State has not come close to this mark.

On the record before the Court, it is likely that a substantial majority of covered companies do not make potentially misleading environmental claims. (*See* Ceres Report 11 (estimating SB 253 would apply to 1,971 companies and SB 261 would apply to 2,675 companies).)

The State estimates that "around 82% of North American companies in [its] sample have made green pledges." (Hsu Decl. ¶ 8; *see* Lyon PI Decl. ¶ 20 (citing study that around 73% of companies in a sample had an emissions target).) Beyond that, as Plaintiffs correctly note, the State has failed to show how Hsu's definition of greenwashing equates to misleading speech that it has an interest in correcting. Some of her indicators may represent potentially misleading speech that the State has a substantial interest in correcting. For example, if a company says it will be "net zero," but then does not disclose that this pledge relates only to carbon dioxide emissions, the company's pledge could mislead consumers into thinking the company is doing more than it has said. (*See* Hsu Decl. ¶ 10; Lyon PI Decl. ¶ 30 (providing example of company that discloses it reduced emissions but does not define its measure of emissions).) Or a company that fails to make meaningful progress towards a stated

35

emissions reduction target and does not retract the target when it knows it will not reach that target may mislead consumers and investors into thinking the company is doing what it said it would do.  (*See* Hsu Decl. ¶ 10.)  But other of Hsu's indicators have little to do with whether a company's announced emissions target is misleading.  Failing to provide a publicly available plan, (*see id.*), is not necessarily misleading, if the company has a private plan to reach its emissions targets.  Most concerning is the labelling of speech as misleading if a company engages in lobbying that undermines climate action.  (*See* Hsu Decl. ¶ 10; *see also* Lyon PI Decl. ¶ 29 fig. 4 (considering "[b]oasting green commitments while lobbying against environmental laws" as greenwashing).)  Ignoring the subjectivity of this measure, Hsu does not show how such activities even correlate to whether a company is meeting its target pledge.

Also, it is unclear how some of the real-world examples the State provides as misleading speech are actually misleading.  In arguing that "[v]oluntary disclosures do not prevent the use of misleading language and greenwashing," the State provides an example of a company that "aim[s] to achieve net-zero Scope 1 and 2 greenhouse gas emissions in our operated assets by 2050."  (Lyon PI Decl. ¶ 31.)  The State characterizes this commitment as misleading because the company "ignores the fact that Scope 3 emissions are far and away the most important climate impact of oil and gas production."  (*Id.* ¶ 31.)  Perhaps, if the company only committed to net-zero emissions, the speech would be misleading.  But it strains credulity to call a claim misleading when the company explicitly identifies the very metric it is using, even if it is not the State's preferred metric.

In sum, based on the record before the Court, SB 253 requires a substantial number of companies that have decided not to speak about climate impact to do so.  Even of those companies that have chosen to speak, the State's evidence does not show the prevalence of those companies engaging in misleading speech.  Taken together, with respect to the State's interest in correcting misleading information, SBs 253 is overbroad, unduly burdensome, and not reasonably related to this interest.

The State "may reasonably decide to require disclosure for a class of solicitations that it determines pose a risk of deception." *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 735 (9th Cir. 2017). But SB 253 mandates disclosures from companies outside this "class" of speech. It does not, for example, require only companies that pledge to reduce emissions to define their metrics and report emissions according to those metrics. On this record, the laws extend broader than reasonably necessary to correct potentially misleading speech. *NIFLA*, 585 U.S. at 777 (finding notice requirement fails rational basis review where California required disclosures "wholly disconnected from California's informational interest" by requiring "covered facilities to post California's precise notice, no matter what the facilities say on site or in their advertisements").

As to whether a facial challenge succeeds, if the asserted interest of addressing misleading speech was the State's sole interest supporting SB 253, the Court would conclude "that a substantial majority of its applications are likely to fail First Amendment scrutiny." *NetChoice*, 113 F.4th at 1123. But, as discussed, the State's other proffered other interests support denial of the Motion. Accordingly, based on the above analysis, the Court finds that Plaintiffs do not show a likelihood of success on the merits as to their facial challenge to SB 253 based on the State's dual interests in providing investors with reliable information on which to make investment decisions and in reducing emissions.

### 2. SB 261

SB 261 is subject to intermediate scrutiny, so "the government may compel a disclosure of commercial speech only if (1) it directly advances a substantial governmental interest, and (2) the restriction is not more extensive than necessary to serve that interest." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1282–83. The State asserts the same three interests in SB 261's disclosures as it raises for SB 253's disclosures. (*See* Opp'n 16–19.)

As with SB 253, the State asserts "a compelling interest in reliable information that enables investors and consumers to make informed judgments about the impact of climate-related risks on their economic choices." (Opp'n 17.) Peter Cashion is Managing Investment Director for Sustainable Investments of CalPERS, California's public defined pensions benefit fund with roughly $500 billion in assets. (Cashion Decl. ¶¶ 1, 5.) In a declaration, he expresses the importance of SB 261's disclosure requirements to CalPERS's investments. (*Id.*) Cashion declares that "physical impacts and . . . transition risks have the power to affect our fixed assets, disrupt supply chains and increase volatility in the financial markets." (*Id.* ¶ 11.) He further explains that "consideration of climate-related financial risk and other factors is a necessary component of being an informed and responsible investor." (*Id.* ¶ 12.) Ultimately, SB 261 will enable CalPERS and other investors to "better understand the financial implications" of its investments. (*Id.* ¶ 15; *see* Lyon PI Decl. ¶ 9 (describing types of investors who benefit from disclosure of climate-related financial risks).)

Plaintiffs make the same argument to challenge SB 261 on this interest as they do with SB 253—that the law is not tailored to this interest because "the laws are not limited to companies seeking investments." (Reply 7.) While the State's burden under intermediate review is higher than the rational basis review applied to SB 253, the reasons for denying Plaintiffs' Motion to enjoin SB 253 equally apply to their challenge to SB 263. Ultimately, under intermediate review, "[t]he fit" between the legislature's ends and its means "need not be perfect nor the single best to achieve those ends, but one whose scope is narrowly tailored to achieve the legislative objective." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004). At this stage, the State has made a sufficient showing as to the benefits of investors' desire for the specific disclosures required by SB 261 to achieve the legislature's objective in reliable information that enables investors to make informed judgments about the impact of climate-related risks on their economic choices. Therefore, as with SB 253, Court concludes that SB 261's potentially unconstitutional applications

(as applied to companies without California investors) do not "substantially outweigh" the constitutional applications (as applied to companies with California investors). *X Corp.*, 116 F.4th at 898; (*see* Ceres Report 11 (estimating 73% of covered companies are public).)   Accordingly, Plaintiffs have not shown a likelihood of success on the merits as to their facial challenge to enjoin SB 261.

For completeness, the Court addresses the State's remaining articulated interests and finds that Plaintiffs have shown a likelihood of success of the merits that State's two other asserted interests do not survive First Amendment scrutiny.   First, as discussed with respect to SB 253, Plaintiffs are likely to succeed in showing that SB 261's required disclosures do not directly advance the State's stated interest "in protecting its investors, consumers, and other stakeholders from fraud or misrepresentation." (Opp'n 16.)

Second, unlike with SB 253, the State's interest in reducing emissions does not support SB 261 surviving First Amendment review.   As with SB 253, Plaintiffs do not dispute that this a substantial state interest but argue that the State has offered "no evidence" that SB 261 will result in fewer emissions.   (Mot. 14–15 (emphasis omitted).)   In response, the State contends it has "presented evidence demonstrating that disclosures of this type lead to a reduction in emissions of 7 to 10%." (Opp'n 18 (citing Lyon SJ Decl. ¶ 50).)   The State cites the same four studies previously discussed for this proposition; however, none of them have studied whether the disclosures required by SB 261—climate-related risks—lead to a reduction in emissions.   In three studies, the authors only considered the effect of reporting of greenhouse gas emissions, not climate-related risks, on future emissions.   (*See* Lyon SJ Decl. Ex. 54 at 1382; Lyon SJ Decl. Ex. 55 at 1422–24; Lyon SJ Decl. Ex. 56 at 1466–68.)   Without considering the effect of climate-related disclosures like those required by SB 261, these studies cannot show that SB 261's disclosures would reduce emissions.   The final study—while considering some climate risk disclosures—only concerned voluntary disclosure, and the State provided no evidence to suggest that the

studied disclosures are like the ones required by SB 261. Therefore, Plaintiffs show a likelihood that the State's interest in reducing emissions does not support SB 261 surviving First Amendment review.

However, as discussed, Plaintiffs do not show a likelihood that the State's interest in providing reliable information to investors fails intermediate scrutiny in a substantial majority of SB 261's applications. Accordingly, the Court find that Plaintiffs have not shown a likelihood that SB 261's compelled disclosures violate the First Amendment.[8]

In sum, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to either of its facial First Amendment challenges to SBs 253 and 261.

## F.    The Remaining *Winter* Factors

Plaintiffs argue they will be irreparably harmed by SBs 253 and 261 because the laws compel speech in violation of the First Amendment. (Mot. 18–20; Reply 9–10.) As Plaintiffs have not demonstrated that the laws violate the First Amendment, they have also not shown irreparable harm. *See CTIA*, 928 F.3d at 851 (concluding challengers did not show irreparable harm where the court concluded that the city's "ordinance complies with the First Amendment").

Moreover, the balance of equities favors denial of Plaintiffs' Motion. *See id.* at 852 (finding challengers failed to demonstrate any hardship tipping the balance in their favor where their "First Amendment claim is unlikely to succeed"). This is especially true because enjoining SBs 253 and 261 would delay the State from advancing the public interests for which it adopted the laws. *See id.* (finding "that an

---

[8] Plaintiffs also argue that SB 261 violates the First Amendment because "the definition of 'climate-related financial risk' is so broad and vague that California could almost certainly find fault in the disclosure (or lack of disclosure) of *any* company the State disfavors." (Mot. 16.) In defining "climate-related financial risk," SB 261 references a reporting framework that provides sufficiently clear guidance to covered entities how to comply with the law. *See* Cal. Health & Safety Code § 38533(b)(1)(A)(i); (*see* Lyon SJ Decl. ¶ 14 (reporting that a large number of companies make disclosures using the TCFD Framework).)

injunction would injure the public interest in having a free flow of accurate information").

## V.    CONCLUSION

For the reasons discussed above, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction.  (ECF No. 78.)


**IT IS SO ORDERED.**


August 13, 2025

_____
                **OTIS D. WRIGHT, II**
        **UNITED STATES DISTRICT JUDGE**