**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA CHAMBER OF COMMERCE; CALIFORNIA CHAMBER OF COMMERCE; AMERICAN FARM BUREAU FEDERATION; LOS ANGELES COUNTY BUSINESS FEDERATION; CENTRAL VALLEY BUSINESS FEDERATION; WESTERN GROWERS ASSOCIATION,

*Plaintiffs - Appellants*,

v.

LAUREN SANCHEZ, in her official capacity as Chair of the California Air Resources Board; STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board; ROB BONTA, in his official capacity as Attorney General of California,

*Defendants - Appellees*.

No. 25-5327

D.C. No. 2:24-cv-00801-ODW-PVC

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, II, District Judge, Presiding

Argued and Submitted January 9, 2026
San Francisco, California

Filed November 9, 2026

Before: Jacqueline H. Nguyen and Mark J. Bennett, Circuit Judges, and Kiyo A. Matsumoto, District Judge.*

Opinion by Judge Nguyen;
Partial Concurrence and Partial Dissent by Judge Bennett

## SUMMARY**


### First Amendment / Preliminary Injunction

The panel affirmed in part and reversed in part the district court's denial of a preliminary injunction in a suit by several chambers of commerce and business associations (collectively, the "Chambers") alleging that California's Climate Corporate Data Accountability Act (SB 253) and the Climate-Related Financial Risk Act (SB 261) are facially unconstitutional under the First Amendment.


* The Honorable Kiyo A. Matsumoto, United States District Judge for the Eastern District of New York, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

California enacted SB 253 and SB 261, which require companies to disclose information about their greenhouse gas emissions and exposure to climate-related risks, to provide investors with information relevant to capital markets, to reduce emissions, and to address misleading corporate statements concerning climate impacts,

In SB 253, three categories of emissions are at issue. Scope 1 requires the covered companies to report greenhouse gas emissions from sources they directly own or control. Scope 2 requires the disclosure of emissions from the companies' purchased energy. Scope 3 compels the reporting of indirect emissions arising across a company's value chain, including those from its suppliers and customers.

The panel affirmed the district court's denial of a preliminary injunction as to SB 253's Scope 1 and Scope 2 disclosure requirements. The panel held that SB 253's Scope 1 and Scope 2 disclosures regulate commercial speech because they compel disclosure of factual information on emissions generated through the reporting entities' own operations and bear on capital transactions. Applying intermediate scrutiny, the panel concluded that, for purposes of preliminary injunctive relief, the State demonstrated substantial interests in mitigating information asymmetries for investors and reducing emissions, as well as a likelihood that the Scope 1 and 2 disclosure requirements directly advance those interests and are no more extensive than necessary.

The panel reversed the district court's denial of a preliminary injunction as to SB 253's Scope 3 disclosure requirement and SB 261 in its entirety. The panel held that because SB 253's Scope 3 disclosures concern diffuse third-

party conduct in the value chain, they are insufficiently tethered to the reporting entity's own operations and capital transactions to qualify as commercial speech. As such, this provision is subject to strict scrutiny, which it fails. Because SB 253's Scope 3 disclosure provisions are likely unconstitutional, the panel remanded to the district court to determine, in the first instance, whether those provisions are severable.

Turning to SB 261, the panel held that SB 261 compels noncommercial speech by requiring covered entities to disclose, among other information, subjective ideological assessments. Applying strict scrutiny, the panel held that even assuming overcoming information asymmetries and reducing emissions are compelling state interests, SB 261 fails on tailoring grounds because the State could have employed less restrictive means to accomplish its goals.

The panel held that the remaining *Winter* factors favor preliminary relief as to SB 253's Scope 3 disclosure requirement and SB 261.

Accordingly, the panel affirmed the district court's denial of a preliminary injunction as to SB 253's Scope 1 and 2 disclosures; reversed the denial of a preliminary injunction as to SB 261, and as to SB 253's Scope 3 disclosures; and remanded for the district court to decide in the first instance whether the Scope 3 disclosures are severable.

Concurring in the judgment in part and dissenting in part, Judge Bennett wrote that because the majority opinion can be read as equating investors' interest in companies with consumers' interest in products, and further, may open the door to compelled disclosures targeting individuals, the majority strays too far from the usual definition of

commercial speech as speech that does no more than propose a commercial transaction. He believes both SB 253 and SB 261 compel noncommercial speech and he would apply strict scrutiny to both laws. Because at this preliminary juncture it appears likely that both laws' unconstitutional applications substantially outweigh the constitutional ones, a loss of First Amendment freedoms constitutes an irreparable injury, and the third and fourth factors— balance of equities and public interest—also favor Plaintiffs, he would reverse and remand with instructions to preliminarily enjoin both SB 253 and SB 261.

---

## COUNSEL

Eugene Scalia (argued), Jonathan C. Bond, and Brian A. Richman, Gibson Dunn & Crutcher LLP, Washington, D.C.; Bradley J. Hamburger, Elizabeth Strassner, and Samuel Eckman, Gibson Dunn & Crutcher LLP, Los Angeles, California; Robert E. Dunn and Collin Vierra, Eimer Stahl LLP, Campbell, California; Kevin Palmer and Stephanie A. Maloney, Chamber of Commerce of the United States of America, Washington, D.C.; for Plaintiffs-Appellants.

Caitlan L. McLoon (argued), Katherine S. Gaumond, Emily Hajarizadeh, M. Elaine Meckenstock, Dylan Redor, and Elizabeth Song, Deputy Attorneys General; Myung J. Park and Laura J. Zuckerman, Supervising Deputy Attorneys General; Annadel A. Almendras, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, Los Angeles, California; for Defendants-Appellees.

James R. Wedeking, Boyden Gray PLLC, Washington, D.C.; Cory L. Andrews, Washington Legal Foundation,

Washington, D.C.; for Amicus Curiae Washington Legal Foundation.

Matthew E. Miller, Foley Hoag LLP, Boston, Massachusetts, for Amicus Curiae Ceres Inc..

Chelsea Bowling and Kelsey R. Eberly, FarmSTAND, Washington, D.C., for Amicus Curiae FarmSTAND.

Matthew D. Zinn and Chloe S. Lew, Shute Mihaly & Weinberger LLP, San Francisco, California, for Amicus Curiae Environmental Defense Fund.

Dave E. Jones and Ted Lamm, Center for Law Energy & the Environment, Berkeley, California; David S.S. Nahmias, Seth E. Mermin, and Adam Dean, Center for Consumer Law & Economic Justice, UC Berkeley School of Law, Berkeley, California; for Amicus Curiae UC Berkeley Center for Consumer Law & Economic Justice.

---

## OPINION

NGUYEN, Circuit Judge:

Climate change will increasingly affect human activity in the years ahead, forcing social, economic, and political systems to adapt to changing environmental conditions. In response, California seeks to require companies to disclose information about their greenhouse gas emissions and exposure to climate-related risks through two statutes: the Climate Corporate Data Accountability Act (Senate Bill 253) and the Climate-Related Financial Risk Act (Senate Bill 261). California enacted these measures to provide investors with information relevant to capital markets, to

reduce emissions, and to address misleading corporate statements concerning climate impacts.

The First Amendment, however, limits the government's ability to compel speech. Several chambers of commerce and business associations (collectively, the "Chambers") challenged the statutes as facially unconstitutional and sought to enjoin the laws before they took effect. The district court denied their request for preliminary relief, finding that Senate Bills 253 and 261 regulate commercial speech and were therefore not subject to strict scrutiny, and that the Chambers were unlikely to succeed on the merits of their First Amendment claims. The district court also weighed the remaining *Winter* factors in favor of California (the "State"). *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). We affirm in part and reverse in part.

SB 253 applies to any entity doing business in California with more than $1 billion in annual revenue. Cal. Health & Safety Code § 38532(b)(2). Three categories or "scopes" of emissions are at issue. *Id.* § 38532(c)(1). Scope 1 requires the covered companies to report greenhouse gas emissions from sources they directly own or control. *Id.* § 38532(b)(3). Scope 2 requires the disclosure of emissions from the companies' purchased energy. *Id.* § 38532(b)(4). Because these two provisions compel disclosure of factual information on emissions generated through the reporting entities' own operations and bear on capital transactions, they regulate commercial speech. Applying intermediate scrutiny, we conclude that these provisions are sufficiently tailored to advance California's substantial interests, and the remaining *Winter* factors favor the State. The Chambers are therefore not entitled to a preliminary injunction as to SB 253's Scope 1 and Scope 2 disclosures.

The Scope 3 disclosure requirement, however, is different. That provision compels the reporting of indirect emissions arising across a company's value chain, including those from its suppliers and customers. *Id.* § 38532(b)(5). Scope 3 disclosures do not qualify as commercial speech, and the provision is therefore subject to strict scrutiny, which it fails. The district court erred in concluding otherwise.

The district court similarly erred with respect to SB 261, which applies to companies with more than $500 million in annual revenue that do business in California. Cal. Health & Safety Code § 38533(a)(4). Unlike SB 253's Scope 1 and 2 disclosure requirements, SB 261 goes far beyond compelling the reporting of factual information about the entities' emissions. Compliance would require a reporting entity to assess and disclose climate-related financial risks, which involves predictive and normative judgments about future economic conditions and a politically fraught subject. Because SB 261 does not regulate commercial speech, it is subject to strict scrutiny, a standard which the State all but concedes it cannot satisfy.

We therefore affirm the district court's denial of a preliminary injunction as to SB 253's Scope 1 and Scope 2 disclosure requirements. We reverse its denial of a preliminary injunction as to SB 253's Scope 3 disclosure requirement and SB 261 in its entirety. We remand for the district court to determine in the first instance whether SB 253's Scope 3 provision is severable.

# BACKGROUND AND PROCEDURAL HISTORY

## I. Statutory Background

### A. Senate Bill 253

The Climate Corporate Data Accountability Act, S.B. 253, 2023–2024 Reg. Sess. (Cal. 2023) (codified at Cal. Health & Safety Code § 38532) ("SB 253") directs the California Air Resources Board ("CARB") to "develop and adopt regulations" requiring covered companies[1] to annually disclose their greenhouse gas emissions "in conformance with the Greenhouse Gas ["GHG"] protocol standards and guidance." *Id.* § 38532(c)(2)(A)(ii). The GHG protocol defines three "scopes" of emissions (Scope 1, Scope 2, and Scope 3) for accounting and reporting purposes to improve transparency and clearly distinguish between direct and indirect emissions. This protocol has been widely adopted for corporate disclosures. For example, 92% of Fortune 500 companies responding to a voluntary investor-driven disclosure project adhered to the protocol in 2016, and approximately 82% of S&P 500 companies already report Scope 1 and Scope 2 figures under GHG protocol methodologies. Likewise, 82% of North American companies in the State's dataset—spanning Forbes 2000 public companies and the hundred largest private companies—have made public "green pledges," meaning a pledge to reduce emissions with a report of at least one emissions target.

Scope 1 emissions are "all direct greenhouse gas emissions that stem from sources that a reporting entity owns or directly controls," including fuel combustion activities.

[1] A recent report estimated that SB 253 would apply to approximately 1,971 companies.

*Id.* § 38532(b)(3). Scope 2 emissions are "indirect greenhouse gas emissions" derived from purchased or acquired electricity, steam, heating, or cooling. *Id.* § 38532(b)(4). Scope 3 emissions are "indirect upstream and downstream greenhouse gas emissions" from sources that the reporting entity "does not own or directly control," including purchased goods and services, business travel, employee commutes, and the processing and use of sold products. *Id.* § 38532(b)(5). Scope 3 emissions may be calculated either through the collection of primary data, such as from suppliers, or estimated using "secondary data sources," including industry averages, proxy data, and other generic data. *Id.* § 38532(c)(2)(A)(ii). SB 253 does not require reporting of Scope 4 (avoided) emissions. *Id.* § 38532(c)(6).

The statute also directs CARB to adopt regulations that minimize duplicative reporting by allowing entities to submit reports prepared to satisfy other national or international disclosure requirements. *Id.* § 38532(c)(2)(D)(i). In addition, CARB must require third-party assurance of the quality and accuracy of reported emissions data. *Id.* § 38532(c)(2)(F)(i). CARB or its designee will make the disclosed emissions data publicly available through both a report and a digital platform. *Id.* § 38532(d)(1)–(2), (e)(1).

### B. Senate Bill 261

The Climate-Related Financial Risk Act, S.B. 261, 2023–2024 Reg. Sess. (Cal. 2023) (codified at Cal. Health & Safety Code § 38533) ("SB 261") requires covered companies[2] to publish biennially on their own websites

[2] SB 261 applies to approximately 2,675 companies.

"climate-related financial risk information"—information concerning the "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks." *Id.* § 38533(a)(2), (b)(1)(A), (c)(1). Covered companies must report (1) their climate-related financial risks in accordance with the framework established in the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosures (June 2017) (the "TCFD Framework"), and (2) the measures they have adopted to reduce and adapt to those risks. *Id.* § 38533(b)(1)(A)(i)–(ii).

The TCFD Framework organizes disclosure into four categories—governance, strategy, risk management, and metrics-and-targets. Under the governance category, companies disclose their governance structures for addressing "climate-related risks and opportunities." The strategy category requires the disclosure of "the actual and potential impacts of climate-related risks and opportunities on the organization's businesses, strategy, and financial planning where such information is material." The risk-management category addresses how a company identifies, assesses, and manages climate-related risk. And the metrics-and-targets category requires disclosure of the metrics and targets used to assess and manage relevant climate-related risks and opportunities "where such information is material." SB 261's required disclosures are "focused on a company's actual or planned activities." A company that does not evaluate climate-related risks may disclose that it has no governance, strategy, risk-management processes, or metrics addressing such risks, and may describe any plans to evaluate them. A company may disclose that it has assessed climate-related risks and determined that it faces none.

## II. Procedural History

On October 7, 2023, Governor Gavin Newsom signed Senate Bills 253 and 261 into law. In January 2025, the Chambers filed suit against California, alleging that SB 253 and SB 261 are facially unconstitutional under the First Amendment.[3] The Chambers sought to enjoin both laws on First Amendment grounds, arguing that the statutes compel noncommercial speech and fail strict scrutiny.

The district court denied the Chambers' motion for preliminary injunction. It held that SB 253 and 261 regulate commercial speech and, accordingly, are not subject to strict scrutiny review.

The court applied intermediate scrutiny to SB 261, reasoning that its disclosures require companies to assess "the effect of current and future events on a company" and therefore involve subjective and predictive judgments. The district court found that SB 261 satisfies intermediate scrutiny because the required disclosures advance California's objective of providing investors with information needed "to make informed judgments about the impact of climate-related risks on their economic choices."

By contrast, the court concluded that the more deferential *Zauderer* review applied to SB 253 because the statute requires disclosure of "purely factual and uncontroversial information." *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 585 U.S. 755, 768 (2018); *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626 (1985). Applying *Zauderer* review, the district court concluded that SB 253's disclosure requirements are

---

[3] The Chambers also raise non-First Amendment claims, which are not at issue in this appeal.

reasonably related to California's substantial interests in providing investors with reliable information to make informed economic choices and reducing emissions.

Accordingly, the district court concluded that neither statute violates the First Amendment. The district court therefore found that the Chambers had not shown a likelihood of success on the merits of their First Amendment claims and denied the motion for preliminary injunction. The court further concluded that the Chambers failed to show likely irreparable harm or that either the balance of hardships or public interest favored them.

On November 18, 2025, we enjoined the enforcement of SB 261 pending appeal, but we denied the Chambers' motion for a similar injunction as to SB 253.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over appeals of interlocutory orders denying injunctions under 28 U.S.C. § 1292(a)(1). "We review the grant or denial of a preliminary injunction for abuse of discretion." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). Under this standard, "[l]egal conclusions are reviewed *de novo* while factual findings are reviewed for clear error." *Washington v. Trump*, 145 F.4th 1013, 1022 (9th Cir. 2025). Our review is narrow: we will reverse the district court only "when its application of the standard is 'illogical, implausible, or without support in inferences that may be drawn from the record.'" *Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). In First Amendment cases, however, we "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Thunder*

*Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Plaintiffs seeking such relief must show that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent an injunction, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Id.* at 20. Injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

## DISCUSSION

"As a general matter, a content-based regulation is presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *X Corp. v. Bonta*, 116 F.4th 888, 899–900 (9th Cir. 2024) (quoting *NIFLA*, 585 U.S. at 766). Strict scrutiny applies because "[w]hen a state compels individuals to speak a particular message, the state alters the content of their speech, and engages in content-based regulation." *Id.* at 900 (simplified).

The analysis differs, however, when the compelled speech at issue is commercial in nature. *See Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 814–22 (9th Cir. 2025). "Commercial speech is generally subject to intermediate scrutiny." *X Corp.*, 116 F.4th at 900; *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980). And when compelled commercial speech is "purely factual and uncontroversial" and neither unjustified nor unduly burdensome, *NIFLA*, 585 U.S. at 768, the even more deferential *Zauderer* standard applies, *Zauderer*, 471 U.S. at 651. Such review is "akin to a rational

basis test." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1266 (9th Cir. 2023).

Although SB 253 and SB 261 both require climate-related disclosures, they compel different types of speech and therefore implicate different levels of First Amendment scrutiny. We address each below.

## I. Likelihood of Success on the Merits

### A. SB 253

SB 253's Scope 1 and 2 disclosure requirements regulate commercial speech and withstand First Amendment scrutiny. The statute's Scope 3 requirement, however, neither regulates commercial speech nor survives review.

#### 1. SB 253's Scope 1 and 2 Disclosure Requirements Regulate Commercial Speech

"Because of the difficulty of drawing clear lines between commercial and non-commercial speech, the Supreme Court in *Bolger* outlined three factors to consider." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021); *see Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983). "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66–67). These "*Bolger* factors" serve as useful guideposts but are not dispositive. *Compare First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) ("[E]ach characteristic need not 'necessarily be present in order for speech to be commercial.'" (quoting *Bolger*, 463 U.S. at 67 n.14)), *with X Corp.*, 116 F.4th at 901

(holding compelled disclosure was not commercial speech where it "fail[ed] to satisfy at least two of the three *Bolger* factors").

Courts "try to give effect to a common-sense distinction between commercial speech and other varieties of speech." *Stolfi*, 153 F.4th at 820 (quoting *X Corp.*, 116 F.4th at 900). Consistent with this approach, we have characterized speech as commercial "even if not a clear fit" with the *Bolger* framework "where the speech nonetheless 'communicates the terms of an actual or potential [commercial] transaction.'" *Id.* (alteration in original) (quoting *X Corp.*, 116 F.4th at 901).

Our recent decision in *Stolfi* is instructive. There, we concluded that a law requiring prescription drug manufacturers to disclose information such as current and historical drug prices, generic alternatives, sales revenue, and factors contributing to drug prices regulated commercial speech. *Id.* at 821–25. Much of the information, we explained, consisted of "basic marketing information that manufacturers already disclose to the federal government and/or the public." *Id.* at 821. And the remaining disclosures—including manufacturing costs, factors contributing to price increases, and profit information—were "no less tethered to commercial transactions." *Id.* at 821–22.

Here, SB 253 compels reporting entities to disclose numerical emissions data—calculated using standardized methodologies—to a government entity, either CARB or a designated emissions reporting organization. Cal. Health & Safety Code § 38532(c)(1). Scope 1 disclosures cover direct GHG emissions from sources that a covered company owns or directly controls—principally, "emissions resulting from

the burning or use of fossil fuels." *Id.* § 38522(b)(3). Scope 2 disclosures cover GHG emissions from purchased energy consumed in the company's operations. *Id.* § 38522(b)(4).

Both categories provide parties to actual or potential commercial transactions with pertinent factual information about a regulated entity's operations—namely, how much emissions it emits from its sale of products or provision of services, whether from sources it owns or directly controls or from its use of energy. Purchases of stock or other investment products, as well as issuances of debt or insurance policies, are commercial transactions. The record shows that carbon emissions expose firms to greater risk, and that markets penalize higher-emitting firms. Emissions data thus bear directly on a business's ability to raise capital and its overall profitability—information that investors, insurers, and other capital-market participants use to decide whether to transact and on what terms. In that respect, emissions disclosures function like product warnings in capital markets: higher emissions may signal a greater risk of diminished returns.

We conclude therefore that these disclosures communicate "the terms of an actual or potential commercial transaction." *Stolfi*, 153 F.4th at 820 (simplified). The Scope 1 and 2 emissions are sufficiently tethered to the reporting entity's own commercial operations and capital transactions—much like the drug-pricing disclosures in *Stolfi* were tied to pharmaceutical transactions. *See id.* at 821–22; *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 309–10 (1st Cir. 2005) (applying commercial speech doctrine to disclosures requiring pharmacy benefit managers to disclose conflicts of interest).

The Chambers urge us to apply the *Bolger* factors more strictly and to define commercial speech narrowly as speech that "does no more than propose a commercial transaction." *X Corp.*, 116 F.4th at 900 (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). But our precedent calls for a more flexible approach, at least in the government reporting context. *See Stolfi*, 153 F.4th at 811–16 (discussing the inapplicability of the *Bolger* factors in the government reporting context); *see also First Resort*, 860 F.3d at 1272 ("Our commercial speech 'analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category.'" (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 284 (4th Cir. 2013))).

"[S]peech that does not propose a commercial transaction on its face can still be commercial speech." *Ariix*, 985 F.3d at 1115. We have repeatedly "applied the commercial speech doctrine [to compelled disclosures] because they . . . provided parties to 'actual or potential' commercial transactions with information about those transactions." *Stolfi*, 153 F.4th at 821. For example, we have applied the commercial speech doctrine to regulations requiring landlords to provide disclosures to tenants' rights organizations before initiating buyout negotiations, *San Francisco Apartment Ass'n v. San Francisco*, 881 F.3d 1169, 1176–78 (9th Cir. 2018); retailers to provide warnings regarding federal radio-frequency radiation exposure guidelines for cell phone users, *CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 841–42 (9th Cir. 2019); and municipal storm sewer operators to educate the public about the dangers of improper waste disposal, *Env't Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 849 (9th Cir. 2003). Accordingly,

although compelled disclosures such as these typically do not, in and of themselves, "propose a commercial transaction," that does not render them noncommercial.

Nor does the firm-level nature of the Scope 1 and 2 data alter the analysis. In capital markets, the relevant product is the security or financial instrument itself—an interest in the firm as a whole. Firm-level information is therefore pertinent to the value of that transaction. *Cf. Bolger*, 463 U.S. at 67 n.14 ("[W]e express no opinion as to whether reference to any *particular* product or service is a necessary element of commercial speech.") (emphasis added).

And as we observed in *Stolfi*, "statutes and regulations that require regulated entities and individuals to report information to a government agency are a common feature of modern government." 153 F.4th at 809–10. Factual disclosure mandates have long pervaded tax, securities, environmental, and public health regulation. *See id.*; Annie Brett, *Rethinking Environmental Disclosure*, 112 CAL. L. REV. 1535, 1542–43 (2024) (tracing information-forcing measures to early common law). They often serve as a "lighter-touch" regulatory tool, promoting market transparency and democratic accountability without imposing direct substantive commands. *See* Amanda Shanor, *The New Lochner*, 2016 WIS. L. REV. 133, 165–67 (2016); Paula J. Dalley, *The Use and Misuse of Disclosure as a Regulatory System*, 34 FLA. ST. U. L. REV. 1089, 1092 (2007).

Applying strict scrutiny to compelled factual disclosures like those required by SB 253's Scope 1 and 2 provisions merely because they do not fit neatly within *Bolger* or themselves propose a commercial transaction would jeopardize broad areas of ordinary regulation and impede the

flow of information that supports economic decision-making and democratic self-governance.[4] *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 765 (1976); *Rowe*, 429 F.3d at 316 (Boudin, C.J., concurring) (noting the existence of "literally thousands" of routine disclosure regulations and rejecting the premise that each requires extensive First Amendment analysis).

The Chambers also contend that the Scope 1 and 2 requirements compel "politically fraught" ideological expression and therefore fall outside the commercial speech doctrine. *Stolfi*, 153 F.4th at 823. In two recent cases, we applied strict scrutiny to evaluate compelled disclosures. In *NetChoice*, we considered a California law requiring online businesses to identify, for each offered online service, product, or feature likely to be accessed by children, any risk of material detriment arising from their data-management

[4] Our dissenting colleague would require an exacting *Bolger* fit, arguing that compelled factual disclosures can generally survive only when "a direct connection between the speech compelled and a particular product or service" exists. Dissent at 69. Against the weight of authority instructing us to apply the *Bolger* test flexibly, the dissent's test introduces a brightline "specific-product rule": both SB 253 and 261 fail because they do not inform "market participants about *a specific product*." Dissent at 70 (emphasis in original). The dissent's approach might therefore uphold a law requiring a company to disclose on each product label the total GHG emissions generated in connection with that specific product. But the same test might strike down a law compelling the same company to disclose the simple sum of those same numbers, because that firm-wide data is too untethered from a specific product. No doubt, the former informs purchasers about the climate impact of a specific product. But the latter likewise elucidates the company's firm-wide climate risk, thus directly informing particular capital-market transactions. The dissent's test therefore introduces a distinction without much difference—while calling into question the legality of many routine firm-level regulations.

practices, and to assess harm-related factors before offering new services. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1116 (9th Cir. 2024). We classified the compelled disclosures as noncommercial and applied strict scrutiny because the law effectively "deputize[d] covered businesses into serving as censors for the [s]tate," requiring them to "opine on potential speech-based harms to children . . . disconnected from any economic transaction." *Id.* at 1118–20.

Similarly, in *X Corp.*, we applied strict scrutiny to legislation requiring social media companies to convey their policy views on politically fraught topics—hate speech, racism, misinformation, and radicalization—and to explain how they applied those policies. 116 F.4th at 901–02. The statute did not regulate commercial speech because it compelled companies "to recast [their] content-moderation practices in language prescribed by the [s]tate" and to opine on "whether and how certain controversial categories of content should be moderated." *Id.* at 901. Importantly, we distinguished the mandated disclosures from laws requiring platforms to disclose their existing terms of service and content-moderation practices without compelling them to express views on controversial topics like hate speech or racism. *Id.* at 901, 903.

As we later explained in *Stolfi*, "our application of strict scrutiny [in *NetChoice and X Corp.*] ultimately turned on the subjective and political or ideological nature of the information that the regulations required." 153 F.4th at 818. "Specifically, in both cases, we concluded that the government reporting requirement at issue forced regulated entities to opine on fraught political issues, such as what online content is 'harmful to children' or what content constitutes 'hate speech or racism.'" *Id.* Because the laws

required speakers to disseminate ideological messages, strict scrutiny applied. *Id.* By contrast, the Oregon reporting law in *Stolfi* did not compel ideological speech and therefore did not trigger strict scrutiny. *Id.* at 819.

The reporting requirements here fall on the *Stolfi* side of the line. The compelled Scope 1 and 2 disclosures concern only factual information—emissions data reported using standardized measurement protocols the industry has long employed. *See* Cal. Health & Safety Code § 38532(c)(2)(A)(ii) (adopting GHG Protocol standards). They do not compel companies "to express any . . . normative view" about their emissions, or "to define" their emissions "in value-laden, state-prescribed language." *Stolfi*, 153 F.4th at 823. No reporting entity is required to attribute culpability, assign moral significance to its emissions, or endorse the State's climate-policy positions.[5] And companies remain free to contextualize disclosures,

---

[5] The dissent warns that the majority opens the door to never-ending compelled disclosures, including those targeting individuals, invoking hypotheticals about abortion, political affiliation, and immigration enforcement. *See* Dissent at 44–46. The dissent's hypotheticals invoke undeniably controversial political topics and introduce questions we have not been asked to—and do not—decide. On the fact-specific inquiry of this case, the disclosures we uphold are non-controversial, factual reporting of industry-accepted, standardized emissions data. That is both a natural application of our precedent, *Stolfi*, 153 F.4th at 822–24, and fundamentally inapposite to the dissent's cautionary scenarios.

We note, however, that the dissent's own test fails to assuage the very warnings it advances. The dissent's approach might strike down a law requiring a company to disclose the number of noncitizens it employs. But the same test could uphold a law mandating the same company disclose on each product label the number of noncitizens employed in connection with that specific product. *See supra*, fn. 4.

dispute their significance, provide explanatory commentary, or publicize offsetting emissions calculations. Reporting entities must report, "as a matter of historical fact," the quantity of emissions associated with their operations, not a viewpoint. *Id.* at 824.

The Chambers' reliance on *National Association of Manufacturers v. SEC ("NAMF II")*, 800 F.3d 518 (D.C. Cir. 2015), is misplaced. There, diamond sellers were required to label their diamonds as either "conflict free" or "not conflict free," thereby compelling them to convey the morally charged message that their products were "ethically tainted," even if they disputed that characterization. *Id.* at 530. By contrast, SB 253 does not require a company to characterize itself as part of the climate solution or a contributor to its degradation. The statute requires companies to report emissions data about their operations. That is a factual disclosure, not a moral one. *See, e.g.*, *Env't Def. Ctr.*, 344 F.3d at 850 (holding that informing the public about safe toxin disposal was "non-ideological" and compelled no "affirmation of belief") (quoting *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 88 (1980)); *Md. Shall Issue, Inc. v. Anne Arundel County*, 91 F.4th 238, 246–48 (4th Cir. 2024) (treating a firearm-safety advisory as factual commercial speech and rejecting the argument that it conveyed an ideological message that firearms cause suicide).

Nor does commercial speech lose its commercial character simply because it "can be tied in some way to a controversial issue." *CTIA*, 928 F.3d at 845. Speech may remain commercial "notwithstanding the fact that [it] contain[s] discussions of important public issues." *Bd. of Trs. v. Fox*, 492 U.S. 469, 475 (1989) (quoting *Bolger*, 463 U.S. at 67–68). We applied that principle in *Stolfi*, holding

that "although drug pricing decisions may implicate controversial public policy issues," that was "insufficient to transform the required reports into noncommercial speech." 153 F.4th at 824. So too here. The fact that emissions disclosures may, to some degree, bear on climate policy debates does not convert factual, transaction-relevant disclosures into noncommercial speech.

SB 253's Scope 1 and 2 provisions only require disclosure of operational emissions data relevant to capital transaction decision-making. The commercial speech doctrine therefore applies.

**2. SB 253's Scope 1 and 2 Disclosure Requirements Survive Intermediate Scrutiny**

Compelled commercial speech is generally subject to intermediate scrutiny. *See X Corp.*, 116 F.4th at 900. But when the disclosure compels "purely factual and uncontroversial information," courts apply the more deferential *Zauderer* review. *NIFLA*, 585 U.S. at 768. We need not resolve which standard applies to SB 253's Scope 1 and Scope 2 disclosures, because they likely survive the more stringent standard—intermediate scrutiny under *Central Hudson*. *See Stolfi*, 153 F.4th at 825–26; *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

Under *Central Hudson*, the State must show that the law "directly advance[s] a 'substantial' governmental interest" through means not "more extensive than necessary." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1275 (quoting *Cent. Hudson*, 447 U.S. at 564–66). The "direct advancement" requirement is modest. The State need only show that "the harms it recites are real and that [the disclosure requirement]

will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 769 (1993). "The fit need not be perfect nor the single best to achieve those ends, but one whose scope is narrowly tailored to achieve the legislative objective." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004). Nor must the law employ the "least restrictive means." *Fox,* 492 U.S. at 480. The government may satisfy that burden through studies, anecdotes, history, consensus, or common sense. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001); *Stolfi*, 153 F.4th at 827.

The State identifies three interests supporting the disclosure requirements: (1) advancing investor interests and mitigating information asymmetries, (2) reducing emissions, and (3) preventing misleading speech. The first two are substantial. The third is not supported by the record. We address each in turn.

The State's interest in reducing information asymmetries—providing investors with accurate emissions data to enable informed investment decisions—is substantial. The record demonstrates that Carbon emissions expose firms to greater risk, markets penalize high-emitting companies, and environmental performance affects share prices. As the State's expert, Professor Lyon, explained, "a large body of research shows that environmental performance is material to stakeholders." Likewise, CalPERS, California's largest public pension fund, relies on Scope 1 and Scope 2 emissions data as "crucial" to investment decisions. The district court therefore did not err in finding that investors rely on and need emissions data.

The record also establishes an information gap between corporations and stakeholders that voluntary disclosure

cannot reliably close. Companies have exclusive access to operational information that they may choose not to disclose and that investors cannot readily obtain. According to Professor Lyon, "asymmetric information undermines market performance," and "[m]andatory and standardized information on carbon performance would . . . not only increase market efficiency but result in better allocation of capital within the real economy."

The Chambers counter that the State's asserted interest is merely a "repackaged version of the 'consumer curiosity' rationale this Court has rejected." *See CTIA*, 928 F.3d at 844. But as we explained in *Stolfi*, "[a]lthough 'consumer curiosity' alone is generally insufficient," the State's interest here extends beyond "transparency for its own sake." 153 F.4th at 826. The interests *Stolfi* recognized as substantial—reducing information asymmetries, facilitating informed commercial transactions, and improving market efficiency—are precisely those at stake here. *Id.*

Those interests also accord with the animating purpose of the commercial speech doctrine: protecting the free flow of factual information relevant to economic decision-making and democratic self-governance. In *Virginia Pharmacy*—the first case to extend First Amendment protection to commercial speech—Justice Blackmun grounded that protection in the speech's informational value, explaining that such information enables "intelligent and well informed" private economic decisions and is "indispensable to the formation of intelligent opinions as to how [the free enterprise] system ought to be regulated or altered." *Va. State Bd. of Pharmacy*, 425 U.S. at 765; *see also Cent. Hudson*, 447 U.S. at 561–62 (recognizing that commercial speech "assists consumers and furthers the societal interest in the fullest possible dissemination of information"); *Stolfi*,

153 F.4th at 822 (holding statute furthered the doctrine's central purposes of "improv[ing] the 'free flow of commercial information'" and facilitating future transactions).

Courts likewise have repeatedly recognized substantial governmental interests in protecting commercial welfare and promoting economic vitality. *See, e.g.*, *San Francisco Apartment Ass'n*, 881 F.3d at 1177 (recognizing substantial interests in promoting fair buyout negotiations between landlords and tenants and reducing the likelihood that tenants will accept "unfair" agreements); *Mainstream Mktg. Servs. v. FTC*, 358 F.3d 1228, 1237 (10th Cir. 2004) (recognizing a substantial interest in protecting consumers against the risk of fraudulent and abusive solicitation); *Edwards v. District of Columbia*, 755 F.3d 996, 1002–03 (D.C. Cir. 2014) (recognizing a substantial interest in promoting an industry that contributes to economic vitality). The State's interest in reducing information asymmetries that undermine market efficiency falls comfortably within that recognized category.

The State's second asserted interest—reducing GHG emissions—is also substantial. The parties do not contest that GHG emissions contribute to climate change and that climate change inflicts real, documented harms. Any reduction in emissions therefore is a substantial State interest, even if that reduction does not, by itself, halt climate change.

The Chambers do not seriously dispute the legitimacy of this interest. Instead, they contend that it is too vague and that any resulting emissions reductions would not meaningfully alleviate climate change. But that argument misunderstands intermediate scrutiny, which does not

require the State to solve climate change entirely before taking steps to combat it. Courts do not "require that the Government make progress on every front before it can make progress on any front." *United States v. Edge Broad.*, 509 U.S. 418, 434 (1993). Nor does the First Amendment "require [the government] to forgo addressing the problem at all unless it completely eliminates [it]." *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995). It is enough that the asserted interest is real rather than purely hypothetical. *See NIFLA*, 585 U.S. at 776. The State's interest in reducing GHG emissions is therefore substantial.

Finally, the State asserts a third interest: preventing misleading speech. We conclude that this alleged interest is not sufficiently supported by the record. The State presented evidence that some companies advertise themselves as environmentally responsible and publicize climate commitments in ways that may mislead consumers, a practice commonly described as "greenwashing." But the greenwashing indicators the State relied on sweep in conduct that is not inherently misleading, such as failing to provide a publicly available emissions-reduction implementation plan or lobbying against climate legislation while utilizing environmentally conscious branding. The record does not show that companies discussing climate change routinely engage in misleading speech. Because "[a] state may not [burden] speech to prevent something that does not appear to occur," *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023), this interest fails.

Still, because the State's interests in mitigating information asymmetries and reducing emissions are substantial, the State has met its burden on that prong. Additionally, the State's substantial interests are directly advanced by SB 253's Scope 1 and Scope 2 disclosures, and

the compelled speech is no more extensive than necessary to further those interests.[6]

With respect to the first interest—mitigating information asymmetries—requiring accurate and complete disclosure of the information that industry experts deem necessary for investors would directly advance the State's interest. The record demonstrates that investors need Scope 1 and 2 emissions data to make informed economic decisions regarding capital transactions. Requiring companies to report that information to the government for public dissemination would therefore remedy the identified information gap. And "courts have repeatedly characterized the mechanism of disclosure here—wherein the State rather than a regulated entity makes disclosed information available to the public—as narrowly tailored." *Stolfi*, 153 F.4th at 828 (collecting cases).

The Chambers raise three primary objections on tailoring grounds, none of which is persuasive. First, they argue that the State should have limited reporting to public companies. But a court evaluating a facial challenge may not focus on "possible applications" of a statute to only "a subset of the businesses covered by [the statute]" and "speculate[] about how that subset of applications could" violate the First Amendment. *NetChoice*, 113 F.4th at 1123. A facial challenge succeeds only if the unconstitutional applications of the law "substantially outweigh its constitutional ones." *X Corp.*, 116 F.4th at 898–99 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024)). Facial challenges are "hard

[6] Because the State's proffered substantial interest in preventing misleading speech is not substantiated by the record, we do not address whether SB 253 directly advances it. *See INS v. Bagamasbad*, 429 U.S at 25.

to win," because they "often rest on speculation about the law's coverage and its future enforcement" and "threaten to short circuit the democratic process." *Moody*, 603 U.S. at 723 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).

Here, the district court found that over 75% of covered companies are estimated to be publicly traded and that the revenue threshold is an accurate proxy for companies that have or may seek outside investors, given that it is "unlikely that entrepreneurs can attain scale without capital outlays that are beyond the self-financing capabilities of the average entrepreneur." We agree that this is sufficient for the statute to survive a facial challenge. A substantial majority of SB 253's applications therefore do not raise First Amendment concerns.

Second, the Chambers argue that the State could achieve the same ends by generating its own emissions estimates or by relying on market demand and voluntary reporting. But neither alternative would serve the State's interest as effectively. For Scope 1 and 2 emissions, the relevant data is drawn from companies' own internal records, including financial accounts, fixed asset records, lease listings, and utility invoices. Those internal records are typically not available to outside observers, and outside estimates are therefore less accurate than company-reported data. Reliance on estimates would thus produce less reliable reports and undermine the State's ability to reduce information asymmetries.

Voluntary disclosures are likewise inadequate to ensure that complete information reaches the marketplace. "[F]irms—like individuals—often have incentives to disclose information that is favorable to them and to

withhold information that is damaging." Consistent with that dynamic, companies that do report often disclose only a subset of their emissions, leaving material gaps that investors cannot fill. And even as to the information companies choose to disclose, voluntary reporting supplies inadequate assurance of accuracy, because environmental claims are "essentially impossible for most external stakeholders to verify."

Finally, the Chambers contend that investors have no demonstrated need for the specific emissions data SB 253 requires. But as discussed above, investors, insurers, and other capital-market participants rely on Scope 1 and 2 data to assess risk and value in commercial transactions, thereby improving resource allocation and market efficiency. That reliance is well-documented in the record.

Scope 1 and 2 disclosures also directly advance the State's interest in reducing emissions and are not more extensive than necessary. The district court relied on studies demonstrating that emissions reporting leads to emissions reductions. The most probative of these examined *mandatory* Scope 1 and Scope 2 reporting—the regime SB 253 imposes—and documented reductions of approximately 7 to 8%. A separate study of *voluntary* reporting found reductions of 7 to 10% for Scope 1 and 4% and 2% for Scope 2 and Scope 3, respectively. The studies in the record indicate that Scope 1 and Scope 2 disclosures are likely to materially reduce emissions. Given the parallel nature between the mandatory Scope 1 and Scope 2 disclosures studied and those SB 253 requires—and the documented reductions associated with those disclosures—the district court did not err in concluding that the evidence was sufficient to satisfy the State's burden. *See Lorillard*, 533 U.S. at 555.

Common sense points the same way: requiring covered companies to disclose their emissions will likely encourage them to reduce those emissions, as transparency prompts behavioral changes. *See, e.g.*, David Weil et al., *The Effectiveness of Regulatory Disclosure Policies*, 25 J. POL'Y ANALYSIS & MGMT. 155, 155–56, 167–70 (2006) (explaining how disclosure regimes can produce lasting behavioral change among regulated actors); George Loewenstein et al., *Disclosure: Psychology Changes Everything*, 6 ANN. REV. ECON. 391, 396, 400–04 (2014) (explaining that disclosure can alter the behavior of the disclosing party).

The Chambers' objection that this evidence is too speculative cannot be squared with the studies' documented reductions. *See Fox,* 492 U.S. at 480 (explaining that the fit need not be "necessarily perfect" or represent the "single best disposition," but must instead be proportionate to the interest served).

We therefore conclude that, for purposes of preliminary injunctive relief, the State has demonstrated substantial interests in mitigating information asymmetries for investors and reducing emissions, as well as a likelihood that the Scope 1 and 2 disclosure requirements directly advance those interests and are no more extensive than necessary.

### 3. SB 253's Scope 3 Disclosure Requirement Does Not Regulate Commercial Speech

The analysis differs with respect to Scope 3 disclosures. Unlike Scope 1 emissions, which arise from sources the reporting company itself owns or controls, and Scope 2 emissions, which arise from energy the reporting company purchases and consumes in its operations, the Scope 3 provision compels the disclosure of upstream and

downstream emissions arising from sources the reporting entity "does not own or directly control." Cal. Health & Safety Code § 38532(b)(5). At bottom, the Scope 3 disclosure compels companies to collect, synthesize, and report information about the conduct of independent actors across complex commercial networks, including suppliers, customers, distributors, and other third parties throughout the value chain. *Id.* Because Scope 3 disclosures concern diffuse third-party conduct in the value chain, they are insufficiently tethered to the reporting entity's own operations and capital transactions to qualify as commercial speech. *See NIFLA*, 585 U.S. at 768–69; *CTIA*, 928 F.3d at 845; *Stolfi*, 153 F.4th at 821–22.

### 4. SB 253's Scope 3 Disclosure Requirement Fails Strict Scrutiny

Because Scope 3 disclosures are not commercial speech, they are subject to strict scrutiny, which they likely fail to satisfy. "Strict scrutiny 'is a demanding standard.'" *X Corp.*, 116 F.4th at 903 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011)). The government must prove that the challenged restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). The state must also "specifically identify an actual problem in need of solving," and show that "the curtailment of free speech [is] actually necessary to the solution." *Brown*, 564 U.S. at 799 (citations omitted). And "[i]f a less restrictive alternative would serve the government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

Because the State has failed to show that its concerns about misleading speech are substantial, it cannot satisfy the higher threshold of demonstrating that such an interest is compelling. And even assuming that mitigating information asymmetries and reducing emissions are compelling governmental interests, the State has not shown that the Scope 3 disclosure requirement is narrowly tailored to achieve either interest.

The State's interest in mitigating information asymmetries rests on two premises: that companies possess information unavailable to investors and that investors need that information to make informed investment decisions. *See supra* Section I.A.2. Neither premise holds for Scope 3 emissions.

As for the first premise, reporting companies do not possess Scope 3 emissions data in the way they possess Scope 1 and Scope 2 data. The information needed to calculate Scope 1 and 2 emissions is generally available within a company's existing business records. Scope 3 emissions data, however, originates with third parties that the reporting company neither owns nor controls. *See* Cal. Health & Safety Code § 38532(b)(5). SB 253 therefore permits companies to satisfy their Scope 3 reporting obligations by either collecting data directly from suppliers, contractors, and other value-chain participants, or by relying on estimates derived from secondary sources, including industry averages and proxy data. *Id.* § 38532(c)(2)(A)(ii).

Neither option provides the accuracy necessary to justify mandatory disclosure over less burdensome alternatives, such as voluntary reporting or state-generated estimates. A company must either collect emissions data from third parties across its value chain—data that, as discussed, may

be difficult to verify and prone to error—or rely on the same estimates that the State contends are inadequate for Scope 1 and 2 emissions. And nothing in the record indicates that estimates derived from industry averages or proxy data differ materially from, or are more reliable than, estimates the State or the public could independently generate.

As for the state's second premise—investors' need for the information—the link between Scope 3 emissions and informed investment decisions is too attenuated to satisfy strict scrutiny. The State's investor-interest argument for Scope 1 and 2 emissions rests on the fact that those emissions arise directly from a company's own operations and thus reflect its risk profile, regulatory exposure, and operational efficiency. Scope 1 and 2 emissions therefore bear directly on capital transactions. *See supra* Sections I.A.1, I.A.2. But Scope 3 emissions are different because they are generated by independent third parties. Although those emissions are "embedded in the firm's value chain" and may distantly affect a firm's value, their connection to the reporting company's specific risk exposure or profitability is too remote to make them pertinent to actual or potential investors. The Scope 3 disclosure requirement is therefore not narrowly tailored to the State's asserted interest in mitigating information asymmetries. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1202–04 (9th Cir. 2009) (explaining that narrow tailoring requires evidence of "some nexus" between the regulated communications and the asserted harm).

The State's interest in reducing emissions fares no better with respect to Scope 3 disclosures. Every study in the record linking mandatory disclosure to emissions reductions concerns Scope 1 or Scope 2 reporting; none examines mandatory Scope 3 reporting. That leaves only the

emissions-reduction trends observed in voluntary reporting programs, which did involve Scope 3 emissions. But those programs cannot cure the State's evidentiary gap. Companies that voluntarily report emissions are self-selected; they are likely already predisposed, to some extent, to reducing their environmental impact. Inferring that companies compelled to report—including those that declined to do so voluntarily—would respond in the same way requires an inferential leap that the record does not support. The State has thus failed to show that Scope 3 disclosures are "actually necessary" to reduce emissions. *Brown*, 564 U.S. at 799; *see also IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1126 (9th Cir. 2020).

Because SB 253's Scope 3 disclosure provisions are likely unconstitutional, we remand to the district court to determine, in the first instance, whether those provisions are severable. *See X Corp.*, 116 F.4th at 904.

**B. SB 261**

The SB 261 disclosure requirement does not regulate commercial speech and fails strict scrutiny.

**1. SB 261 Does Not Regulate Commercial Speech**

SB 261 compels noncommercial speech by requiring covered entities to disclose, among other information, subjective ideological assessments. Specifically, under the TCFD framework incorporated into SB 261, *see* Cal. Health & Safety Code § 38533(b)(1)(A)(i), the statute requires covered companies to:

- Identify and assess various climate-related risks, including those related to "the

*transition* to a lower-carbon economy" (policy, legal, technology, market, reputational) and those related to "the *physical* impacts of climate change" (event-driven and long-term climate patterns).

- Identify and assess climate-related opportunities, such as resource efficiency gains, cost savings, low-emission energy adoption, new products and services, market expansion, and supply chain resilience.
- Disclose governance structures for climate-related risks and opportunities, including by describing, for example, board oversight and management's role in assessing and managing climate-related risks and opportunities.
- Explain processes for identifying, assessing, and managing climate-related risks.
- Disclose material impacts of climate-related risks and opportunities on business, strategy, and financial planning, including under different climate scenarios.
- Report metrics and targets used to evaluate climate-related risks and opportunities, including effects on capital

> allocation, research and development, and compensation policies.

Covered companies must post this and other information on their own websites. *Id.* § 38533(c)(1).

SB 261 requires companies to opine on whether climate change poses financial risks to their operations and business model, thereby making predictive judgments about uncertain future conditions. Companies must also analyze and disclose whether mitigating those risks is worth the cost, requiring them to make normative assessments about competing priorities and values. Like the law in *X Corp.*, SB 261 "would require [a covered entity] to convey the company's policy views on intensely debated and politically fraught topics"—here, how businesses should adapt to climate change. 116 F.4th at 901–02.

In practical effect, SB 261 requires companies to answer a speculative and contested policy question: "How should climate change shape the company's future operations and economic planning?" The required disclosures thus compel covered companies to express normative, and inherently subjective, judgments about the significance of climate change, its long-term consequences for their businesses, and the extent to which it should influence their operations and strategy. *See Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (holding that speech mandated by a statute requiring "vendors to undertake contextual analyses, weighing and balancing many factors . . . that depend on community standards" was noncommercial).

SB 261 further requires companies to address climate-related risks in accordance with State-prescribed language. Under the TCFD framework incorporated into the bill, the

State dictates the parameters of the discussion; covered entities must opine on whether their business models will be affected by, for example, rising sea levels or increased litigation risk due to the failure to adapt to climate change. This requires covered companies to publish speculative, value-based judgments about future legislation, litigation, and reputational harm, among other things, in a state-prescribed framework.

That SB 261 leaves companies free to disagree with the State's views on climate change, such as by saying that they do not face any climate risks because, for example, they do not believe in climate change, "is immaterial or at least non-dispositive as to the *nature* of the speech being conveyed, which is fundamentally non-commercial." *X Corp.*, 116 F.4th at 901 n.9. The compelled disclosures require companies to go beyond providing economic information tethered to any commercial transaction. Instead, companies must share value-laden judgments on a politically fraught subject, and thus the disclosures fall outside the commercial speech doctrine.[7]

**2. SB 261 Fails Strict Scrutiny**

The State asserts the same interests for SB 261 as it does for SB 253—mitigating information asymmetries for

[7] To be sure, it is not the mere presence of judgment or opinion that renders speech noncommercial outright. Rather, the problem is that the compelled speech requires companies to make and disclose normative assessments and opine on a politically fraught subject. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988) (explaining that heightened scrutiny depends not on whether speech contains opinion, but on whether it conveys ideological messages). By requiring companies to evaluate and publicly disclose the significance of climate change for their business models and future operations, SB 261 crosses that line.

investors, reducing emissions, and correcting misleading speech. Even assuming overcoming information asymmetries and reducing emissions are compelling state interests, SB 261 fails on tailoring grounds.

The State could have employed less restrictive means to accomplish its goals, such as by disseminating existing voluntary climate-related financial risk disclosures to the public or incentivizing voluntary disclosure by companies. Accordingly, SB 261 is not sufficiently narrowly tailored to achieve any stated interest in overcoming information asymmetries.

The State also fails to show that SB 261 will reduce emissions. The studies on which the State relies do not demonstrate that disclosure of climate-related financial risks is likely to affect future emissions, much less reduce them. Three of these studies do not analyze climate-related risk reporting at all, and while one study did, it concerned only voluntary disclosures that are not sufficiently similar to those required under SB 261. *See supra* Section I.A.2.

The State also could have pursued its emissions-reduction objective through less restrictive means, such as by directly regulating emissions or incentivizing companies to reduce emissions on their own. SB 261 therefore fails strict scrutiny review because it is not narrowly tailored.

## II. The Remaining *Winter* Factors Favor Preliminary Relief as to SB 261 and SB 253's Scope 3 Disclosure Requirement, but Not as to SB 253's Scope 1 and 2 Disclosure Requirements

The irreparable-harm factor favors preliminary relief as to SB 261 and SB 253's Scope 3 disclosure requirement. Because the Chambers have shown that SB 261 likely

violates the First Amendment, they will suffer irreparable injury absent an injunction. *See Am. Beverage Ass'n v. San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc). "It is axiomatic that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (en banc) (quoting *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020)).

The same is true of SB 253's Scope 3 disclosure requirement. Because that requirement likely violates the First Amendment—and because, absent severance, the defect would exist in "every application" of SB 253—the Chambers have shown that enforcement of the statute as written would cause irreparable injury. *X Corp.*, 116 F.4th at 899, 904.

By contrast, the Chambers have not established irreparable harm arising from SB 253's Scope 1 and 2 disclosure requirements. Because they have not shown that they are likely to succeed on their First Amendment challenge as to those requirements, they cannot establish irreparable harm on that basis. *See CTIA*, 928 F.3d at 851 (concluding challengers failed to show irreparable harm where the law complied with the First Amendment). Nor have the Chambers identified any other nonspeculative injury warranting preliminary relief. *See Am. Hosp. Ass'n. v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (holding "injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm"); *Council for Resp. Nutrition v. James*, 159 F.4th 155, 171–72 (2d Cir. 2025) (recognizing ordinary compliance costs are typically insufficient to constitute irreparable injury); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674

(9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").

The remaining *Winter* factors—balance of hardships and public interest—likewise favor granting preliminary relief as to SB 261 and SB 253's Scope 3 requirement. When the government is a party, these factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The Chambers' showing of serious First Amendment concerns "compels a finding that . . . the balance of hardships tips sharply in [their] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002)). And although duly enacted laws generally reflect the public interest, *see Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009), "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano*, 303 F.3d at 974).

The equities point in the opposite direction as to SB 253's Scope 1 and 2 disclosure requirements. Enjoining those provisions would delay the State's efforts to advance the public interests underlying them. *See CTIA*, 928 F.3d at 852 (explaining that an injunction "would injure the public interest in having a free flow of accurate information"); *Stormans*, 586 F.3d at 1140 (recognizing enforcement of the law is in the public's interest). Accordingly, the balance of hardships and the public interest favor the State as to those provisions.

## CONCLUSION

We affirm the district court's denial of a preliminary injunction as to SB 253's Scope 1 and 2 disclosures. We

reverse the denial of a preliminary injunction as to SB 261, and as to SB 253's Scope 3 disclosures. SB 253 includes a severability clause, *see* Cal. Health & Safety Code § 38532(i), and we remand for the district court to decide in the first instance whether the Scope 3 disclosures are severable. *See, e.g.*, *X Corp.*, 116 F.4th at 904.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

---

BENNETT, Circuit Judge, concurring in the judgment in part and dissenting in part:

This case is about "the inalienable right of every" person to decide "how best to speak." *See Chiles v. Salazar*, 607 U.S. 627, 640 (2026) (simplified). We are asked to decide whether that right receives lesser protection in the context of compelled environmental disclosures. *See United States v. Edler Indus., Inc.*, 579 F.2d 516, 520 (9th Cir. 1978). Now as fifty years ago, the question is "highly unsettled." *See id.*

The majority holds that California may compel companies to disclose emissions data—subject to intermediate scrutiny—because that information might inform capital transactions. Majority Op. at 15–24. After finding that California's emissions disclosures compel commercial speech, *id.* at 24, the majority concludes that such disclosures likely pass intermediate scrutiny because they directly advance the State's "substantial interests in mitigating information asymmetries for investors and reducing emissions," *id.* at 32. In that way, the majority continues, "emissions disclosures function like product warnings in capital markets: higher emissions may signal a

greater risk of diminished returns" to market participants. *Id.* at 17. The result is that, at least in some circumstances, government may compel companies to disclose facts about themselves simply because information asymmetries exist in markets, subject only to lesser First Amendment scrutiny.

Because the majority opinion can be read as equating investors' interest in companies with consumers' interest in products, there may be "no end to the information that states" can now "require [companies] to disclose." *See Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996). For instance,

> [s]ome consumers might want to know whether their U.S.-made product was made by U.S. citizens and not by illegal immigrants. Some consumers might want to know whether a doctor has ever performed an abortion. Some consumers might want to know the political affiliation of a business's owners. These are not far-fetched hypotheticals, particularly at the state or local level. Do such consumer desires suffice to justify compelled commercial disclosures of such information on a product or in an advertisement? I think not, and history and tradition provide no support for that kind of free-wheeling government power to mandate compelled commercial disclosures.

*See Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 32 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring in the judgment). Like emissions data, such information is ordinarily unavailable to investors. But the majority writes

that because emissions data "bear directly on a business's ability to raise capital and its overall profitability," "emissions disclosures function like product warnings in capital markets: higher emissions may signal a greater risk of diminished returns." Majority Op. at 17. The majority therefore concludes "that [emissions] disclosures communicate the terms of an actual or potential transaction." *Id.* (internal quotation marks omitted). Analogizing from there, one could argue as follows: "In the face of increased immigration enforcement, higher numbers of undocumented immigrant employees may signal a greater risk of diminished returns due to potential employee turnover. By compelling the disclosure of such information, government can correct information asymmetries concerning a company's ability to raise capital and its overall profitability." I see both the majority's statement and my hypothetical as too far removed from disclosures that communicate the terms of an actual or potential commercial transaction.

Beyond this, I believe the majority opinion may open the door to compelled disclosures targeting individuals. Information asymmetries exist in a variety of markets in which individuals transact, including the market for employment. Workers' speech in that market, we have held, constitutes commercial speech. *See Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818–19 (9th Cir. 2013). Under the majority opinion, then, can government compel individuals to publicly disclose information relevant to their employment—such as prior income, work attendance records, and reasons for past leave—subject only to lesser First Amendment scrutiny? Compelled disclosure of such information would certainly "mitigat[e] information asymmetries" in the employment market. *See* Majority Op.

at 29. I do not believe the response can be that the First Amendment protects individuals and corporations differently with respect to compelled disclosures; "it should never be forgotten that corporations are formed by humans to assist them in realizing their goals and potential." Martin H. Redish, *Compelled Commercial Speech and the First Amendment*, 94 Notre Dame L. Rev. 1749, 1764 (2019).

In my view, these hypotheticals demonstrate that the majority strays too far from the "usual[] defin[ition]" of commercial speech "as speech that does no more than propose a commercial transaction." *See United States v. United Foods*, 533 U.S. 405, 409 (2001). I believe that both SB 253 and SB 261 compel noncommercial speech. I would therefore apply strict scrutiny to both laws. And because California "all but concedes it cannot satisfy" that standard at this preliminary juncture, Majority Op. at 8, it appears likely to me that both laws' "unconstitutional applications substantially outweigh [the] constitutional ones," *see Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024). Thus, I would reverse and remand with instructions to preliminarily enjoin both SB 253 and SB 261. Because the majority does so only as to SB 261, I respectfully concur in the judgment in part and dissent in part.

## I.

In response to climate change, California recently enacted two laws that compel companies to disclose emissions and climate-related information: SB 253 and SB 261.[1] California asserts that it did so to (1) mitigate information asymmetries in capital markets; (2) reduce

[1] I carry over defined terms from the majority opinion but refer to the Chambers as "Plaintiffs" throughout.

emissions; and (3) prevent misleading speech by corporations about their impact on climate change ("greenwashing").

**A**

SB 253 directs CARB to adopt regulations requiring a covered entity to annually disclose emissions data to CARB. *See* Cal. Health & Safety Code § 38532(c).[2] The required public disclosures include "all of the reporting entity's scope 1 emissions, scope 2 emissions, and scope 3 emissions," *id.* § 38532(c)(1), measured and reported "in conformance with the [GHG protocol] standards and guidance," *id.* § 38532(c)(2)(A)(ii). Scope 1 emissions are "all direct greenhouse gas emissions that stem from sources that a reporting entity owns or directly controls, regardless of location." *Id.* § 38532(b)(3). Scope 2 emissions are "indirect greenhouse gas emissions from consumed electricity, steam, heating, or cooling purchased or acquired by a reporting entity, regardless of location." *Id.* § 38532(b)(4). Scope 3 emissions are "indirect upstream and downstream greenhouse gas emissions, other than scope 2 emissions, from sources that the reporting entity does not own or directly control." *Id.* § 38532(b)(5). In addition to reporting these emissions, a covered entity must also "obtain an assurance engagement performed by an independent third-party assurance provider," *id.*

[2] Under SB 253, CARB "may contract with an emissions reporting organization to develop a reporting program to receive and make publicly available [the] disclosures." Cal. Health & Safety Code § 38532(c)(3). "[I]f contracted for services," CARB can delegate certain responsibilities to the "emissions reporting organization." *See, e.g.*, *id.* § 38532(c)(1)(A). Because this delegation ability is not germane to the issues presented here, I refer throughout only to CARB.

§ 38532(c)(1), and provide "a copy of the complete assurance provider's report" to CARB, *id.* § 38532(c)(2)(F)(i).

SB 253 also dictates that disclosures "maximize[] access for consumers, investors, and other stakeholders to comprehensive and detailed greenhouse gas emissions data," and be "made in a manner that is easily understandable and accessible." *Id.* § 38532(c)(2)(B). Disclosures must "include[] the name of the reporting entity and any" aliases and logos "used by the reporting entity." *Id.* § 38532(c)(2)(C). Reporting must be "structured in a way that minimizes duplication of effort." *Id.* § 38532(c)(2)(D)(i). Further, disclosures must "take[] into account acquisitions, divestments, mergers, and other structural changes that can affect the greenhouse gas emissions reporting." *Id.* § 38532(c)(2)(E). Reports must be "posted publicly" by CARB on a purpose-built "digital platform" or on CARB's "internet website." *Id.* § 38532(d)(2)(A)–(B); *see also id.* § 38532(e)(1)(A) (requiring the creation of "a digital platform . . . accessible to the public, that will feature the emissions data of reporting entities").

SB 253 directs CARB to "adopt regulations that authorize it to seek administrative penalties for nonfiling, late filing, or other failure to meet the [law's] requirements." *Id.* § 38532(f)(2)(A). For each reporting entity, SB 253 authorizes administrative penalties up to $500,000 "in a reporting year." *Id.* SB 253 also requires reporting entities to pay annual fees to CARB in amounts "sufficient to cover [CARB's] full costs of administering and implementing [SB 253]." *Id.* § 38532(c)(2)(G)(i)–(ii).

## B

SB 261, on the other hand, requires a covered entity to biennially "prepare a climate-related financial risk report." Cal. Health & Safety Code § 38533(b)(1)(A). To comply, the report must disclose the company's "climate-related financial risk," defined to mean "material risk of harm to immediate and long-term financial outcomes due to physical and transition risks," "in accordance with the [TCFD Framework]." *Id.* § 38533(a)(2), (b)(1)(A)(i). The report also must state the company's "measures adopted to reduce and adapt to climate-related financial risk." *Id.* § 38533(b)(1)(A)(ii). According to California's expert, if the company does not evaluate climate-related financial risk, has not adopted relevant measures, or both, the company may state that and disclose any relevant plans to do so. Once completed, the company must "make available to the public, on its own internet website, a copy of the report." *Id.* § 38533(c)(1).

By incorporating the TCFD Framework, SB 261 compels covered entities to disclose relevant information about its governance, strategy, risk management, and internal metrics and targets. To highlight just a few disclosures, a covered company must assess and describe various "climate-related risks," detail its governance structures for addressing "climate-related risks and opportunities," disclose "strategic plans" responsive "to a range of plausible future states," and reveal internal metrics and targets used to assess and manage climate risks and opportunities. The TCFD Framework requires that these disclosures be "specific and complete," "clear, balanced, and understandable," "consistent over time," and "reliable, verifiable, and objective," among other requirements.

Like SB 253, SB 261 directs CARB to "adopt regulations that authorize it to seek administrative penalties from a covered entity that fails to" publish the required report on its website, "or publishes an inadequate or insufficient report." *Id.* § 38533(f)(2). And to fund CARB's "full costs of administering and implementing [SB 261]," *id.* § 38533(c)(2)(B)(i), covered entities must annually "pay a fee to [CARB]," *id.* § 38533(c)(2)(A).

### C

Plaintiffs sued, alleging that SB 253 and SB 261 facially violate the First Amendment. The district court denied Plaintiffs' motion for a preliminary injunction. Finding that both laws compel commercial speech, the district court determined that SB 253's disclosures reasonably relate to providing reliable information to investors and reducing emissions, both of which the district court found to be substantial state interests. The district court also concluded that SB 261 directly advances California's interest in providing investors with information needed "to make informed judgments about the impact of climate-related risks on their economic choices," but not its interest in reducing emissions. As to both laws, the district court rejected California's asserted interest in preventing greenwashing, finding that interest unsupported. This appeal followed.

## II.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 766 (2018). "The First Amendment 'envisions the United States as a rich and complex place' where all enjoy the 'freedom to think as you

will and to speak as you think.'" *Chiles*, 607 U.S. at 640 (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023)). To bring that vision to life, "the First Amendment protects the inalienable right of every individual to decide for himself 'how best to speak.'" *Id.* (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 791 (1988)).

Arguing that California has compelled noncommercial speech, Plaintiffs claim that SB 253 and SB 261 abridge speech freedoms in facial violation of the First Amendment. California responds that it has constitutionally compelled only *commercial* speech. We must therefore mark the boundaries of commercial speech, determine whether the speech compelled by SB 253 and SB 261 falls inside or outside those boundaries, and then apply the appropriate standard of First Amendment scrutiny. I begin by recounting some relevant history.

**A**

In *Valentine v. Chrestensen*, 316 U.S. 54 (1942), the Supreme Court held that "the Constitution imposes no . . . restraint on government as respects purely commercial advertising." *Id.* at 54. That holding "summarily severed speech in the commercial realm from other forms of traditionally protected communication." Martin H. Redish, *The First Amendment in the Marketplace: Commercial Speech and the Values of Free Expression* ("*1A in the Marketplace*"), 39 Geo. Wash. L. Rev. 429, 430 (1971). Following *Valentine*, "purely commercial advertising received no First Amendment protection." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64 n.6 (1983).

*Valentine* came under scrutiny because, as one scholar expressed it, "no adequate justification exists for omitting

certain types of commercial speech [entirely] from the scope of the [F]irst [A]mendment." Redish, *1A in the Marketplace*, *supra*, at 431. Moreover, as Professor Redish and others viewed it, *Valentine* had effectively reduced "the judiciary's role" in many cases "to the often perplexing problem of determining what speech is 'commercial.'" *Id.* at 432. And in solving that problem, he explained, "all too often the courts, beginning with the assumption that commercial speech is unprotected," ended up "improperly includ[ing] under that heading"—and thus denying First Amendment protection to—"traditionally protected expression." *Id.*

In 1976, the Supreme Court overruled *Valentine*. The Court held that the First Amendment protects even "speech which does no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (simplified). The Court explained that the interests of all speech participants supported this result. Though "the advertiser's interest" in speaking may be "a purely economic one," that "hardly disqualifies" the resulting speech "from protection under the First Amendment." *Id.* Likewise, in listening to commercial speech, consumers' "interest in the free flow of commercial information" could equal or even exceed their "interest in the day's most urgent political debate." *Id.* at 763. And "society also may have a strong interest in the free flow of commercial information." *Id.* at 764.

The Court further explained that "commercial advertising" disseminates "information as to who is producing and selling what product, for what reason, and at what price." *Id.* at 765. Addressing the ends served by such speech in our "predominantly free enterprise economy," the Court reasoned that the free flow of information furthers the societal goal of efficient resource allocation not just by

informing private economic decisionmaking, but also by informing both regulation and alteration of the system. *See id.* The Court thus concluded that, "even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy," "the free flow of information" in commercial advertising serves (or at least does not conflict with) the societal goal of efficient resource allocation in a free market economy. *Id.*

In affording First Amendment protection to commercial speech, however, the Court made clear that "[s]ome forms of commercial speech regulation are surely permissible." *Id.* at 770. In other words, the Court did "not discard[] the commonsense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978) (simplified). The Court has since explained that, for communications "neither misleading nor related to unlawful activity," a restriction on commercial speech "must directly advance the [substantial] state interest involved" and be "in proportion to that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980). The Court has also held that a State may require commercial speakers to include in their "advertising purely factual and uncontroversial information about the terms under which [their] services will be available," so long as the "disclosure requirement[] [is] reasonably related to the State's interest in preventing deception of consumers." *Zauderer v. Off. of Disc. Couns.*, 471 U.S. 626, 651 (1985).

Today, courts by and large agree that "[l]aws regulating commercial speech are generally subject to a lesser standard [of review] than strict scrutiny." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024). "The contours" of

commercial speech remain "highly unsettled," however. *See Edler Indus.*, 579 F.2d at 520. Classification has been relatively straightforward when the speech at issue "fall[s] within the core notion of commercial speech—'speech which does no more than propose a commercial transaction.'" *Bolger*, 463 U.S. at 66 (quoting *Va. State Bd. of Pharm.*, 425 U.S. at 762). But classification has "present[ed] a closer question" in cases involving speech that "cannot be characterized merely as proposals to engage in commercial transactions." *Id.* In those cases, we have tried "to give effect to a 'common-sense distinction' between commercial speech and other varieties of speech." *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (quoting *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021)). This analysis, we have recognized, "is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Id.* (quoting *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017)).

In applying this fact-driven standard to close cases, we have to some extent come to embrace within the category of commercial speech more speech than just that which merely proposes a commercial transaction. *See id.* at 901. Our precedents teach that commercial speech "communicates the terms of an actual or potential transaction," *id.*, or "provide[s] parties to actual or potential commercial transactions with information about those transactions," *Pharma. Rsch. & Manufs. of Am. v. Stolfi*, 153 F.4th 795, 821 (9th Cir. 2025) (simplified), *petition for cert. filed*, No. 25-1018 (U.S. Feb. 24, 2026). As a limiting principle that distinguishes commercial speech from other forms of speech, we have "highlight[ed] the close tether between" commercial speech and commercial transactions. *Id.* at 822

n.18. Speech "that is incidental to a commercial transaction," we have explained, "is not far removed from the 'core' of commercial speech, *i.e.*, speech that 'propose[s] a commercial transaction.'" *Id.* (alteration in original) (quoting *United Foods*, 533 U.S. at 409).

**B**

The law of compelled speech is likewise "hard to pin down." *See* Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355, 356 (2018). But for the most part, the applicable compelled-speech principles can be identified.

Here, the challenged laws compel the disclosure of information (and more) on the State's terms. The Supreme "Court has held that the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).[3] The Court has also held that "compelled statements of fact . . . burden[] protected speech." *Riley*, 487 U.S. at 797–98 (simplified); *accord Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (agreeing that "compelled statements of fact . . . , like compelled statements of opinion, are subject to First Amendment scrutiny"). "The First Amendment's guarantee of freedom of speech," moreover, "makes no distinction of 'constitutional significance' 'between compelled speech and compelled silence.'" *X Corp.*, 116 F.4th at 900 (quoting

---

[3] *But see Uber Techs., Inc. v. City of Seattle*, 168 F.4th 1202, 1214 (9th Cir. 2026), *amended by* 2026 WL 3255510 (9th Cir. Oct. 29, 2026). In my dissent, I reasoned that the *Uber* majority opinion contravenes this line of Supreme Court precedent. *See id.* at 1222–24 (Bennett, J., dissenting in part), *amended by* 2026 WL 3255510, at *10–11.

*Riley*, 487 U.S. at 796–97). The First Amendment thus unquestionably applies to SB 253 and SB 261.

"When enforcing" the First Amendment, courts must "distinguish between content-based and content-neutral regulations of speech." *NIFLA*, 585 U.S. at 766. "Content-based regulations 'target speech based on its communicative content.'" *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). And in general, content-based regulations are subject to strict scrutiny; they "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

Laws that "compel[] individuals to speak a particular message" necessarily "alter[] the content of their speech." *NIFLA*, 585 U.S. at 766 (simplified) (quoting *Riley*, 487 U.S. at 795). In my view, the same is true of laws that compel companies to state particular facts. *See id.*; *accord X Corp.*, 116 F.4th at 902 ("Even a pure 'transparency' measure, if it compels non-commercial speech, is subject to strict scrutiny."). The most basic example illustrates the point. When a company would otherwise have remained silent, a compulsion to state facts alters the content of that company's speech by involuntarily transforming silence into speech.[4] And "compelled statements of opinion" "cannot be distinguished" from "compelled statements of 'fact'"

[4] *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47 (2006), does not suggest otherwise. There, the challenged statute compelled law schools to "send e-mails and post notices" about U.S. Army recruiting events. *Id.* at 61. But that speech was "plainly incidental to the [statute's] regulation of conduct": requiring law schools to allow U.S. Army recruiters on campus. *Id.* at 51, 61–62. And as discussed below, government may regulate conduct, even when that conduct incidentally involves speech.

because "either form of compulsion burdens protected speech." *Riley*, 487 U.S. at 797–98. I concede that compelled statements of opinion possess greater potential to impress government ideology upon citizens than compelled statements of fact. *See Rumsfeld*, 547 U.S. at 61–62 (discussing *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 642 (1943), and *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)). But a factual speech compulsion nonetheless alters the content of speakers' speech, thereby reversing the "presum[ption] that speakers, not the government, know best both what they want to say and how to say it." *See Riley*, 487 U.S. at 791. Because compulsions to state facts "target speech based on its communicative content," *see Reed*, 576 U.S. at 163, such compulsions are in my view "[c]ontent-based," *see NIFLA*, 585 U.S. at 766. And the Supreme Court has clarified that, in general, a content-based regulation "may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests."[5] *Id.*

---

[5] Another possible standard of review is exacting scrutiny, "a less demanding test than" strict scrutiny. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 894 (2018); *Riley*, 487 U.S. at 798 (holding that the content-based regulation at issue "is subject to exacting First Amendment scrutiny"); *see also Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (opinion of Roberts, C.J.) (reasoning that exacting scrutiny applies "to First Amendment challenges to compelled disclosure" in the free-association context); *Chiles*, 607 U.S. at 657–659 (Kagan, J., concurring) (noting the possibility that a less demanding standard than strict scrutiny might apply to some content-based but viewpoint-neutral laws). Under exacting scrutiny, the challenged law "must serve a compelling state interest that cannot be achieved through means significantly less restrictive of [First Amendment] freedoms." *See Janus*, 585 U.S. at 894 (simplified). But because the parties do not specifically dispute whether

This rule allows for few exceptions because government may not "impose content-based restrictions on speech without persuasive evidence of a long (if heretofore unrecognized) tradition to that effect." *Id.* at 767 (simplified). Recognized exceptions cover laws "addressing fraud, defamation, and 'fighting words'"; such laws generally do not "trigger heightened scrutiny because of their long historical pedigree." *Chiles*, 607 U.S. at 643. Courts also have generally come to accept that commercial speech "may be regulated in ways that might be impermissible in the realm of noncommercial expression." *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 n.5 (1985) (plurality opinion). Further, states may regulate conduct, even when that conduct incidentally involves speech. *Rumsfeld*, 547 U.S. at 62; *accord NIFLA*, 585 U.S. at 769 ("The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." (simplified)). Outside these established categories, however, the Supreme "Court has been reluctant to mark off new categories of speech for diminished constitutional protection." *NIFLA*, 585 U.S. at 767 (simplified). In adjudicating the constitutionality of "content-based" laws, the Court has proceeded "narrow[ly]," with a focus on a specific speech regulation's "history and tradition." *See Vidal v. Elster*, 602 U.S. 286, 301, 310 (2024).

Heeding the Court's "especial reluctance" to diminish constitutional protections applicable to content-based

---

exacting or strict scrutiny applies to compelled noncommercial speech, and because I do not believe that application of exacting scrutiny (in lieu of strict scrutiny) would materially change the result here, I assume that strict scrutiny applies to SB 253 and SB 261 unless an exception applies.

regulations, *Chiles*, 607 U.S. at 650 (simplified) (quoting *NIFLA*, 585 U.S. at 767), I believe we should proceed with caution here. We must chart new waters because, under existing precedent, it is unclear whether an exception to strict scrutiny exists "for pure compulsions to state facts to the government," or "for pure compulsions to state facts to third parties." Volokh, *supra*, at 379. But the Supreme Court *has* emphasized that newly demonstrating "a long tradition of permissible content regulation . . . comes with a daunting burden." *Chiles*, 607 U.S. at 650. Government can meet that burden only by submitting "persuasive evidence of a long (if heretofore unrecognized) tradition," *NIFLA*, 585 U.S. at 767 (simplified), of pure compulsions to state facts to the government or to third parties. But California has not attempted to meet that burden. Instead, California asks us to expand the definition of commercial speech to include firm-level factual disclosures that some investors may use to inform private economic decisions in capital markets.

## III.

Against this backdrop, I conclude that *both* SB 253 and SB 261 compel noncommercial speech. Thus, I would subject both laws to strict scrutiny.[6] From there, I would find that Plaintiffs are likely to succeed on the merits of their facial challenges to both laws.

To repeat, "SB 253 compels reporting entities to disclose numerical emissions data" calculated per the GHG protocol "to a government entity." Majority Op. at 16. The compelled disclosures cover Scope 1 "emissions from sources that a covered company owns or directly controls,"

---

[6] As discussed, I would also consider applying exacting scrutiny. But neither Plaintiffs nor the State asks us to apply that standard.

Scope 2 "emissions from purchased energy consumed in the company's operations," and Scope 3 emissions arising from upstream and downstream entities. *Id.* at 14, 34. Companies must report this information to CARB for publication by the State. Cal. Health & Safety Code § 38532(d)(2)(A)–(B).

Under SB 261, a covered company must disclose its "climate-related financial risk" by revealing its governance, strategy, risk management, and internal metrics and targets relating to climate change. *Id.* § 38533(a)(2), (b)(1)(A)(i)–(ii). By requiring these disclosures, SB 261 compels covered companies to "mak[e] predictive judgments about uncertain future conditions," express "normative assessments about competing priorities and values," and "address climate-related risks in accordance with State-prescribed language." Majority Op. at 38–39. SB 261 thus goes further than SB 253 by "requir[ing] companies to make and disclose normative assessments and opine on a politically fraught subject"—climate change. *Id.* at 39 n.7. All this information, moreover, must be posted on companies' websites. *See* Cal. Health & Safety Code § 38533(c)(1).

**A**

In summary, both SB 253 and SB 261 compel covered companies to disclose information about themselves that California views as relevant to climate change. So this question is paramount: Does the speech compelled by SB 253 and SB 261 "communicate[] the terms of an actual or potential transaction," *X Corp.*, 116 F.4th at 901, or "provide[] parties to 'actual or potential' commercial transactions with information about those transactions," *Stolfi*, 153 F.4th at 821 (quoting *X Corp.*, 116 F.4th at 901)? The majority and I reach different conclusions.

I start with the "general rule." *X Corp.*, 116 F.4th at 901. Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United Foods*, 533 U.S. at 409. And exceptions to this general rule "are limited." *X Corp.*, 116 F.4th at 901. That is, we must not define commercial speech "too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed." *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 961 (9th Cir. 2012) (quoting *Cent. Hudson*, 447 U.S. at 579 (Stevens, J., concurring)).

In close cases, we look to the "so-called *Bolger* factors" as "important" but "not necessarily dispositive" guideposts for distinguishing commercial speech from noncommercial speech. *X Corp.*, 116 F.4th at 900. Applying these factors, "'strong' support that the speech should be characterized as commercial speech is found whe[n] [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." *Id.* (alterations in original) (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011)). These factors work toward the same goal: identifying a "close tether between the speech compelled" and commercial transactions. *See Stolfi*, 153 F.4th at 822 n.18.

**1**

That close tether exists when speech "does no more than propose a commercial transaction." *See United Foods*, 533 U.S. at 409. Such speech *itself* carries out or attempts to carry out a commercial transaction. Consider for example the compelled speech law challenged in *Uber Technologies*, 168 F.4th at 1215, *amended by* 2026 WL 3255510, at *4–*5. There, gig platform companies sought to enjoin a Seattle ordinance compelling such companies to draft and publish a

written deactivation policy. *Id.* at 1222 (Bennett, J., dissenting in part), *amended by* 2026 WL 3255510, at *10. No judge on the panel doubted that, if the ordinance regulated speech, the speech at issue was commercial speech. *See id.* at 1215 (majority opinion), *amended by* 2026 WL 3255510, at *4–*5; *accord id.* at 1221, 1224 (Bennett, J., dissenting in part), *amended by* 2026 WL 3255510, at *10–*11. We agreed that our "commercial speech" precedents cover the "speech at issue": communications sent "by Uber or Instacart to temporary app-based workers" about "proposed terms of engagement." *See id.* at 1215 (majority opinion), *amended by* 2026 WL 3255510, at *4.

We reached a similar result in *Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224 (9th Cir. 2023). There, plaintiffs challenged a Nevada law "requir[ing] debt collectors to provide written notification to debtors 60 days before taking any action to collect a medical debt." *Id.* at 1229. We found that the law compelled commercial speech. *See id.* at 1232. "When debt collection agencies communicate with a debtor in an attempt to collect medical debt," we reasoned, "the communication proposes a commercial transaction in which the debtor would pay, in whole or in part, a past-due medical debt." *Id.* Such speech might not propose a new commercial transaction, but it undoubtedly executes the existing debt transaction. *See id.* So debt-collection efforts communicate the violated "terms of an actual" transaction. *See X Corp.*, 116 F.4th at 901. The notice at issue therefore fit within the usual definition of commercial speech. *See Aargon Agency*, 70 F.4th at 1232.

**2**

Classification becomes more difficult outside the "usual[] definit[ion]" of commercial speech, *see id.* (quoting

*United Foods*, 533 U.S. at 409), for example, with speech "provid[ing] parties to actual or potential commercial transactions with information about those transactions," *Stolfi*, 153 F.4th at 821 (simplified). In classifying that kind of speech as commercial speech, our cases suggest that we must find strong evidence of the second *Bolger* factor—namely, a showing that the information disclosure "refer[s] to a specific product." *See* 463 U.S. at 66.

In *San Francisco Apartment Ass'n v. City & County of San Francisco*, for example, landlords challenged an ordinance requiring them to provide each tenant with a "disclosure form written by" a government agency "prior to the commencement of buyout negotiations for a rental unit." 881 F.3d 1169, 1174 (9th Cir. 2018). The disclosure form stated tenants' rights in buyout negotiations, including to reject buyout, "consult with an attorney," and "rescind any buyout agreement for up to forty-five days after the agreement's execution." *Id.* We "conclud[ed] that a discussion between a landlord and a tenant about the possibility of entering into a buyout agreement is commercial speech, as it relates solely to the economic interest of the parties and does no more than propose a commercial transaction." *Id.* at 1176. The close tether to a commercial transaction was present because the disclosure form informed parties to a potential transaction about the "product" for sale—lease rights.

Next, in *American Beverage Ass'n v. City & County of San Francisco*, industry groups challenged an ordinance "requir[ing] health warnings on advertisements for certain sugar-sweetened beverages." 916 F.3d 749, 753 (9th Cir. 2019) (en banc). This ordinance compelled disclosure of information about specific products marketed by covered

sellers. *See id.* We thus concluded that the ordinance "regulates commercial speech." *Id.* at 755.

Subsequently, in *CTIA-The Wireless Ass'n v. City of Berkeley*, cell phone retailers challenged an ordinance requiring them "to disclose information to prospective cell phone purchasers about the federal government's radio-frequency radiation exposure guidelines relevant to cell phone use." 928 F.3d 832, 837 (9th Cir. 2019). That ordinance too compelled disclosure of information about the product being sold and thus had a close tether to commercial transactions. So unsurprisingly, the parties agreed that the "ordinance is a regulation of commercial speech." *Id.* at 841.

Then came a challenge to California's well-known "Prop. 65" warning requirement. *See Cal. Chamber of Comm. v. Council for Educ. & Rsch. on Toxics* (*CERT*), 29 F.4th 468, 472 (9th Cir. 2022). As applied to food and beverage sellers, covered sellers were required to warn buyers as follows: "Consuming this product can expose you to [name of chemical], which is known to the State of California to cause cancer." *Id.* at 472–73 (alteration in original) (quoting Cal. Code Regs. tit. 27, § 25607.2(a)(1), (2)). Given the close tether between the required disclosure and the products sold by covered sellers, we found that Prop. 65 compels commercial speech. *See id.* at 478; *see also Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1266, 1275, 1282–83 (9th Cir. 2023) (applying intermediate scrutiny under the commercial speech doctrine in a subsequent as-applied challenge to Prop. 65).

In a subsequent case, churches seeking to operate preschools challenged a California law that, as relevant here, required daycare facilities "to inform parents that a child is to be free to attend religious services or activities of his/her

choice . . . ." *Foothills Christian Ministries v. Johnson*, 148 F.4th 1040, 1048, 1053 (9th Cir. 2025) (simplified). We determined that the law "compelled commercial speech" because it required sellers of daycare services to inform customers about statutory rights enjoyed by users of those particular services. *See id.* at 1054.

Most recently, in *Pharmaceutical Research & Manufacturers of America v. Stolfi*, pharmaceutical manufacturers challenged an Oregon law requiring them "to disclose to [a state agency] information related to the costs, revenues, and prices of certain prescription drugs." 153 F.4th at 805. The panel majority determined that this "reporting requirement is best categorized as commercial speech." *Id.* at 809. It did so despite recognizing that the disclosures "do[] not neatly fit" the first and third *Bolger* factors. *Id.* at 816. The panel majority reasoned that those factors "were designed to determine the appropriate level of scrutiny to apply to laws that regulate voluntary speech from a regulated commercial entity to a public audience," and thus are "inapt" when applied to compelled reporting of information to government. *See id.*

From there, the *Stolfi* majority determined that Oregon's compelled disclosures constitute commercial speech because they "communicate the terms of potential commercial transactions" by "provid[ing] parties to 'actual or potential' commercial transactions with information about those transactions." *Id.* at 821 (quoting *X Corp.*, 116 F.4th at 901). Judge Bea dissented in part because he viewed the law as "compel[ling] non-commercial speech that does much more than just propose a commercial transaction." *Id.* at 844 (Bea, J., concurring in part and dissenting in part). In response, the panel majority "highlight[ed]" as a "limiting principle" "the close tether between the speech compelled by

[the Oregon law] and commercial pharmaceutical transactions." *Id.* at 822 n.18 (majority opinion). The panel majority emphasized that, as in past cases involving compelled commercial speech, the speech at issue concerned "product-specific economic information" directly tethered to the purchase and sale of specific products—there, prescription drugs. *Id.* at 821–22. In other words, the law compelled commercial speech because the disclosures all referred to "specific product[s]." *See Bolger*, 463 U.S. at 66.

Throughout these compelled speech cases, we have classified information disclosures as commercial speech when they provide parties to commercial transactions with information about a particular product or service offered for sale. Stated another way, to help distinguish commercial speech from noncommercial speech in compelled speech cases, we have stressed the second *Bolger* factor: whether "the speech refers to a particular product." *See Hunt*, 638 F.3d at 715. That approach best adheres to existing Supreme Court precedent because compelled informational disclosures, in general, "do[] not neatly fit" the other two *Bolger* factors. *See Stolfi*, 153 F.4th at 816. Compelled informational disclosures rarely promote the pertinent product or service in the way that an "advertisement" does. *See id.* (quoting *Bolger*, 463 U.S. at 66–67). "[A]nd regulated entities and individuals typically produce [such disclosures] out of legal obligation, not economic motivation." *See id.* (citing *Bolger*, 463 U.S. at 66–67). In compelled disclosure cases, therefore, the commercial speech analysis largely must turn on the second *Bolger* factor. *See id.* at 822 n.18.

### 3

Absent a close tether to a specific product or service, and thus to commercial transactions, we have rejected attempts to classify compelled disclosures as commercial speech. In *X Corp. v. Bonta*, X Corp. challenged a California law requiring "that social media companies report whether and how they define six categories of content." 116 F.4th at 898. In effect, the law "require[d] a [covered] company to recast its content-moderation practices in language prescribed by the State, implicitly opining on whether and how certain controversial categories of content should be moderated." *Id.* at 901. We found that such disclosures "are not commercial speech." *Id.* Importantly, the challenged law required disclosure of a covered company's "opinions about and reasons for" its "existing [terms of service] and content moderation policies." *Id.* Distinguishing business judgments from service policies, we explained that terms of service and content moderation policies themselves "may be commercial speech." *See id.* That conclusion made sense under the second *Bolger* factor—such terms and policies convey information about the services offered by the platform company. *See Uber Techs.*, 168 F.4th at 1215, *amended by* 2026 WL 3255510, at *4–*5 (discussing *X Corp.*). But we determined that a company's "opinions about and reasons for those policies" differ "in . . . kind" because they do not inform consumers about the services provided by the company. *X Corp.*, 116 F.4th at 901–02. The disclosures at issue also differed "in character" from commercial speech—their "political" nature highlighted the considerable distance between the compelled disclosures and any commercial transaction. *Id.*

*NetChoice, LLC v. Bonta* confirms that compelled disclosures are commercial in nature only when the speech

directly informs consumers about a particular product. 113 F.4th 1101. There, a trade association challenged another California law compelling disclosures. *Id.* at 1108. This law required "online businesses to create" reports "identifying, for each offered online service, product, or feature likely to be accessed by children, any risk of material detriment to children that arise from the data management practices of the business." *Id.* at 1109 (simplified). We found that this requirement "regulates far more than mere commercial speech" because, in the required report, "a covered business must do far 'more than propose a commercial transaction.'" *Id.* at 1119 (quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 762). Instead, the challenged law compelled businesses to "opine on potential speech-based harms to children . . . *disconnected from any economic transaction*." *Id.* (emphasis added). "The mere fact that a business may earn revenue from its services is," we explained, "'insufficient by itself' to render its opinions about those services 'commercial.'" *Id.* at 1120 (quoting *Bolger*, 463 U.S. at 67). In short, the required disclosures again "differe[d] in character and kind" from commercial speech. *See X Corp.*, 116 F.4th at 901.

## B

Here, California contends that its challenged laws compel commercial speech because they are intended to provide parties to debt, insurance, and capital transactions with information pertinent to those transactions. As I have explained, under our precedent, we must test that claim by searching for a "close tether between the speech compelled" and commercial transactions. *See Stolfi*, 153 F.4th at 822 n.18. Guided by our compelled speech precedents, I believe that we should do so by stressing the second *Bolger* factor. As a general rule, I would classify government-compelled

information disclosure as commercial speech only when the compelled disclosure informs market participants about "a specific product" or service. *See Bolger*, 463 U.S. at 66; *Stolfi*, 153 F.4th at 822 n.18. In other words, I would generally require a direct connection between the speech compelled and a particular product or service.

But because "the commercial speech analysis is fact-driven," *X Corp.*, 116 F.4th at 900 (simplified), I reject Plaintiffs' suggestion that the absence of two out of three *Bolger* factors "compels" the conclusion that the speech at issue is noncommercial speech. In some cases, the absence of several *Bolger* factors has sufficed to show that the speech at issue is noncommercial. *See, e.g.*, *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020) ("The facts here do not present a close question . . . ."); *Dex Media*, 696 F.3d at 959 (declining to conclude that speech was commercial when two *Bolger* factors were absent). As we have explained, however, the *Bolger* factors are "not necessarily dispositive" in every case. *X Corp.*, 116 F.4th at 900. Rather, when two out of three *Bolger* factors are missing, I would generally require a strong showing on the remaining "important guidepost[]" (a reference to a specific product or service) before finding commercial speech. *See id.* at 900–02 (quoting *Ariix*, 985 F.3d at 1116).

In applying this general rule, I would not rule out the possibility of some other "close tether" to commercial transactions, *see Stolfi*, 153 F.4th at 822 n.18, that might suffice to show that compelled speech is commercial in nature even in the absence of two or three *Bolger* factors. Indeed, the *Bolger* Court did not "mean to suggest that each of the" *Bolger* factors "must necessarily be present in order for speech to be commercial." 463 U.S. at 67 n.14. But again, the absence of two "important guideposts" for

identifying commercial speech, *Ariix*, 985 F.3d at 1116, generally "support[s] the conclusion that the compelled speech is noncommercial," *see X Corp.*, 116 F.4th at 900–01. And when all three *Bolger* factors are absent or remote, I believe that the existence of a *close* tether between compelled speech and commercial transactions will be found only in rare and exceptional cases. In my view, such a close tether is much easier to demonstrate when at least one *Bolger* factor is present—for example, when a compelled disclosure concerns specific products, thus satisfying the second *Bolger* factor.

Applying this test, I believe that all of SB 253's and SB 261's disclosures are noncommercial in nature. In my view, both laws compel disclosure of information lacking a close tether to commercial transactions. I reach that conclusion because neither law informs market participants about *a specific product*.

**1**

As to SB 253, I start in agreement with the majority. "Purchases of stock or other investment products, as well as issuances of debt or insurance policies, are" no doubt "commercial transactions." Majority Op. at 17. Our precedent confirms this in part—we have held that debt transactions involve commercial speech. *See Aargon Agency*, 70 F.4th at 1232. And while Plaintiffs dispute the existence of a close tether between the compelled disclosures and capital transactions, no one doubts that capital transactions are commercial transactions. Further, I see no reason to conclude otherwise as to insurance transactions.

But from there, my reasoning differs from the majority's. I start with the *Bolger* factors, which "are important guideposts" for discerning commercial speech. *Ariix*, 985

F.3d at 1116. Because this is a compelled disclosure case, the first and third *Bolger* factors "do[] not neatly fit." *See Stolfi*, 153 F.4th at 816. While that is "not necessarily dispositive," the absence of two out of three *Bolger* factors indicates to me "that the compelled speech is non-commercial." *X Corp.*, 116 F.4th at 901. I would still consider the second *Bolger* factor because "the commercial speech analysis is fact-driven." *Id.* at 900 (simplified). But due to the absence of the other *Bolger* factors, and because California does not identify some other tether to commercial transactions, I would require an especially close tether between the speech compelled and a specific product. *See Stolfi*, 153 F.4th at 822 n.18.

I believe that link is missing here. California attempts to demonstrate a close tether to three types of commercial transactions. The supposed "products" for sale are debt, insurance, and stock. As to debt, SB 253's emissions data informs market participants about the *issuer* or *purchaser* of debt, not the *debt* "*product*" itself. The same is true of insurance. SB 253's disclosures inform market participants about the *insurer* or the *insured*, not the *insurance product* offered for sale.

The analysis does not differ as to stock, in my view. Shares of stock are "the units into which the proprietary interests in a corporation are divided." 11 Fletcher Cyc. Corp. § 5081 (Sep. 2026 Update) ("Fletcher"). "These proprietary interests generally include (1) a right to exercise some control over the corporation's management, (2) a right, upon dissolution, to share in any residual proceeds from liquidation of the assets, and most important (3) a right to share in the corporation's residual earnings." *Id.*

From this definition, it follows that core information about stock as a "product" concerns a stockholder's rights to (1) control management (most prominently, through voting); (2) claim an interest in the corporation's assets upon liquidation; and (3) to claim a share of the corporation's residual earnings. This is the fundamental information that "communicates the terms of an actual or potential [stock] transaction." *See X Corp.*, 116 F.4th at 901. These terms inform buyers and sellers directly about the specific "product" being sold—that is, they inform the investor about the rights they are acquiring by purchasing stock, and the corporation (or the current stockholder) about the rights they are giving up by selling stock. For example, a statement that "Class A shares confer voting rights but Class B shares do not" satisfies the second *Bolger* factor. Like a warning that certain beverages contain added sugars, *see Am. Beverage Ass'n*, 916 F.3d at 753, such speech informs market participants about the specific characteristics of the "product" offered for sale.

I concede that the second *Bolger* factor is not *wholly* absent here. I do not disagree with the majority's observation that "the relevant product" in capital markets "is the security or financial instrument itself—an interest in the firm as a whole." Majority Op. at 19. Despite not having "direct ownership rights to corporate property," shareholders "do resemble proprietary owners" in "that they are the primary bearers of entrepreneurial risk and reward." 11 Fletcher § 5081. "Firm-level information is therefore pertinent to the value of [stock] transaction[s]" in capital markets. Majority Op. at 19.

But because firm-level disclosures convey information about the *issuer of stock*, such disclosures refer only *indirectly*—through the information recipient's own analysis

and inference—to the price of stock, and thus to the specific "product" at issue. As a result, when government compels the disclosure of firm-level information to inform investors about a company's stock, the second *Bolger* factor remains remote. Put more directly, the mere fact that investors value stock based on information about the issuing corporation cannot "mean that basically any compelled disclosure by any business about its activities" is commercial in nature. *See X Corp.*, 116 F.4th at 902. That "position is difficult to reconcile with the contours of the commercial speech doctrine as drawn in Supreme Court opinions." *See SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 372 (D.C. Cir. 1988).

Because the two other *Bolger* factors "do[] not neatly fit" when applied to compelled speech, *see Stolfi*, 153 F.4th at 816, I would generally require government to show a direct link between the compelled speech and a specific product before classifying compelled speech as commercial speech. Thus, when government compels disclosures from companies to inform stock market participants, absent some other "close tether between the speech compelled" and stock transactions, *see id.* at 822 n.18, I would require government to show that the compelled disclosure informs investors about *stock* itself. In my view, such a close tether is missing when government compels the disclosure of information about, more broadly, *companies that issue stock*.

Speech *about a corporation* encompasses much more speech than just speech *about that corporation's stock*. In general, information about a company is "encyclopedic, not transactional," in the same way that information about actors is "encyclopedic, not transactional." *See IMDb.com*, 962 F.3d at 1122. It therefore constitutes error to "assum[e] that all expression emanating from commercial associations is

commercial speech." *See IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1197 (9th Cir. 1988). Were it otherwise, even "feature articles that profile an individual firm" would fall into the category of commercial speech, a result that is plainly antithetical to First Amendment values. *See Wall St. Publ'g Inst.*, 851 F.2d at 367, 372–73.

I do not contend that speech about corporations can never be commercial in nature. Consider the context of a private fund seeking investment that sends marketing decks to potential investors. If a fund manager told potential investors that the fund's portfolio companies produce less GHG emissions than competitors, I would likely view that speech as commercial in nature. In such circumstances, the first *Bolger* factor is present because the fund manager's statement is effectively, if not literally, an advertisement about the fund. There is a weak showing of the second *Bolger* factor because the speech refers *indirectly* to the particular investment "product." While the statement does not inform listeners directly about the fund's structure, capitalization, or expected return, listeners can use the information to reach their own conclusions about, for example, the fund's likely future performance. And on the third *Bolger* factor, the speaker has an economic motivation because the fund manager is seeking investment for the fund.

But the disclosures at issue here are far different. SB 253 compels a covered company to disclose data about emissions produced by its own activities, by its energy consumption, and by its upstream and downstream entities. *See* Cal. Health & Safety Code § 38532(b)–(c). Such disclosures inform the listener about *a covered company*, not that company's *stock*. Some investors might use the information to inform their "private economic decisions." *See Va. State Bd. of Pharm.*, 425 U.S. at 765. And such information might

even aid in "the formation of intelligent opinions as to how" the free enterprise "system ought to be regulated or altered." *See id.* But the information is not an advertisement. *See Bolger*, 463 U.S. at 66. Emissions disclosures do not directly "refer[] to a specific product." *See id.* And covered companies do not have "an economic motivation for" independently making such disclosures, s*ee id.* at 67, they do so only "out of legal obligation," *Stolfi*, 153 F.4th at 816. Here, the virtual absence of all three *Bolger* factors confirms (indeed compels) that SB 253's disclosures are "disconnected from any economic transaction." *See NetChoice*, 113 F.4th at 1119.

I therefore conclude that SB 253 compels noncommercial speech. I am not convinced by California's attempt to show a "close tether" between the compelled speech and capital transactions. From my perspective, SB 253's disclosures do not directly inform investors about *stock*. Rather, SB 253 compels disclosures about the *company issuing stock*, which will, at least in certain cases, be irrelevant to investors' evaluation of stock. Thus, a direct tether to a specific product is lacking. And so, SB 253's compelled speech is unlike the compelled speech that we have previously classified as commercial in nature. Even in *Stolfi*, which I consider to be our boundary case, the most contested disclosures—drug manufacturers' pricing factors and pricing strategies for particular prescription drugs—conveyed "economic information" about a specific product. *Stolfi*, 153 F.4th at 823. Here, by contrast, SB 253 compels disclosure of *operational* information about *companies issuing stock* (or *companies transacting in* debt or insurance). Thus, the second *Bolger* factor is at best remote, supporting the conclusion that SB 253 compels noncommercial speech.

**2**

SB 261 also compels noncommercial speech. A covered entity's governance, strategy, risk management, and internal metrics and targets relating to climate change inform the listener about *the company*, not *the company's stock*. As regards SB 253, the second *Bolger* factor is again remote or absent. SB 261, moreover, "regulates *far* more than mere commercial speech." *See NetChoice*, 113 F.4th at 1119 (emphasis added). Indeed, as the majority notes, "SB 261 requires companies to answer a speculative and contested policy question: 'How should climate change shape the company's future operations and economic planning?'" Majority Op. at 38. SB 261's required disclosure are therefore "normative, and inherently subjective." *Id.* at 38. The "presence of judgment [and] opinion," *see id.* at 39 n.7, confirm that SB 261's disclosures are not just different in kind, but also "different in character" from commercial speech, *see X Corp.*, 116 F.4th at 901. For these reasons, I agree with the majority that strict scrutiny applies to SB 261.

But I respectfully disagree with some of the majority's reasoning as to why SB 261 compels noncommercial speech. According to the majority, SB 261 crosses the line into compelling noncommercial speech because the law "requires companies to make and disclose normative assessments and opine on a politically fraught subject." Majority Op. at 39 n.7. But "communications can 'constitute commercial speech notwithstanding the fact that they contain discussions of important public issues.'" *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 475 (1989) (quoting *Bolger*, 463 U.S. at 67–68). And commercial speech encompasses more than just "purely factual and uncontroversial" speech. *See Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1266.

For example, in *American Beverage Ass'n*, we considered "required health warnings on advertisements for certain sugar-sweetened beverages." 916 F.3d at 753, 755. Covered advertisements were required to include the following statement: "WARNING: Drinking beverages with added sugar(s) contributes to obesity, diabetes, and tooth decay." *Id.* at 753. In my view, this warning was, at least to some degree, "normative" speech that "opine[d] on a politically fraught subject." *See* Majority Op. at 39 n.7. Obesity prevalence could be characterized as a "politically fraught subject." *See id.* And a warning not to consume too much sugar expresses an opinion about that subject that is normative to some degree: You should refrain from overconsuming sugary beverages because doing so is bad for your health and causes higher rates of obesity. We nonetheless found that the required health warning "regulates commercial speech." *Am. Beverage Ass'n*, 916 F.3d at 753, 755. I believe we did so, at least in part, because the compelled speech directly concerned sugar-sweetened beverages—and thus, *specific products*.[7]

Because we have held that commercial speech includes at least some normative statements on politically fraught subjects, I hinge my analysis on the near-total absence of the second *Bolger* factor in SB 261's compelled disclosures. From there, I would apply the presence of judgment and opinion to reinforce the conclusion that SB 261 compels

[7] The first *Bolger* factor did "not neatly fit" in *American Beverage Ass'n*. *See Stolfi*, 153 F.4th at 816. While the compelled warnings were to be placed "on advertisements," *Am. Beverage Ass'n*, 916 F.3d at 753, the compelled speech itself was "not an 'advertisement,'" *see Stolfi*, 153 F.4th at 816 (quoting *Bolger*, 463 U.S. at 66–67)).

noncommercial speech "disconnected from any economic transaction." *See NetChoice*, 113 F.4th at 1119.

In sum, I believe that both SB 253 and SB 261 compel noncommercial speech. And California raises no other argument that a lesser standard of scrutiny applies. I would thus apply strict scrutiny to both SB 253 and SB 261.

**C**

In responding to these arguments, the majority suggests that under my test, I might uphold a law requiring a company to disclose GHG emissions on each product label, while striking down a law compelling the same company to disclose the sum of those same numbers for all its products. Majority Op. at 20 n.4. And in a similar vein, the majority suggests that I might "uphold a law mandating the same company disclose on each product label the number of noncitizens employed in connection with that particular product," while striking "down a law requiring a company to disclose the number of noncitizens it employs." Majority Op. at 22 n.5. The majority states that both scenarios introduce a "distinction without much difference." Majority Op. at 20 n.4.

But I believe the majority sets up and then takes down a straw man. True, I would "*generally* require government to show a direct link between the compelled speech and a specific product before classifying compelled speech as commercial speech" (at least where the other two *Bolger* factors are lacking). *See supra* pp. 73–75 (emphasis added). In many cases though, a link to a specific product will not be sufficient, by itself, to classify a compulsory disclosure as *commercial* speech. Rather, as I have explained, the *Bolger* factors are a means to an end; an end which is identifying a "*close tether* between the speech compelled" and a

commercial transaction. *See Stolfi*, 153 F.4th at 822 n.18 (emphasis added).

In my view, the majority's hypotheticals—again, based on product labels pertaining to GHG emissions and numbers of noncitizens employed in making a product—would not compel the type of "product-specific, economic information" our precedents classify as commercial speech. *Id.* at 823. Indeed, the hypothetical compelled disclosures proffered by the majority are far different from, for example, compelling "current and past list prices, generic alternatives, and the length of time . . . drugs have been on the market." *Id.* At the highest level of generality, the information posited in the majority's hypotheticals could be *relevant* to a consumer transaction. But as I have discussed, our standards for classifying commercial speech demand more.[8]

**D**

In some respects, the majority characterizes SB 253 as merely compelling "routine disclosure of economically significant information designed to forward ordinary regulatory purposes." *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin, C.J., and Dyk, J., concurring); *id.* at 297–98 (per curiam) (explaining

---

[8] I note that even were one to consider either of the majority's hypotheticals to be commercial speech, both hypothetical laws would still need to pass intermediate scrutiny. *See Cent. Hudson*, 447 U.S. at 564–66. I would be quite skeptical of that result under existing precedent, including because I disagree with the majority that "mitigating information asymmetries," standing alone, is a substantial state interest. *See* Majority Op. at 25–27. But I am concerned that following the majority's precedential decision here, and its significant extension of the outer limits of commercial speech, many such hypothetical laws, including the majority's, realistically would, or at the very least could, qualify as commercial speech.

that "the joint concurring opinion . . . represents the opinion of the court" on the "First Amendment issues"). And I recognize that courts have rarely struck down such laws as violative of the First Amendment. *See, e.g.*, *id.* at 316; *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995). To strengthen my conclusion that the *commercial speech doctrine* does not permit application of lesser scrutiny to SB 253, I note three possible pathways to lesser scrutiny for routine disclosure laws, none of which help California in this appeal.

First, and as explained above, some compelled disclosures are truly commercial in nature. For example, in *Stolfi*, all panel members agreed that Oregon could compel disclosure of general marketing information concerning particular pharmaceutical drugs. *See* 153 F.4th at 821; *accord id.* at 842 (Bea, J., concurring in part and dissenting in part). When the speaker's "interest is a purely economic one," *Va. State Bd.*, 425 U.S. at 762, no one pauses when courts apply lesser First Amendment scrutiny to advance consumers' and society's shared "interest in the free flow of commercial information," *id.* at 764. And per *Stolfi*, this logic holds even when the speaker has a *purely economic interest* in nondisclosure. *See* 153 F.4th at 821. But a speaker's interest in the nondisclosure of "encyclopedic" information about itself, *see IMDb.com*, 962 F.3d at 1122, involves more than just a purely economic interest.

Second, government's power to regulate speech "has never been equated with its power to restrict action." *See* Redish, *1A in the Marketplace*, *supra*, at 445. Thus, "[t]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *NIFLA*, 585 U.S. at 769 (quoting *Sorrell*, 564 U.S. at 567). Put more directly, "government undeniably

possesses the power to regulate [conduct]," which includes the power to compel disclosure of information that "relate[s] in a significant fashion to" the regulation of conduct. *See Edler Indus.*, 579 F.2d at 520. This is one reason why, for example, "[i]ssuers of securities must make all sorts of disclosures about their products for the benefit of the investing public." *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 531 (D.C. Cir. 2015) (Srinivasan, J., dissenting). Such disclosures are "communications occurring within the umbrella of an overall regulatory scheme," *Wall St. Publ'g Inst.*, 851 F.2d at 373, aimed at regulating capital markets, *see Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011).[9]

Indeed, no one doubts that California has the power within our constitutional structure, consistent with other limits on the regulatory powers of states (such as the dormant Commerce Clause), to directly regulate conduct producing GHG emissions. *See, e.g.*, *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1107 (9th Cir. 2013) (upholding California regulation of crude oil and derivatives sold in the state). But in my view, the First Amendment calls for strict scrutiny when a State seeks to regulate conduct *by compelling speech.*[10] Such speech compulsions can

---

[9] Securities disclosures might also draw lesser scrutiny as compelled disclosures aimed at preventing "fraud." *See Chiles*, 607 U.S. at 641. In this appeal, however, any relation that California's asserted interest in preventing greenwashing might have to securities regulation is inapposite. The district court found insufficient evidence of greenwashing to support that asserted interest. Like the majority, Majority Op. at 28, I see no clear error in that factual finding.

[10] Some have suggested that "robust" First Amendment protection for "commercial speech rights" would amount to a new form of economic substantive due process. *See* Amanda Shanor, *The New Lochner*, 2016

"obscure an 'underlying governmental policy' that could be implemented without regulating speech." *Cf. 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality opinion) (quoting *Cent. Hudson*, 447 U.S. at 566 n.9). Perhaps for that reason, the use of compelled disclosure to regulate conduct is a shortcut that the First Amendment views with great suspicion. *Cf. Ams. for Prosperity Found.*, 594 U.S. at 608 (holding in the free association context that states may not compel disclosures to regulate conduct without passing exacting scrutiny). California unmistakably seeks that shortcut here—the State forthrightly asserts that SB 253 and SB 261 are intended in part to reduce emissions.[11] Unless a valid exception applies, however, I believe that California may not take this shortcut without passing heightened First Amendment scrutiny.

Third, the Supreme Court has "left open the possibility that a future party might present persuasive evidence of a long (if heretofore unrecognized) tradition of content regulation regarding additional categories of . . . speech that might . . . warrant only diminished First Amendment protection." *Chiles*, 607 U.S. at 650 (simplified). States

---

Wisc. L. Rev. 133, 183, 191–204. "Such wrong-headed analysis confuses regulation of *conduct* with regulation of *expression*." Redish, *Compelled Commercial Speech*, *supra*, at 1762.

[11] The majority allows California to take this route. The majority does so by concluding that SB 253's Scope 1 and Scope 2 disclosures likely pass intermediate scrutiny as disclosures that "directly advance" California's substantial "interest in reducing emissions." Majority Op. at 31. Respectfully, I believe that the majority does so in error. California has the power to regulate conduct producing emissions, and to compel information disclosure as incident to such conduct regulation. But in my view, the commercial speech doctrine is inconsistent with the route that the majority authorizes.

therefore may attempt to demonstrate in our Nation's history an exception to strict scrutiny "for pure compulsions to state facts to the government," or even "for pure compulsions to state facts to third parties." *See* Volokh, *supra*, at 379. Indeed, the existence of this kind of exception to strict scrutiny would help explain several compelled speech precedents where we applied *Zauderer*'s reasoning—and thus lesser First Amendment scrutiny—without expressly classifying the speech as commercial. *See, e.g.*, *Fresenius Med. Care Orange Cnty., LLC v. Bonta*, 172 F.4th 718, 734 (9th Cir. 2026); *Env't Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 849 (9th Cir. 2003). And scholars have suggested that evidence of such an exception might exist, for example by arguing that "[i]nformation forcing as a feature of American law dates back to early common-law disclosure requirements." Annie Brett, *Rethinking Environmental Disclosure*, 112 Calif. L. Rev. 1535, 1542 (2024). But to succeed with this "line of argument," California must overcome "a daunting burden" by presenting persuasive historical evidence of such a tradition. *Chiles*, 607 U.S. at 650. California has not even attempted to do so here.

In my view, these potential pathways for routine disclosure laws reinforce the conclusion that California's veiled attempt "to mark off [a] new categor[y] of speech for diminished constitutional protection" by expanding the *commercial speech doctrine* is unlikely to prevail. *See NIFLA*, 585 U.S. at 767 (simplified).

## IV.

Applying strict scrutiny to SB 253 and SB 261, I believe that the preliminary injunction factors favor Plaintiffs. To obtain a preliminary injunction, "a plaintiff 'must establish [1] that he is likely to succeed on the merits, [2] that he is

likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *CERT*, 29 F.4th at 477 (alterations in original) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Under strict scrutiny, Plaintiffs are likely to succeed on the merits. To pass strict scrutiny, "[a] [S]tate must show that the statute 'furthers a compelling governmental interest and is narrowly tailored to that end.'" *X Corp.*, 116 F.4th at 903 (quoting *Reed*, 576 U.S. at 171). But California does not even attempt to satisfy strict scrutiny as to either SB 253 or SB 261. Thus, I believe it is likely that each challenged "law's unconstitutional applications substantially outweigh its constitutional ones." *See Moody*, 603 U.S. at 724. "With respect to the second factor, a loss of First Amendment freedoms constitutes an irreparable injury." *X Corp.*, 116 F.4th at 903. It follows from there that "[t]he third and fourth factors—balance of equities and public interest—also favor" Plaintiffs. *See id.* at 904. I would therefore reverse and remand with instructions to preliminarily enjoin both SB 253 and SB 261. Thus, I respectfully concur in the judgment in part and respectfully dissent in part.